**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT COURT OF NEW YORK**

| | |
|---|---|
| LOIS MARTIN, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>    v.<br><br>ARBOR REALTY TRUST, INC., IVAN KAUFMAN, and PAUL ELENIO,<br><br>               Defendants | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Lois Martin ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by ABR Realty Trust, Inc. ("ABR" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of ABR's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired ABR's securities between May 7, 2021 to July 11, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class")

2.      Throughout the Class Period, Defendants provided investors with false and/or materially misleading information concerning ABR's operational and financial health, including its balance sheet loan book and net interest income. Defendants provided investors with this information in quarterly and annual reports filed with the SEC as well as orally during earnings conference calls.

3.      Investors discovered that these statements were false and/or materially misleading over the course of several corrective disclosures. First, on March 14, 2023, NINGI Research published a report on ABR (the "NINGI Report"), claiming *inter alia* that "ABR has been hiding a toxic real estate portfolio of mobile homes with a complex web of real and fake holdings companies for more than a decade." In response to the report, ABR's stock price fell from $12.99/share on March 13, 2023 to $12.12/share on March 14, 2023 and then $11.53/share on March 15, 2023.

4.      Next, on December 5, 2023, Viceroy published an in-depth study of ABR's Jacksonville, FL properties (the "Viceroy Report"). Based on their findings, Viceroy declared that in an "industry plagued with delusion and bad decisions, ABR stands out as the worst of the worst. Viceroy's dive into ABR's CLOs suggest its entire loan book is distressed and underlying collateral is vastly overstated." In response to the report, ABR's stock price declined from

$13.86/share on December 4, 2023 to $13.67/share on December 5, 2023 and then $13.15/share on December 6, 2023.

5.      On July 12, 2024, several months later, investor concerns stemming from the NINGI Report and Viceroy Report intensified when Bloomberg reported that ABR was "being probed by federal prosecutors and the Federal Bureau of Investigation in New York."  According to the news report, "[t]he investigators are inquiring about lending practices and the company's claims about the performance of their loan book." In response to the report, ABR's stock price declined from $15.53/share on July 11, 2024 to $12.89/share on July 12, 2024.

<u>JURISDICTION AND VENUE</u>

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 18 of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as ABR is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased ABR's common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud.

12.     ABR is a Maryland corporation with its principle executive offices located at 333 Earle Ovington Boulevard, Suite 900, Uniondale, NY. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "ABR".

13.      Defendant Ivan Kaufman ("Kaufman") was at all relevant times, the Chief Executive Officer, President and Chairman of ABR.

14.     Defendant Paul Elenio ("Elenio") was at all relevant times, the Chief Financial Officer and Executive VP of ABR.

15.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of ABR's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

16.     ABR is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

17.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to ABR under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

18.     ABR is a Maryland corporation formed in 2003. They are a nationwide real estate investment trust ("REIT") and direct lender, providing loan origination and servicing for commercial real estate assets.

19.     ABR operates through two business segments: Their Structured Loan Origination and Investment Business, or "Structured Business," and their Agency Loan Origination and Servicing Business, or "Agency Business."

## False and Misleading Statements

### *February 19, 2021*

20.     On February 19, 2021, Defendants issued a press release which would have incorporated the earliest purchase of listed delinquent properties in the Viceroy Report (*below*).  On the corresponding earnings call, Chairman, President, and CEO Kaufman attested to the recent growth and overall health of Arbor's loan book: "We have already grown our balance sheet loan book 14% in the first quarter to $6.3 billion on $1 billion in new originations, and we have a very robust pipeline, which will allow us to meaningfully grow our loan book for the balance of the year. This unprecedented growth will significantly increase our run rate of net interest income going forward. And very importantly, these balance sheet loans also create a

substantial pipeline of future GSE agency origination volumes and long-dated servicing revenues, further increasing our future earnings and dividends.

*May 7, 2021*

21.     On May 7, 2021, Defendants issued a press release announcing ABR's first quarter earnings for 2021. In pertinent part, the press release stated as follows:

**Arbor Realty Trust Reports First Quarter 2021 Results and Increases Dividend for Fourth Consecutive Quarter to $0.34 per Share**

Company Highlights:

- Diversified operating platform with a multifamily focus that continues to produce strong distributable earnings and dividends in all cycles

    o GAAP net income of $0.55 and distributable earnings of $0.52 per diluted common share

    o Raised cash dividend on common stock to $0.34 per share, or 13.3% higher than a year ago, representing our fourth consecutive quarterly increase

    o Generated pretax income of $22.5 million from our residential mortgage banking joint venture

    o Raised $158 million of accretive growth capital through the issuance of common shares

- Agency Business:

    o Segment income of $35.3 million

    o Loan originations of $1.40 billion and a servicing portfolio of $25.46 billion

- Structured Business:

    o Segment income of $43.9 million

    o Portfolio growth of 14% on $1.09 billion of loan originations

    o Closed a $785 million collateralized securitization vehicle

6

22.     On the same day, Defendants also held an earnings conference call to discuss the Company's 1Q21 earnings. In pertinent part,  Chairman, President, and CEO Kaufman attested to the recent growth and overall health of ABR's loan book: "We have already grown our balance sheet loan book 14% in the first quarter to $6.3 billion on $1 billion in new originations, and we have a very robust pipeline, which will allow us to meaningfully grow our loan book for the balance of the year. This unprecedented growth will significantly increase our run rate of net interest income going forward. And very importantly, these balance sheet loans also create a substantial pipeline of future GSE agency origination volumes and long-dated servicing revenues, further increasing our future earnings and dividends."

*February 18, 2022*

23.     On February 18, 2022, Defendants issued their subsequent annual press release and corresponding earnings call detailing their FY2021 results. In pertinent part, CEO Kaufman stated: "I want to highlight some of our more notable 2021 accomplishments, which include generating substantial growth in our earnings, allowing us to increase our dividend 4x or 12% to an annual run rate of $1.48 a share . . . we grow our balance sheet book 122% in 2021 to $12.2 billion on record originations of $9.7 billion, and we have a very large pipeline, which gives us great confidence to continue to meaningfully grow our loan book in 2022."

*February 19, 2023*

24.     On February 19, 2023, Defendants issued their FY2022 results, pertinently noting "CECL provisions totaling $23.0 million during 2022 … [which] primarily reflects increases in our loans and investment balance, as a result of portfolio growth, along with rising interest rates and inflation in our CECL models for our Structured Business, which predominantly consists of variable rate losses."

## First Partial Corrective Disclosure

### *March 14, 2023*

### *The Ningi Report*

25.     On March 14, 2023, NINGI Research published the NINGI Report which claimed, among other things, that "Arbor has been hiding a toxic real estate portfolio of mobile homes with a complex web of real and fake holding companies for more than a decade." The NINGI Report concluded that, "Arbor hid its toxic mobile homes portfolio to manipulate its stock price and avoid insolvency, $599 million of Arbor's escrows evaporated overnight, the company's escrow balances and revenue are fake, in an Archegos-like situation $2.5 billion of repo facilities are subject to margin call provisions, Arbor's funding through repo desks is drying up, the CECL allowances and provisions have been severely understated to boost earnings, Arbor's financial statements for the last twelve years cannot be trusted, and auditors, as well as the board, turned a blind eye on misstatements and misconduct."

## Additional False and Misleading Statements

### *May 5, 2023*

### *Ningi Report Addressed by CEO*

26.     On May 5, 2023, CEO Kaufman addressed the short seller report broadly, stating, in pertinent part: "The report is replete with factual misstatements, all of the [indiscernible] false in formation and [indiscernible] that is cloaked in the form of an opinion and a transparent attempt to mislead the investing public … No one has a sense of appropriate accounting treatment for certain transactions and who's motivated solely for profit on this short position through the dissemination of false and misleading information . . . I urge our shareholders and the investment public to pay no attention to this noise that is clearly coming from biased source lacking in

credibility and instead of focusing on fundamentals of our business, our tremendous operating results and fin fact we are a leader in our space and continue to massively outperform our peers."

27.     While the Company did not respond directly to any of the accusations in the NINGI Report, they did speak pertinently on both their CECL reserves and the performance of their loan book.  On the former, Paul Anthony Elinio, Executive VP and CFO of ABR, stated: "We also recorded an additional $20 million in CECL reserves on our balance sheet loan book during the quarter as a result of using more conservative assumptions in our model due to a decline in the macroeconomic outlook for commercial real estate."

28.     In regards to the loan book, CFO Elinio noted that their "balance sheet loan book continues to perform well in this market with no increases in default or delinquencies in the first quarter."  During the following question-and-answer period, CEO Kaufman again touted their loan book's growth, stating: "So in terms of valuation, listen, we've grown our book, we continue to grow our book.  It's amazing to see our book grew 45% for years."

**<u>Second Partial Corrective Disclosure</u>**

*<u>December 5, 2023</u>*

***Viceroy's In-Depth Study***

29.     On December 5, 2023 Viceroy published an in-depth study of Arbor's Jacksonville, FL properties. Based on their findings, Viceroy declared that in an "industry plagued with delusion and bad decisions, Arbor stands out as the worst of the worst.  Viceroy's dive into Arbor's CLOs suggest its entire loan book is distressed and underlying collateral is vastly overstated.  These loans do not qualify for refinancing anywhere, and substantially all mature withing the next 18 months."  In conclusion, Viceroy "believe(s) Arbor is a donut," setting its price rating at "$0.00.

**Additional False and Misleading Statements**

*February 16, 2024*

**CEO Addresses the Viceroy Report**

30.     On February 16, 2024, covering results for FY 2023, CEO Kaufman addressed the

Viceroy report:

> I would like to spend some time talking about the short reports that have been
> written on our company.  On our loyal investors base to understand that these
> reports are written in a way that is purposely designed to drive down the company's
> stock price to achieve the desired goal of profit from a short position.  As such, the
> facts, assumptions predicated future events and marketing conditions as well as
> conclusions in these reports are exaggerated, lease with incomplete and inaccurate
> data, it's slanted only to provide a negative view on ABR and again, purely for
> personal gain.

> . . .

> This is a perfect example of using select data as of a point in time, does not contain
> the full picture or represent the industry's focus only to inject fear into the market
> for personal gain . . . We've been criticized for a core part of our business that we
> have been extremely effective at, and we'll continue to fulfill a very important
> mandate for the federal agencies as well as the social needs for society.

31.     During the Q&A session that followed, CEO Kaufman spoke directly in response

to an inquiry as to whether the Company has "any concern that the overall quality of your loans or

borrowers, and I don't mean a large percentage, but do you think you have some assets, loans in

your portfolio that are not of sufficient quality to be refinanced with permanent financing into

Freddie Mac and Fannie Mae?" CEO Kaufman responded as follows:  "So our idea, of course, is

that every sponsor that we take on is going to perform correctly, not all sponsors do that and a lot

of this, sometimes they'll be a sponsor who couldn't hit his business plan or who had all the

problems or isn't what we thought and they don't qualify, that's just the way it goes. Nobody is

perfect. We're not perfect . . . So that's kind of the way we look at the world. It's not a perfect

situation where every asset that we take in ends up meeting our execution."

32.     During the call, CFO Elenio pertinently addressed the Company's CECL reserves and overall loan book health, stating in pertinent part: "we continue to build our reserves, recording an additional $23 million in CECL reserves in our balance sheet loan book during the quarter . . . Very important to emphasize that despite booking approximately $90 million in CECL reserves across our platform in 2023, $74 million of which was in our balance sheet business, we still grew our book value 2% to $12.80 a share from $12.50 a share last year.  And we are one of the only companies in our space that has significant book value appreciation over the last 3 years with roughly 30% growth from around $10 a share to nearly $13 a share."

<u>*May 3, 2024*</u>

33.     On May 3, 2024, ABR reported its Q1 FY24 results, announcing continued growth of the CECL reserves.  CFO Elenio stated, in pertinent part, "We also continue to build our CECL reserves, recording an additional $18 million on our balance sheet loan book in the first quarter. We feel it's very important to emphasize that despite booking approximately $108 million CECL reserves across our platform in the last 15 months, $88 million of which was in our balance sheet business, we still grew our book value per share of 1% to $12.64 a share at 3/31/2024 from $12.53 a share at 12/31/2022, which is well above the performance of our peers, the vast majority of which have experienced significant book value erosion in this market."

34.     The above statements in Paragraphs 20 to 33 were false and/or materially misleading. Defendants provided investors with material information concerning ABR's continual claims of strong health of their loan book which materially mislead and/ or failed to disclose information pertinent to the investors.

## **Final Corrective Disclosure**

### *July 12, 2024*

35.     On July 12, 2024, Bloomberg reported that ABR "is being probed by federal prosecutors and the Federal Bureau of Investigation in New York." Bloomberg further noted that, "The investigators are inquiring about lending practices and the company's claims about the performance of their loan book."

### *Loss Causation and Economic Loss*

36.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of ABR's common stock and operated as a fraud or deceit on Class Period purchasers of ABR's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of ABR's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of ABR's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

37.     Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts. When the truth emerged over several corrective disclosures, investors and analysts reacted immediately as the artificial inflation in ABR's stock price that had been created by Defendants' false statements began to dissipate. Specifically, following the aforementioned corrective disclosures, the price of ABR's common stock declined dramatically, as follows:

- In response to the NINGI Report, ABR's stock price fell from $12.99/share on March 13, 2023 to $12.12/share on March 14, 2023 and then $11.53/share on March 15, 2023;

- In response to the Viceroy Report, ABR's stock price declined from $13.86/share on December 4, 2023 to $13.67/share on December 5, 2023 and then $13.15/share on December 6, 2023; and

- In response to the Bloomberg report, ABR's stock price declined from $15.53/share on July 11, 2024 to $12.89/share on July 12, 2024.

38.     At all relevant times, the market for ABR's common stock was an efficient market for the following reasons, among others:

(a)     ABR's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)     ABR communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     ABR was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about ABR was reflected in and incorporated into the Company's stock price during the Class Period.

39.     As a result of the foregoing, the market for ABR's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in ABR's stock price. Under these circumstances, all purchasers of ABR's common stock during the Class Period suffered similar injury through their purchase of ABR's securities at artificially inflated prices, and a presumption of reliance applies.

40.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

41.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

42.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

14

could cause actual results to differ materially from those in the purportedly forward-looking statements.

43.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of ABR who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ABR's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

45.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ABR's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be

ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ABR or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of April 26, 2024, there were approximately 188,514,660 shares of outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ABR;

    (c)      whether the Individual Defendants caused ABR to issue false and misleading financial statements during the Class Period;

    (d)      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

    (e)      whether the prices of ABR's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

    (f)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

49.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*
### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

50.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

52.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other

members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ABR common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire ABR's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

53.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for ABR's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

54.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew

or recklessly disregarded that material facts were being misrepresented or omitted as described above.

55.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of ABR's internal affairs.

56.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to ABR's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ABR's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired ABR's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

57.    During the Class Period, ABR's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of ABR's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other

members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of ABR's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of ABR's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

58.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Against the Individual Defendants
### for Violations of Section 20(a) of the Exchange Act

60.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

61.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about ABR's misstatements.

62.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by ABR which had become materially false or misleading.

63.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ABR disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ABR to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ABR's common stock.

64.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause ABR to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

65.     By reason of the above conduct, the Individual Defendants and/or ABR are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: July 31, 2024                          Respectfully submitted,

                                              **LEVI & KORSINSKY, LLP**


                                              */s/ Adam M. Apton*
                                              Adam M. Apton
                                              33 Whitehall Street, 17th Floor
                                              New York, New York 10004
                                              Tel.: (212) 363-7500
                                              Fax: (212) 363-7171
                                              Email: aapton@zlk.com

                                              *Attorneys for Plaintiff*