**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

LOIS MARTIN, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

ARBOR REALTY TRUST, INC., IVAN KAUFMAN, and PAUL ELENIO,

Defendants.

Case No. 1:24-cv-05347

**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**CLASS ACTION**

Demand for Jury Trial

**TABLE OF CONTENTS**

I. NATURE OF THE ACTION .... 1
II. JURISDICTION AND VENUE .... 5
III. PARTIES .... 6
A. Plaintiffs .... 6
B. Defendants .... 6
IV. FORMER EMPLOYEES CORROBORATING FACTUAL ALLEGATIONS .... 8
A. FE1 .... 8
B. FE2 .... 9
C. FE3 .... 9
D. FE4 .... 10
E. FE5 .... 10
F. FE6 .... 11
G. FE7 .... 12
H. FE8 .... 12
I. FE9 .... 12
J. FE10 .... 13
K. FE11 .... 13
L. FE12 .... 14
V. SUBSTANTIVE ALLEGATIONS .... 14
A. The Company's Background .... 14
B. ABR's Collateralized Loan Obligations .... 19
C. ABR's Stated Underwriting and Risk Management and Approval Process .... 22
D. The Multifamily Real Estate Boom Fueled by Inexperienced Syndicators .... 26
E. ABR Secretly Abandons Its Stated Underwriting Standards to Grow the Volume of Its Structured Loan Portfolio .... 29
F. Shifts in Economic and Market Conditions Obliterated ABR's Pipeline and Significantly Increased its Risk of Loss Due to Non-Performance and Default .... 39
G. Material Weakness in ABR's Internal Controls Concerning Concentration of Credit Risk .... 46
H. Material Weakness in ABR's Internal Controls Over the Reporting of Non-Performing Loans .... 55
I. Defendants' Violations of Accounting Rules and Regulations .... 63
J. The Extent and Nature of Defendants' Fraudulent Conduct is Revealed Through a Series of Partial Corrective Disclosures .... 66

K. Additional Events Confirming Defendants' Fraudulent Misconduct .................. 74

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS .................................. 75

A. 1Q21 .................................................................................................... 75

B. 2Q21 .................................................................................................... 83

C. 3Q21 .................................................................................................... 91

D. 4Q21 .................................................................................................... 104

E. 1Q22 .................................................................................................... 117

F. 2Q22 .................................................................................................... 124

G. 3Q22 .................................................................................................... 134

H. 4Q22 .................................................................................................... 141

I. 1Q23 .................................................................................................... 161

J. 2Q23 .................................................................................................... 169

K. 3Q23 .................................................................................................... 177

L. 4Q23 .................................................................................................... 186

M. 1Q24 .................................................................................................... 197

VII. ADDITIONAL SCIENTER ALLEGATIONS ...................................................... 204

A. The Individual Defendants Certified ABR's Class Period Statements .............. 205

B. The Individual Defendants Held Themselves Out as Knowledgeable ............... 206

C. The Multifamily Bridge Loans Were Critical to ABR's Core Operations ......... 207

D. The Individual Defendants had Financial Motive to Grow the Volume of ABR's Floating-Rate Bridge Loans and Conceal its Increasing Risk of Loss ............... 208

VIII. LOSS CAUSATION/ECONOMIC LOSS ........................................................... 210

IX. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET DOCTRINE........... 214

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................ 216

XI. CLASS ALLEGATIONS ................................................................................... 217

XII. CLAIMS FOR RELIEF .................................................................................... 219

XIII. REQUEST FOR RELIEF .................................................................................. 223

XIV. JURY DEMAND ............................................................................................. 223

Lead Plaintiff David Hawkins and additional named plaintiff Lois Martin (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned counsel, allege the following based upon personal knowledge as to Plaintiffs' own acts, and upon facts obtained through the investigation conducted by and through Plaintiffs' counsel, which included, *inter alia*, a review and analysis of public announcements made by Arbor Realty Trust, Inc. ("ABR" or the "Company"), filings with the United States Securities and Exchange Commission ("SEC"), conference calls, press releases, analyst and media reports concerning ABR, publicly available data relating to the prices and trading volumes of ABR securities, interviews with confidential witnesses described herein, pleadings and other documents filed in other relevant litigations, and information readily obtainable on the internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action lawsuit on behalf of a class consisting of all persons and entities who purchased or otherwise acquired ABR's securities between May 7, 2021 and July 11, 2024, both dates inclusive (the "Class Period"). Plaintiffs seek to recover damages caused by ABR's and certain of its executive officers' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Throughout the Class Period, ABR and those who ran it—particularly its Founder, Chief Executive Officer, President, Chairman, and voting member of the Company's Credit Committee, Ivan Kaufman and its Executive Vice President, Chief Financial Officer, and Head of Investor Relations, Paul Elenio—touted ABR's purportedly effective internal controls,

conservative loan-underwriting standards, and strong book valuation when, in fact, they were routinely overriding the Company's internal controls (which former employees described as vague and unreliable), engaging in substandard lending practices, and secretly flouting agency requirements and other directives. When investors ultimately became aware that Defendants were engaging in this behavior, contrary to numerous statements Defendants made during the Class Period, the price of ABR securities declined significantly, and as a result, Plaintiffs and other members of the Class suffered damages.

3. In recent years, ABR has consistently reported extraordinary growth and record profitability while other real estate investment trusts ("REITs") faced small and shrinking dividends amid high interest rates and a recessionary environment. ABR's reported net income grew from $121.1 million, or $1.27 per diluted common share, for its fiscal year ending December 31, 2019, to $330.1 million, or $1.75 per diluted common share, for the fiscal year ending December 31, 2023, driven primarily by its balance sheet loan portfolio, *i.e.*, the Structured Business. The price of ABR securities also skyrocketed on the Company's purportedly strong performance, reaching a high of $20.73 per share during the Class Period.

4. ABR's success has been attributed to its ability to attract money by offering Collateralized Loan Obligations ("CLO") and then using the money to amass a portfolio of short-term, floating-rate loans, otherwise known as, *i.e.*, bridge loans, primarily for multi-family commercial real estate assets. Between 2021 and 2022, the Company raised $8.3 billion securitizing these multifamily bridge loans into six CLO pools.

5. The Company is also known for its capital-light Agency Business, through which it originates, sells and services a range of multi-family finance products, primarily fixed-rate long-term mortgages, through government-sponsored enterprises, such as Freddie Mac and Fannie Mae.

6. During the fiscal year 2021, the Company's Agency Business completed a total of $6.41 billion in loan originations and the Structured Business completed $9.72 billion in loan originations. During the fiscal year 2022, the Company's Agency Business completed a total of $4.77 billion in loan originations and the Structured Business completed $6.15 billion in loan originations. As of December 31, 2022, 98% of ABR's Structured Business consisted of housing-related bridge loans, 91% of which consisted of multi-family commercial real estate bridge loans.

7. ABR prides itself on being able to provide both Structured and Agency loans through its direct originations and in-house underwriting capabilities. Throughout the Class Period, Defendants represented the Company's large multi-family balance sheet loan book as a "strategic advantage" claiming it "naturally feeds [ABR's] Agency Business" based on its adherence to conservative loan-underwriting standards, effective internal controls, and investment in the right asset class. Defendant Kaufman frequently referred to the Company's strategy of purportedly underwriting Structured loans for an Agency takeout as "a free bite to the apple with each product" as it "creates long-dated revenue streams."

8. As detailed in this Complaint, however, Defendants' misrepresentations and omissions portraying ABR as a careful, prudent institution masked a troubled entity that resorted to high-risk lending practices and disregarding internal controls to fraudulently boost its loan volume and earnings. In doing so, ABR was subject to substantial regulatory and compliance risk, as well as concealed risk of loss that it masked, in part, during the Class Period, with undisclosed related party transactions.

9. The allegations of troubling conduct at ABR are informed by firsthand accounts from numerous former employees of the Company, a number of whom describe senior management (particularly Kaufman, either directly or through his subordinates) as improperly

pressuring or directing (a) asset management personnel to alter or change loan risk ratings and valuations so as to conceal compliance issues from auditors and investors and (b) underwriting personnel to complete loans that otherwise would or should not have been approved.

10. In truth, during the Class Period, Defendants engaged in a fraudulent scheme to artificially inflate the Company's loan volume and reported earnings by abandoning or, at minimum, recklessly disregarding, ABR's underwriting standards to complete high-risk bridge loans borrowed most often by syndication groups managed by sponsors who otherwise would not qualify for such loans in the conventional market because of poor creditworthiness, low debt service coverage ratios, high loan-to-value ratios, and/or other risk factors.

11. While this scheme had the short-term effect of enabling Defendants to inflate the Company's reported financial results, it also put ABR at great, undisclosed risk. The truth regarding ABR's sub-par lending practices, inadequate controls concerning its concentration of risk and allowance for credit losses, and material risk of loss due to non-performance and default, began to leak out to the public on November 16, 2023 when Viceroy Research Group published a report, concluding that after its review of hundreds of ABR's multifamily bridge loans comprising its CLOs, the Company's entire loan book was distressed and non-performance was inevitable. On this news, ABR's securities price dropped from $13.84 per share on November 15, 2023 to $12.24 per share on November 16, 2023, or 11.56%.

12. On December 5, 2023, Viceroy issued a follow up report providing a deeper dive into a syndicated portfolio in Jacksonville, Florida to highlight the overvaluation of ABR's underlying assets and dismal DSCRs. On this news, ABR's securities price declined from $13.86 per share on December 4, 2023 to $13.15 per share on December 6, 2023, or 5.12%.

13. Then, on May 9, 2024, Viceroy published a report detailing a scheme whereby ABR financed purchases of assets from its own foreclosures of distressed bridge loans, via off-balance sheet entities controlled by former ABR associates, and entirely financed with ABR equity capital, which allowed ABR to avoid writing down its loans. In response, ABR's securities price declined from $13.50 per share on May 8, 2024 to $12.84 per share on May 9, 2024, or 4.9%.

14. Finally, on July 12, 2024, Bloomberg reported that the Manhattan U.S. Attorney's Office and the Federal Bureau of Investigation in New York were actively investigating ABR's "lending practices and the Company's claims about the performance of their loan book." On this news, ABR's securities price declined from $15.53 per share on July 11, 2024 to $12.89 per share on July 12, 2024, or 17.33%.

15. ABR's public investors sustained significant investment losses as the Company's securities price plummeted. Plaintiffs bring this action to recover the market losses that they and other similarly situated shareholders sustained as a result of Defendants' Class Period violations of the Exchange Act.

## II. JURISDICTION AND VENUE

16. The claims asserted herein arise under and pursuant to Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because ABR is headquartered in this District and a significant portion of its business, the alleged actions including, *inter alia*, the preparation and dissemination of materially

false and misleading information, and subsequent damages to Plaintiffs and the Class, took place in this District.

19. In connection with the acts, conduct, and other wrong doings alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange markets.

## III. PARTIES

### A. Plaintiffs

20. Lead Plaintiff David Hawkins, as set forth in his previously filed Certification, incorporated by reference here, purchased ABR securities during the Class Period and because of the violations of the federal securities laws alleged herein, suffered damages as a result.

21. Additional named plaintiff Lois Martin, as set forth in her previously filed Certification incorporated by reference here, purchased ABR securities during the Class Period and because of the violations of the federal securities laws alleged herein, suffered damages as a result.

### B. Defendants

22. ABR is a Maryland corporation with its principle executive offices located at 333 Earle Ovington Boulevard, Suite 900, Uniondale, NY. During the Class Period, the Company's common stock traded on the New York Stock Exchange ("NYSE") under the symbol "ABR".

23. Defendant Ivan Kaufman ("Kaufman") has served as ABR's Chief Executive Officer ("CEO"), President, and Chairman since 2003. In 1983, Mr. Kaufman co-founded a predecessor of Arbor National Holdings Inc., the predecessor of Arbor Commercial Mortgage ("ACM"). Mr. Kaufman has been CEO and President of ACM since its inception in 1993.

24. At all relevant times, Mr. Kaufman also served as a voting member of the Company's Credit Committee, which consists of ABR's CEO, Chief Credit Officer ("CCO"), Andrew G. Guziewicz ("Guziewicz"), and Executive Vice President ("EVP"), Structured Finance, Gianni Ottaviano ("Ottaviano").

25. Defendant Paul Elenio ("Elenio") has served as ABR's EVP, Chief Financial Officer ("CFO") since 2005. At all relevant times, Mr. Elenio was also in charge of investor relations. Mr. Elenio joined Arbor National Holdings, Inc. in 1991. Prior to joining the Company, he worked for Ernst & Young from 1989 to 1990 in the auditing department.

26. According to ABR's SEC filings, Mr. Elenio is "responsible for overseeing all aspects of [the Company's] financial operations. This includes financial reporting, tax planning, budgeting, and the appropriate utilization of [its] capital."

27. Defendants Kaufman and Elenio are referred to as the "Individual Defendants."

28. ABR, together with the Individual Defendants, are referred to as "Defendants."

29. Each Individual Defendant: (i) directly participated in the management of ABR; (ii) was directly involved in the Company's day-to-day operations at the highest levels; (iii) was privy to confidential proprietary information concerning ABR and its business and operations; (iv) was directly or indirectly involved in drafting, producing, reviewing and/or dissemination of the materially false and/or misleading statements alleged herein; (v) approved or ratified the alleged misstatements in violation of the federal securities laws; and/or (vi) was directly or indirectly involved in the oversight or implementation of the Company's internal controls.

30. Because of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of ABR's SEC filings, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*,

the market. Each Individual Defendant had the ability and opportunity to prevent the issuance of the materially false and/or misleading statements alleged herein or cause them to be corrected. Because of their positions and access to material non-public information, each Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. Consequently, each Individual Defendant is liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

31. ABR is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the normal scope of their employment with authorization. Likewise, the Individual Defendants' requisite state of mind, *i.e.*, scienter, is imputed to ABR under *respondeat superior* and agency principles.

## IV. FORMER EMPLOYEES CORROBORATING FACTUAL ALLEGATIONS

### A. FE1

32. Former Employee #1 ("FE1") was employed by ABR from November 2021 to January 2023 as an Assistant Vice President ("AVP"), Structured Finance Underwriter. During their tenure with ABR, FE1 reported to Sean Lucy, Senior Vice President ("SVP"), Structured Finance Underwriter and Mr. Ottaviano, EVP, Structured Finance Production, who, in turn, reported to Mr. Guziewicz, CCO, and Defendants Kaufman and Elenio.

33. In this role, FE1 was responsible for assisting in all aspects of financial analysis, underwriting and loan structuring for ABR's Structured Business, including statement analysis, risk assessment, projections, sensitivity analysis, industry and management assessments, collateral

analysis and credit approval documentation. In particular, FE1 described their participation in the preparation of final credit memos submitted to Mr. Guziewicz for review prior to the approval of each loan.

### B. FE2

34. Former Employee #2 ("FE2") was employed by ABR from January 2021 to May 2022 as an underwriter. When FE2 began their tenure with ABR, FE2 worked on Agency loans. However, three months before their departure from the Company, FE2 was also tasked with underwriting bridge loans for ABR's Structured Business. During their tenure with ABR, FE2 reported to Arbor's SVP, Deputy Chief Underwriter, Agency Lending, who, in turn, reported to John G. Caulfield, EVP, Chief Operating Officer, Agency Lending, who, in turn, reported to Defendants Kaufman and Elenio. FE2 also reported to Mr. Lucy, SVP, Structured Finance Underwriter and Mr. Ottaviano, EVP, Structured Finance Production, who, in turn, reported to Mr. Guziewicz, CCO, and Defendants Kaufman and Elenio.

35. In this role, FE2 was primarily responsible for underwriting and loan structuring, including statement analysis, risk assessment, projections, sensitivity analysis, industry and management assessments, collateral analysis and credit approval documentation.

### C. FE3

36. Former Employee #3 ("FE3") was employed by ABR from 2019 to 2022 as an Assistant Vice President (AVP), Structured Asset Management. During their tenure with ABR, FE3 reported to Louis Sarube, SVP and Managing Director, Structured Asset Management, and Eduardo Moreno, SVP, Team Lead, Structure Asset Management, who, in turn, reported to Danny van der Reis, EVP, Servicing and Asset Management, who, in turn, reported to Defendants Kaufman and Elenio.

37. In this role, FE3 was responsible for ensuring borrowers comply with loan document provisions, meet performance thresholds, and established construction deadlines. In addition, FE3's primary responsibilities included loan valuation and the restructuring of bridge loans, including identifying and implementing value-enhancement opportunities and coordinating loan activity to ensure compliance with CLO requirements for the Company.

### D. <u>FE4</u>

38. Former Employee #4 ("FE4") was employed by ABR from December 2021 to September 2024 as a senior underwriter for the Structured Business. During their tenure with ABR, FE4 reported to Mr. Lucy, SVP, Structured Finance Underwriter and Mr. Ottaviano, EVP, Structured Finance Production, who, in turn, reported Mr. Guziewicz, CCO, and Defendants Kaufman and Elenio.

39. In this role, FE4 was primarily responsible for underwriting and loan structuring, including statement analysis, risk assessment, projections, sensitivity analysis, industry and management assessments, collateral analysis and credit approval documentation.

### E. <u>FE5</u>

40. Former Employee #5 ("FE5") was employed by ABR from October 2020 to October 2021 as an Investment Analyst. During their tenure with ABR, FE5 reported to Chris Femino, SVP, Deputy Chief Underwriter, Agency Lending, who, in turn, reported to Mr. Caulfield, EVP, Chief Operating Officer, Agency Lending, who, in turn, reported to Defendants Kaufman and Elenio.

41. In this role, FE5 was primarily responsible for assisting the deal team with accumulating information for loan processing, ordering reports for use in the due diligence process, preparing the credit memorandums for submission to the credit committee, and assembling

complete loan files for examination by the underwriter. Duties and responsibilities of FE5 as an investment analyst included, *inter alia*, reviewing and analyzing financial statements, tax returns and cash flow statements of borrowers and guarantors; assisting underwriters in the completion of analytical spreadsheets and underwriting narratives in preparation for the loan committee; tracking loan applications; and communicating with other departments in the coordination of underwriting, closing, and managing loans.

### F. <u>FE6</u>

42. Former Employee #6 ("FE6") was employed by ABR from November 2022 to June 2023 as an Analyst, Structured Asset Management. During their tenure with the Company, FE6 primarily worked on multifamily properties in tertiary markets. During their tenure with ABR, FE6 reported to Mr. Sarube, SVP and Managing Director, Structured Asset Management, who, in turn, reported to Mr. Reis, EVP, Servicing and Asset Management, who, in turn, reported to Kaufman and Elenio.

43. In this role, FE6 was primarily responsible for the analysis, servicing and reporting of loans in ABR's loan portfolio. Duties and responsibilities of FE6 as a Structured Asset Management Analyst included, *inter alia*, assisting asset managers with financial statement entry and analysis of property operations compared to underwriting, borrower budgets, and stabilized projections; assisting asset managers with market research, review and analysis of leases, appraisals and other third-party reports, and preparation of valuation models; providing borrower support, loan administration; and preparing and editing financial reports for investors, auditors, and senior management. FE6 specifically recalled that they were responsible for providing the loan performance data that was used in the quarterly rating meetings that Kaufman and Elenio for in attendance for.

### G. FE7

44. Former Employee #7 ("FE7") was employed by ABR from September 2021 to May 2023 as Director of Accounting. During FE7's tenure with the Company, they reported to Defendant Elenio.

45. In this role, FE7 was responsible for overseeing ABR's accounting operations and financial reporting functions, including budgeting and internal audit.

### H. FE8

46. Former Employee #8 ("FE8") was employed by ABR from July 2022 through December 2022 as an SVP, Structured Asset Management. During their tenure with the Company, FE8 reported to Mr. Sarube, SVP and Managing Director, Structured Asset Management, who, in turn, reported to Mr. Reis, EVP, Servicing and Asset Management, who, in turn, reported to Defendants Kaufman and Elenio.

47. In this role, FE8 was primarily responsible for a portfolio of multifamily bridge loans, focusing on loan workouts, loan restructuring, and special resolutions. During FE8's tenure with the Company, FE8 managed an estimated 30 to 35 loans, of which about 15 were paid off or stabilized under FE8's management.

### I. FE9

48. Former Employee #9 ("FE9") was employed by ABR from September 2020 to May 2022 as an underwriter. FE9 worked out of the Company's Boston office. When FE9 began their tenure with the Company, FE9 worked on Agency loans. FE9 explained that there were about 20 underwriters in the Boston office, all working on Agency loans. But soon after FE9 began at ABR, due to the high volume of bridge loans, FE9 stated that everybody on their floor became a bridge and agency underwriter.

49. In this role, FE9 was primarily responsible for underwriting and loan structuring, including statement analysis, risk assessment, projections, sensitivity analysis, industry and management assessments, collateral analysis and credit approval documentation.

### J. FE10

50. Former Employee #10 ("FE10") was employed by ABR between October 2021 and June 2022 as an Investment Analyst. During their tenure with the Company, FE10 worked on both structured and agency deals.

51. In this role, FE10 was primarily responsible for assisting the deal team with accumulating information for loan processing, ordering reports for use in the due diligence process, preparing the credit memorandums for submission to the credit committee, and assembling complete loan files for examination by the underwriter. Duties and responsibilities of FE10 as an investment analyst included, *inter alia*, reviewing and analyzing financial statements, tax returns and cash flow statements of borrowers and guarantors; assisting underwriters in the completion of analytical spreadsheets and underwriting narratives in preparation for the loan committee; tracking loan applications; and communicating with other departments in the coordination of underwriting, closing, and managing loans.

### K. FE11

52. Former Employee #11 ("FE11") was employed by ABR between September 2021 and June 2023 as an Investment Analyst. During their tenure with the Company, FE11 worked exclusively on Agency deals.

53. In this role, FE11 was primarily responsible for assisting the deal team with accumulating information for loan processing, ordering reports for use in the due diligence process,

preparing the credit memorandums for submission to the credit committee, and assembling complete loan files for examination by the underwriter.

### L. FE12

54. Former Employee #12 ("FE12") was employed by ABR from August 2023 to July 2024 as a Director, Structured Asset Management. FE12 was based out of the Company's Atlanta office and reported to Gina Ogborn, SVP, Team Lead, Structured Asset Management, who, in turn, reported to Mr. Sarube, SVP and Managing Director, Structured Asset Management, who, in turn, reported to Mr. Reis, EVP, Servicing and Asset Management, who, in turn, reported to Defendants Kaufman and Elenio.

55. In this role, FE12 was responsible for ensuring borrowers comply with loan document provisions, meet established performance thresholds, and construction deadlines. FE11 primarily managed borrower compliance on bridge loans in Georgia, North Carolina, South Carolina, Louisiana, and Virginia.

## V. SUBSTANTIVE ALLEGATIONS

### A. The Company's Background

56. Defendant Kaufman co-founded ABR's predecessor in 1983. In 2004, ABR became a publicly traded company.

57. The Company is organized as a REIT and direct lender, providing loan origination and servicing for multifamily, single-family rental ("SFR"), and other commercial real estate assets for its own portfolio and for sale in the secondary market.

58. The Company operates through two business segments: (1) its Agency Loan Origination and Servicing Business ("Agency Business") and (2) its Structured Loan Origination and Investment Business ("Structured Business").

59. Through its Agency Business, the Company originates, sells and services a range of multifamily finance products through the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, the government-sponsored enterprises, or "GSEs"), the Government National Mortgage Association ("Ginnie Mae"), Federal Housing Authority ("FHA") and the U.S. Department of Housing and Urban Development (together with Ginnie Mae and FHA, "HUD").

60. ABR is one of 25 approved lenders in Fannie Mae's Delegated Underwriting and Servicing ("DUS") programs, one of 22 Freddie Mac Multifamily Conventional loan lenders for multi-family, manufactured, student, affordable, and senior housing, one of 12 in the Freddie Mac Small Balance Loans ("SBL") – properties with fewer than 30 units – program, and an approved HUD Multifamily Accelerated Processing ("MAP") and LEAN lender, providing construction permanent loans to developers and owners of multi-family, affordable, and senior housing, and healthcare facilities.

61. To maintain the Company's status as an approved lender for Fannie Mae and Freddie Mac and as a HUD-approved mortgagee and issuer of Ginnie Mae securities, ABR is required to originate and service loans in accordance with the applicable program requirements and guidelines established by these agencies. In addition, ABR is required to meet and maintain various eligibility criteria established by these entities, such as minimum net worth, operational liquidity and collateral requirements and compliance with reporting requirements.

62. Through its Agency Business, ABR also originates and services permanent financing loans, referred to as its "Private Label" loans, which according to the Company's annual report for the fiscal year ("FY") ended December 31, 2021, filed with the SEC on Form 10-K on February 18, 2022 ("FY21 10-K") and its annual report for the fiscal year ended December 31,

2022, filed with the SEC on Form 10-K on February 17, 2023 ("FY22 10-K"), are "underwritten using the guidelines of our existing agency loans sold to the GSEs."

63. Through ABR's Structured Business, the Company invests in a portfolio of structured finance assets, mainly in the multifamily commercial real estate market, primarily consisting of bridge loans, in addition to mezzanine loans, junior participating interests in first mortgages, and preferred and direct equity.

64. "Bridge loans" are generally offered on commercial real estate properties that are in transition, such as renovations, repositioning or lease-up. Bridge loans typically have a maturity date of one to three years from their origination date and carry a floating interest rate.

65. A "floating-rate" refers to a variable interest rates that changes over the duration of the debt obligation instead of remaining fixed. The interest rate on a bridge loan "floats" up and down, reflecting economic or financial market conditions.

66. These short-term, floating-rate loans are considered transitional such that the underlying assets are expected to have more value in the future, and therefore, long-term, fixed-rate financing may not reflect optimal leverage for a non-stabilized property. Accordingly, the purpose of a short-term, floating-rate bridge loan is to allow the borrower time to stabilize a property before refinancing into a long-term, fixed-rate loan.

67. A multifamily property is generally considered "stabilized" when it has a consistent occupancy rate, predictable cash flow, and a healthy net operating income ("NOI"). This is usually achieved after the initial lease-up period or other rehabilitation efforts are completed. Signs of a stabilized multifamily property include, *inter alia*, increased occupancy rate that is typical for its market; lower turnover rates, indicating stable tenant retention; rent alignment with market rates;

leasing management and marketing costs decrease as occupancy rates increase; and the property's NOI meets or exceeds its financial projections.

68. At all relevant times, ABR maintained that its "[b]orrowers typically use the proceeds of a conventional mortgage, such as our GSE/agency loans, to repay a bridge loan," otherwise referred to as a takeout loan.

69. A "takeout" loan is a method of financing whereby a loan that is procured later is used to replace the initial loan. More specifically, a takeout loan, or takeout financing, is a long-term financing that the lender (like ABR) promises to provide at a particular date or when particular criteria for completion of a project are met.

70. According to ABR's SEC filings, the Company's loans held-for-investment, through its Structured Business, are intended to be held-to-maturity and, accordingly, are carried at cost, net of unamortized loan origination costs and fees, loan purchase discounts, and net of the allowance for credit losses.

71. The Company's Agency Business primarily generates revenue based on the gains and fees recognized from the origination and sale of mortgage loans. The Company's Structured Business primarily generates revenue based on interest margin (yield on investments less cost to finance investments) on loans held.

72. At all relevant times, the Company's primary business objective was to bring in a borrower at the acquisition or renovation stage of the underlying asset on a bridge loan originated by ABR, carry them through the transitional period, *i.e.*, to maturity of the bridge loan or upon property stabilization, and exit them with an Agency loan originated, sold, and serviced by ABR, thereby providing it with two bites at the same deal.

73. According to SEC filings, ABR's provided "Investment Strategy" was as follows:

> We believe that providing both structured products and GSE/agency loans through direct originations and in-house underwriting capabilities throughout our national network of sales offices and lending solutions through various GSE and HUD programs provides us with a competitive advantage, since this allows us to meet the multiple needs of borrowers through fully integrated, comprehensive product offerings.

74. To achieve its stated business objectives, ABR claimed to deploy the following investment strategies:

- ***Provide Customized Financing.*** We provide a suite of comprehensive customized financing solutions to meet the various needs of borrowers. We target borrowers whose options may be limited by conventional bank financing, have demonstrated a history of enhancing the value of the properties they operate and who may benefit from the customized financing solutions we offer.
- ***Execute Transactions Rapidly.*** We act quickly and decisively on proposals, provide commitments and close transactions within a few weeks and sometimes days, if required. We believe that our rapid execution attracts opportunities from both borrowers and other lenders that would not otherwise be available and that our ability to structure flexible terms and close loans quickly gives us a competitive advantage.
- ***Manage Credit Quality.*** A critical component of our strategy is our ability to manage the real estate risks associated with our investment portfolio. We actively manage the credit quality of our portfolio by using the expertise of our asset management group, which has a proven track record of structuring and repositioning investments to improve credit quality and yield.
- ***Use Our Relationships with Existing Borrowers.*** We have solid relationships with a large nationwide borrower base and maintain a strong reputation in the commercial real estate finance industry. Through the expertise of our originators, we offer a wide range of customized financing solutions and benefit from our existing customer base by using existing business to create potential refinancing opportunities.
- ***Long-Established Relationships with GSEs.*** Our Agency Business benefits from our long-established relationships with Fannie Mae, Freddie Mac and HUD enabling us to offer a broad range of loan products and services which maximizes our ability to meet borrowers' needs.
- ***Leverage the Experience of Executive Officers and Our Employees.*** Our executive officers and employees have extensive experience originating and managing structured commercial real estate investments. Our senior management team has, on average, over 30 years of experience in the financial services industry.

75. At all relevant times, ABR maintained that while it "pursue[s] short-term and long-term lending and investment opportunities," the Company's "primary focus has been, and

continues to be, first mortgage lending in the highly attractive and ***stable*** multifamily real estate sector" (emphasis added).

## B. ABR's Collateralized Loan Obligations

76. To fund loans it originates, ABR maintains credit facilities with warehouse lenders. A warehouse lender is a financial institution, typically a commercial bank or other corporate entity, that provides various structured financial solutions – either lines of credit or repurchase agreements – to non-depository independent lenders, like ABR, allowing them to fund new loans before selling them on the secondary market, essentially acting as a temporary source of capital to facilitate the loan origination process by using the originated loans as collateral for the debt incurred under the credit facility. When loans serving as collateral lose value, the Company's warehouse lenders have the option to make a margin call requiring ABR to pay cash back to the warehouse lender.

77. ABR generally does one of two things with its originated loans – securitizes or sells the loan. Loans originated under ABR's GSE and HUD programs are generally sold within 60 days of the origination date, while its Private Label loans are pooled and generally sold and securitized within 180 days of origination. ABR pools and securitizes the Private Label loans through conduit/commercial mortgage-backed securities ("CMBS") programs and sells certificates to third-party investors. CMBS programs are typically collateralized by stabilized properties.

78. Collateralized loan obligations (CLOs) are a form of securitization—*i.e.*, a structured finance transaction—whereby multiple loans are pooled together into a marketable security collateralized by the pool of commercial real estate assets. Income earned on the underlying pool of assets is used to pay periodic interest and principal when to investors. As payments are received from the real estate borrowers on the underlying loans, payments are made

to CLO investors in order of priority determined by the specific tranche held by that investor in the CLO. The most senior tranche is the first to get paid when proceeds come in and the last to realize any loss if the real estate borrowers are late in making payments or default on the loan. Each lower tranche gets paid sequentially later than the immediately higher tranche and thus is at greater risk of non-payment if all of the funds due are not received.

79. ABR utilized multiple CLOs to finance its balance sheet portfolio. For instance, during the fiscal year ended December 31, 2021 (FY21), the Company closed four CLO securitizations (CLO 14, CLO 15, CLO 16, and CLO 17) totaling $5.2 billion in structured debt transactions. In the fiscal year ended December 31, 2022 (FY22), the Company closed two CLO securitizations (CLO 18 and CLO 19) totaling $3.1 billion in structured debt transactions. Comparatively, during the four years prior (FY17 through FY20), the Company closed five CLO securitizations (CLO 9, CLO 10, CLO 11, CLO 12, and CLO 13) collectively totaling $3.1 billion in structured debt transactions.

80. The result of the CLO process is that the risk of loss is transferred, in part, from the real estate lender to investors who purchase CLO debt securities. Thus, by securitizing the bridge loans that its Structured Business originated, ABR created income for itself through its role as portfolio manager, while removing risk from its balance sheet. Of course, CLOs are structured so that the lender becomes a junior partner in the investment, meaning if the assets that back the debt underperform or default, they are the last to get paid.

81. This structure incentivizes lenders to ensure the investments run smoothly and that investors get paid. It can also make lenders more willing to grant loan modifications to stave off trouble stemming from non-performing loans or defaults. Likewise, the Company's CLOs were structured with reinvestment periods (usually one to three years), during which time ABR could

buy and sell loans in and out of the underlying portfolio, allowing the Company to replace troubled debt in their CLO pool if it is in default or at imminent risk of default.

82. Because the collateralized assets are transitional or non-stabilized properties, the borrowers, CLO managers (like ABR), which manage the underlying portfolio of loans, and CLO investors maintain regular forms of communication and engage in frequent dialogue, to ensure that the underlying loans remain performing.

83. Moreover, the securitization process did not allow for the transfer of ***all*** the risks of loss since ABR was still responsible for guarantees, in the form of recourse obligations upon violation of representations and warranties given to investors. These representations encompassed compliance with the underwriting standards and guidelines used to originate bridge loans comprising debt securities, including debt service coverage ratios ("DSCR"), debt to equity ratios, minimum servicing portfolio tests, and other facts material to the investment decisions of purchasers of debt securities.

84. The representations and warranties given by ABR played a crucial role in the sale of its CLO debt securities. Typical representations and warranties assured buyers that the loans being packaged complied with underwriting standards and met certain criteria relevant to the riskiness of the loan, such as the borrower's creditworthiness, the ratio of the borrower's total indebtedness to income or assets, and operational performance of the underlying property. If ABR violated its representations and warranties OR a borrower defaulted, the investors could require the Company to repurchase the non-performing loan out of the CLOs.

85. Throughout the Class Period, Defendants publicly pronounced the Company's commitment to credit quality declaring that ABR was "in compliance with all financial covenants and restrictions."

### C. <u>ABR's Stated Underwriting and Risk Management and Approval Process</u>

86. At all relevant times, ABR provided investors with representations regarding the underwriting standards it purportedly followed in originating loans.

87. According to the Company's FY21 10-K, filed on February 18, 2022, ABR's underwriters "perform due diligence on all proposed transactions prior to approval and commitment using several tools to manage and mitigate potential loan losses and risk sharing exposure." ABR identified "[k]ey factors" considered in its credit decisions to include, *inter alia*, "debt service coverage, loan-to-value ratios and property financial and operating performance."

88. The "debt service coverage ratio" (DSCR) is a measure of the cash flow available to pay current debt obligations. In other words, the DSCR is a financial metric used to assess a property's ability to generate enough cash to cover its debt obligations. To calculate a property's DSCR, divide its annual net operating income by its annual debt service payments, which include principal and interest.

89. A "loan-to-value ratio" ("LTV") is a financial term that compares the amount of a loan to the value of the asset being purchased. In other words, the LTV ratio is used to describe the percentage of a property's appraised value that is covered by its debt obligations. To calculate a property's LTV ratio, divide the loan balance by the appraised value of the property and multiply the result by 100 to get a percentage. LTV ratios are used to evaluate the financial risk of a loan – the higher the LTV ratio typically the riskier the loan. In addition, lenders use LTV ratios to determine how much they are willing to lend to a particular property.

90. A property's "financial and operating performance" can include metrics such as revenue, expenses, and net operating income (NOI). Factors that affect a multifamily property's performance include, *inter alia*, operating expenses – costs associated with maintaining the

property, such as utilities, insurance, management and payroll; interest rates – higher interest rates can increase capitalization rates, or cap rates, and decrease valuations; inflation – high inflation can increase expenses faster than revenue; and supply and demand – when supply is high relative to demand, rent growth may slow and occupancy rates may decrease.

91. According to the Company's FY21 10-K, "underwriters analyze each loan application in accordance with the guidelines below to determine the loan's conformity with the guidelines," which "[i]n general, … require evaluation of the following:"

- The borrower and each person directing a borrowing entity's activities (a "key principal"), including a review of their experience, credit, operating, bankruptcy and foreclosure history;
- Historic and current property revenues and expenses;
- Potential for near-term revenue growth and opportunity for expense reduction and increased operating efficiencies;
- The property's location, its attributes and competitive position within its market;
- Proposed ownership structure, financial strength and real estate experience of the borrower and property management;
- Third-party appraisal, environmental review, flood certification, zoning and engineering studies;
- Market assessment, including property inspection, review of tenant lease files, surveys of comparable properties and an analysis of area economic and demographic trends;
- Review of an acceptable mortgagee's title policy and an 'as built' survey;
- Construction quality of the property to determine future maintenance and capital expenditure requirements;
- The requirements for any reserves, including those for immediate repairs or rehabilitation, replacement reserves, tenant improvement and leasing commission costs, real estate taxes and property casualty and liability insurance; and
- For any application for one of our Agency products, we will underwrite the loan to the relevant agency or Company guidelines.

92. In addition, ABR purported to "apply an established investment approval process to all loans and other investments proposed for our Structured Business before submitting each proposal for final approval." According to the Company's FY21 10-K, the investment approval process included as follows:

> A written report is generated for every loan or other investment that is submitted to our credit committee for approval, which consists of our chief executive officer, chief credit officer and executive vice president of structured finance. The report includes a description of the prospective borrower and any guarantors, the collateral, and the proposed use of investment proceeds, as well as borrower and property financial statements and analysis. The report also includes an analysis of borrower liquidity, net worth, cash investment, income, credit history and operating experience. All transactions require the approval of the majority of the members of our credit committee. Following the approval of a transaction, our underwriting and servicing departments, together with our asset management group, assure that all loan approval terms have been satisfied and conform to lending requirements established for that particular transaction.

93. The GSEs' leadership in the multifamily market is recognized principally in terms of setting the standards for underwriting and financing multifamily properties. For example, to qualify for a multifamily fixed-rate mortgage loan through Fannie Mae, the property must maintain 85% physical occupancy and 70% economic occupancy for three months preceding the commitment date, while Freddie Mac generally requires a minimum of 90% physical occupancy. Freddie Mac multifamily guidelines require a minimum DSCR of 1.20x and Fannie Mae requires a minimum of 1.25x. Fannie Mae and Freddie Mac generally allow LTV ratios of up to 80% for multifamily financing, because fixed-rate mortgage loans come with stricter borrowing requirements and higher interest rates. That said, to refinance a multifamily loan with Fannie Mae, the agency accepts a maximum LTV ratio of 75%.

94. Accordingly, a DSCR of at least 1.25x is generally considered acceptable for a non-stabilized property, with a DSCR of 1.25x to 1.5x being ideal. A lower DSCR means that a borrower might need to pay out of pocket if the property is vacant or operating expenses are higher than expected. Consequently, riskier properties with shorter term leases or less creditworthy tenants, like workforce housing, tend to fall on the higher end of the 1.25x to 1.5x range to account for potential volatility in income generated by the property. In general, an industry-acceptable LTV ratio for bridge loans is between 65% and 75%; meaning lenders usually allow borrowers to secure

debt equal to 65% to 75% of the property's appraised value, requiring at least 25% to 35% equity from the borrower.

95. Prior to the start of the Class Period, Defendants maintained that ABR utilized conservative underwriting standards for its Structured loans. For example, on October 15, 2019, Raymond James & Associates issued an analyst report, entitled "Key Takeaways From Recent Management Meetings; Reiterated Outperform," following recent investor meetings with Defendant Elenio. The report highlighted ABR's "[c]onservative underwriting standards amid increasing competition" noting that "[d]uring our meetings, ABR stressed that they have maintained their conservative underwriting standards and continue to underwrite loans on an 'as-is' basis with no rent growth… as some competitors are willing to do higher LTVs, cash-out refi[nance]s, and assume rent growth." The report recounted that, "[w]hile ABR is willing to compete on spreads, the company is not willing to bend on credit, even if it results in lower volumes. Throughout the day, ABR stressed that it continues to be disciplined with its underwriting standards."

96. Likewise, during the Company's investor conference call to discuss its financial earnings for the three-month period ended June 30, 2020, held on July 31, 2020 ("2Q20 Earnings Call"), when analyst George Bahamondes, Deutsche Bank AG, asked about ABR's underwriting standards in response to the COVID pandemic, specifically, "how has that changed in this environment versus what it looked like before? Just given maybe the many tenants who are taking government assistance today. And just kind of any thoughts on just kind of how underwriting has changed as we maybe look to some dislocation as the impact of government assistance wears off on multifamily assets," Defendant Kaufman responded:

> So I believe the loans we're putting on now could be the best loans we ever put on in the history of the firm. I think there's a lot of structure in the loans for the

> agencies. They've implemented interest reserves anywhere from 6 months to 18 months for principal and interest and often taxes. So you have an enormous cushion that you never had before.
>
> In the past in a up market, a 10-year up market, you had rent growth of 3% to 5% annually. You had to underwrite that and keep expecting that was going to occur. And I think if you go back to my transcripts over the last 18 months, we had a tremendous amount of caution in that period and believe those last loans and expecting rent growth of probably ones that you needed to have a lot of caution.
>
> When we're underwriting loans today, not only do we have those reserves, but you're underwriting to a flat rent growth in a different environment. And you can proceed with a lot of caution. So I think the environment is very strong, but you go market to market and you proceed with a lot of discipline.
>
> But I do believe that for the time being, we can proceed in a very conservative way, probably lower loan to values with interest reserves and conservative underwriting.

## D. <u>The Multifamily Real Estate Boom Fueled by Inexperienced Syndicators</u>

97. Beginning around late 2020, the multi-family real estate market was flooded with a new generation of crowdfunders, inexperienced syndicators – individuals that pool funds from multiple small-time investors to buy properties – who pounced on rising rents and low interest rates to do billions of dollars in deals throughout the pandemic.

98. A real estate syndication is where a syndicator, or "sponsor", raises money from a group of investors to buy a large commercial property, often an apartment complex, self-storage facility, or housing community, that they likely cannot afford on their own. Once the funds are pooled, the investors become the limited partners ("LPs") in the deal and the sponsors become the general partners ("GPs").

99. As the GPs, the sponsors' primary duties include, *inter alia*, finding investors and raising capital for the transaction, arranging the financing, negotiating with the seller and structuring the deal, building and executing a business plan, working with the property management team, asset management, and investor relations.

100. Unlike public companies, however, syndicators are typically not required to give regular updates on their properties' financial performance to investors, and as limited partners,

investors have no say over the financing or how the money is spent. Moreover, syndicators collect acquisition fees from investors that typically go from about 2% to 5% on a property's purchase price. They also take management fees of 2% to 3% of the property's gross income. As a result, syndicators often profit even if the investment is a failure.

101. Between 2020 and 2022, a burgeoning class of amateur real estate titans, many with no financial or real estate background, sought to capitalize on rising rents across the country, particularly in the Sun Belt – the southern and southwestern portion of the U.S. including states like Texas, Florida, and Georgia – to draw in investors interested in passive income, promising out-sized returns on multifamily deals based on a "value-add" strategy.

102. On YouTube and TikTok, many of these self-appointed landlord influencers touted get-rich-quick schemes and promises of financial independence to anyone willing to pay for expensive seminars in the hopes of leaving the daily grind behind. The pitch was that rent increases, made possible by renovations and constrained supply, would boost revenue, with double-your-money returns for investors.

103. Syndicator investors bought into the notion that high demand for affordable housing and a limited supply meant working-class renters, often with poor credit, had few options. That calculation propelled thousands of real estate deals by syndicators across the country who hunted for buildings where they believed tenants could be charged much higher rents than what they were paying.

104. From 2020 to 2022, real estate syndicators reported raising at least $115 billion from investors, hitting a historic high in 2022, according to a Wall Street Journal analysis of SEC filings. In Sunbelt cities such as Phoenix, Las Vegas, and Atlanta, these so-called value-add

purchases accounted for more than 60% of all multifamily deals over the past decade, according to the property-data firm CoStar Group, Inc.

105. As an asset class, the multifamily commercial real estate market has generally been viewed as recession-proof: people will always need a place to live. And commercial real estate is generally seen as a good investment in the event of high inflation because rents can be raised. But with an influx of interest in these so-called value-add deals, so too came a more competitive lending market.

106. Consequently, syndicators, who make money by collecting acquisition and management fees, were emboldened to take risks with money pooled from investors. As a result, multifamily syndicators turned to floating-rate debt, or bridge loans, for a quicker close. Indeed, floating-rate financing dominated commercial real estate acquisitions made in 2021 and 2022.

107. With easy access to credit through floating-rate bridge loans, there was significant risk of these multifamily syndicators becoming overleveraged. When a syndicator's portfolio is built upon mountains of low-interest debt, when every non-stabilized property is leveraged to the brim and in some cases cross-collateralized with one another, they become highly susceptible to rising interest rates.

108. Moreover, the multifamily syndicators who purchased these non-stabilized properties with little of their own money, likely recouped in acquisition and management fees, would suffer little to no loss if the property is condemned or there is a forced sale. Consequently, bridge loans collateralized by properties dependent on stabilization to secure agency refinancing, or some other form of permanent fixed-rate financing, were highly susceptible to inflation, such that there was significant risk that the unincentivized and inexperienced syndicator would deprive the property of necessary rehabilitation when faced with increased operating expenses.

### E. ABR Secretly Abandons Its Stated Underwriting Standards to Grow the Volume of Its Structured Loan Portfolio

109. With this boom in multifamily real estate syndication as a backdrop, Defendants grew ABR's Structured Business into one of the largest sub-prime lenders in the country.

110. Between FY20 and FY21, ABR's Structured Business grew 122% to $12.6 billion on loan originations totaling $9.72 billion, as compared to $2.43 billion the year prior. Of the $9.72 billion Structured loans originated in FY21, $9.19 billion, or 95%, were multifamily bridge loans. As of December 31, 2021, 91% of the Company's Structured loan portfolio consisted of multifamily commercial real estate assets. Commercial real estate assets located in Florida and Texas made up 12% and 19% of ABR's Structured Business, respectively.

111. In FY22, the Company's Structured Business grew another 19% to $14.46 billion on loan originations totaling $6.15 billion, of which $4.88 billion were completed in the first half of the year ($2.83 billion in 1Q22 and $2.05 billion in 2Q22). Of the $6.15 billion Structured loans originated in FY22, $5.79 billion, or 94%, were multifamily bridge loans. As of December 31, 2022, 98% of ABR's Structured portfolio consisted of housing-related bridge loans, 91% of which were multifamily commercial real estate assets. Commercial real estate assets located in Florida and Texas made up 14% and 22% of the Company's Structured Business, respectively.

112. Despite this wave of inexperienced, and inherently risky, real estate syndicators flooding the multifamily asset market, throughout the Class Period, Defendants assured analysts and investors that ABR maintained its conservative underwriting standards when originating this influx of multifamily bridge loans on its balance sheet portfolio.

113. For example, during the Company's investor conference call to discuss its financial earnings for the three-month period ended September 30, 2021, held on October 29, 2021 ("3Q21

Earnings Call"), analyst Jade Joseph Rahmani, Keefe, Bruyette, & Woods, Inc., asked if Defendant Kaufman could share his view on the competitive spending markets stating, "[d]ebt funds and mortgage REITs clearly have seen a surge in their originations. Do you have any concerns about underwriting standards and competitive pressures in the market?" To which Kaufman responded, in relevant part:

> We have a great reputation in the market. We pick our spots. We know where to put our dollars. We believe that in all competitive markets, there are a lot of mistakes that are always going to be made. And we just have to proceed very prudently. We've put a huge focus on lending on cash flow deals, deals that have positive coverage that need very little heavy lift. That's very different than what happened 4 or 5 years ago when there were a lot of B and C assets being bought with tremendous amount of lift. The lift is very small. It's basically unit terms.
>
> Our biggest concern right now is the market turned into a syndicator market, where you have a lot of syndicators coming in with very little net worth and liquidity raising money and don't have the liquidity to withstand [] any bumps in the road. So we're very careful of who we're dealing with. Usually where speed bumps is with multiple assets. And we want to make sure the structure between the GP and the LPs are good. I think that's where a lot of mistakes are being made right now. They're working with thinly capitalized sponsors. They're working with people who they're trying to win a deal for 5 basis points with no structure. We're maintaining our structure on our deals. Other people are not. So I think we have a lot of experience in the way we run our business, and we're able to be a little more selective than most.

114. "Loan structure" refers to the different characteristics of the agreement that a lender can choose from when extending credit to a borrower. Such characteristics considered include the loan term, interest rate, risk, collateral, and repayment. The purpose of loan structure is to meet the borrowers' financing needs while protecting the lender from losses due to non-performance or default.

115. Defendants reinforced their Class Period representations regarding ABR's conservative underwriting standards and touted the strength of its loan book valuation claiming that, growing the Company's Structured portfolio "provides a pipeline to growth in [its] Agency/GSE servicing portfolio," purporting that every bridge loan is done for Agency takeout.

116. For example, during the Company's investor conference call to discuss its financial earnings for the three-month period ended December 31, 2021, held on February 18, 2022 ("4Q21 Earnings Call"), analyst Richard Barry Shane, JPMorgan Chase & Co, commented, "when we think about the structured business, I kind of think of that as potential energy ultimately for the agency business. And when we look at the terms of those loans, that's clearly the business model" and posed the question, "when you underwrite loans and think about business plans, are you starting to contemplate higher interest rates or exits as you're taking on those loans within the structured product business with the idea that it may be more expensive for managers, owners to get financing?" To which Defendant Kaufman responded, in relevant part: "We are constantly readjusting our models based on different economics and we always underwrite our bridge loans to where the takeout is going to be and we use a certain constant. So that's something that's different about the way we do our business…."

117. Contrary to Defendants' representations, the Company did not maintain conservative underwriting standards and Defendants caused its employees to disregard ABR's stated guidelines in an effort to increase the volume of loans it originated. As discussed below, numerous former employees detail pervasive, widespread abandonment of the Company's stated conservatism when it came to implementing its underwriting guidelines and substantial pressures to approve such high-risk loans with little to no oversight.

118. According to FE2, in the lending industry ABR is referred to as a "volume shop," meaning it does not underwrite its loans as closely or carefully as it should, it just pumps out loans. For example, FE2 stated that Fannie Mae hits ABR with a penalty every year, because of the quality of the loans it closes. FE2 also recalled that, during their tenure with the Company (January

2021 to May 2022), any loan rejected by the agencies would go to ABR's Private Label and it would close.

119. While employed by ABR as an Investment Analyst between October 2020 to October 2021, FE5 primarily handled Agency loans but described a heavy volume across the board. Specifically, FE5 explained that during their tenure with the Company, ABR was signing up deals left and right. FE5 recalled that ABR had some underwriters handling approximately 13 to 15 different loans at once. According to FE5, no one at the Company really asked questions, as long as they could get the loans closed. FE5 described it was a "whatever-it-takes mindset." FE5 questioned ABR's ability to maintain quality at such high volumes.

120. FE1, an Assistant Vice President, Structured Finance Underwriter, recalled how ABR's loan applications spiked in FY21, but because there was a roughly two-to-three-month lag between application and closing, these loans were also processed at high rates through the first half of FY22. According to FE1, ABR brought in a few additional people to assist with the influx in volume but still recalled "working 24-7" through the summer of 2022.

121. After being tasked with underwriting for the Structured Business roughly three months before their departure in May 2022, FE2 recalled closing about two bridge loans per month while still working on Agency loans. FE2 noted that underwriters working full-time on the Structured Business closed many more bridge loans during the same period. FE2 described ABR as a factory pumping out these bridge loans. According to FE2, the underwriting just was not sufficient enough to really examine these projects and owners.

122. That said, FE2 recalled that basically no loans did not get approved. FE2 stated that ABR would pull in underwriters with no experience on bridge loans, and they would just close. Referring to their own experience, FE2 explained that they were an agency underwriter until ABR

pulled FE2 into these bridge loans, and even though FE2 had no prior experience, the loans just got approved. No questions asked, FE2 stated.

123. FE2 recalled that Defendant Kaufman personally signed off on each of the bridge loans they completed. FE2 described receiving confirmation emails informing them that a proposed loan had been approved and within the email chain FE2 could see prior correspondence received and sent by Defendant Kaufman. According to FE2, based on the timestamps of the emails, Kaufman would approve the bridge loans in like a minute of receiving the proposed deal and FE2 could see that Kaufman's approval was coming from a mobile device based on the signature line indicating, "'Sent from my iPhone.'"

124. Likewise, FE9 described a similar experience of multiple agency underwriters being tasked with also working on Structured bridge loans. FE9 also acknowledged that less experience could have affected the overall quality of underwriting. FE9 recounted seeing some "weird assets" shown to them by syndicator borrowers. For instance, FE9 described a super old brick building on the outskirts of Houston, Texas. According to FE9, the property did not show well in photos on CoStar and usually photos try to show a property in the best light. FE9 recalled thinking to themselves, how is this going to pay its debt service? FE9 said that they took the position that they would present the numbers for what they were but suspected that there was probably a lot more about the deal that made it risky. FE9 recalled jokes between the Company's underwriting analysts like, "I can't believe this guy is going to buy this trash." In the case of the super old brick building outside of Houston, FE9 recalled that ABR approved the loan.

125. According to FE4, a senior underwriter for the Structured Business from December 2021 to September 2024, ABR lacked oversight on the credit side, merely providing broad guidelines that were unreliable. FE4 explained that as an underwriter at ABR, it was up to the

individual to determine what the guidelines meant, and as a result, FE4 recounted that ABR took on a lot of risk on its deals.

126. Similarly, FE10 described the Company's underwriting guidelines as "underwriting without support." According to FE10, ABR underwriters frequently resorted to using a baseline standard without proper market adjustments. For example, FE10 recounted that for a payroll expense, the Company's employees would go to $1,250 per unit, which, for a certain market, might have been appropriate, but FE10 recalled that ABR's underwriters did not look at a lot of comps to support that. Same thing for general administrative expenses. FE10 claimed that Company employees would use $350 per unit. FE10 described this as a standard number that it used across the board as a soft indicator of where loan proceeds would go, but again, FE10 stated that they did not use comps to adjust it accordingly.

127. FE10 went on to explain that because the Company's originators had a relationship with the debt brokers looking for a client for financing, ABR's underwriting team never confirmed supporting documents, to make sure they were legit and not authored by just anybody. According to FE10, these unverified documents might include property financials, rent rolls, budgets and more. Any financial statements that were sent to us were never vetted, FE10 stated. FE10 noted that the agencies had recently released a fraud supplement concerning falsified operating financial statements, but repeated that they did not recall ever having confirmed statements provided by brokers while employed at ABR.

128. In addition, FE4 repeatedly emphasized the Company's aggressive and risky "culture" when it came to getting a deal done. FE4 explained the process in which underwriters would submit the potential deals to ABR's credit committee, including Defendant Kaufman, for approval. When discussing their interactions with the credit committee, FE4 recalled that,

typically, there was a push to be aggressive, so FE4's input carried very little weight. FE4 went on to explain that once a deal came in the door, they would have to "find ways" to make the deal work. FE4 opined that the quality of the deals spoke for themselves, and that these things are always led from the top down.

129. ABR was able to "find ways" to get these deals done and grow the volume of its Structured loans by relaxing credit requirements. For example, FE4 recounted that, in the lending industry there is a certain minimum accepted on debt-to-credit ratio in the takeout, and ABR would, most of the time, go below that, just to get the deal done. FE4 said lenders typically want to see a debt service coverage ratio (DSCR) at 1.25x or higher, but ABR typically underwrites at 1.15x, relying on the guarantor's (if any) financial position or wherewithal to support that gap.

130. A "guarantor" in a syndicated loan is a person or entity that agrees to pay a loan if the borrower defaults. Guarantors under a syndicated loan are usually affiliates of the borrower but for some transactions, third party guarantees (given by entities connected with the transaction) may also be provided in addition or instead.

131. With respect to equity, FE4 said during their tenure at ABR, they did deals as low as 15% equity, whereas industry standard is typically 25% or more. FE4 also commented on ABR's lending to syndication groups, stating that with the sponsor, typically a lender would want to see 10% or more of the sponsor's own money in the deal or "skin in the game," but ABR would go as low as 2% or 3%.

132. Likewise, FE9 recalled that the Company's underwriting team was instructed to work towards a 7% debt yield. "Debt yield" is the ratio of a property's net operating income (NOI) to the loan amount. A higher debt yield means the property generates more income relative to the loan. While debt yield requirements vary, most lenders prefer debt yields of 10% or more. Only in

highly exceptional circumstances, say for premium properties located in top-tier markets, like New York City or Los Angeles, may lenders be willing to accept debt yields as low as 8% to 9%.

133. During this time, the Company also did away with rate caps. FE9 recalled that ABR stopped requiring rate caps for "stronger performing deals" around mid- to late-2021. FE8 reported that when they first began working for ABR in July 2022, a couple of deals under the Structured Business had rate caps, but following "the change"—*i.e.*, no longer requiring rate caps for any bridge loans—in approximately early 2022, the new originations did not. Of the 15 to 20 loans remaining in FE8's portfolio as of December 2022, FE8 described these bridge loans as "new originations", meaning they were in year one or two of their term.

134. A "rate cap" is a financial instrument that limits how high an interest rate can rise over a set period of time. It is generally considered a type of insurance that protects borrowers from unexpected interest rate increases. The buyer of the rate cap receives payments if the interest rate goes above a predetermined level, called the strike price. Rate caps are often used to hedge against interest rate risk for short-term debt, and lenders typically require borrowers to purchase rate caps before closing on a floating-rate loan.

135. FE8 also highlighted that the Company's underwriters did not perform stress testing on its bridge loans. The "stress testing" process involves evaluating a potential loan or investment by adjusting key financial variables to simulate adverse economic conditions, assessing how significantly these changes could impact the borrower's ability to repay and the overall financial health of the investment under stressful scenarios, like rising interest rates, declining property values, or reduced income for borrowers.

136. Another means by which ABR was able to grow the volume of its Structured loans originated was by relaxing collateral requirements. This was done by falsifying and/or

manipulating property appraisals so they would purport to comply with the Company's underwriting policies. According to FE2, the Company was giving out money based on unrealistic appraisals. FE2 claimed that the appraisers were putting whatever number ABR wanted. FE3 also recalled that appraisers would provide property valuations right on top of where ABR needed it to come in to close the deal.

137. Appraisers play a key role in real estate lending. An appraiser's valuation is used as a basis for how much a lender is willing to lend. Inflated property valuations can lead to borrowers obtaining loans at amounts larger than they would have otherwise obtained, which increases the risk of default or non-performance, especially on highly leveraged "value-add" properties that require stabilization prior to takeout.

138. FE2 recalled that, during their tenure with the Company, ABR used the appraisal firm, BBG Real Estate Services, "a lot" for its loans. FE10 echoed FE2 stating that while ABR worked with pretty much all national appraisers, the most common was BBG.

139. FE12 recalled being on a call, in February or March 2024, with the entire Structured management team, during which Mr. Sarube informed the Company's employees that they would no longer be using BBG for its appraisals. According to FE12, the Company had just gotten "a bunch" of appraisals by BBG in the prior quarter (4Q23).

140. On May 22, 2024, commercial real estate newsletter, The Promote, first reported that Freddie Mac had put BBG, one of the largest appraisal firms in the country, under internal review, amidst the agency's widening investigation into mortgage fraud, and circulated a memo indicating that BBG had been placed on its restricted vendor list and the agency would not accept any new loans with valuations or appraisals done by the firm or Jon DiPietra, a managing director of BBG's New York office, in any capacity.

141. Furthermore, the Company abandoned its stated policy of underwriting bridge loans for Agency takeout. FE1 explained that during their time at ABR (November 2021 to January 2023), the Company held weekly pipeline meetings at which all "live" deals that were about to close under the Structured Business were discussed. FE1 stated that the entire Structured team, including all managing directors and Mr. Guziewicz, CCO, attended these weekly pipeline meetings. According to FE1, during these weekly pipeline meetings to discuss bridge loans that were in the process of closing, there was no discussion of existing loans or Agency readiness.

142. Likewise, FE2 recounted that every single bridge loan they did during their tenure with the Company was not supportable by refinance – meaning the borrowers would need to add non-traditional sources of money, like a mezzanine loan or additional capital from investors, to pay off the loan. FE2 went on to explain that basically underwriters at ABR were underwriting bridge or construction loans without viable takeouts. FE2 described the Company's underwriting of bridge loans at this time as unrealistic underwriting for Agency loans.

143. When FE11 was asked about red flags related to the Company's underwriting standards, FE11 noted that the agency team did not have access to ABR's bridge loan files. According to FE11, this meant that if they wanted to look at a property that the Company had underwritten, FE11 could not look at their files. This came up when FE11 was looking for comps for properties they were assessing for Agency loans.

144. When discussing ABR's influx in bridge loans completed, FE3 recounted that the sentiment, generally, amongst ABR's asset management team was a lot of deals were high-leverage, aggressively underwritten. FE3 went on to explain that, after attending the Company's weekly asset management meetings (discussed in further detail below), at which this group communicates the status of each transaction, FE3 got the impression that ABR's originators had

been "working the deal" in whatever way necessary to get it done and described the underwriting on these bridge loans as "shoddy".

145. Consequently, Defendants knew, but failed to disclose, that these improper lending practices resulted in bridge loans that were structurally unsound when issued during the years of 2021 and 2022 to a record number of borrowers, in complete disregard of ABR's duty to reasonably evaluate the risks of non-performance and default. As later revealed, had the Company engaged in appropriate underwriting, many of these borrowers would never have qualified for their loans or, at the very least, not on the terms which they were secured.

146. Defendants also knew, but actively concealed from ABR's investors, that the problems the Company faced relating to non-performance and default were even more acute because many of the underlying bridge loans comprising its CLOs were the product of inadequate underwriting, in violation of the representations and warranties made when it securitized the loans. Because of the terms and tranches of the CLOs, ABR was forced to shoulder the burden of the losses associated with the underlying assets' underperformance and borrowers' default, in part, through billions of dollars of loan modifications on less favorable terms. And when modification was not enough, ABR resorted to selling the defaulted loans at a loss or through undisclosed related party transactions to avoid write-downs.

### F. <u>Shifts in Economic and Market Conditions Obliterated ABR's Pipeline and Significantly Increased its Risk of Loss Due to Non-Performance and Default</u>

147. For a time, Defendants' fraudulent misconduct was a success. ABR's loan volume increased, and delinquencies or non-performance rates did not immediately skyrocket. Moreover, as described below, borrowers were able to restructure or modify their loans rather than defaulting. But as the Federal Reserve continued to ratchet interest rates through the better part of 2022, the

Company's floating-rate bridge loans borrowed by inexperienced, overleveraged syndicators on non-stabilized multifamily properties became very expensive, very fast.

148. So, while rising rates provided an excellent income boost for the Company's almost exclusively floating-rate balance sheet portfolio, it concurrently made nearly every single loan in ABR's book unaffordable to the borrowers. As a result, any hopes of property stabilization sufficient to meet agency standards evaporated and borrowers quickly began struggling to make payments, significantly increasing ABR's risk of loss.

149. In 2021, the federal interest rate was 0%. But in an effort to tame inflation, on March 17, 2022, the Federal Reserve raised rates by 0.25%; increased by 0.50% on May 5, 2022; increased by 0.75% on June 16, 2022; and increased by another 0.75% on July 28, 2022. By September 21, 2022, the Federal Reserve had increased interest rates to 3.25%. Then, on November 1, 2022, rates were raised to 4.00%; and to close out the year, rates were raised yet again to 4.50%, on December 13, 2022.

150. With rates reflective of economic and market conditions, in 2021, floating-rate bridge loans offered initial rates as low as 3.5%. But by 2023, bridge loan rates had risen to around 10%. With higher interest rates, property values also decreased due to higher borrowing costs. Indeed, in the two years after their peak in July 2022, commercial real estate property prices fell more than 20%, according to a report generated by the data-firm MSCI Real Assets. At the same time, inflation contributed to higher operating expenses, such as increased insurance premiums and larger maintenance bills, and hindered improvement projects, inhibiting rent increases necessary to keep pace with costs.

151. Internally, signs of trouble stemming from ABR's sub-par lending practices, utilized to originate roughly $14.07 billion in high-risk multifamily bridge loans over the last 18

months, exacerbated by rising interest rates, declining property values, and increased operating expenses quickly began to emerge in the second half of 2022.

152. As an SVP, Structured Asset Management, FE8 described attending the Company's quarterly rating meeting (described in detail below) for the three-month period ended September 30, 2022 ("Q3 2022"), held in October 2022. According to FE8, at this time due to rising interest rates, ABR's Structured portfolio was already experiencing headwinds, which only increased during the next quarter. FE8 noted that because ABR discontinued rate caps on its bridge loans, when the interest rates began to rise, the DSCR and debt yield on these loans declined so much that ABR began encouraging borrowers to seek out rate hedging to purchase a strike price. FE8 explained that out of the roughly 15 to 20 bridge loans remaining in their portfolio at the end of December 2022—loans originated in 2021 or 2022—there was already more than one property behind schedule in terms of turning its units or increasing rents. FE8 also recalled reports from other portfolios showing construction, interest reverses, escrow, taxes, etc., which, according to FE8, already showed properties with an increasing interest reserve balance, and construction reserve balance dropping.

153. An "interest reverse" on a bridge loan is a portion of the loan amount held by a lender to cover interest payments on the loan during the transitional phase of asset. The interest reverse allows a lender to periodically advance loan funds to pay interest charges on the outstanding balance. The purpose of the interest reserve is to ensure that the lender can pay the interest even if the borrower does not have immediate income from the property; this reserve is typically used when a property is not generating enough income to cover the loan payments.

154. A "construction reserve" is a portion of the loan amount held by a lender during a construction or renovation project to cover unexpected costs or potential shortfalls in funding

throughout the building process, ensuring the project can be completed successfully. A construction reserve can be used to make interest payments on the loan while the project is underway. The lender typically holds and manages the construction reserve, disbursing funds as needed. For bridge loans in particular, lenders want to monitor how funds are being utilized because the value of the property securing the loan is heavily dependent upon the completion of the project under the specified development plan. If the borrower is unable to complete the project, and assuming the lender has disbursed the funds correctly, the lender could choose to step in with the remaining funds to finish the project.

155. Likewise, FE12 recalled being on calls with Defendant Kaufman, to discuss the loans in their portfolio, going through the deals that were struggling, and FE12 said that Kaufman would end up calling a lot of these owners to do loan workouts. FE12 explained that ABR was very much pressuring its borrowers by saying, "'If you want a deal done, you have to come current,'" so it would make the Company look good. According to FE12, Defendant Kaufman made it clear to all of the Company's employees that the deals needed to be made current – so for a lot of these deals, they would pull from construction reserves, or other reserves to bring it current.

156. For example, FE12 recalled a deal they worked on in Atlanta, where ABR pulled from the interest reserve to bring it current. FE12 also described a situation where a borrower owed past real estate taxes, and so they shadowed it from another reserve account, to pay real estate taxes, until ABR agreed to a loan restructuring. And then the Company would shadow the money back to where it came from – *i.e.*, the other reserve accounts. FE12 mocked how on the Company's quarterly calls, Defendants would say, "'These people are coming up with money, to get the loan restructured.'"

157. According to FE12, there was a lot of pressure on the Company's asset managers to pressure struggling borrowers so that the underlying loan is not over 90 days delinquent. FE12 explained that when the Company's loans were over 90 days delinquent, the CLOs knew, and it became a big issue. FE12 asserted that the Company makes the loan look better than it is.

158. Similarly, FE6 explained that, during their tenure with the Company (November 2022 to June 2023), as an Analyst, Structured Asset Management, the properties assigned to FE6 were struggling a lot. FE6 described their assigned loan portfolio as made up of distressed properties that were not making money. FE6 went on to explain that a lot of these properties were very unprofitable, and the debt was way too high. FE6 recalled that a decent amount of the properties underlying FE6's loan portfolio were "in the red."

159. FE1 stated that, by the fall of 2022, the Company's Structured pipeline dried up. FE1 recalled doing a couple of in-house refinancings between September 2022 and November 2022 and did no deals at all in December 2022 or January 2023. FE1 went on to explain that beginning 3Q22, the proceeds were cut on all their deals so the sponsor would give more equity. FE1 recounted that at the end of 2022, a lot of underwriters were losing deals because interest rates were too high for how much equity the borrowers had to give; the deals just would not work.

160. FE12 explained that prior to 2023, appraisals were only called for roughly every two years. But, at the height of the downward shift in economic and market conditions, and according to FE12, with ABR's bridge loans really struggling, FE12 claimed that there was a ton of appraisal activity. FE12 explained that this uptick in appraisals was so that the Company could have it in their back pocket, in case loan restructuring was necessary.

161. FE12 went on to state that 1Q24 was a particularly active quarter internally in terms of reassessing its risk ratings to be more favorable for the Company and ABR management pushing

asset managers to push back on reappraisal values to make sure the value did not fall below the loan amount (described in further detail below). According to FE12, everybody was stressed out for sure; that is when FE12 started to see that the Company's balance sheet was getting pretty full with non-performing loans purchased out of its CLOs.

162. The Company's CLO data collected and analyzed by Viceroy Research Group ("Viceroy") confirms that by October 2022 roughly half of the bridge loans pooled under ABR's CLOs were at or below a DSCR of 1x, with a collective average of 0.80x by January 2023:

| Weighted avg NOI DSCR | ARCLO 2021-FL1 | ARCLO 2021-FL2 | ARCLO 2021-FL3 | ARCLO 2021-FL4 | ARCLO 2022-FL1 | ARCLO 2022-FL2 |
|---|---|---|---|---|---|---|
| Apr 2021 | 1.18x | | | | | |
| Jul 2021 | 1.54x | 1.44x | | | | |
| Oct 2021 | 1.30x | 1.68x | 1.47x | | | |
| Jan 2022 | 1.39x | 1.55x | 1.62x | 1.39x | 1.39x | |
| Apr 2022 | 1.33x | 1.46x | 1.53x | 1.35x | 1.34x | 1.30x |
| Jul 2022 | 1.22x | 1.42x | 1.45x | 1.22x | 1.14x | 1.10x |
| Oct 2022 | 1.01x | 1.12x | 1.35x | 0.93x | 0.88x | 0.93x |
| Jan 2023 | 0.82x | 0.76x | 1.09x | 0.72x | 0.64x | 0.76x |
| Apr 2023 | 0.91x | 0.72x | 0.90x | 0.79x | 0.82x | 0.84x |
| Jul 2023 | 0.75x | 0.67x | 0.78x | 0.68x | 0.76x | 0.78x |
| Oct 2023 | 0.66x | 0.59x | 0.64x | 0.57x | 0.62x | 0.64x |

*Figure 5 – Viceroy analysis, data sourced from trustee data*

163. Rather than disclose to investors that ABR faced an increased risk of loss due to its structurally unsound, underperforming bridge loans, Defendants continued to represent that the Company's Structured loans were of superior quality and were not exposed to the declines in value affecting the housing market. At the same time, Defendants continued to emphasize the Company's stated business model of converting its multifamily bridge loans into Agency loans.

164. For example, during ABR's investor conference call to discuss its financial earnings for the fourth quarter and fiscal year ended December 31, 2022, held on February 17,

2023 ("4Q22 Earnings Call"), Defendant Kaufman addressed the economic and market shifts that occurred during the year stating, in relevant part, that:

> We have strategically built our platform to succeed in all cycles, as a result we believe we're extremely well positioned to continue to outperform in this economic downturn. We have been very cognizant over the last 18 months preparing for what we believe would be a very challenging recessionary environment. As a result, we have taken a patient and selective approach to new investment and have been heavily focused on preserving and building up the strong liquidity position. This has allowed us to accumulate over $800 million of cash and liquidity on hand, providing us with the unique ability to remain offensive and take advantage of the many opportunities that will exist in this recession to garner premium yields on our capital.
>
> We are also invested in the right asset class and have strategically positioned ourselves with the appropriate liability structures, highlighted by a significant amount of non-recourse, non-mark-to-market CLO debt with pricing that is well below the current market allowing us to garner premium yields on our assets. As we cannot emphasize enough, especially in the current environment, the importance is having a best-in-class dedicated asset management function and an experienced and tenured executive management team that have a proven track record of successfully operating through multiple cycles, which is why we believe we are in a class by ourselves and have been the best-performing REIT in our space for several years in a row.

165. In the same prepared remarks, when discussing the results for the Company's Agency Business in 4Q22, Kaufman touted that ABR's "pipeline remains strong, giving us confidence in our ability to produce similar volumes in 2023. Additionally, we have a strategic advantage in that we focus on the workforce housing part of the market and have a large multifamily balance sheet loan book that naturally feeds our Agency business."

166. Likewise, during the Question-and-Answer portion of the call, when Mr. Shane asked about "the migration between the Structured Business and the Agency business to the extent historically [ABR] put loans on balance sheet, worked with borrowers to complete the projects and then securitized those or sold them to the agencies" and "how that compares to other commercial mortgage REIT models where the ultimate takeout is in the private term markets as opposed to the government term markets," Kaufman responded by stating, in relevant part, that:

> So as you know, our business model on every bridge loan we do is for an Agency takeout. That's how we're built. That's how we're structured. That's how the economics of the firm really flows, and that's the value of our franchise. So each and every loan that's in our portfolio is underwritten accordingly. … But unlike our competitors, our model is built in that manner. It's multifamily debt. It's Agency eligible. And that's one of the primary exits every time we do a loan.

167. As set forth below, Defendants' continued insistence that ABR's Structured portfolio performed better than the market in general because of its conservative underwriting and asset management practices and continued to support growth in its capital-light Agency Business, producing significant long-dated income streams, was accepted by investors as true yet was demonstrably false.

### G. **<u>Material Weakness in ABR's Internal Controls Concerning Concentration of Credit Risk</u>**

168. The policies, procedures, and internal controls used by the Company were specifically employed by Defendants to conceal the problems created by ABR's high-risk bridge loans. Defendants also repeatedly reported throughout the Class Period that they had sufficiently tested and appropriately attested to the operational effectiveness of the Company's internal controls. But internal controls cannot be considered effective where a material weakness exists. Here, ABR's internal controls regarding its risk rating system and LTV ratios were broken. Defendants set policies and implemented practices that improperly took advantage of that material weakness to keep the Company's risk of loss from surfacing throughout the Class Period.

169. Throughout the Class Period, Defendants repeatedly assured investors that ABR was carefully monitoring the performance of its Structured loan portfolio. Such monitoring was critical because sudden losses or collateral deterioration would undermine ABR's capital cushion, as well as its credibility. The Company stated as much.

170. According to ABR's SEC filings, "[a] critical component of [the Company's] strategy is [its] ability to manage the real estate risks associated with [ABR's] investment portfolio. We actively manage the credit quality of our portfolio by using the expertise of our asset management group, which has a proven track record of structuring and repositioning investments to improve credit quality and yield."

171. When discussing "Asset Management," ABR's FY21 10-K provided that:

> Effective asset and portfolio management is essential to maximize the performance and value of a real estate investment. The asset management group customizes a plan with the loan originators and underwriters to track each investment from origination through disposition. This group monitors each investment's operating history, local economic trends and rental and occupancy rates and evaluates the underlying property's competitiveness within its market. This group assesses ongoing and potential operational and financial performance of each investment in order to evaluate and ultimately improve its operations and financial viability. The asset management group performs frequent onsite inspections, conducts meetings with borrowers and evaluates and participates in the budgeting process, financial and operational review and renovation plans of each underlying property. This group also focuses on increasing the productivity of onsite property managers and leasing brokers. This group communicates the status of each transaction against its established asset management plan to senior management, in order to enhance and preserve capital, as well as to avoid litigation and potential exposure.
>
> Timely and accurate identification of an investment's operational and financial issues and each borrower's objectives is essential to implementing an executable loan workout and restructuring process, if required. Since the existing property management may not have the requisite expertise to manage the workout process effectively, our asset management group determines the current operating and financial status of an asset or portfolio and performs a liquidity analysis of the property and ownership entity and then, if appropriate, identifies and evaluates alternatives to maximize the value of an investment.

172. FE3 recalled weekly asset management meetings attended by every asset manager assigned to the Structured Business – approximately ten individuals managing their own portfolio of loans; all asset management AVPs (including FE3) and SVPs; and Mr. Reis.

173. ABR also told investors it maintained an internal risk rating system for its loans. According to SEC filings, the Company "assign[s] a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a passing rating being the

lowest risk and a doubtful rating being the highest risk." ABR's purported internal controls required that "[a]ll portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed…" and the Company would assign ratings based on DSCRs, LTVs, market factors, sponsor strength, and other items. The first three ratings ("pass," "pass/watch," and "special mention") indicated no performance risk or issues tied to the collection of interest and principal with the loan or investment. A risk rating of "substandard" indicated that a loan may require a modification of some kind, while a rating of "doubtful" indicated ABR expected the loan to underperform over its term, and there could be loss of interest and/or principal.

174. Additionally, for each of the Company's Structured investment portfolios, ABR provided a weighted average of its Last Dollar LTV Ratio. According to SEC filings, the "Last Dollar LTV Ratio" is calculated by comparing the total of the carrying value of the Company's loan and all senior lien positions within the capital stack to the fair value of the underlying collateral to determine the point at which ABR will initially absorb a loss.

175. LTV ratios increase when the loan amount is relatively larger compared to the property's appraised value, which can happen due to factors like making a smaller down payment, a lower property appraisal value, or a higher purchase price for the property. As discussed in Section V.E., *supra*, the accounts of multiple former employees confirm that, Defendants falsified and/or manipulated the property appraisals for multifamily assets, particularly when originating bridge loans during the years of 2021 and 2022, so they would purport to comply with the Company's underwriting policies, resulting in unreasonably high property valuations and purchase prices. For a time, these improper lending practices artificially reduced ABR's reported LTV ratios, boosting the Company's book valuation. However, as discussed in Section V.F., changes in

economic and market conditions beginning in 2022 and continuing through the remainder of the Class Period significantly strained ABR's artificially low LTV ratios.

176. FE12 explained that during 2023, with rents and values decreasing, the Company's asset management team focused heavily on ensuring that the value of underlying asset did not go below the loan amount. FE12 recalled that, during this time, there was definitely more pushing with the appraisers to get property values up. FE12 described this practice of pushing back on property appraisal as common knowledge amongst the Company's asset management team. Specifically, FE12 stated that whenever the Company got an appraisal, it was known that asset manager had to "dive in" to make sure that they got the value the Company was looking for.

177. While FE12 acknowledged that pushback on an appraiser's initial numbers could sometimes be carried out in good faith, FE12 recalled frequently observing efforts to manipulate numbers in ABR's favor. FE12 said the appraisers would totally change comps around and assumptions around when pushed by the Company's employees. FE12 described it as amazing and a little shocking, how much they could get the appraisers to move the property valuations around.

178. FE12 recounted that Company management, including Team Lead, Gina Osborn, would instruct asset managers to seek out the same appraiser that assisted during the underwriting process. FE12 explained that they would get the appraisal back, then email the appraiser questions and go back and forth, until they got the number the Company wanted. According to FE12, some appraisers would push back more than others, while others would just come out and ask, 'What's the value you want?' FE12 said they would try to have email traffic, to make it seem like the appraisal was all good. After Mr. Sarube's announcement that ABR would no longer be working with BBG in February or March 2024, FE12 recalled that by the end of the first quarter of 2024, they observed more discussion and openness about needing to push back on appraisals.

179. FE12 explained having regular discussions with Ms. Osborn, Colin Chaudhuri, VP and Head of Valuations and Asset Management, and Sarah Brinkman, VP, Structured Asset Management, regarding the appraisals received and pushing back for a better value. FE12 recalled one particularly egregious instance involving, Ms. Osborn and Ms. Brinkman, when the initial appraisal came back for an Atlanta, Georgia property owned by Generations Property Owner LLC. Ogborn and Brickman told FE12, "'You need to go back and change that appraisal.'" FE12 recalled thinking the appraisal seemed low, but they knew the borrower was not going to pay. FE12 explained that the underlying asset was not going through any value-add.

180. FE12 went on to explain that this loan was one that ABR originated when it was just churning out loans left and right – referring to the influx in bridge loan activity during FY21 and the first half of FY22. And while property values were on the decline across the board, FE12 stated this loan in particular was one that FE12 knew the Company was definitely pushing the value for on reappraisal. According to FE12, the value of Generations Atlanta was below the $100 million valuation stated by the Company. FE12 said that this was one of the loans that they knew ABR was pushing up so it would not get impaired.

181. FE12 also noted emergency calls on the weekend, where Defendant Kaufman wanted to talk about Generations Atlanta. Together with Mr. Reis and Mr. Sarube, FE12 and Defendant Kaufman would discuss FE12's asset portfolio, particularly Generations, and maybe three other assets. FE12 recalled that Defendant Kaufman would have his own opinions and conservations regarding the properties, and during these emergencies calls, they would share their thoughts on what direction they would want to go in.

182. FE12 further detailed how this loan was one that was bought out of the Company's CLO and put on its balance sheet portfolio due to non-performance. FE12 explained that in 4Q23,

ABR thought it might be able to work out a restructuring or modification, but by the next quarter it was clear that the loan was going to default. According to a Viceroy report issued on September 3, 2024, Generations Atlanta last appeared in the Company's CLO in May 2024, at which point ABR purported that the outstanding principal for a $60.6 million loan collateralized by Generations Atlanta was collected—*i.e.*, purchased out by ABR to hold on its balance sheet.

183. On September 3, 2024, the real estate news outlet, The Real Deal, reported that Generations Atlanta, a 336-unit apartment complex, was facing foreclosure after the property's owner defaulted on a $104.4 million loan originated by ABR. The foreclosure notice stated that the borrower did not make debt service payments for March, April, and May of 2024, and failed to maintain a $7.4 million reserve. The complex made news headlines in July 2024 when its residents went days without running water after a water main break in the city, Fox5 Atlanta reported. The Real Deal article goes on to state that the property was purchased in 2021 for $126.9 million, making it the submarket's largest multifamily sale.

184. According to FE3, asset managers would, on average, review the loans in their assigned portfolio once a month, when borrowers submitted monthly financial statements. Based on their review, asset managers would assign a risk rating to each loan, which was then submitted to the supervising VP and team, who would make overrides or adjustments, as deemed appropriate. FE3 explained that sometimes there were "legitimate" reasons to adjust the assigned ratings. For example, FE3 said that ABR did not want too much of a swing to valuation, good or bad, so just because it may have a good quarter that does not mean sustained improvement to the property.

185. FE3 explained that each month the VPs and team would present each loan rating to Mr. Reis and other executive and/or senior officers, including members of ABR's finance team. In addition to the monthly rating meetings, FE3 described quarterly meetings attended by the entire

Structured team, such as asset management, underwriters, finance, etc., at which Defendants Kaufman and Elenio would also be in attendance. FE3 stated that a couple of days prior to the quarterly meetings, Kaufman and Elenio would receive an Excel spreadsheet with proposed ratings and valuations for each of the Structured loans.

186. FE3 stated that there was consistent pressure from "the top" on the VPs and team to look for ways to override loan ratings assigned by asset managers to skew the rating to a more favorable outcome for ABR's overall book valuation. FE3 recounted that on numerous occasions, during meetings with Mr. Reis and the other members of ABR's executive team, including Kaufman and Elenio, the VPs and team would present them with a loan rating that, according to FE3, the executive team did not like and, as a result, they would look for ways to override the proposed ratings. According to FE3, loan ratings skewed optimistic across the board.

187. FE12 described their experience with the Company's risk rating system and interactions with ABR management during the quarterly rating meetings. According to FE12, the Company's rating system spits out a number, and then the asset managers go back and put in their assumptions based on their review of the asset. FE12 recalled arguing with ABR management, including Mr. Sarube, during the Company's quarterly rating meetings about the risk rating assigned, where FE12 would say what the algorithm generated, to which management would respond with well, "'I say this.'"

188. FE12 also recounted that there were definitely some quarterly rating meetings, including the meeting that occurred during 1Q24, where Mr. Sarube would explicitly say the Company has too many high ratings, so we are going to lower this, lower that—referring to lowering risk ratings assigned to loans. FE12 recalled that one of the loans Mr. Sarube chose to lower the risk rating during the 1Q24 quarterly meeting was the bridge loan for Generations

Atlanta. FE12 described thinking this decision was definitely weird because, at the time, it was clear based on the conditions of this loan that restructuring was not an option and Generations Atlanta was definitely going into foreclosure. FE12 questioned why lower its risk rating when the Company is just going to need to raise it?

189. Though FE7 did not attend the quarterly rating meetings with the Structured loan teams, FE7 could confirm that those in attendance at these meetings, including Kaufman and Elenio, went through each of ABR's individual loans' ratings and valuations because, according to FE7, the Company's finance team (including FE7) prepared questions to be asked during the meeting based on prior meetings held with corporate officers, internal auditors, and third-party auditors. FE7 explained that there would be prior meetings, leading up to the quarterly rating meeting, which FE7 also referred to as risk rating meetings, where FE7 would walk through the Company's loan ratings with its internal auditors, asset management leadership within accounting, third-party auditors, Mr. Reis, Mr. Friedman, and Defendant Elenio.

190. The chart below, generated and shared by Viceroy on February 21, 2024, depicts the risk ratings of ABR's multifamily asset portfolio from 1Q20 through 4Q23. Notably, between 3Q22 and 2Q23, when FE6 and FE8 described the Company's loan book as underperforming or "in the red" and indicated that ABR was pulling on reserves to cover payments, ABR recorded 0.7% to 4% of its loan book as "substandard" and a mere 0.1% as "doubtful" only in 2Q23.




| | Q1-2020 | Q2-2020 | Q3-2020 | Q4-2020 | Q1-2021 | Q2-2021 | Q3-2021 | Q4-2021 | Q1-2022 | Q2-2022 | Q3-2022 | Q4-2022 | Q1-2023 | Q2-2023 | Q3-2023 | Q4-2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % Doubtful | 0.0% | 0.0% | 0.0% | 0.4% | 0.3% | 0.3% | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.2% | 0.3% |
| % Substandard | 5.1% | 2.6% | 3.7% | 3.3% | 3.1% | 2.8% | 1.9% | 1.1% | 0.5% | 0.5% | 0.7% | 2.6% | 3.2% | 4.0% | 4.0% | 6.9% |
| % Special mention | 28.2% | 22.8% | 22.0% | 28.7% | 25.5% | 21.5% | 15.7% | 9.8% | 12.6% | 26.1% | 35.3% | 31.2% | 35.2% | 39.8% | 38.8% | 42.7% |
| % Pass/Watch | 33.8% | 49.6% | 48.0% | 42.1% | 41.0% | 34.0% | 36.6% | 27.8% | 30.6% | 49.0% | 59.3% | 56.8% | 54.5% | 50.5% | 54.0% | 48.3% |
| % Pass | 33.0% | 25.0% | 26.3% | 25.4% | 30.1% | 41.4% | 45.7% | 61.3% | 56.3% | 24.4% | 4.7% | 9.5% | 7.0% | 5.6% | 3.0% | 1.7% |

191. Then, on May 3, 2024, *after* multiple reporting by Viceroy describing ABR's Structured portfolio as "distressed" and detailing numerous non-performing or delinquent loans (described in detail below), the Company filed its quarterly report for the three-month period ended March 31, 2024 with the SEC on Form 10-Q ("1Q24 10-Q") which provided, in relevant part, a summary of the loan portfolio's internal risk ratings by asset class at March 31, 2024, classifying $174.24 million of unpaid balance ("UPB") on multifamily loans originated in 2021, as "doubtful", as compared to the $13.93 million at December 31, 2023, representing a 92% increase quarter-over-quarter.

192. Accordingly, Defendants knew of the scope of the problems associated with the failures of the Company's internal controls concerning its concentration of risk, particularly for those multifamily bridge loans originated during the years 2021 and 2022. While the Company's policies and practices that were supposed to ensure that the assigned ratings and reported LTV

ratios were correct and accurate, that the Company could adequately determine its concentration of risk, those very policies and practices were ripe for manipulation, allowing Defendants to conceal the true nature and strength of ABR's loan book. Throughout the Class Period, Defendants concealed from the public this material weakness in ABR's internal controls, and these underlying problems regarding its risk ratings and LTV ratios.

### H. Material Weakness in ABR's Internal Controls Over the Reporting of Non-Performing Loans

193. In addition to the material weaknesses in ABR's internal controls concerning its risk ratings and LTV ratios, the controls used by the Company for reporting its non-performing loans were specifically employed by Defendants to conceal the problems created by ABR's high-risk bridge loans.

194. During the Class Period, ABR included in its SEC filings under its "Allowance for Credit Losses" section, specifically from its Form 10-Q for 1Q21 (filed on May 7, 2021) to its Form 10-Q for 2Q23 (filed on July 28, 2023), "a summary of our non-performing loans by asset class [] as follows (in thousands):"

| | March 31, 2021 | | | December 31, 2020 | | |
|---|---|---|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Student Housing | $ 36,500 | $ — | $ 36,500 | $ 36,500 | $ — | $ 36,500 |
| Multifamily | 17,700 | — | 17,700 | 17,700 | — | 17,700 |
| Healthcare | 4,625 | — | 4,625 | 4,625 | — | 4,625 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Retail | 920 | — | 920 | 920 | — | 920 |
| Office | 880 | — | 880 | 880 | — | 880 |
| Total | $ 62,325 | $ — | $ 62,325 | $ 62,325 | $ — | $ 62,325 |

195. At no point between May 7, 2021 and July 28, 2023, did ABR provide any other defining characteristics of "non-performing loans" in its SEC filings beyond those provided in the chart above. Based on the chart's column headers, the Company appeared to classify its "non-

performing loans" based length of time past due—specifically, "Less Than 90 days Past Due" or "Greater Than 90 days Past Due."

196. During the Class Period, ABR recorded its first "Less Than 90 Days Past Due" non-performing loans for the multifamily asset class, when reporting its 2Q23 results, in the amount of $116.69 million.

| | June 30, 2023 | | |
|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Multifamily | $ 119,291 | $ 116,686 | $ 2,605 |
| Retail | 3,445 | — | 3,445 |
| Commercial | 1,700 | — | 1,700 |
| Total | $ 124,436 | $ 116,686 | $ 7,750 |

197. During the Company's investor conference call to discuss its financial results for the three-month period ended June 30, 2023, held on July 28, 2023 ("2Q23 Earnings Call"), analyst Steven Cole Delany, JMP Securities LLC, asked about the Company's "3 new NPLs, all multifamily," inquiring as to they were "3 loans to 3 distinct borrowers," to which Defendant Elenio responded, in relevant part:

> So we did have 3 new non-performing loans during the quarter on our balance sheet totaling about over $116 million. They were all to different borrowers. Two of the properties were in the Houston, Texas, area and the other was in the Atlanta, Georgia, area. I've gone -- the deals have gone 60 days delinquent this quarter, but that's kind of the geographics and the borrowers were all different borrowers.

198. Then, on October 27, 2023, ABR filed with the SEC its quarterly report for the three-month period ended September 30, 2023 on Form 10-Q ("3Q23 10-Q"), at which point, the Company provided that: "Loans are classified as non-performing once the contractual payments ***reach*** 60 days past due" (emphasis added). However, the chart summarizing non-performing loans by asset class, maintained the column header of "Less Than 90 Days Past Due."

| | September 30, 2023 | | | |
|---|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB |
| Multifamily | $ 152,717 | $ 122,847 | $ 29,870 | $ 2,605 |
| Retail | 3,445 | — | 3,445 | 3,445 |
| Commercial | 1,700 | — | 1,700 | 1,700 |
| Total | $ 157,862 | $ 122,847 | $ 35,015 | $ 7,750 |

199. On February 20, 2024, ABR filed with the SEC its annual report for the fiscal year ended December 31, 2023 on Form 10-K ("FY23 10-K"), providing for the first time a separate section for "Non-performing and Other Non-accrued Loans." Under this new section, the Company provided that: "Loans are classified as non-performing once the contractual payments ***exceed*** 60 days past due" (emphasis added). The corresponding summary chart maintained the column header of "Less Than 90 Days Past Due" but did not indicate any qualifying non-performing loans.

| | December 31, 2023 | | |
|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Multifamily | $ 271,532 | $ — | $ 271,532 |
| Commercial | 1,700 | — | 1,700 |
| Retail | 920 | — | 920 |
| Total | $ 274,152 | $ — | $ 274,152 |

200. Rather in a comment below ABR provided that: "In this challenging economic environment, we have recently experienced late and partial payments on certain loans in our structured portfolio. At December 31, 2023, these loans included twenty-four multifamily bridge loans with an aggregate [unpaid principal balance] UPB of $956.9 million that were 60 days or less past due."

201. However, as discussed below, the FY23 10-K continued to mislead investors as the $956.9 million figure only related to delinquencies between 30 and 60 days, excluding any loans that were considered delinquent within the first 30 days of non-performance.

202. Notably, the Company filed its FY23 10-K *after* the Viceroy November 16, 2023 and December 5, 2023 reports (detailed below) revealing that the majority of ABR's loan book was distressed and that significant portion its multifamily bridge loans were already delinquent or non-performing. In addition, Viceroy issued an update on ABR's December 2023 CLO performance on December 23, 2023. In this report, Viceroy provided the following chart showing that the Company's CLO data conflicted with its public reporting of non-performing loans.

| # of Delinquent Loans Total | ARCLO 2021-FL1 | ARCLO 2021-FL2 | ARCLO 2021-FL3 | ARCLO 2021-FL4 | ARCLO 2022-FL1 | ARCLO 2022-FL2 | All deals |
|---|---|---|---|---|---|---|---|
| Jan 2023 | 2 | 2 | 1 | 3 | 0 | 0 | 8 |
| Feb 2023 | 0 | 1 | 1 | 4 | 2 | 0 | 8 |
| Mar 2023 | 2 | 1 | 0 | 4 | 2 | 0 | 9 |
| Apr 2023 | 2 | 1 | 1 | 3 | 1 | 0 | 8 |
| May 2023 | 2 | 1 | 3 | 2 | 3 | 1 | 12 |
| Jun 2023 | 2 | 2 | 3 | 2 | 2 | 0 | 11 |
| Jul 2023 | 6 | 2 | 3 | 3 | 4 | 0 | 18 |
| Aug 2023 | 5 | 2 | 4 | 4 | 6 | 2 | 23 |
| Sep 2023 | 4 | 2 | 7 | 5 | 4 | 2 | 24 |
| Oct 2023 | 8 | 2 | 9 | 5 | 5 | 4 | 33 |
| Nov 2023 | 11 | 5 | 11 | 7 | 8 | 4 | 46 |
| **Dec 2023** | **15** | **4** | **12** | **19** | **13** | **6** | **69** |
| *m/m change* | *36.36%* | *-20.00%* | *9.09%* | *171.43%* | *62.50%* | *50.00%* | *50.00%* |

*Figure 1 – Viceroy Analysis from CLO trustee data*

203. For instance, according to Viceroy, in March 2023, the Company had nine delinquent loans in its CLOs. Comparatively, when reporting its financial results for 1Q23, the Company reported that at March 31, 2023, ABR had "four non-performing loans with a carrying value of $7.7 million, before related loan loss reserves of $5.1 million, which was unchanged from December 31, 2022." The chart above indicates that in June 2023, the Company had eleven delinquent loans, while the Company reported that, at June 30, 2023, it had only seven non-performing loans with a carrying value of $122.4 million. Viceroy reported that, in September 2023, ABR had twenty-four delinquent loans. When reporting its financial results for 3Q23, the

Company reported that, at September 30, 2023, it had "twelve non-performing loans with a carrying value of $137.9 million."

204. Likewise, according to Viceroy's reporting, in December 2023, the Company had sixty-nine delinquent loans. ABR, however, reported in its FY23 10-K that, "[a]t December 31, 2023, sixteen loans with an aggregate net carrying value of $235.6 million, net of related loan loss reserves of $27.1 million, were classified as non-performing" and "twenty-four multifamily bridge loans with an aggregate UPB of $956.9 million that were 60 days or less past due."

205. Questions surrounding the Company's misleading reporting of non-performing loans came to a head during ABR's investor conference call to discuss its financial results for the fourth quarter and fiscal year ended December 31, 2023, held on February 16, 2024 ("4Q23 Earnings Call"). For example, Defendant Elenio engaged with analyst Richard Barry Shane, JPMorgan Chase & Co., during the Question-and-Answer portion of this call as follows:

> **Richard Barry Shane JPMorgan Chase & Co, Research Division – Senior Equity Analyst**: Ivan [Kaufman], you talked and Paul [Elenio], you referenced the delinquency data. I believe that's related to the CLO, which I estimate it represents about 2/3 of the assets. If we look at -- if that's the correct description, if we look at the overall portfolio, can you provide the delinquency statistics for the total portfolio, not just the CLO?
>
> **Paul Anthony Elenio Arbor Realty Trust, Inc. – Executive VP & CFO**: Okay. So Rick, you're correct. What I was referring to was on the CLOs, because I thought that was the question that people were asking from the short report. What we do have now, we don't have it out yet. And when we file our [10-K], it will be there is we have the 60-day-plus delinquencies, which is my nonperforming loans. But there are some loans that I mentioned in my commentary that we're 30 or inside of 30 days delinquent that we conservatively just chose not to accrue at year-end. I don't have that number with me now, but that number will be in our filings. And so you can take those numbers and extrapolate it to the overall portfolio to get the delinquency rate, if that's what you're looking to do.
>
> **Richard Barry Shane JPMorgan Chase & Co, Research Division – Senior Equity Analyst**: Got it. So is there a difference between the 60-day delinquencies in the CLO that you cited in the 60-day delinquencies, I'm going to call it the managed portfolio, because that's how we would think about it. Is there a difference there?

**Paul Anthony Elenio Arbor Realty Trust, Inc. – Executive VP & CFO**: No. So the non-performing loans that are disclosed in our filing today of $262 million are all our loans, whether they're in the CLO or not, that are over 60 days delinquent. So that's the crossover. What we gave you today was numbers on what 30-plus day delinquent in our CLOs. But what you don't have is the 30-plus delinquent in the total portfolio, although it's not substantively different, because, as you said, most of the loans are in the vehicles.

206. Viceroy issued a follow up report on February 21, 2024 highlighting Defendants' inconsistencies when it comes to defining delinquent and non-performing loans. The report provided a recap of ABR's February 2024 CLO data, which according to Viceroy showed that Defendants continued to provide misleading information concerning the status of ABR's multifamily loans, whether it be considered a delinquent loan or non-performing loan.

207. Then, on May 3, 2024, the Company filed its quarterly report for the three-month period ended March 31, 2024 with the SEC on Form 10-Q ("1Q24 10-Q"), at which point ABR separated its "Non-performing Loans" and "Other Non-accrued Loans" into distinct sections and modified the chart summarizing its non-performing loans by asset class.

208. As defined in the Company's FY23 10-K, the 1Q24 10-Q provided that "Loans are classified as non-performing once the contractual payments exceed 60 days past due." However, the summary chart now included the column header "61-90 Days Past Due" as opposed to "Less Than 90 Days Past Due."

| | March 31, 2024 | | |
|---|---|---|---|
| | UPB | 61 - 90 Days Past Due | Greater Than 90 Days Past Due |
| Multifamily | $ 462,207 | $ — | $ 462,207 |
| Commercial | 1,700 | — | 1,700 |
| Retail | 920 | — | 920 |
| Total | $ 464,827 | $ — | $ 464,827 |

209. Under the "Other Non-accrued Loans" section, the Company provided that: "In this challenging economic environment, we have recently experienced late and partial payments on certain loans in our structured portfolio. At March 31, 2024 and December 31, 2023, these loans

included twelve and twenty-four multifamily bridge loans with a total UPB of $489.4 million and $956.9 million, respectively, that were 60 days or less past due."

210. During the Company's investor conference call to discuss the financial results of the three-month period ended March 31, 2024 ("1Q24 Earnings Call"), Defendant Elenio addressed the "confusing" commentary regarding the Company's non-performing and delinquent loans during the 4Q23 Earnings Call and explained ABR's new "bucket" of non-accrued loans. Specifically, during the Question-and-Answer portion of the call, Elenio engaged with analyst Richard Barry Shane, JP Morgan Chase & Co as follows:

> **Richard Barry Shane JPMorgan Chase & Co, Research Division – Senior Equity Analyst**: Of the $1.9 billion in mods during the quarter, I'm curious how much were loans that were less than 60 days delinquent and how much were on loans more than 60 days delinquent. And what -- of the $1.9 billion, how much were in the CLOs?
>
> **Paul Anthony Elenio Arbor Realty Trust, Inc. – Executive VP & CFO**: Yes. So let me give some numbers, Rick. Appreciate the question. So as I said in my prepared remarks, out of the $1.9 billion we modded, $1.1 billion of them, we modded with some form of rate relief. But out of the $1.9 billion, $713 million of those loans were less than 60 days delinquent and we warrant accruing from the prior quarter. Another I think, $40 million of loans were loans that were non-performing that we were able to modify, take out of our non-performing bucket, although new loans came in. So that's the bucket of how we look at the modifications.
>
> As far as how many were in the CLO, I don't have that here, because I tried to give you guys numbers I think we got a little bit off track last quarter talking about CLO delinquencies and I think what people care about is total delinquencies, whether they're in the CLO or not, and that's what we're giving you, which is that $954 million I disclosed today. $464 [million] in non-performing that are greater than 60 and $4[8]9 [million] that are less than 60, which is all inclusive of loans, whether they're in the CLOs, on our balance sheet and our warehouse lines. I can't tell you exactly, but I would say the majority of those loans were probably in the CLOs because the bulk of our loans are financed in the CLOs.
>
> **Richard Barry Shane JPMorgan Chase & Co, Research Division – Senior Equity Analyst**: Got it. Yes, that makes sense. And again, I do -- I would agree with you that the commentary last quarter was confusing, and I think everybody spent a lot of time trying to parse it out. So I appreciate you trying to put it in sort of a clearer context this quarter. I would – it's interesting is you've been providing this in some of the detail. I've been trying to tie it out to what's stated either in the

> press release or the 10-Q. And some of it's there, some of it's not. It would be great if on a go-forward basis, we could see that because it's just a lot easier to sort of match up if we can see it and print and understand what's going on there.
>
> **Paul Anthony Elenio Arbor Realty Trust, Inc. – Executive VP & CFO**: Rick, to that comment in the press release, it's a little bit less disclosure. But in the Q, it's very robust. And I think tell me if I'm wrong, when you reread it, that when we do talk about the buckets of loans we modded, we have 3 buckets in the Q. And in there, you'll see a subset of the loans is the $713 million that were less than 60. So I tried to roll it forward to you guys basically saying, 'Hey, we had $957 million of loans that were less than 60 days. That's our nonaccrual bucket that's in the Q. That's now at $4[8]9 [million] and how you get there is $175 million loans moved up, $713 loans were modded and $420 million loans were added,' and I did the same for the non-performing bucket. So I do think it's all there. We can have a discussion offline after you read it again, you don't think that's correct. Happy to take any suggestions on how to improve the disclosure, but we tried real hard to be very transparent so everybody could follow the numbers.

211. Accordingly, Defendants knew of the scope of the problems associated with the failures of the Company's controls for reporting non-performing loans, particularly for those originated during the years 2021 and 2022. These material weaknesses allowed Defendants to conceal the true nature and strength of ABR's loan book. Throughout the Class Period, Defendants concealed from the public this material weakness in internal controls, and these underlying risks regarding its delinquent or non-performing loans.

212. After the Class Period, on August 6, 2024, the Company filed its quarterly report for the three-month period ended June 30, 2024 with the SEC on Form 10-Q ("2Q24 10-Q"), which provided further clarity regarding the inadequacies of ABR's prior reporting of non-performing loans. Specifically, the summary chart of non-performing loans by asset class now only included one column, titled "Greater Than 60 Days Past Due."

| | June 30, 2024 | | December 31, 2023 | |
|---|---|---|---|---|
| | UPB | Greater Than 60 Days Past Due | UPB | Greater Than 60 Days Past Due |
| Multifamily | $ 673,630 | $ 673,630 | $ 271,532 | $ 271,532 |
| Commercial | 1,700 | 1,700 | 1,700 | 1,700 |
| Retail | 920 | 920 | 920 | 920 |
| Total | $ 676,250 | $ 676,250 | $ 274,152 | $ 274,152 |

213. Further, in the 2Q24 10-Q, the Company now provided "a summary of those loans that are 60 days past due or less that we have classified as non-accrual, and changes to those loans for the period presented (in thousands)."

| | Three Months Ended June 30, 2024 | Three Months Ended March 31, 2024 |
|---|---|---|
| Beginning balance (twelve and twenty-four multifamily bridge loans, respectively) | $ 489,438 | $ 956,917 |
| Loans that progressed to greater than 60 days past due | (263,990) | (174,860) |
| Loans modified or paid off (1) | (138,548) | (712,922) |
| Additional loans that are now less than 60 days past due experiencing late and partial payments | 281,038 | 420,303 |
| Ending balance (fourteen and twelve multifamily bridge loans, respectively) | $ 367,938 | $ 489,438 |

## I. Defendants' Violations of Accounting Rules and Regulations

214. Throughout the Class Period, the Company issued financial statements that were materially misstated and not presented in accordance with current Generally Accepted Accounting Principles ("GAAP"). ABR overstated its net income by understating its current expected credit loss ("CECL") allowance. Defendants Kaufman and Elenio also repeatedly signed management certifications regarding ABR's financial statements and the adequacy of its internal controls, detailed in Section VII.A., *infra*, which were materially false and misleading as these sworn certifications concealed ABR's violations of GAAP.

215. GAAP is recognized by the accounting profession as conventions, rules and procedures necessary to define accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (FASB). SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP will be presumed misleading, despite footnotes or other disclosures.

216. On January 1, 2020, the Company adopted FASB Accounting Standards Update ("ASU") 2016-13, Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments ("ASU 2016-13"), which utilizes a current expected credit loss

methodology (CECL) for the recognition of credit losses for the Company's structured loans and investments, held-to-maturity debt securities and its loss-sharing obligations related to the Fannie Mae DUS program, at the time the financial asset is originated or acquired.

217. According to SEC's Staff Accounting Bulletin ("SAB") No. 119, providing guidance on the agency's interpretation of FASB ASC Topic 326, the allowance for credit losses is an estimate of current expected credit losses considering available information relevant to assessing collectability of cash flows over the contractual term of the financial asset. Information considered relevant to establishing a CECL allowance includes historical credit loss experience on financial assets with similar risk characteristics, current conditions, and reasonable and supportable forecasts that affect the collectability of the remaining cash flows over the contractual term of the financial assets.

218. According to SAB No. 119, public companies are required to report in net income (as a credit loss expense) the amount necessary to adjust the allowance for credit losses and liabilities for credit losses on off-balance-sheet credit exposures for management's current estimate of expected credit losses.

219. Defendants violated GAAP by manipulating and artificially increasing the Company's reported net income by not recording sufficient or reasonable CECL allowance based on ABR's substantial deviation from its underwriting guidelines, providing structurally unsound high-risk bridge loans to persons with inferior credit quality that could be expected to default.

220. Because Defendants caused the Company's employees to deviate from ABR's stated underwriting guidelines when originating floating-rate bridge loans, particularly during FY21 and the first half of FY22, Defendants should have substantially increased the Company's CECL allowance at the same time. This did not happen.

221. As reflected in the chart below, the Company reduced or nominally added to its credit loss allowance during this critical period. Further, despite a growing number of non-performing loans ("NPLs") during the second half of the Class Period, ABR maintained significantly lower CECL allowances in percentage proportion to its reported NPLs.

| Reporting Period | Provision for Losses | Total CECL | Total Structured Portfolio | NPLs | CECL as a % of NPLs |
|---|---|---|---|---|---|
| ($ in millions) | | | | | |
| 2Q20 | $10.6 | $152.8 | $4,970 | $60.5 | 252.56% |
| 3Q20 | ($6.1) | $146.7 | $5,100 | $62.9 | 233.23% |
| 4Q20 | $1.7 | $148.3 | $5,480 | $60.3 | 245.94% |
| 1Q21 | ($1.02) | $147.3 | $6,260 | $60.3 | 244.28% |
| 2Q21 | ($8.3) | $138.4 | $7,390 | $84.0 | 164.76% |
| 3Q21 | ($4.1) | $131.5 | $9,170 | $55.6 | 236.51% |
| 4Q21 | ($10.3) | $113.2 | $12,160 | $22.7 | 498.68% |
| 1Q22 | $3.1 | $116.4 | $14,170 | $25.2 | 461.90% |
| 2Q22 | $4.9 | $121.3 | $15,030 | $25.2 | 481.35% |
| 3Q22 | $1.0 | $122.3 | $14,990 | $24.2 | 505.37% |
| 4Q22 | $10.3 | $132.6 | $14,460 | $7.7 | 1,722.08% |
| 1Q23 | $20.5 | $153.1 | $13,640 | $7.7 | 1,988.31% |
| 2Q23 | $16.0 | $169.1 | $13,490 | $122.4 | 138.15% |
| 3Q23 | $15.0 | $184.1 | $13,120 | $137.9 | 133.50% |
| 4Q23 | $17.3 | $195.7 | $12,620 | $1,231.1 | 15.90% |
| 1Q24 | $17.8 | $211.9 | $12,520 | $954.2 | 22.21% |
| 2Q24 | $28.9 | $238.9 | $11,870 | $1,044.1 | 22.88% |

222. Notably, during the Class Period, the CECL allowances in percentage proportion to NPLs would have been significantly lower had ABR properly reported all NPLs, as described in Section V.H., *supra*, particularly in times of confirmed delinquency or non-performance .

223. Consequently, by overstating the Company's net income during the Class Period, Defendants also artificially inflated its non-GAAP financial measure of distributable earnings. According to the Company's SEC filings, ABR provides distributable earnings because "it is an

important supplemental measure of our operating performance and is useful to investors, analysts and other parties in the evaluation of REITs and their ability to provide dividends to stockholders." The Company goes on to state, in relevant part:

> Dividends are one of the principal reasons investors invest in REITs. To maintain REIT status, REITs are required to distribute at least 90% of their REIT-taxable income. We consider distributable earnings in determining our quarterly dividend and believe that, over time, distributable earnings is a useful indicator of our dividends per share.
>
> We define distributable earnings as net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as depreciation and amortization (adjusted for unconsolidated joint ventures), non-cash stock-based compensation expense, income from MSRs, amortization and write-offs of MSRs, gains/losses on derivative instruments primarily associated with Private Label loans not yet sold and securitized, the tax impact on cumulative gains/losses on derivative instruments associated with Private Label loans sold during the periods presented, changes in fair value of GSE-related derivatives that temporarily flow through earnings, deferred tax (benefit) provision, CECL provisions for credit losses (adjusted for realized losses as described below) and amortization of the convertible senior notes conversion option. We also add back one-time charges such as acquisition costs and one-time gains/losses on the early extinguishment of debt.
>
> We reduce distributable earnings for realized losses in the period we determine that a loan is deemed nonrecoverable in whole or in part. Loans are deemed nonrecoverable upon the earlier of: (i) when the loan receivable is settled (i.e. when the loan is repaid, or in the case of foreclosure, when the underlying asset is sold); or (ii) when we determine that it is nearly certain that all amounts due will not be collected. The realized loss amount is equal to the difference between the cash received, or expected to be received, and the book value of the asset.

224. Accordingly, during the Class Period, Defendants manipulated the Company's earnings by inadequately reserving for potential credit losses on loans held for investment.

## J. <u>The Extent and Nature of Defendants' Fraudulent Conduct is Revealed Through a Series of Partial Corrective Disclosures</u>

225. The true nature and extent of Defendants' fraudulent conduct was revealed to the market through a series of partial corrective disclosures, including reports published by the

international financial research group, Viceroy, on November 16, 2023, December 5, 2023, and May 9, 2024, and a Bloomberg article published on July 12, 2024.

226. Viceroy was founded in 2016 by Fraser John Perring, Aiden Lau and Gabriel Bernarde. The research group's breakthrough moment was in 2017, when it published a report that detailed the sinister corporate structure behind Steinhoff, the South African listed furniture retailer that imploded within days of that report. But Viceroy is best known for its reporting on Wirecard. Mr. Perring was one of the first to raise concerns about Wirecard. In 2016, he published a report describing the company as "uninvestable" claiming it had engaged in "blatant accounting fraud" and accused Wirecard executives of engaging in "criminal actions." Instead of investigating Wirecard, at the company's request, German regulators investigated Viceroy and its founders.

227. Then, in June 2020, the once blue-chip stock on the Frankfurt Stock Exchange, Wirecard, collapsed after its chief executive officer, Markus Braun, was arrested following the company's admission that a reported ~$2.1 billion on its balance sheet, did not exist. In December 2022, Braun and two other Wirecard managers went on trial for fraud, and in June 2023, two executives were sentenced to prison. The scandal is considered one of the largest accounting and financial reporting frauds in history. It led to a fine and audit ban for Ernst & Young, Wirecard's long-time auditor, and brought attention to politicians who supported Wirecard and regulators who delayed investigating the company.

228. On November 16, 2023, Viceroy published a report claiming its investigative research team had reviewed hundreds of ABR's individual loans and determined that they were all at severe risk due to rising interest rates, declining property values, and impending maturity dates without viable refinancing options anywhere. Specifically, for this report, Viceroy pulled trustee data for every single loan in ABR's CLOs – representing approximately two-thirds of the

Company's Structured portfolio. Based on this review, Viceroy reported that ABR's entire loan book was distressed, and its underlying collateral was vastly overstated. Viceroy stated that "[i]n this industry plagued with delusion and bad decisions, Arbor stands out as the worst of the worst."

229. In this report, Viceroy revealed that ABR borrowers had confirmed that the Company did not have hedging requirements, contrary to Defendants' public claims that there is a rate cap requirement for all borrowers. The report also described how borrowers who had not hedged interest rate variance on short-term floating-rate loans were all underwater, which would require dipping into equity to fund their interest-only payments. According to Viceroy, the then-current DSCR of ABR's ~$7.6 billion CLOs was roughly 0.63x, meaning the properties backing these loans were not generating enough cash flow to cover their debt payments. In one $759 million CLO pool, nearly 70% of the loans had a DSCR of below 1x, and at least seven of the loans were considered delinquent. Viceroy concluded that a default of ABR's CLOs is "inevitable" and the Company "has not properly assessed its default risk."

230. Viceroy also revealed that the Company had, in fact, extended billions of dollars in bridge loans to "finfluencers" and real estate "guru" syndicators who had zero real estate investment backgrounds, and detailed how this portfolio of loans was not eligible for refinancing anywhere without huge equity investments from borrowers, which they likely did not have. Viceroy detailed how a significant portion of the properties underlying the CLOs had not been rehabilitated, and in fact, were in deplorable condition with some properties having already been condemned and/or labelled as slums. Further, the report noted that NOI figures had not improved, suggesting that even if the properties had been rehabilitated, NOI improvements had not been forthcoming. Viceroy concluded that "[e]ven if these properties enjoyed bullish NOI increases

post renovation (they're not) and moved to cheaper agency loans (which they can't), these investments would still be hemorrhaging cash and eating into equity."

231. Under the report's "Key Takeaways", Viceroy summed up its review of no less than twelve syndicators with underperforming, and in some cases already defaulting loans, accounting for more than $1.57 billion of the Company's ~$7.6 billion CLOs, stating "the above serves to show that Arbor's loans are not being made to the most sophisticated or financially sound borrowers, and some of them have already hit hard times."

232. On this news, ABR's securities price dropped from $13.84 per share on November 15, 2023 to $12.24 per share on November 16, 2023, or 11.56%.

233. On December 5, 2023, Viceroy published a follow-up report entitled, "Arbor – Jacksonville Case Study", providing a deeper dive into a syndicated portfolio in Jacksonville, Florida to highlight the overvaluation of ABR's underlying assets and dismal DSCRs. The report indicated that "[w]histleblowers have reached out to Viceroy en-masse to provide evidence and public citations of current, distressed Arbor deals and underlying assets" noting that "the information asymmetry between real estate industry professionals and Arbor's investors is vast."

234. The report focused on three Jacksonville properties – Silversmith Creek, Oasis, and Lakewood Oaks – owned by related party syndicates managed by Ricardo Sanabria. According to Viceroy, prior to his foray into managing tens, if not hundreds of millions of dollars of solicited investment capital, Mr. Sanabria owned two restaurants in Colombia, both failed. Viceroy explained that each of these properties had been acquired in the last one to two years, at which time they were purchased at almost 100% premiums to their previous sales in 2018-2020. Whistleblowers indicated to Viceroy that the properties were then for sale for the third time in

roughly five years, and that their price values were expected to fall below the outstanding balances on loans collateralized by these assets.

235. For example, Viceroy reported that Silversmith Creek was purchased by a syndicate managed by Mr. Sanabria on June 29, 2022 for $21.05 million, partially financed by a $17.2 million ABR bridge loan. The same property sold on March 20, 2018 for $9.46 million, partially financed by a $7.47 million mortgage from ABR. According to Viceroy, the property had been revalued at 2.22x its purchase price just four years prior despite no apparent renovations or other rehabilitation efforts being completed. At the time of Viceroy's reporting, Silversmith Creek's DSCR was 0.43x.

236. Next, Viceroy reported that Mr. Sanabria purchased Oasis on June 27, 2022 for $36.6 million, partially financed by a $29.47 million ABR bridge loan. The same property sold in 2019 for $20 million, representing a ~45% discount. According to Viceroy, no apparent renovations were completed during this time. The report noted that because the bridge loan attributed to this property was not pooled in one of the Company's CLOs, Viceroy had limited visibility on the underlying performance of the asset, but noted that reviews on the property were almost exclusively from prospective tenants, likely solicited by the managing agents, and highlighted that in February 2023, a man was shot in his car in broad daylight in the car park.

237. Lastly, Viceroy reported that Lakewood Oaks was purchased by Mr. Sanabria on January 10, 2021 for $17.85 million, partially financed by a $14.15 million ABR bridge loan. The property was previously sold in 2019 for $12.1 million, representing a 20% discount. According to Viceroy, no apparent renovations were completed during this time. At the time of Viceroy's reporting, Lakewood Oaks' DSCR was 0.67x.

238. On this news, ABR's securities price declined from $13.86 per share on December 4, 2023 to $13.15 per share on December 6, 2023, or 5.12%.

239. On February 16, 2024, during the Company's investor conference call to discuss its fourth quarter and full year 2023 financial earnings ("Q4 2023 Earnings Call"), Defendant Kaufman attempted to qualm investor concerns and rectify the market's negative reaction following the Viceroy reports, claiming "the facts, assumptions predicated future events and marketing conditions as well as conclusions in these reports are exaggerated, l[aced] with incomplete and inaccurate data, it's slanted only to provide a negative view on Arbor and again, purely for personal gain."

240. Unable to dispel the numerous truths and realities provided in the Viceroy reports, concerning the conditions of ABR's underlying assets and practice of lending to inexperienced syndicators, Kaufman tried to minimize the risks posed by their apparent lack of rehabilitation claiming, in relevant part:

> It is also very important to emphasize that a significant portion of Arbor's lending is multifamily focused specifically in the workforce housing part of the market. As we all know, Fannie Mae and Freddie Mac have had a specific mandate to address the workforce/affordable housing needs, which is a major issue in the United States, making Arbor a great partner. This product requires a level of -- a high level of management, tremendous expertise, which we have been effective at for decades, because this product may not have the same curb appeal as other multifamily product types. We've been criticized for a core part of our business that we have been extremely effective at, and we'll continue to fulfill a very important mandate for the federal agencies as well as the social needs for society.

241. Further, Kaufman chose to highlight that "as of today" the Company's CLO delinquency rates for the months December 2023 and January 2024 were down from when last reported by Viceroy. Consequently, Kaufman claimed "[t]his is a perfect example of using select data as of a point in time, does not contain the full picture or represent the industry's focus, only to inject fear into the market for personal gain. We urge our long-term shareholders to ignore these

one-sided self-motivated reports and focus only on our results and public disclosures and the fact that we've consistently outperformed our peers."

242. During the Question-and-Answer portion of the Q4 2023 Earnings Call, when specifically asked about the quality of ABR's loans or borrowers, focusing on certain distressed assets highlighted in the Viceroy reports, Defendant Kaufman doubled down on prior assertions that every bridge loan is done for Agency takeout, and rather than admit to abandoning the Company's conversative underwriting standards, Kaufman framed ABR's lending to inexperienced syndicators as an isolated execution problem on the part of the borrower:

> Steven Cole Delaney, JMP Securities LLC, Research Division – MD, Director of Mortgage & Real Estate Finance Research & Equity Research Analyst: Okay. So Ivan [Kaufman], on your point, this is kind of strategic, and I am speaking directly to some of the short reports I think early on, maybe there was a Houston assets, someone used the term Slumlord to describe your portfolio. Your 3 bites out of the apple strategy that you've used forever. Do you have any concern that the overall quality of your loans or borrowers, and I don't mean a large percentage, but do you think you have some assets, loans in your portfolio that are not of sufficient quality to be refinanced with permanent financing into Freddie Mac and Fannie Mae?
>
> Ivan Paul Kaufman Arbor Realty Trust, Inc. – Chairman, President & CEO: Well, clearly, our agenda is when we do a bridge loan, it's for the sole purpose of creating an agency loan. You have to have a quality sponsor and you have to have a quality asset. So our idea, of course, is that every sponsor that we take on is going to perform correctly, not all sponsors do that and a lot of this, sometimes they'll be a sponsor who couldn't hit his business plan or who had all the problems or isn't what we thought and they don't qualify, that's just the way it goes. Nobody is perfect. We're not perfect.
>
> With respect to the assets, if you're improving an asset, you got to approve that asset and you got to get it up to industry standards and the agency standards. If it doesn't, it won't meet that agency eligible. So if we have a $16 billion portfolio, not all $16 billion is going to make that mark. I mean, I think, of 75%, 80% of them get to an agency status and convert, that's pretty good. In other cases, when they don't do that, the assets will be sold or put into new ownership who will get that asset up to spec. So that's kind of the way we look at the world. It's not a perfect situation where every asset that we take in ends up meeting our execution.

243. On May 3, 2024 ABR released its financial earnings for the first quarter of 2024 ("1Q24"). Notably, the Company reported that during 1Q24 it modified 39 multi-family bridge

loans totaling nearly $1.9 billion by extending maturity dates and giving borrowers temporary rate relief. In exchange, the Company purported that some borrowers agreed to pay down principal, buy new rate caps, and deposit more cash into reserves for renovations or increases in interest rates. In addition, during the Company's 1Q24 Earnings Call, Defendant Elenio confirmed that ABR bought out $223 million in non-performing loans from its CLOs, adding the Company has worked out most of that balance.

244. On May 9, 2024, Viceroy published a report entitled, "Arbor Realty Trust – Fraud." The report described a scheme whereby ABR financed purchases of assets from its own foreclosures of distressed ABR bridge loans, via off-balance sheet entities controlled and run by former ABR associates, and entirely financed with ABR equity capital, which allowed ABR to avoid writing down its Structured loans. According to Viceroy, ABR has fraudulently overstated the value of its loan book through such undisclosed, off-balance sheet, related party transactions.

245. In response, ABR's securities price declined from $13.50 per share on May 8, 2024 to $12.84 per share on May 9, 2024, or 4.9%.

246. On July 12, 2024, after the markets opened, Bloomberg published an article entitled, "Arbor Realty Probed by DOJ Over Lending Practices, Loan Book," reporting that the Manhattan U.S. Attorney's Office and the Federal Bureau of Investigation ("FBI") in New York were actively investigating ABR's operations and reporting "on the heels of short seller attacks about the lender's practices and disclosures." According to the report, people familiar with the matter confirmed that the federal prosecutors' and FBI's ongoing investigation included inquiries concerning ABR's "lending practices and the Company's claims about the performance of their loan book." When asked for comment regarding the DOJ and FBI investigation, ABR is quoted

in the report as saying, "We routinely cooperate with regulatory inquiries and are very confident that we conduct ourselves properly."

247. On this news, ABR's securities price declined from $15.53 per share on July 11, 2024 to $12.89 per share on July 12, 2024, or 17.33%.

## K. Additional Events Confirming Defendants' Fraudulent Misconduct

248. On March 28, 2024, the Jacksonville Daily Record published an article entitled, "Silversmith Creek Apartment Homes Sold for $14.86 Million", reporting that, on March 14, 2024, Cedar Grove Capital, purchased the 140-unit community, built in 1971, at a $106,142 per-unit price. The article highlighted the June 2022 purchase price of $21.05 million, which represents 29.4% decline in value in less than two years. Moreover, the news of this sale confirmed Viceroy and whistleblower expectations that the underlying assets of ABR's distressed loan portfolio would sell for less than their outstanding balance. Indeed, based on this report, Silversmith Creek sold for ~$2.34 million below the outstanding balance.

249. On April 11, 2024, the Jacksonville Daily Record published an article entitled, "New York Investment Firm Buys 3 Jacksonville Apartment Communities", reporting that Cedar Grove Capital had purchased three Jacksonville properties on March 14, 2024 for a combined $65.23 million. Of the three properties purchased, two were included in the distressed properties highlighted in the December 5, 2023 Viceroy report, Oasis and Lakewood Oaks. Based on property records, the Jacksonville Daily Record revealed that Oasis was purchased for $26.03 million, representing a 28.8% decline in value from Mr. Sanabria's purchase price of $36.6 million less than two years prior. Moreover, as Viceroy and whistleblowers expected, the property sold for ~$3.44 million below the outstanding balance of ABR's bridge loan. The article further disclosed that Lakewood Oaks was purchased for $13.37 million, representing a 25.1% decline in value from

its previous sale price of $17.85 million. Again, the property sold for ~$1.13 million below the outstanding balance of ABR's bridge loan.

250. On September 6, 2024, Viceroy provided an update on its appeal of records withheld pursuant to Exemption 7(A) in response to a FOIA request sent to the SEC, which authorizes the withholding of "records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information … could reasonably be expected to interfere with enforcement proceedings." The appeal denial noted that staff for the SEC's Division of Enforcement "confirmed the existence of responsive records concerning Arbor Realty Trust, Inc."

251. Since first reporting on ABR on November 16, 2023, Viceroy has issued 32 reports relating to the Company's lending practices and loan book performance, particularly multifamily bridge loans pooled under its CLOs, with the most recent report issued on December 20, 2024.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

252. Throughout the Class Period, Defendant made a number of statements in filings with the SEC, in press releases, and in conversations with analysts and investors that were false and misleading and/or omitted material information.

### A. <u>1Q21</u>

253. On May 7, 2021, ABR filed with the SEC its quarterly report for the three-month period ended March 31, 2021 on Form 10-Q ("1Q21 10-Q"), signed and certified by Defendants Kaufman and Elenio.

254. The Company reported a net income of $81.1 million for 1Q21, compared to a net loss of $68.4 million for the quarter ended March 31, 2020. For 1Q21, Arbor reported net income attributable to common stockholders of $69.5 million, or $0.55 per diluted common share,

compared to a net loss of $59.3 million, or $0.54 per diluted common share for the quarter ended March 31, 2020.

255. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a reversal in the amount of $1.08 million.

256. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Three Months Ended March 31, 2021 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Land | Multifamily | Retail | Office | Hotel | Healthcare | Student Housing | Other | Total |
| Allowance for credit losses: | | | | | | | | | |
| Beginning balance | $ 78,150 | $ 36,468 | $ 13,861 | $ 1,846 | $ 7,759 | $ 3,880 | $ 4,078 | $ 2,287 | $ 148,329 |
| Provision for credit losses (net of recoveries) | (54) | (6,439) | (13) | 6,205 | (5) | (8) | (580) | (135) | (1,029) |
| Ending balance | $ 78,096 | $ 30,029 | $ 13,848 | $ 8,051 | $ 7,754 | $ 3,872 | $ 3,498 | $ 2,152 | $ 147,300 |

257. In addition, under the "Non-GAAP Financial Measures", the 1Q21 10-Q reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $75.1 million, or $0.52 per diluted common share, compared to $40.5 million, or $0.31 per diluted common share for the quarter ended March 31, 2020.

258. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

259. Under the Company's "Concentration of Credit Risk", the 1Q21 10-Q stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.
>
> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

260. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at March 31, 2021 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset Class / Risk Rating | 2021 | 2020 | 2019 | 2018 | 2017 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 575,864 | $ 874,039 | $ 85,964 | $ — | $ 32,500 | $ 744 | $ 1,569,111 |
| Pass/Watch | 403,657 | 773,882 | 784,425 | 138,705 | 3,500 | 28,800 | 2,132,969 |
| Special Mention | — | 369,329 | 745,731 | 94,333 | 117,758 | — | 1,327,151 |
| Substandard | — | 14,340 | 96,300 | 23,405 | 16,500 | 8,250 | 158,795 |
| Doubtful | — | — | — | — | 17,700 | — | 17,700 |
| Total Multifamily | $ 979,521 | $ 2,031,590 | $ 1,712,420 | $ 256,443 | $ 187,958 | $ 37,794 | $ 5,205,726 |

261. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 75% to its total multifamily asset class.

262. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls

concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants falsified and/or manipulated property appraisals so they would purport to comply with the Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

263. That same day, the Company issued a press release entitled, "Arbor Realty Trust Reports First Quarter 2021 Results and Increases Dividend for Fourth Consecutive Quarter to $0.34 per Share" ("1Q21 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Defendant Elenio.

264. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.55 and distributable earnings of $0.52 per diluted common share."

265. The 1Q21 Earnings Release provided that "Arbor reported net income for the quarter of $69.5 million, or $0.55 per diluted common share, compared to a net loss of $59.3 million, or $0.54 per diluted common share for the quarter ended March 31, 2020. Distributable

earnings for the quarter was $75.1 million, or $0.52 per diluted common share, compared to $40.5 million, or $0.31 per diluted common share for the quarter ended March 31, 2020."

266. In addition, the 1Q21 Earnings Release reported that "[d]uring the first quarter of 2021, ***the Company recorded a $1.02 million reversal of provisions for loan losses associated with CECL***. At March 31, 2021, the Company's ***total allowance for loan losses was $147.3 million***. The Company had seven non-performing loans with a carrying value of $60.3 million, before related loan loss reserves of $6.5 million as of March 31, 2021 and December 31, 2020" (emphasis added).

267. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

268. Later that day, May 7, 2021, the Company hosted an investor conference call to discuss the financial results for the first quarter of 2021 ("1Q21 Earnings Call"). During the call, Defendant Elenio stated in his prepared remarks that, "we had another exceptional quarter, producing distributable earnings of $75 million or $0.52 per share for the first quarter" and touted that ABR's "adjusted book value at March 31 was approximately $10.86 a share, adding back roughly $62 million of noncash general CECL reserves on a tax-affected basis. This is up 5% from

approximately $10.35 a share last quarter, largely due to our first quarter capital raise as well as the significant earnings we generated in the first quarter that were well in excess of our dividend."

269. The statements identified in the immediately preceding paragraph are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As a result, the Company's distributable earnings and adjusted book value were likewise artificially inflated.

270. During the 1Q21 Earnings Call, Defendant Kaufman provided, in relevant part:

> ***We produced distributable earnings of $0.52 per share,*** which is an incredible accomplishment and well in excess of our current dividend, representing a payout ratio of just around 65%.
>
> Our ability to consistently generate exceptional results and increase our dividend is a true testament to the value of our franchise and the many diversified income streams we have created. ***We continue to realize significant benefits from many areas of our diverse platform, including*** continued growth in our GSE agency platform that produces strong margins and increased servicing fees, strong contributions from our private label program, record growth and significant benefits from the size and scale of our balance sheet business as well as ***superior execution in our liability structures.*** Strong performance of our multifamily focused portfolios with very few delinquencies and extremely low forbearances and substantial income from our residential business. And ***these reoccurring benefits,*** combined with our versatile originations platform, strong pipeline ***and credit quality of our portfolio puts us in a unique position to be able to continue to produce significant distributable earnings going forward as we are extremely well positioned for future growth and success***.

(Emphasis added).

271. The statements identified in the immediately preceding paragraph are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As a result, the Company's distributable earnings were likewise artificially inflated. Defendant Kaufman also knew but concealed the Company's acute risks relating to non-performance or default of the underlying bridge loans comprising its CLOs, the majority of which were the product of improper lending practices, in violation of the representations and warranties made when ABR securitized the loans. Accordingly, contrary to Kaufman's representations, Defendants' "execution in [ABR's] liability structures" was *not* "superior" and the credit quality of the Company's portfolio was on the decline, and therefore, the Company was *not* "well positioned for future growth and success."

272. During his prepared remarks, Defendant Kaufman went on to state, in relevant part, that "one of key business strategies is the financing of our ***high-quality balance sheet portfolio***" and claimed that the Company's "***balance sheet loans also create a substantial pipeline of future GSE agency origination volumes and long-dated servicing revenues, further increasing our future earnings and dividends***" (emphasis added).

273. This statements identified in the immediately preceding paragraph is false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an

influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In addition, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout. As a result, contrary to Defendant Kaufman's representations, the Company had not maintained a "high-quality balance sheet portfolio" and its balance sheet loans no longer supported a "pipeline of future GSE agency origination volumes and long-dated servicing revenues."

274. During the Question-and-Answer portion of the 1Q21 Earnings Call, analyst Charles Douglas Arestia, JPMorgan Chase & Co, Research Division, posed the question:

> We've heard a lot recently about there being a lot of capital chasing after multifamily and industrial properties lately, sort of a flight to quality post COVID, broader unknowns around office and hospitality and more of the known issues with retail. Obviously, multifamily is most relevant to Arbor by a wide margin. But Ivan, would love to get your view on what you're seeing out there in terms of competition for your core assets. If you're seeing that competition pick up recently as more of your peers have gotten more comfortable deploying capital than maybe a quarter or 2 ago.

275. To which, Defendant Kaufman responded:

> The competition is fierce. I mean it's actually greater now than it was pre pandemic. And even a lot of the people who got hurt are back and being very aggressive. So there's no question there's a lot of compression on our pricing, but trying to make that up on the debt side. And we do have a franchise. And so we do have a lot of momentum. We did bulk up in the fourth quarter and first quarter to kind of get ahead. So we have good spreads in place. We'll work on our liability structures and keep an eye on credit. ***And I think one of the other things we're going to focus on very, very, very precisely is that for the loans we do put on our balance sheet, we're going to try and turn them as much as we can into agency and pick up the back end fees and reduce our risk on some of the loans on our books.*** But make no mistake about it. It's an extraordinarily aggressive environment right now.
>
> (Emphasis added).

276. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had already substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In addition, as corroborated by FE1, FE2, and FE11, the Company had already abandoned its stated standards of underwriting its Structured loans for Agency takeout.

## B. 2Q21

277. On July 30, 2021, ABR filed with the SEC its quarterly report for the three-month period ended June 30, 2021 on Form 10-Q ("2Q21 10-Q"), signed and certified by Defendants Kaufman and Elenio.

278. The Company reported a net income of $84.3 million for 2Q21, compared to a net loss of $54.1 million for the quarter ended June 30, 2020. For 2Q21, ABR reported net income attributable to common stockholders of $69.1 million, or $0.51 per diluted common share, compared to a net income of $44.1 million, or $0.40 per diluted common share for the quarter ended June 30, 2020.

279. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a reversal in the amount of $7.8 million.

280. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Three Months Ended June 30, 2021 | | | | | |
|---|---|---|---|---|---|---|
| | Land | Multifamily | Retail | Office | Healthcare | |
| Allowance for credit losses: | | | | | | |
| Beginning balance | $ 78,096 | $ 30,029 | $ 13,848 | $ 8,051 | $ 3,872 | $ |
| Provision for credit losses (net of recoveries) | (39) | 131 | (29) | (229) | (6) | |
| Ending balance | $ 78,057 | $ 30,160 | $ 13,819 | $ 7,822 | $ 3,866 | $ |

281. In addition, under the "Non-GAAP Financial Measures", the 2Q21 10-Q reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $68.8 million, or $0.45 per diluted common share, compared to $59.8 million, or $0.45 per diluted common share for the quarter ended June 30, 2020.

282. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

283. Under the Company's "Concentration of Credit Risk", the 2Q21 10-Q stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are

> reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.
>
> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

284. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at June 30, 2021 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset Class / Risk Rating | 2021 | 2020 | 2019 | 2018 | 2017 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 1,852,008 | $ 753,955 | $ 44,035 | $ — | $ — | $ 335 | $ 2,650,333 |
| Pass/Watch | 699,139 | 817,032 | 468,975 | 121,555 | 36,000 | 29,150 | 2,171,851 |
| Special Mention | 50,537 | 415,935 | 697,673 | 111,483 | 98,138 | — | 1,373,766 |
| Substandard | — | 18,840 | 120,530 | 16,925 | 16,500 | 8,250 | 181,045 |
| Doubtful | — | — | — | — | 17,700 | — | 17,700 |
| Total Multifamily | $ 2,601,684 | $ 2,005,762 | $ 1,331,213 | $ 249,963 | $ 168,338 | $ 37,735 | $ 6,394,695 |

285. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 76% to its total multifamily asset class.

286. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants

falsified and/or manipulated property appraisals so they would purport to comply with the Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

287. That same day, the Company issued a press release entitled, "Arbor Realty Trust Reports Second Quarter 2021 Results and Increases Quarterly Dividend to $0.35 per Share" ("2Q21 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Elenio.

288. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.51 and distributable earnings of $0.45 per diluted common share."

289. The 2Q21 Earnings Release provided that "Arbor reported net income for the quarter of $69.1 million, or $0.51 per diluted common share, compared to net income of $44.1 million, or $0.40 per diluted common share for the quarter ended June 30, 2020. Distributable earnings for the quarter was $68.8 million, or $0.45 per diluted common share, compared to $59.8 million, or $0.45 per diluted common share for the quarter ended June 30, 2020."

290. In addition, the 2Q21 Earnings Release reported that "[d]uring the second quarter of 2021, the Company ***recorded an $8.3 million reversal of provisions for loan losses associated with CECL,*** which includes a $7.5 million loan loss recovery. At June 30, 2021, the Company's ***total allowance for loan losses was $138.4 million***. The Company had eight non-performing loans with a carrying value of $84.0 million, before related loan loss reserves of $6.5 million, compared

to seven loans with a carrying value of $60.3 million, before related loan loss reserves of $6.5 million as of March 31, 2021" (emphasis added).

291. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

292. Later that day, July 30, 2021, the Company hosted an investor conference call to discuss the financial results for the second quarter of 2021 ("2Q21 Earnings Call").

293. During the call, Defendant Kaufman discussed the Company's recent capital activity purporting that: "***Every time we raise capital is to fund our growing balance sheet loan business***, which is not only high accretive to our current earnings and dividends, but also ***allows us to build a pipeline for 2 to 3 years of new GSE agency loans***, showing the long-term growth of our platform and creating higher quality earnings and dividends in the future" (emphasis added).

294. Defendant Kaufman went on to discuss the Company recent CLO activity stating, in relevant part: "We have consistently been a leader in the CLO securitization market as financing ***a high-quality balance sheet portfolio*** with the appropriate liability structures continues to be one of our key business strategies" (emphasis added).

295. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had already

substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In particular, as corroborated by FE1, FE2, and FE11, the Company had already abandoned its stated standards of underwriting its Structured loans for Agency takeout. Defendant Kaufman also knew but concealed the Company's acute risks relating to non-performance or default of the underlying bridge loans comprising its CLOs, the majority of which were the product of improper lending practices, in violation of the representations and warranties made when ABR securitized the loans. Accordingly, contrary to Kaufman's representations, the Company had not maintained a "high-quality balance sheet portfolio."

296. During the 2Q21 Earnings Call, when discussing the Company's "second quarter performance," Defendant Kaufman touted that:

> [O]ur quarterly financial results were once again truly remarkable. ***We produced distributable earnings of $0.45 per share, which is incredible accomplishment and well in excess of our current dividend, representing a payout ratio of around 78%.*** Our ability to consistently generate exceptional results and increase our dividend is a true testament to the value of our franchise and the many diverse income streams we have created.
>
> We continue to realize significant benefits from many areas of our diverse operating platform, continued growth in our GSE agency platform which produces strong margins and increased servicing fees, significant contributions from our private label program, record growth and significant benefits from the size and scale of our balance sheet business as well ***as superior execution on our liability structures***, strong performance of our multifamily-focused portfolio with very few delinquencies and substantial income from our residential businesses. And these reoccurring benefits, combined with our versatile originations platform, strong pipeline and ***credit quality of our portfolio puts us in a unique position to be able to continue to produce significant distributable earnings going forward as we're extremely well-positioned for future growth and success***.
>
> (Emphasis added).

297. The statements identified in the immediately preceding paragraph are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As a result, the Company's distributable earnings were likewise artificially inflated. Defendant Kaufman also knew but concealed the Company's acute risks relating to non-performance or default of the underlying bridge loans comprising its CLOs, the majority of which were the product of improper lending practices, in violation of the representations and warranties made when ABR securitized the loans. Accordingly, contrary to Kaufman's representations, Defendants' "execution in [ABR's] liability structures" was *not* "superior" and the credit quality of the Company's portfolio was on the decline, and therefore, the Company was *not* "well positioned for future growth and success."

298. Defendant Kaufman went on to discuss the Company's "pipeline" claiming that, "***these balance sheet loans also create substantial pipeline of future GSE agency loan origination volumes and long-dated servicing revenues***, further increasing our future earnings and dividends" (emphasis added).

299. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or

default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In addition, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout. As a result, contrary to Defendant Kaufman's representations, the Company's balance sheet loans no longer supported a "pipeline of future GSE agency origination volumes and long-dated servicing revenues."

300. During the 2Q21 Earnings Call, Defendant Elenio discussed the Company's financial performance stating, in relevant part, that: "we had another exceptional quarter, producing distributable earnings of $69 million or $0.45 per share. These results once again translated into industry high ROEs of approximately 17% for the quarter and allowed us to increase our dividend to an annual run rate of $1.40 a share. And this quarterly dividend increase reflects our fifth consecutive quarterly increase and our 21st increase in the last 10 years."

301. Defendant Elenio went on to tout that the Company's "adjusted book value at June 30 was approximately $11.35, adding back roughly $61 million of noncash general CECL reserves on a tax-effected basis."

302. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E.,

corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As a result, the Company's distributable earnings and adjusted book value were likewise artificially inflated.

## C. 3Q21

303. On October 29, 2021, ABR filed with the SEC its quarterly report for the three-month period ended September 30, 2021 on Form 10-Q ("3Q21 10-Q"), signed and certified by Defendants Kaufman and Elenio.

304. The Company reported a net income of $86.1 million for 3Q21, compared to a net loss of $97.7 million for the quarter ended September 30, 2020. For 3Q21, ABR reported net income attributable to common stockholders of $72.8 million, or $0.51 per diluted common share, compared to a net income of $82 million, or $0.72 per diluted common share for the quarter ended September 30, 2020. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a reversal in the amount of $3.9 million.

305. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Three Months Ended September 30, 2021 | | | | | |
|---|---|---|---|---|---|---|
| | Land | Multifamily | Retail | Office | Student Housing | I |
| Allowance for credit losses: | | | | | | |
| Beginning balance | $ 78,057 | $ 30,160 | $ 13,819 | $ 7,822 | $ 2,365 | $ |
| Provision for credit losses (net of recoveries) | (45) | (2,093) | — | (95) | (542) | |
| Ending balance | $ 78,012 | $ 28,067 | $ 13,819 | $ 7,727 | $ 1,823 | $ |

306. In addition, under the "Non-GAAP Financial Measures", the 3Q21 10-Q reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $75.7 million, or $0.47 per diluted common share, compared to $67.1 million, or $0.50 per diluted common share for the quarter ended September 30, 2020.

307. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

308. Under the Company's "Concentration of Credit Risk", the 3Q21 10-Q stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.
>
> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

309. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at September 30, 2021 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset Class / Risk Rating | 2021 | 2020 | 2019 | 2018 | 2017 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 3,167,965 | $ 350,623 | $ 185,265 | $ — | $ 20,300 | $ 276 | $ 3,724,429 |
| Pass/Watch | 1,458,271 | 1,077,411 | 256,877 | 127,255 | 32,500 | 28,800 | 2,981,114 |
| Special Mention | 180,723 | 415,519 | 617,506 | 63,233 | — | 350 | 1,277,331 |
| Substandard | — | 14,340 | 89,330 | 11,400 | 31,117 | 8,250 | 154,437 |
| Doubtful | — | — | — | — | 17,700 | — | 17,700 |
| Total Multifamily | $ 4,806,959 | $ 1,857,893 | $ 1,148,978 | $ 201,888 | $ 101,617 | $ 37,676 | $ 8,155,011 |

310. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 76% to its total multifamily asset class.

311. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants falsified and/or manipulated property appraisals so they would purport to comply with the Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's

internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

312. That same day, the Company issued a press release entitled, "Arbor Realty Trust Reports Third Quarter 2021 Results and Increases Quarterly Dividend to $0.36 per Share" ("3Q21 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Defendant Elenio.

313. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.51 and distributable earnings of $0.47 per diluted common share."

314. The 3Q21 Earnings Release provided that, "Arbor reported net income for the quarter of $72.8 million, or $0.51 per diluted common share, compared to net income of $82.0 million, or $0.72 per diluted common share for the quarter ended September 30, 2020. Distributable earnings for the quarter was $75.7 million, or $0.47 per diluted common share, compared to $67.1 million, or $0.50 per diluted common share for the quarter ended September 30, 2020."

315. In addition, the 3Q21 Earnings Release reported that:

> During the third quarter of 2021, the Company ***recorded a $4.1 million reversal of provisions for loan losses associated with CECL***, which includes a $1.1 million loan loss recovery. At September 30, 2021, ***the Company's total allowance for loan losses was $131.5 million***. The Company had six non-performing loans with a carrying value of $55.6 million, before related loan loss reserves of $2.6 million, compared to eight loans with a carrying value of $84.0 million, before related loan loss reserves of $6.5 million as of June 30, 2021.

(Emphasis added).

316. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable

increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

317. Later that day, October 29, 2021, the Company hosted an investor conference call to discuss the financial results for the third quarter of 2021 ("3Q21 Earnings Call").

318. During Defendant Kaufman's prepared remarks for the 3Q21 Earnings Call, he discussed the Company's business model stating, in relevant part, that:

> It is very important for us to continue to emphasize the value of having multiple products with diverse income streams which has allowed us to consistently grow our earnings and dividends while maintaining a very low dividend payout ratio.
>
> We've strategically built an annuity-based business model of creating multiple income streams from a single investment. As a result, not only did we generate strong risk-adjusted returns on our capital, which positively affect our current earnings, more importantly, ***we are also building a much higher-quality future earnings and dividend growth story by ensuring that our assets will provide us with multiple other products in the future.*** And this is one of the major differentiators of our business platform, which is why we strongly believe we should consistently trade at a substantial premium and much lower dividend yield than anyone else in our peer group.
>
> (Emphasis added).

319. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In addition, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for

Agency takeout. As a result, contrary to Kaufman's representations, Defendants were *not* "ensuring" that ABR's assets will provide it with multiple other products in the future.

320. During the call, Defendant Kaufman discussed the Company's recent capital activity purporting that: "***Every time we raise capital to fund our growing balance sheet loan business***, which is not only accretive to our current earnings and dividends, but also ***allows us to build a pipeline for 2 to 3 years of new GSE agency and private label loans that produce additional long-term-dated income streams***, ensuring the growth of our platform and creating high-quality earnings and dividends for the future."

321. Defendant Kaufman went on to discuss the Company recent CLO activity stating, in relevant part: "We have consistently been a leader in the CLO securitization market. It's financing ***our high-quality balance sheet portfolio*** with the appropriate liability structures continuing to be one of the key business strategies" (emphasis added).

322. The statements identified the immediately preceding paragraphs are false and misleading because Kaufman knew but failed to disclose that the Company had already substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In particular, as corroborated by FE1, FE2, and FE11, the Company had already abandoned its stated standards of underwriting its Structured loans for Agency takeout. Defendant Kaufman also knew but concealed the Company's acute risks relating to non-performance or default of the underlying bridge loans comprising its CLOs, the majority of which were the product of improper lending practices, in violation of the representations and warranties made when ABR securitized the loans.

Accordingly, contrary to Kaufman's representations, the Company had not maintained a "high-quality balance sheet portfolio."

323. During the 3Q21 Earnings Call, when discussing the Company's "third quarter performance," Defendant Kaufman touted that:

> Turning now to our third quarter performance, as Paul will discuss in more detail, our quarterly financial results were once again remarkable. We produced distributable earnings of $0.49 per share, which is well in excess of our current dividend, representing a payout ratio of around 75%.
>
> ****
>
> And again, I want to ***emphasize the significant value of our balance sheet business***, which not only generates strong levered returns on our capital, but very importantly, ***these investments also provide us the future agency and private-label transactions with long-dated income streams***.
>
> ****
>
> In summary, we had another exceptional quarter and are well positioned to close out 2021 as another record year. ***We have developed a unique, multi-tiered, annuity-based operating platform that provides us with future annuity of high-quality, long-dated income streams, making us confident in our ability to continue to grow our earnings and dividends and significantly outperform our peers***.

324. The statements identified the immediately preceding paragraph are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As a result, the Company's distributable earnings were likewise artificially inflated. In addition, Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk

of non-performance and/or default from the time of origination. As corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout. As a result, contrary to Defendant Kaufman's representations, the Company's balance sheet loans no longer provided "future agency and private-label transactions," with "high-quality, long-dated income streams."

325. During Defendant Elenio's prepared remarks for the 3Q21 Earnings Call, he stated, in relevant part, that:

> [W]e had another exceptional quarter, producing distributable earnings of $76 million or $0.47 per share and $0.49 per share, excluding a onetime realized loss of $2.8 million on a non-multifamily asset that we had taken a reserve on early last year as a result of the pandemic. These quarterly results once again translated into industry high ROEs of approximately 17% and have allowed us to increase our dividend to an annual run rate of $1.44 a share, and this dividend increase reflects our sixth consecutive quarterly increase and our 22nd increase in the last 10 years.

326. The statements identified in the immediately preceding paragraph are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As a result, the Company's distributable earnings were likewise artificially inflated.

327. Defendant Elenio went on to discuss the Company's loan book strength touting, in relevant part, "as we mentioned in the past, ***the credit quality of our portfolio has been***

***outstanding*** as we have very little exposure to the asset classes that have been affected the most by the recession, and we also believe we have adequately reserved against those positions."

328. The statements identified the immediately preceding paragraph are false and misleading because Elenio knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As a result, contrary to Elenio's representations, the Company "the credit quality of [ABR's] portfolio" had *not* been "outstanding."

329. During the Question-and-Answer portion of the call, analyst Richard Barry Shane, JPMorgan Chase & Co, Research Division, raised the following question:

> Look, I'd like to talk a little bit about the Agency Business and how we should think about the difference between the pipeline on the Fannie, Freddie paper and the private label. I'm curious if there are differences in terms of accumulation periods for each, what the hold times look like, and more importantly, how we should think about hedging and revenue recognition. Is there anything in terms of pipeline hedging with rates moving around we should be aware of?

330. To which Defendant Kaufman responded, in relevant part:

> …Our bridge pipeline is as strong as ever, and we're actually quoting right now to close bridge loans, which used to be done within 45 days, we'll call it, in 75 to 90, just the backup in the industry on third parties and our own processing systems. The demand for bridge product is extremely strong. I think what we're seeing in the market are people are buying a lot of product today, and they're seeing that new rents are 5% to 10% above old rents, so they want to bridge the product for 12 months, get full unit terms and then do a permanent takeout. So that philosophy fits in very well with our business model. This ***will do the bridge loan, get great risk adjustment returns and then turn it into an agency loan and then once again get additional gain on sale and get long-term bridge loans*** and have proprietary deal flow.
>
> ***So that has worked extremely well for our business model, and we see that to be very, very strong all the way through the end of the year***. And we've already

booked -- booking most of our closings for January and February, believe it or not. So that's our overall outlook.

In terms of our floating rate book, we, in the past 6 to 9 months, have been very liberal in terms of people buying caps. ***As of last week, we've made it mandatory for people to buy caps.*** I have a little concern that rates may rise. And in fact, we have the rights under our documents to require people to buy caps.

***For loans in our portfolio, where I'll go through our portfolio now and having people buy rate caps***, I have a little bit of concern that there'll be a little bit of a rise in rates, and we want to protect ourselves against that. So that's our overall philosophy.

(Emphasis added).

331. The statements identified the immediately preceding paragraphs are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In addition, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout.

332. Further, Defendant Kaufman's statements concerning the Company's rate cap requirements were false. According to the accounts of FE9, ABR stopped requiring rate caps for "stronger performing deals" around mid- to late-2021. And FE8 recalled that in early-2022, the Company no longer required rate caps on any bridge loans. As later revealed, even when its loan book was distressed due to high numbers of delinquent and/or non-performing loans, ABR allowed borrowers to restructure their loans without rate caps.

333. During the Question-and-Answer portion of the 3Q21 Earnings Call, analyst Jade Joseph Rahman, Keefe, Bruyette, & Woods, Inc., Research Division, posed the following question:

> I was wondering, Ivan, if you could share your view on the competitive spending markets right now. Debt funds and mortgage REITs clearly have seen a surge in their originations. Do you have any concerns about underwriting standards and competitive pressures in the market?

334. To which Defendant Kaufman responded:

> We've definitely a lot of competitors, and there's a lot of business out there. I do always have concerns when there's a lot of competition. We have a great reputation in the market. We pick our spots. We know where to put our dollars. We believe that in all competitive markets, there are a lot of mistakes that are always going to be made. And we just have to proceed very prudently. ***We've put a huge focus on lending on cash flow deals, deals that have positive coverage that need very little heavy lift.*** That's very different than what happened 4 or 5 years ago when there were a lot of B and C assets being bought with tremendous amount of lift. ***The lift is very small. It's basically unit terms.***
>
> Our biggest concern right now is the market turned into a syndicator market, where you have a lot of syndicators coming in with very little net worth and liquidity raising money and don't have the liquidity to withstand a -- withstand any bumps in the road. ***So we're very careful of who we're dealing with.*** Usually where speed bumps is with multiple assets. And we want to make sure the structure between the GP and the LPs are good. I think that's where a lot of mistakes are being made right now. They're working with thinly capitalized sponsors. They're working with people who they're trying to win a deal for 5 basis points with no structure. ***We're maintaining our structure on our deals.*** Other people are not. So I think we have a lot of experience in the way we run our business, and we're able to be a little more selective than most.
>
> (Emphasis added).

335. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In particular, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout. As a result, contrary to Defendant Kaufman's representations, the Company did

not maintain its structure on its deals; the vast majority of ABR's loans were not cash flow deals and the properties were a lot of B and C assets that needed a tremendous amount of lift; and Defendants were not being "careful" with who they were dealing with – lending billions of dollars to unqualified and overleveraged syndicators.

336. Mr. Rahmani asked the follow up question, "And do you also know the conversion rate historically of the multifamily bridge loans into the agency product?" To which Defendant Elenio responded:

> Sure. So I think you got to look at it a couple of ways, right? So we've historically targeted anywhere to 40% to 60%, sometimes higher, of recapture rate on our bridge loans. Certainly, when there's sales involved, which there have been some lately, you don't always recapture that business because you don't always have that ability. But anything that's not sold that comes up for refinance or takeout, our recapture rate is very, very high, probably in the 70% to 80% range on anything that's not sold. With stuff being sold, it's probably in the 40% to 50% range overall. But that's our target.
>
> And as Ivan mentioned, we're putting a lot of bridge loans right now. And ***with the increase in values and when rents roll, we're really sizing up a lot of these deals to come to agency. That's our model. So we think that recapture rate will be very high on the business we've been putting on***. Ivan, would you agree with that?
>
> (Emphasis added).

337. And Defendant Kaufman followed, adding:

> ***Yes. I think you have to look at the product we're putting on. Most of the products we're putting on is requiring a turn of rents, very little CapEx. And the business model for the person buying it is to put on a bridge loan, make those terms and then turn it to an agency.***
>
> Historically, most of the loans were heavy-lift loans, 20%, 30%, 40% CapEx, huge repositioning and usually a 2-, 3-year gestation period. And what happened with a lot of those loans, the gains were so huge with the market changes that a lot of people chose to sell those assets.
>
> ***So we think the recapture rate is going to be higher because the intended business purpose was specifically for a shorter-term bridge loan with a quick turn into agency or FHA.*** And we do think our FHA platform is going to be a huge beneficiary of our bridge loans. Because as they're doing it, they'll file with the

> FHA, which takes 9 months to a year, and they'll run that process simultaneously. So we're pretty optimistic and hopeful that, that will really feed into our platform.

338. The statements identified the immediately preceding paragraphs are false and misleading because the Individual Defendants knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In particular, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout.

339. During the Question-and-Answer portion of the 3Q21 Earnings Call, analyst, Leon G. Cooperman, Omega Advisors, Inc. raised the following question:

> It was like a potential machine you've created here. I guess the logical question is what could derail this? Is it the rising rates? I mean we're a beneficiary of these low rates which have exposure to rising rates.

340. To which Defendant Kaufman responded:

> Listen, we -- I believe a little differently than most. I believe that rates are going to rise different than most people. I think that we are underwriting and positioning our business to rise in the 10-year to about 2.50%. That's what I'm thinking in the way I'm running our business. ***So we'll make sure that we have appropriate asset management skills, underwrite our loans accordingly and know how they exit and know how to manage that business.*** We're also underwriting LIBOR to probably rise to 50 to 75. That's just our outlook. So we can handle that rise in interest rates and manage our business accordingly and make sure we have ample liquidity to manage the growth in our business.

(Emphasis added).

341. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had substantially

deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In particular, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout.

## D. 4Q21

342. On February 18, 2022, ABR filed with the SEC its annual report for the fiscal year ended December 31, 2021 on Form 10-K ("FY21 10-K"), signed and certified by Defendants Kaufman and Elenio.

343. The Company reported a net income of $377.8 million for FY21, compared to a net income of $196.2 million for the fiscal year ended December 31, 2020. For FY21, ABR reported net income attributable to common stockholders of $317.4 million, compared to a net income of $163.4 million for the fiscal year ended December 31, 2020. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a provision reversal of $21.1 million for loan losses associated with CECL for FY22, compared to a provision of $61.1 million for the fiscal year ended December 31, 2020.

344. The FY21 10-K went on to discuss the Company's "Other Expenses" providing, in relevant part, that: "[t]he decreases in both provision for loss sharing and provision for credit losses were primarily due to the reversal of CECL reserves in both business segments in connection with improved market conditions and expected future forecasts."

345. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Year Ended December 31, 2021 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Land | Multifamily | Office | Retail | Student Housing | Hotel | Healthcare | Other | Total |
| Allowance for credit losses: | | | | | | | | | |
| Beginning balance | $ 78,150 | $ 36,468 | $ 1,846 | $ 13,861 | $ 4,078 | $ 7,759 | $ 3,880 | $ 2,287 | $ 148,329 |
| Provision for credit losses (net of recoveries) | (180) | (17,761) | 6,227 | (42) | (3,442) | (7,751) | (1,099) | (267) | (24,315) |
| Charge-offs | — | — | — | (8,000) | — | — | (2,773) | — | (10,773) |
| Ending balance | $ 77,970 | $ 18,707 | $ 8,073 | $ 5,819 | $ 636 | $ 8 | $ 8 | $ 2,020 | $ 113,241 |

346. In addition, under the "Non-GAAP Financial Measures", the FY21 10-K reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $313.7 million, or $2.01 per diluted common share, compared to $234.9 million, or $1.75 per diluted common share for the fiscal year ended December 31, 2020.

347. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

348. Under the Company's "Concentration of Credit Risk", the FY21 10-K stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are

> reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.
>
> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

349. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at December 31, 2021 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | |
|---|---|---|---|---|
| Asset Class / Risk Rating | 2021 | 2020 | 2019 | 2018 |
| Multifamily: | | | | |
| Pass | $ 6,025,731 | $ 562,885 | $ 176,281 | $ 6,305 |
| Pass/Watch | 2,120,458 | 587,820 | 194,698 | 120,950 |
| Special Mention | 270,813 | 321,031 | 452,980 | 42,500 |
| Substandard | — | 18,827 | 43,575 | 15,533 |
| Total Multifamily | $ 8,417,002 | $ 1,490,563 | $ 867,534 | $ 185,288 |

350. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 76% to its total multifamily asset class.

351. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants

falsified and/or manipulated property appraisals so they would purport to comply with the Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

352. The FY21 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***Risks Related to Our Financing and Hedging Activities.*** We finance a significant amount of our loans and investments through a variety of means, including CLOs, securitizations, credit facilities, equity capital, senior and convertible debt instruments, and other structured financings. These vehicles may contain restrictive covenants and may require us to provide additional collateral or repurchase assets if the value of pledged assets, some of which we guarantee, decline in value. If we are unable to acquire eligible investments, find suitable replacement investments and access financing sources on favorable terms, or at all, we may not be able to obtain the level of leverage necessary to optimize our return on investment and cash available for distribution to our stockholders may decline.

353. The statements identified in the immediately preceding paragraphs are false and misleading because they presented the risks of non-performance or delinquency under the Company's CLOs as a future possibility when, in fact, these risks were actual and had already come to fruition. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had already substantially deviated from its underwriting standards and guidelines to drive up loan volume during the years 2021 and 2022, resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. Most of the Company's bridge loans

(approximately two-thirds), originated under sub-par lending practices, were packaged into ABR's CLO pools in violation of the representations and warranties made when ABR securitized the loans. Because of the terms and tranches of the CLOs, ABR was forced to shoulder the burden of the losses associated with the underlying assets' underperformance and borrowers' delinquency or non-performance, in part, through billions of dollars of loan modifications on less favorable terms.

354. The FY21 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***Loan loss reserves are particularly difficult to estimate in a turbulent economic environment***. We perform a quarterly evaluation of our loans to determine whether an impairment charge is necessary and adequate to absorb probable losses. The valuation process requires certain estimates and judgments, which are more difficult to make during a period in which available commercial real estate credit is limited and commercial real estate transactions have decreased. Our estimates and judgments are based on several factors, including projected cash flows from the collateral securing our loans, loan structure, including the availability of reserves and recourse guarantees, likelihood of repayment in full at loan maturity, potential for refinancing by other lenders and expected market discount rates for varying property types. If our estimates and judgments are not correct, our results of operations and financial condition could be severely impacted.

355. The statements identified in the immediately preceding paragraph are false and misleading because they presented the risks of failing to adequately assess the Company's risk of loss and allocate reasonable or sufficient loan loss reserves as a future possibility when, in fact, these risks were actual and had already come to fruition. As set forth in Section V.E., corroborated by numerous former employee accounts, the Company substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. As set forth in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's

violations of its stated underwriting standards and guidelines, significantly increasing ABR's risk of loss.

356. The FY21 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***We may be unable to invest excess capital on acceptable terms, or at all, which would adversely affect our operating results***. We may not be able to identify investments that meet our investment criteria and we may not be successful in closing the investments that we do identify. In addition, the investments that we fund with our capital may not produce a satisfactory return on capital, which would adversely affect our operating results.

357. The statements identified in the immediately preceding paragraph are false and misleading because they presented the risk of investing in assets that did not meet the Company's "investment criteria" as a future possibility when, in fact, these risks were actual and had already come to fruition. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination.

358. When discussing the Company's "Real Estate Values and Credit Risk," the FY21 10-K provided that:

> Commercial mortgage assets may be viewed as exposing an investor to greater risk of loss than residential mortgage assets since such assets are typically secured by larger loans to fewer obligors than residential mortgage assets. Multifamily and commercial property values, net operating income derived from such properties, and borrowers' credit ratings are subject to volatility and ***may be*** negatively affected by a number of factors, including, but not limited to, events such as natural disasters and pandemics, acts of war, terrorism, local economic and/or real estate conditions (such as industry slowdowns, oversupply of real estate space, occupancy rates, construction delays and costs) and other macroeconomic factors beyond our control. The performance and value of our loan and investment and servicing portfolios depend on the borrowers' ability to operate the properties that serve as

> collateral so that they produce adequate cash flow to pay their loans. ***We attempt to mitigate these risks through our underwriting and asset management processes. Our asset management team reviews our portfolios consistently and is in regular contact with borrowers to monitor the performance of the collateral and enforce our rights as necessary***.

(Emphasis added).

359. The statements identified the immediately preceding paragraph are false and misleading because the Company failed to disclose that it had already substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As described in further detail in Sections V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses in internal controls concerning its concentration of risk, including asset management, to keep its risk of loss from surfacing throughout the Class Period.

360. That same day, the Company issued a press release entitled, "Arbor Realty Trust Reports Fourth Quarter and Full Year 2021 Results and Increases Dividend for Seventh Consecutive Quarter to $0.37 per Share" ("4Q21 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Defendant Elenio.

361. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.71 and distributable earnings of $0.57 per diluted common share."

362. The 4Q21 Earnings Release provided that:

> Arbor reported net income for the quarter of $106.0 million, or $0.71 per diluted common share, compared to net income of $96.6 million, or $0.80 per diluted common share for the quarter ended December 31, 2020. Net income for the year was $317.4 million, or $2.28 per diluted common share, compared to $163.4

million, or $1.41 per diluted common share for the year ended December 31, 2020. Distributable earnings for the quarter was $94.2 million, or $0.57 per diluted common share, compared to $67.4 million, or $0.49 per diluted common share for the quarter ended December 31, 2020. Distributable earnings for the year was $313.7 million, or $2.01 per diluted common share, compared to $234.9 million, or $1.75 per diluted common share for the year ended December 31, 2020.

363. In addition, the 4Q21 Earnings Release stated that:

> During the fourth quarter of 2021, the Company ***recorded a $10.3 million reversal of provision for loan losses associated with CECL*** on the Company's loan and investment portfolio. At December 31, 2021, the Company's ***total allowance for loan losses was $113.2 million***. The Company had three non-performing loans with a carrying value of $22.7 million, before related loan loss reserves of $2.6 million, compared to six loans with a carrying value of $55.6 million, before related loan loss reserves of $2.6 million as of September 30, 2021.

(Emphasis added).

364. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

365. On February 18, 2023, the Company hosted an investor conference call to discuss the financial results for the fourth quarter and fiscal year ended December 31, 2021 ("4Q21 Earnings Call"). During the call, Defendant Kaufman stated, in relevant part:

> [N]ot only do we generate strong risk-adjusted returns on our capital, which positively affect our current earnings, more importantly, ***we are also building a much higher-quality future earnings and dividend growth story by ensuring that our assets will provide us with multiple other products in the future***. And this is one of the major differentiators of our business platform, which is why we strongly

believe we should consistently trade at a substantial premium and much lower dividend yield than anyone in our peer group.

****

Turning now to our fourth quarter performance, as Paul will discuss in more detail, our quarterly financial results were once again remarkable**.** ***We produced distributable earnings of $0.62 per share***, which is well in excess of our current dividend, representing a payout ratio of around 60% for the fourth quarter and 70% for the full year 2021. In our balance sheet lending business, we had another outstanding quarter, producing record volumes of $4.3 billion. We are a top balance sheet lender in the industry and are seeing tremendous growth and efficiencies as we continue to scale our platform.

As a result, we grow our balance sheet book 122% in 2021 to $12.2 billion on record originations of $9.7 billion, and we have a very large pipeline, which gives us great confidence in our ability to continue to meaningfully grow our loan book in 2022. And again, ***these balance sheet loans create significant value for our platform***. They are not only accretive to our current earnings and dividends, but also ***allow us to build a pipeline for 2 to 3 years of new GSE agency and private label loans that produce additional long-dated income streams***, ensuring the long-term growth of our platform and creating high-quality earnings and dividends for the future.

We have consistently been a leader in the CLO securitization market, as financing ***our high-quality balance sheet portfolio*** with the appropriate liability structures continues to be one of our key business strategies. We are very successful in continuing to access the CLO securitization market in 2021, including closing our largest CLO to date, totaling $2.1 billion in the fourth quarter as well as closing another $2 billion CLO just last week. The utilization of these vehicles has contributed greatly to our success by allowing us to appropriately match-fund our assets with nonrecourse, nonmark-to-market, long-dated debt and generate attractive level of returns on our capital.

****

In reflecting on 2021, we had an exceptional year and clearly outperformed our peer group. We are the best performing REIT 5 years in a row, delivering a 26% annualized return over the same time period. ***We are also well positioned for continued success in 2022 through our unique, multi-tiered, annuity-based operating platform that provides us with a future annuity of high-quality, long-dated income streams***, making us confident in our ability to continue to grow our earnings and dividend and significantly outperform our peers.

(Emphasis added).

366. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In addition, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout. Accordingly, contrary to Kaufman's representations, Defendants were *not* "ensuring" that ABR's assets would provide multiple other products in the future, the Company's balance sheet was *not* "high-quality" nor did it add "significant value" to the Company's portfolio.

367. In addition, Defendant Kaufman knew but failed to disclose that the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As a result, the Company's distributable earnings were likewise artificially inflated.

368. Defendant Elenio stated in his prepared remarks that:

> [W]e had another exceptional quarter, producing distributable earnings of $94 million or $0.57 per share and $0.62 per share, excluding a onetime realized loss of $8 million on a non-multifamily asset that we were taking a reserve on during the height of the pandemic. We also had a record year with distributable earnings of $2.01 per share in 2021, a 15% increase over our 2020 results. And these results translated into industry-high ROEs again of approximately 19% in 2021, allowing

> us to increase our dividend to an annual run rate of $1.48 a share, reflecting 4 increases in 2021 and 7 consecutive quarterly increases, representing a 23% increase over that time span.

369. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As a result, the Company's distributable earnings were likewise artificially inflated.

370. During the Question-and-Answer portion of the 4Q21 Earnings Call, analyst Steven Cole Delany, JMP Securities LLC, Research Division, asked the following question:

> Ivan and Paul, congratulations on an excellent close to last year. I think the thing that jumped off the page the most to me, it's a lot of good things in the report and in the year. But the dramatic growth in your structured business in terms of origination volume, you did $9.7 billion, but $6.8 billion or 70% of that came in the second half of the year. So my question is, the strong demand that you're seeing for multifamily bridge loans in the market, do you expect that to carry over into 2022, and is it possible that 2022 could set a new record for origination volume in the structured business?

371. To which Defendant Kaufman responded:

> Clearly, there was a little bit of a shift in the environment, and I'll give you some of the reasons for it, and why we're so well-positioned and so dominant in that space. And if we got more personnel and mobility, we could probably have done more. We limited what we could do, and we're still limiting what we could do. I think with the huge jump in rates of rental rates and is between 10% to 25% increase in rents from people buying properties and not going for permanent financing. So they're going for more transitional financing before they get to the permanent financing. So it's a very, very big shift.

> Through the COVID period, rents were fairly flat and then right after the initial periods of COVID, rents really accelerated. ***So people are buying multifamily properties, taking a year to 2 years to turn those rents and then getting the benefit of an increased NOI and then go for permanent.*** So that's been the shift in the market. ***We are the best balance sheet lender in the business when it comes to multifamily. We do a great job***. And that business has grown just dramatically. We've probably turned away just a huge amount of business.
>
> In terms of the outlook for 2022, we are running at about $1 billion a month in -- on our books for closings for the first quarter. We are still turning down a significant amount of business. We have restrictions. Human capital is a very, very big restriction today. As we all know, hiring people, retaining people is a big task. We're doing a good job with retention, but hiring new people is very difficult. So right now, the outlook on the balance sheet is still very strong and we still are a market leader in that place in the market.
>
> (Emphasis added).

372. The statements identified the immediately preceding paragraphs are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In addition, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout. Accordingly, contrary to Kaufman's representations, ABR could not reasonably be considered the "best balance sheet lender in the business."

373. During the call, analyst Richard Barry Shane, JPMorgan Chase & Co, Research Division, asked, in relevant part:

> …The second thing is that, when we think about the structured business, I kind of think of that as potential energy ultimately for the agency business. And when we look at the terms of those loans, that's clearly the business model. I am curious, when you underwrite loans and think about business plans, are you starting to contemplate higher interest rates or exits as you're taking on those loans within the

> structured product business with the idea that it may be more expensive for managers, owners to get financing?

374. To which Defendant Kaufman responded:

> We are constantly readjusting our models based on different economics and ***we always underwrite our bridge loans to where the takeout is going to be and we use a certain constant***. So that's something that's different about the way we do our business. Back in November, we actually took a look at where the market is, we took a look at where rents have increased to, readjusted our forecast on rent growth a little bit. While we have exorbitant rent growth, we readjusted our rent growth, because people are starting to think that 10% and 20% rent growth is going to last forever. We think that level of rent growth is going to subside this year as they turn [ new ] units and the market adjusts and then we readjusted our rent growth back to a 3% normalized rate. So that's a very big adjustment.
>
> In terms of increasing the constant that we're using, we are constantly adjusting to where the market is. It's something that we do traditionally. ***We've also reallocated our pricing to be more aggressive on lower loan-to-value in primary markets, starting in November. So we've adjusted our portfolio of lending programs as well on a credit basis. So we're sensitized to all of those different factors in our underwriting***.
>
> (Emphasis added).

375. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In addition, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout.

376. Analyst Michael Smyth with KBW posed the following questions "around rates," first asking: "Are you seeing any changes in sentiment behavior or underwriting on the part of investors?" Defendant Kaufman responded stating:

> I don't think we've seen much of a change. I mean, clearly, loan proceeds are going to be cut with rates going up. There has been a very significant rise in the 10-year from a range of 1.50, now a range of 1.90 to 2 in a quarter in my book and that's definitely affecting loan proceeds for people. ***And it's pretty consistent, underwriting guidelines haven't changed that much***. I think just the amount of proceeds people are taking out or the amount of equity that has to go in is going to be changing on a go-forward basis. I think you'll see a little bit of a shift, maybe to 5- and 7-year products, so people can get a little more proceeds. So there may be a shift a little bit from a 10-year product down to a 5 and 7, but you'll have to see a little bit more equitization in transactions today in order to qualify for long-term fixed-rate financing.
>
> (Emphasis added)

377. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In particular, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout.

## E. <u>1Q22</u>

378. On May 6, 2022, ABR filed with the SEC its quarterly report for the three-month period ended March 31, 2022 on Form 10-Q ("1Q22 10-Q"), signed and certified by Defendants Kaufman and Elenio.

379. The Company reported a net income of $79.9 million for 1Q22, compared to a net income of $81.1 million for the quarter ended March 31, 2021. For 1Q22, ABR reported net income attributable to common stockholders of $64.1 million, or $0.40 per diluted common share, compared to a net income of $69.5 million, or $0.55 per diluted common share for the quarter

ended March 31, 2021. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a $2.4 million provision for loan losses associated with CECL.

380. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Three Months Ended March 31, 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Land | Multifamily | Office | Retail | Student Housing | Hotel | Healthcare | Other | Total |
| Allowance for credit losses: | | | | | | | | | |
| Beginning balance | $ 77,970 | $ 18,707 | $ 8,073 | $ 5,819 | $ 636 | $ 8 | $ 8 | $ 2,020 | $ 113,241 |
| Provision for credit losses (net of recoveries) | (30) | 3,377 | 12 | — | (312) | (4) | (3) | 101 | 3,141 |
| Ending balance | $ 77,940 | $ 22,084 | $ 8,085 | $ 5,819 | $ 324 | $ 4 | $ 5 | $ 2,121 | $ 116,382 |

381. In addition, under the "Non-GAAP Financial Measures", the 1Q22 10-Q reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $92.9 million, or $0.55 per diluted common share, compared to $75.1 million, or $0.52 per diluted common share for the quarter ended March 31, 2021.

382. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

383. Under the Company's "Concentration of Credit Risk", the 1Q22 10-Q stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and

> a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.
>
> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

384. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at March 31, 2022 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset Class / Risk Rating | 2022 | 2021 | 2020 | 2019 | 2018 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 1,503,537 | $ 5,251,052 | $ 475,716 | $ 35,332 | $ — | $ 49,100 | $ 7,314,737 |
| Pass/Watch | 865,188 | 2,438,626 | 384,715 | 181,379 | 99,250 | 350 | 3,969,508 |
| Special Mention | 132,660 | 748,587 | 309,846 | 351,985 | 64,200 | 32,500 | 1,639,778 |
| Substandard | — | 7,400 | 18,582 | 32,370 | — | 8,250 | 66,602 |
| Total Multifamily | $ 2,501,385 | $ 8,445,665 | $ 1,188,859 | $ 601,066 | $ 163,450 | $ 90,200 | $ 12,990,625 |

385. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 77% to its total multifamily asset class.

386. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its

underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants falsified and/or manipulated property appraisals so they would purport to comply with the Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

387. That same day, the Company issued a press release entitled, "Arbor Realty Trust Reports First Quarter 2022 Results and Increases Quarterly Dividend to $0.38 per Share" ("1Q22 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Defendant Elenio.

388. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.40 and distributable earnings of $0.55 per diluted common share."

389. The 1Q22 Earnings Release provided that "Arbor reported net income for the quarter of $64.1 million, or $0.40 per diluted common share, compared to net income of $69.5 million, or $0.55 per diluted common share for the quarter ended March 31, 2021. Distributable earnings for the quarter was $92.9 million, or $0.55 per diluted common share, compared to $75.1 million, or $0.52 per diluted common share for the quarter ended March 31, 2021."

390. In addition, the 1Q22 Earnings Release reported that:

> During the first quarter of 2022, the Company ***recorded a $3.1 million provision*** for loan losses associated with CECL on the Company's loan and investment

> portfolio. At March 31, 2022, the Company's ***total allowance for loan losses was $116.4 million.*** The Company had four non-performing loans with a carrying value of $25.2 million, before related loan loss reserves of $5.1 million, compared to three loans with a carrying value of $22.7 million, before related loan loss reserves of $2.6 million as of December 31, 2021.

(Emphasis added).

391. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

392. Later that day, May 6, 2022, the Company hosted an investor conference call to discuss the financial results for the first quarter of 2022 ("1Q22 Earnings Call").

393. During the call, Defendant Kaufman discussed the Company's first quarter performance stating, in relevant part, that:

> Turning now to our first quarter performance. As Paul will discuss in more detail, our quarterly financial results were once again remarkable. We produced ***distributable earnings of $0.55 per share***, which is well in excess of our current dividend, representing a payout ratio of around 70%.
>
> In our balance sheet business, we had another outstanding quarter. As one of the top multifamily balance sheet lenders in the industry, we continue to see opportunities for significant growth. As a result, we grew our balance sheet loan book another 17% in the first quarter to $14.2 billion on $2.8 billion of new originations. We also have a very robust pipeline, which gives us great confidence in our ability to continue to meaningfully grow our loan book for the balance of the year. And again, ***these balance sheet loans create significant value for our platform as they are not only accretive to our current earnings and dividends, but also allow us to build a pipeline for 2 to 3 years of new GSE/Agency and private***

> ***label loans that produce additional long-term dated income streams, ensuring the long-term growth of our platform and creating high-quality earnings and dividends for the future***.

(Emphasis added).

394. Defendant Kaufman went on to discuss the Company CLO activity stating, in relevant part: "We have consistently been a leader in the CLO securitization market as our financing and ***high-quality balance sheet portfolio*** with the appropriate liability structures continues to be one of the key business strategies" (emphasis added).

395. To conclude his prepared remarks, Defendant Kaufman stated:

> In summary, we had another tremendous quarter, allowing us to once again increase our dividend. ***We strategically built our platform with multiple products that produce many diverse income streams, which provides us with the future annuity of high-quality, long-dated reoccurring earnings***. We're also the premier multifamily originator in this space, and ***we are invested in the right asset classes with very stable liability structures, which positions us extremely well to succeed in every market cycle and gives us great confidence in our ability to continue to significantly outperform our peers***.

(Emphasis added).

396. The statements identified the immediately preceding paragraphs are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In addition, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout. Accordingly, contrary to Kaufman's representations, the Company's balance sheet was *not* "high-quality" nor did it provide multiple other products in the future.

397. In addition, Defendant Kaufman knew but failed to disclose that the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As a result, the Company's distributable earnings were likewise artificially inflated.

398. During the 1Q22 Earnings Call, Defendant Elenio discussed the Company's financial performance stating, in relevant part: "we had another exceptional quarter, producing distributable earnings of $93 million or $0.55 per share. These results translated into industry higher ROEs of approximately 18%, allowing us to once again increase our dividend for the eighth consecutive quarter to an annual run rate of $1.52 a share."

399. The statements identified in the immediately preceding paragraph are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As a result, the Company's distributable earnings were likewise artificially inflated.

## F. <u>2Q22</u>

400. On July 29, 2022, ABR filed with the SEC its quarterly report for the three-month period ended June 30, 2022 on Form 10-Q ("2Q22 10-Q"), signed and certified by Defendants Kaufman and Elenio.

401. The Company reported a net income of $88.1 million for 2Q22, compared to a net income of $84.3 million for the quarter ended June 30, 2021. For 2Q22, ABR reported net income attributable to common stockholders of $69.9 million, or $0.43 per diluted common share, compared to a net income of $69.1 million, or $0.51 per diluted common share for the quarter ended June 30, 2021. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a $5.1 million provision for loan losses associated with CECL.

402. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Three Months Ended June 30, 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Land | Multifamily | Office | Retail | Student Housing | Hotel | Healthcare | Other | Total |
| Allowance for credit losses: | | | | | | | | | |
| Beginning balance | $ 77,940 | $ 22,084 | $ 8,085 | $ 5,819 | $ 324 | $ 4 | $ 5 | $ 2,121 | $ 116,382 |
| Provision for credit losses (net of recoveries) | (22) | 5,874 | (1,054) | — | (163) | 12 | (2) | 304 | 4,949 |
| Ending balance | $ 77,918 | $ 27,958 | $ 7,031 | $ 5,819 | $ 161 | $ 16 | $ 3 | $ 2,425 | $ 121,331 |

403. In addition, under the "Non-GAAP Financial Measures", the 2Q22 10-Q reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $93.7 million, or $0.52 per diluted common share, compared to $68.8 million, or $0.45 per diluted common share for the quarter ended June 30, 2021.

404. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I.,

Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

405. Under the Company's "Concentration of Credit Risk", the 2Q22 10-Q stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.
>
> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

406. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at June 30, 2022 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset Class / Risk Rating | 2022 | 2021 | 2020 | 2019 | 2018 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 1,181,993 | $ 2,106,750 | $ 86,978 | $ — | $ — | $ 20,300 | $ 3,396,021 |
| Pass/Watch | 2,288,500 | 3,644,880 | 643,991 | 169,310 | 51,450 | 32,850 | 6,830,981 |
| Special Mention | 798,856 | 2,182,343 | 288,038 | 296,970 | 64,200 | 8,250 | 3,638,657 |
| Substandard | — | 7,400 | 20,400 | 40,325 | — | — | 68,125 |
| Total Multifamily | $ 4,269,349 | $ 7,941,373 | $ 1,039,407 | $ 506,605 | $ 115,650 | $ 61,400 | $ 13,933,784 |

407. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 77% to its total multifamily asset class.

408. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants falsified and/or manipulated property appraisals so they would purport to comply with the Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

409. That same day, the Company issued a press release entitled, "Arbor Realty Trust Reports Second Quarter 2022 Results and Increases Dividend for Ninth Consecutive Quarter to

$0.39 per Share" ("2Q22 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Defendant Elenio.

410. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.41 and distributable earnings of $0.52 per diluted common share."

411. The 2Q22 Earnings Release provided that: "Arbor reported net income for the quarter of $69.9 million, or $0.41 per diluted common share, compared to net income of $69.1 million, or $0.51 per diluted common share for the quarter ended June 30, 2021. Distributable earnings for the quarter was $93.7 million, or $0.52 per diluted common share, compared to $68.8 million, or $0.45 per diluted common share for the quarter ended June 30, 2021."

412. In addition, the 2Q22 Earnings Release reported that:

> During the second quarter of 2022, the Company ***recorded a $4.9 million provision*** for loan losses associated with CECL, which was net of a $1.5 million loan loss recovery. At June 30, 2022, the Company's ***total allowance for loan losses was $121.3 million.*** The Company had four non-performing loans with a carrying value of $25.2 million, before related loan loss reserves of $5.1 million, which is unchanged from March 31, 2022.

(Emphasis added).

413. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

414. Later that day, July 29, 2022, the Company hosted an investor conference call to discuss the financial results for the second quarter of 2022 ("2Q22 Earnings Call"). During the call, Defendant Kaufman stated, in relevant part:

> Additionally, we have successfully operated our business through multiple cycles and have a very seasonal and experienced asset management team that positions us exceptionally well to succeed in this cycle as well. These are significant differentiating factors from the rest of our peer group, most of which have monoline businesses which struggle to maintain their dividend and like the experience and expertise to manage through this downturn.
>
> And this is why we believe we are superiorly positioned or in a class by ourselves and should trade a substantial premium at a much lower dividend yield than anyone in our peer group. Turning now to our second quarter, as Paul will discuss in more detail, our quarterly financial results were once again remarkable. We produced ***distributable earnings of $0.52 per share***, which is well in excess of our current dividend, representing a payout ratio of around 75%. ***Our financial results will also benefit greatly from rising interest rates, which will significantly increase the net interest income on our floating rate loan book as well as earnings on our escrow balances***.
>
> ****
>
> As a result, we recently decided to sell $300 million of multifamily bridge loans, which generated $90 million of fresh capital. We also retained a portion of the upfront origination fees and all of the potential exit fees as well as a 12.5 basis point servicing fee and control over the takeout of each loan, which is vital to our business strategy as ***these balance sheet loans provide us with a pipeline for 2 to 3 years of new GSE/Agency loans and produce additional long-dated income streams***.
>
> ****
>
> In our GSE/Agency and private label programs, we originated $1.2 billion of loans in the second quarter. ***We also have a robust pipeline what will give us confidence in our ability to produce consistent volumes for the rest of the year***. Our GSE/Agency platform continues to offer a premium value as it requires limited capital and generates significant long-dated, predictable income streams and produces significant annual cash flow.
>
> ****
>
> In summary, we had another tremendous quarter, allowing us to once again increase our dividend. ***We strategically built our platform to operate successfully in all cycles with multiple products that produce many diverse income streams providing us with a future annuity of high-quality, long-dated reoccurring***

> ***earnings. We are also the premium multifamily originator in this space and are invested in the right asset classes with very stable liability structures and are well capitalized, which positions us extremely well to succeed in this environment*** and to continue to significantly outperform our peers.

(Emphasis added).

415. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In addition, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout.

416. Next, Kaufman knew but failed to disclose that the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines. As a result, the Company's distributable earnings were likewise artificially inflated and materially misleading.

417. Lastly, because Kaufman chose to speak about how rising interest rates were having a positive impact on the Company's earnings, he had a duty to disclose that described positive impact was unsustainable; rising interest rates significantly increased the risk that the vast majority of ABR's floating-rate, structurally unsound loan portfolio would be unable to make their loan payments, negatively impacting the Company's net interest income.

418. During the 2Q22 Earnings Call, Defendant Elenio stated, in relevant part:

> [W]e had another exceptional quarter, producing distributable earnings of $94 million or $0.52 per share. These results translated into industry high ROEs again of approximately 17%, allowing us to once again increase our dividend for the ninth consecutive quarter to an annual run rate of $1.56 a share.
>
> Net interest income, on the other hand, on our balance sheet loan book increased $10.8 million this quarter from portfolio growth and significant increases in LIBOR and SOFR rates during the quarter. And as the current LIBOR and SOFR curves are predicted to continue to increase***, it's very important to note that any further increases in these rates will continue to increase the net interest income spreads in our floating rate loan book***.

(Emphasis added).

419. The statements identified in the immediately preceding paragraph are false and misleading because Elenio knew but failed to disclose that the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines. As a result, the Company's distributable earnings were likewise artificially inflated and materially misleading. In addition, because Elenio chose to speak about how rising interest rates were having a positive impact on the Company's earnings, he had a duty to disclose that described positive impact was unsustainable; rising interest rates significantly increased the risk that the vast majority of ABR's floating-rate, structurally unsound loan portfolio would be unable to make their loan payments, negatively impacting the Company's net interest income.

420. During the Question-and-Answer portion of the call, analyst Richard Barry Shane, JPMorgan Chase & Co., asked: "I'm just curious in the current environment with the movement in collateral values with potential delays related to supply chain and labor shortages in terms of timelines on construction. And finally, any sort of vacancy absorption, is it realistic that we will

see paper or loans stay in the -- on the balance sheet longer before they are migrated for Agency sales?" To which Kaufman responded:

> So there's two ways to look at that. We actually think, on our balance sheet, there could be a facilitation to Agency execution because of the way the yield curve is. If people are borrowing at 350 over 400 over, then SOFR is driven to a level of -- with a borrower cost of 6%, you can execute on to Agency at -- maybe 1.50 to 1.75 over the 10 year, you have kind of an inverted yield curve. So we're seeing a lot of people, and we're talking for them to convert them off the balance sheet from a 6% -- 5.5% to 6% pay rate would potentially move up in SOFR and more risks and cap costs into a 10-year fixed rate of 4.25% to 4.5%.
>
> ***So for those products that were put on a year ago, 1.5 years ago, I think we're going to see some real movement, which is going to help maintain our Agency volumes***. That's on that side of the coin. And to our surprise, you have a 10-year or 2.75, that's pretty low. So I think we'll see that happen maybe a little quicker than we thought. …

421. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans that were not Agency eligible, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As a result, contrary to Defendant Kaufman's representations, the loans added to the Company's balance sheet roughly 1 to 1.5 years prior could not support ABR's Agency volumes.

422. Mr. Shane followed up by asking, "given the floating rate nature of the loans, do you require borrowers to take any interest rate protection in the form of caps?" To which Defendant Kaufman responded: "***Yes, our loans require caps***. Some of them have spring caps. ***Most of the loans have a lot of caps*** and of course, the rates were moving up. ***All these caps were -- if they weren't in place, it will be put in place and that was a whole process. So a majority of our loans are significant. Super majority of our loans have those caps***" (emphasis added).

423. The statements identified in the immediately preceding paragraph are false. According to the accounts of FE9, ABR stopped requiring rate caps for "stronger performing deals" around mid- to late-2021. And FE8 recalled that in early-2022, the Company no longer required rate caps on any bridge loans. As later revealed, even when its loan book was distressed due to high numbers of delinquent and/or non-performing loans, ABR allowed borrowers to restructure their loans without rate caps.

424. During the 2Q22 Earnings Call, analyst Jade Joseph Rahmani Keefe, Bruyette, & Woods, Inc., posed the question: "Considering the growth in the balance sheet portfolio, you all achieved, the bridge loan portfolio, over the last several quarters and the current change in valuations in real estate. How are you feeling about the credit quality of the existing portfolio and the outlook there?" To which Defendant Kaufman responded:

> So I think when I mentioned earlier, Jade, that we had 8 price increases over the last 9 months, commensurate with that, ***we also adjusted our underwriting standards step by step by step. We've adjusted them by having lower LTVs. I think our LTVs from 9 months ago until now on the originations basis, probably 7 percentage points less. We've adjusted our exit test because as we've talked on this call when we do a bridge loan, every bridge loan is underwritten to agency execution and final takeout***.
>
> So we kept adjusting those underwriting standards. ***So we feel very comfortable with the book that we put on over the last 9 months.*** In addition, a lot of our loans have a lot of different rebalance and tests that have good structural enhancements. ***So we're real comfortable with what we have in place and the way we manage our book and features on them and our asset management capability.***
>
> So we've begun to go through our portfolio. We've begun to work with our borrowers and making sure that they have adequate interest reserves and replenishments to take it into consideration a rise in interest rates. ***And we're comfortable with the way we're running our outlook.***
>
> (Emphasis added)

425. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had substantially

deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In particular, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout. As described in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, significantly increasing ABR's risk of loss due to delinquencies or non-performance.

426. Mr. Rahmani and Defendant Kaufman engaged in the following dialogue regarding rent growth and delinquencies on the Company's multifamily bridge loans.

> **Jade Joseph Rahmani** Keefe, Bruyette, & Woods, Inc., Research Division – Director: …And on the multifamily rent growth side, it seems that rents are continuing to be very robust in the market. Across the servicing portfolio and the bridge loan portfolio in your surveillance, are you seeing continued strong rent growth? And are you seeing the transitional loans, those projects hit their business plans?
>
> **Ivan Paul Kaufman** Arbor Realty Trust, Inc. – Chairman, President & CEO: I think that the rent growths have far exceeded all of our underwriting and all our expectations. I mean you're seeing 10% to 20% rent growth. You're seeing people not having to use their renovation dollars to turn their units and get their rent growth. So the rent growth story is still strong. I would put a caution on that, a little different than the rest of the marketplace having been through a lot of cycles.
>
> I think if you're looking at a recession, we're going to lower rent growth going forward. And we're also going to a little bit higher in economic vacancy. So we're still optimistic about what's in the portfolio and the rent rolls, but we are proceeding with some level of caution for 2023 with probably flat to 3% rent growth and 1 to 2 points higher in economic vacancy. That's how we're looking at 2022.

> **Jade Joseph Rahmani** Keefe, Bruyette, & Woods, Inc., Research Division – Director: And under that scenario, what kind of delinquency rates or default rates does that imply? Anything material?
>
> **Ivan Paul Kaufman** Arbor Realty Trust, Inc. – Chairman, President & CEO: ***Nominal. Not anything that significant, not anything that we can't handle and not anything that's not within our capital projections***.
>
> (Emphasis added).

427. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As described in further detail in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, significantly increasing ABR's risk of loss due to delinquencies or non-performance.

## G. 3Q22

428. On November 4, 2022, ABR filed with the SEC its quarterly report for the three-month period ended September 30, 2022 on Form 10-Q ("3Q22 10-Q"), signed and certified by Defendants Kaufman and Elenio.

429. The Company reported a net income of $79.1 million for 3Q22, compared to a net income of $86.1 million for the quarter ended September 30, 2021. For 3Q22, ABR reported net income attributable to common stockholders of $62.7 million, or $0.37 per diluted common share, compared to a net income of $72.8 million, or $0.51 per diluted common share for the quarter

ended September 30, 2021. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a $2.3 million provision for loan losses associated with CECL.

430. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Three Months Ended September 30, 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Land | Multifamily | Office | Retail | Student Housing | Hotel | Healthcare | Other | Total |
| Allowance for credit losses: | | | | | | | | | |
| Beginning balance | $ 77,918 | $ 27,958 | $ 7,031 | $ 5,819 | $ 161 | $ 16 | $ 3 | $ 2,425 | $ 121,331 |
| Provision for credit losses (net of recoveries) | (8) | (675) | 306 | — | 14 | 2 | 1 | 1,325 | 965 |
| Ending balance | $ 77,910 | $ 27,283 | $ 7,337 | $ 5,819 | $ 175 | $ 18 | $ 4 | $ 3,750 | $ 122,296 |

431. In addition, under the "Non-GAAP Financial Measures", the 3Q22 10-Q reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $105.1 million, or $0.56 per diluted common share, compared to $75.7 million, or $0.47 per diluted common share for the quarter ended September 30, 2021.

432. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

433. The 3Q22 10-Q provided under "Allowance for Credit Losses", a "summary of [ABR's] non-performing loans by asset class [] as follows (in thousands):"

| | September 30, 2022 | | | December 31, 2021 | | |
|---|---|---|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Student Housing | $ 20,500 | $ — | $ 20,500 | $ 21,500 | $ — | $ 21,500 |
| Retail | 3,445 | — | 3,445 | 920 | — | 920 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Total | $ 25,645 | $ — | $ 25,645 | $ 24,120 | $ — | $ 24,120 |

434. The statements identified in the immediately preceding paragraph are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As set forth in Section V.E., corroborated by numerous former employee accounts, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. As described in further detail in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

435. Under the Company's "Concentration of Credit Risk", the 3Q22 10-Q stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower

> strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.
>
> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

436. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at September 30, 2022 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset Class / Risk Rating | 2022 | 2021 | 2020 | 2019 | 2018 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 278,255 | $ 302,181 | $ 5,935 | $ 38,375 | $ — | $ 20,300 | $ 645,046 |
| Pass/Watch | 3,208,311 | 4,006,812 | 599,665 | 279,891 | 41,650 | — | 8,136,329 |
| Special Mention | 1,132,268 | 3,354,479 | 197,450 | 91,917 | 64,000 | 7,594 | 4,847,708 |
| Substandard | — | 10,125 | 52,350 | 40,325 | — | — | 102,800 |
| Total Multifamily | $ 4,618,834 | $ 7,673,597 | $ 855,400 | $ 450,508 | $ 105,650 | $ 27,894 | $ 13,731,883 |

437. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 77% to its total multifamily asset class.

438. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally

unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants falsified and/or manipulated property appraisals so they would purport to comply with the Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

439. That same day, the Company issued a press release entitled, "Arbor Realty Trust Reports Third Quarter 2022 Results and Increases Dividend for Tenth Consecutive Quarter to $0.40 per Share" ("3Q22 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Defendant Elenio.

440. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.36 per diluted common share" and "Distributable earnings of $0.56 per diluted common share, well in excess of our current dividend, representing a 71% payout ratio."

441. The 3Q22 Earnings Release provided that: "Arbor reported net income for the quarter of $62.7 million, or $0.36 per diluted common share, compared to net income of $72.8 million, or $0.51 per diluted common share for the quarter ended September 30, 2021. Distributable earnings for the quarter was $105.1 million, or $0.56 per diluted common share, compared to $75.7 million, or $0.47 per diluted common share for the quarter ended September 30, 2021."

442. In addition, the 3Q22 Earnings Release reported that:

> During the third quarter of 2022, the Company ***recorded a $1.0 million provision for loan losses associated with CECL***. At September 30, 2022, the Company's ***total allowance for loan losses was $122.3 million.*** The Company ***had four non-performing loans with a carrying value of $24.2 million***, before related loan loss reserves of $5.1 million, compared to four loans with a carrying value of $25.2 million, before related loan loss reserves of $5.1 million at June 30, 2022.

(Emphasis added).

443. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

444. In addition, the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As described in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

445. Later that day, November 4, 2022, the Company hosted an investor conference call to discuss the financial results for the third quarter of 2022 ("3Q22 Earnings Call"). During the call, Defendant Kaufman stated, in relevant part, that:

> Turning now to our third quarter performance, as Paul will discuss in more detail. Our quarterly financial results were once again remarkable. We produced ***distributable earnings of $0.56 per share,*** which is well in excess of our current dividend, representing a payout ratio of around 71%. ***Our financial results continue to benefit greatly from rising interest rates, which has significantly increased our net interest income on our floating rate loan book*** as well as earnings on our escrow balances.

446. Defendant Kaufman maintained that "***[w]e have also placed a heavy focus on converting our multifamily bridge loan runoff into agency loans, which is a critical part of our business strategy***, as our Agency Business is capital-light and produces significant additional long-dated income streams." He went on to state that:

> In our GSE/Agency business, we originated another $1.1 billion of loans in the third quarter. October's originations came in at $250 million, and we have seen some leveling off in the pipeline given the rise in the tenure. Despite the current rate environment, ***we believe we can close out the fourth quarter with a similar volume as the third quarter, as, again, we*** have a strategic advantage in that we focus on the workforce housing part of the market, and ***have a large multifamily balance sheet loan book that naturally feeds our Agency Business***.

447. The statements identified the immediately preceding paragraphs are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In addition, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout. As described in Section V.F., corroborated by the accounts of FE1, FE6, and FE8,

shifts in economic and market conditions had already placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, ineligible for Agency takeout, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss.

448. Next, Kaufman knew but failed to disclose that the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines. As a result, the Company's distributable earnings were likewise artificially inflated and materially misleading.

449. Lastly, because Kaufman chose to speak about how rising interest rates were having a positive impact on the Company's earnings, he had a duty to disclose that described positive impact was unsustainable; rising interest rates significantly increased the risk that the vast majority of ABR's portfolio would be unable to make their loan payments and, in fact, as corroborated by FE6 and FE8, many borrowers were already delinquent, negatively impacting the Company's net interest income.

## H. 4Q22

450. On February 17, 2023, ABR filed with the SEC its annual report for the fiscal year ended December 31, 2022 on Form 10-K ("FY22 10-K"), signed and certified by Defendants Kaufman and Elenio.

451. The Company reported a net income of $353.8 million for FY22, compared to a net income of $377.8 million for the fiscal year ended December 31, 2021. For FY22, ABR reported net income attributable to common stockholders of $284.8 million, compared to a net income of

$317.4 million for the fiscal year ended December 31, 2021. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a $21.2 million provision for loan losses associated with CECL for FY22, compared to a provision reversal of $21.1 million for the fiscal year ended December 31, 2021.

452. The FY22 10-K went on to discuss the Company's "Other Expenses" providing, in relevant part, that:

> We recorded CECL provisions totaling $23.0 million during 2022 and a provision recovery of $27.3 million during 2021. The CECL provision in 2022 primarily reflects increases in our loans and investments balance, as a result of portfolio growth, along with rising interest rates and inflation in our CECL models for our Structured Business, which predominantly consists of variable rate loans. The provision recovery during 2021 was primarily due to the reversal of CECL reserves in both business segments in connection with improved market conditions and expected future forecasts.

453. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Year Ended December 31, 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Land | Multifamily | Office | Retail | Student Housing | Healthcare | Hotel | Other | Total |
| Allowance for credit losses: | | | | | | | | | |
| Beginning balance | $ 77,970 | $ 18,707 | $ 8,073 | $ 5,819 | $ 636 | $ 8 | $ 8 | $ 2,020 | $ 113,241 |
| Provision for credit losses (net of recoveries) | 98 | 19,254 | 89 | — | (598) | 8 | 6 | 461 | 19,318 |
| Ending balance | $ 78,068 | $ 37,961 | $ 8,162 | $ 5,819 | $ 38 | $ 16 | $ 14 | $ 2,481 | $ 132,559 |

454. In addition, under the "Non-GAAP Financial Measures", the FY22 10-K reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $405.7 million, or $2.23 per diluted common share, compared to $313.7 million, or $2.01 per diluted common share for the fiscal year ended December 31, 2021.

455. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I.,

Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

456. The FY22 10-K provided under "Allowance for Credit Losses", a "summary of [ABR's] non-performing loans by asset class [] as follows (in thousands):"

| | December 31, 2022 | | | December 31, 2021 | | |
|---|---|---|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Multifamily | $ 2,605 | $ — | $ 2,605 | $ — | $ — | $ — |
| Retail | 3,445 | — | 3,445 | 920 | — | 920 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Student Housing | — | — | — | 21,500 | — | 21,500 |
| Total | $ 7,750 | $ — | $ 7,750 | $ 24,120 | $ — | $ 24,120 |

457. The statements identified in the immediately preceding paragraph are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As set forth in Section V.E., corroborated by numerous former employee accounts, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. As described in further detail in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that

improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

458. Under the Company's "Concentration of Credit Risk", the FY22 10-K stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.
>
> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

459. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at December 31, 2022 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset Class / Risk Rating | 2022 | 2021 | 2020 | 2019 | 2018 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 468,655 | $ 744,231 | $ 10,135 | $ — | $ — | $ 20,300 | $ 1,243,321 |
| Pass/Watch | 3,163,624 | 3,385,114 | 523,057 | 335,573 | 41,650 | — | 7,449,018 |
| Special Mention | 1,193,665 | 2,843,508 | 34,575 | 7,285 | — | 7,594 | 4,086,627 |
| Substandard | — | 255,779 | 26,700 | 22,975 | 32,500 | — | 337,954 |
| Total Multifamily | $ 4,825,944 | $ 7,228,632 | $ 594,467 | $ 365,833 | $ 74,150 | $ 27,894 | $ 13,116,920 |

460. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 77% to its total multifamily asset class.

461. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants falsified and/or manipulated property appraisals so they would purport to comply with the Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

462. The FY22 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***Increases in loan loss reserves and other impairments are likely if economic conditions deteriorate***. A decline in economic conditions could negatively impact the credit quality of our loan and investment portfolio and could cause us to experience increases in loan loss reserves, defaulted loans and other asset impairment charges.

463. The statements identified in the immediately preceding paragraph are false and misleading because they presented a negative impact on the credit quality of ABR's loan and investment portfolio stemming from a decline in economic conditions as a future possibility when, in fact, these risks were actual and had already come to fruition. As described in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions, beginning in March 2022 and continuing through the end of the Class Period, placed significant strain on the Company's portfolio, full of structurally unsound, floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss due to loan restructuring, modification, and/or default. For instance, by January 2023, roughly two-thirds, if not more, of ABR's Structured portfolio had DSCRs of >1x – meaning the properties backing these loans were not generating enough cash flow to cover their debt payments.

464. The FY22 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***Risks Related to Our Financing and Hedging Activities.*** We finance a significant amount of our loans and investments through a variety of means, including CLOs, securitizations, credit facilities, equity capital, senior and convertible debt instruments, and other structured financings. These vehicles may contain restrictive covenants and may require us to provide additional collateral or repurchase assets if the value of pledged assets, some of which we guarantee, decline in value. If we are unable to acquire eligible investments, find suitable replacement investments and access financing sources on favorable terms, or at all, we may not be able to obtain the level of leverage necessary to optimize our return on investment and cash available for distribution to our stockholders may decline.

465. The statements identified in the immediately preceding paragraphs are false and misleading because they presented the risks of non-performance or delinquency under the Company's CLOs as a future possibility when, in fact, these risks were actual and had already come to fruition. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3,

FE4, FE5, FE8, FE9, FE10, and FE11, the Company had already substantially deviated from its underwriting standards and guidelines to drive up loan volume during the years 2021 and 2022, resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. Most of the Company's bridge loans (approximately two-thirds), originated under sub-par lending practices, were packaged into ABR's CLO pools in violation of the representations and warranties made when ABR securitized the loans. Because of the terms and tranches of the CLOs, ABR was forced to shoulder the burden of the losses associated with the underlying assets' underperformance and borrowers' delinquency or non-performance, in part, through billions of dollars of loan modifications on less favorable terms.

466. The FY22 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***Loan loss reserves are particularly difficult to estimate in a turbulent economic environment***. We perform a quarterly evaluation of our loans to determine whether an impairment charge is necessary and adequate to absorb probable losses. The valuation process requires certain estimates and judgments, which are more difficult to make during a period in which available commercial real estate credit is limited and commercial real estate transactions have decreased. Our estimates and judgments are based on several factors, including projected cash flows from the collateral securing our loans, loan structure, including the availability of reserves and recourse guarantees, likelihood of repayment in full at loan maturity, potential for refinancing by other lenders and expected market discount rates for varying property types. If our estimates and judgments are not correct, our results of operations and financial condition could be severely impacted.

467. The statements identified in the immediately preceding paragraph are false and misleading because they presented the risks of failing to adequately assess the Company's risk of loss and allocate reasonable or sufficient loan loss reserves as a future possibility when, in fact, these risks were actual and had already come to fruition. As set forth in Section V.E., corroborated by numerous former employee accounts, the Company substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound

multifamily bridge loans at material risk of non-performance and/or default from the time of origination. As set forth in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines. As described in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions, beginning in March 2022 and continuing through the end of the Class Period, placed significant strain on the Company's portfolio, full of structurally unsound, floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss due to loan restructuring, modification, and/or default.

468. The FY22 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***Loan repayments are less likely in a volatile market environment***. Loan repayments are a significant source of liquidity for us. If borrowers are unable to refinance loans at maturity, the loans could go into default and the liquidity that we expect to receive from such repayments may not be available. Further, in the event the commercial real estate finance market deteriorates, borrowers that have extension rights will be more likely to exercise such rights, which will further delay our ability to access liquidity through repayments.

469. The statements identified in the immediately preceding paragraph are false and misleading because they presented the risks of non-performance or default stemming from a decline in economic conditions as a future possibility when, in fact, these risks were actual and had already come to fruition. As described in Section V.F., corroborated by the accounts FE6 and FE8, borrowers were already struggling to make loan payments by October 2022, and as corroborated by FE1, FE2, FE11, and FE12, refinancing at maturity, or Agency takeout, was not

option due to the Company's substantial deviation from its underwriting standards, as described in Section V.E.

470. The FY22 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***We may be unable to invest excess capital on acceptable terms, or at all, which would adversely affect our operating results***. We may not be able to identify investments that meet our investment criteria and we may not be successful in closing the investments that we do identify. In addition, the investments that we fund with our capital may not produce a satisfactory return on capital, which would adversely affect our operating results.

471. The statements identified in the immediately preceding paragraph are false and misleading because they presented the risk of investing in assets that did not meet the Company's "investment criteria" as a future possibility when, in fact, these risks were actual and had already come to fruition. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination.

472. The FY22 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***Volatility in values of multifamily and commercial properties may adversely affect our loans and investments***. …In the event a property's net operating income decreases, a borrower may have difficulty repaying our loan, which could result in losses to us. In addition, decreases in property values reduce the value of the collateral and the potential proceeds available to a borrower to repay our loans, which could negatively impact our operating results…

473. The statements identified in the immediately preceding paragraph are false and misleading because they presented the risk of declining NOIs and property values as a future

possibility when, in fact, these risks were actual and had already come to fruition. As set forth in Section V.F. and V.G., corroborated by FE6, FE8, and FE12, rising operating costs, declining rent growth, inflation, and declining property valuations were already having a negative impact on borrowers' NOIs and declining property values were already having a negative impact on the Company's ability to restructure or modify non-performing or defaulted loans on favorable terms. Indeed, FE12 describes detailed efforts by the Company to artificially drive up property values to avoid losses or impairment.

474. The FY22 10-K, when discussing "Inflation" provided that, "Currently, rising interest rates will positively impact our net interest income since our structured loan portfolio exceeds our corresponding debt balances and the vast majority of our loan portfolio is floating-rate based on SOFR or LIBOR."

475. The statements identified in the immediately preceding paragraph are false and misleading because they omitted material adverse information concerning the negative impacts rising interest rates were already having on the Company's Structured loan portfolio. Because ABR chose to speak about how rising interest rates were having a positive impact on the Company's earnings, it had a duty to disclose that described positive impact was unsustainable; rising interest rates significantly increased the risk that the vast majority of ABR's portfolio would be unable to make their loan payments and, in fact, as corroborated by FE6 and FE8, many borrowers were already delinquent, negatively impacting the Company's net interest income.

476. When discussing the Company's "Real Estate Values and Credit Risk," the FY22 10-K provided that:

> Commercial mortgage assets may be viewed as exposing an investor to greater risk of loss than residential mortgage assets since such assets are typically secured by larger loans to fewer obligors than residential mortgage assets. Multifamily and commercial property values, net operating income derived from such properties,

> and borrowers' credit ratings are subject to volatility and ***may be*** negatively affected by a number of factors, including, but not limited to, events such as natural disasters and pandemics, acts of war, terrorism, local economic and/or real estate conditions (such as industry slowdowns, oversupply of real estate space, occupancy rates, construction delays and costs) and other macroeconomic factors beyond our control. The performance and value of our loan and investment and servicing portfolios depend on the borrowers' ability to operate the properties that serve as collateral so that they produce adequate cash flow to pay their loans. ***We attempt to mitigate these risks through our underwriting and asset management processes. Our asset management team reviews our portfolios consistently and is in regular contact with borrowers to monitor the performance of the collateral and enforce our rights as necessary***.

(Emphasis added).

477. The statements identified the immediately preceding paragraph are false and misleading because the Company failed to disclose that it had already substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As described in further detail in Sections V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses in internal controls concerning its concentration of risk, including asset management, to keep its risk of loss from surfacing throughout the Class Period.

478. That same day, February 17, 2023, the Company issued a press release entitled, "Arbor Realty Trust Reports Fourth Quarter and Full Year 2022 Results and Declares Dividend of $0.40 per Share" ("4Q22 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Defendant Elenio.

479. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.49 per diluted common share" and "Distributable earnings of $0.60 per diluted common share1, well in excess of our current dividend, representing a 67% payout ratio."

480. The 4Q22 Earnings Release provided that:

> Arbor reported net income for the quarter of $88.2 million, or $0.49 per diluted common share, compared to net income of $106.0 million, or $0.71 per diluted common share for the quarter ended December 31, 2021. Net income for the year was $284.8 million, or $1.67 per diluted common share, compared to $317.4 million, or $2.28 per diluted common share for the year ended December 31, 2021. Distributable earnings for the quarter was $114.0 million, or $0.60 per diluted common share, compared to $94.2 million, or $0.57 per diluted common share for the quarter ended December 31, 2021. Distributable earnings for the year was $405.7 million, or $2.23 per diluted common share, compared to $313.7 million, or $2.01 per diluted common share for the year ended December 31, 2021.

481. In addition, the 4Q22 Earnings Release reported that:

> During the fourth quarter of 2022, the Company ***recorded a $10.3 million provision for loan losses associated with CECL.*** At December 31, 2022, the Company's ***total allowance for loan losses was $132.6 million***. The Company had ***four non-performing loans with a carrying value of $7.7 million***, before related loan loss reserves of $5.1 million, compared to four loans with a carrying value of $24.2 million, before related loan loss reserves of $5.1 million at September 30, 2022.

(Emphasis added).

482. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

483. In addition, the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As described in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

484. On February 17, 2023, the Company hosted an investor conference call to discuss the financial results for the fourth quarter and fiscal year ended December 31, 2022 ("4Q22 Earnings Call"). During the call, Defendant Kaufman stated, in relevant part:

> ***We have strategically built our platform to succeed in all cycles, as a result we believe we're extremely well positioned to continue to outperform in this economic downturn. We have been very cognizant over the last 18 months preparing for what we believe would be a very challenging recessionary environment. As a result, we have taken a patient and selective approach to new investment*** and have been heavily focused on preserving and building up the strong liquidity position. This has allowed us to accumulate over $800 million of cash and liquidity on hand, providing us with the unique ability to remain offensive and take advantage of the many opportunities that will exist in this recession to garner premium yields on our capital.
>
> Turning now to our fourth quarter performance. As Paul will discuss in more detail, our quarterly financial results were once again remarkable. ***We produced distributable earnings of $0.60 per share, which is well in excess of our current dividend, representing a payout ratio of around 67%. Our financial results also have continued to benefit greatly from rising interest rates, which has significantly increased the net interest income and on our floating rate loan book as well as earnings on our escrow balances.*** And clearly, with our extremely low payout ratio and multiple predictable reoccurring income streams, we are uniquely

positioned as one of the only companies in our space with a very sustainable, protected dividend even in a challenging environment.

***We continue to place a heavy focus on converting our multifamily bridge loans into Agency loans, which is a critical part of our business strategy,*** and our Agency business is capital light and produces significant long-dated income streams. We had tremendous success in the fourth quarter recapturing over $500 million, or around half of our balance sheet runoff, into new Agency originations. ***A key component to our success in this area is a unique opportunity that exists in today's markets given the inverted yield curve to garner premium yields on our capital by refinancing certain of our balance sheet loans into Agency product and provide mezzanine financing***.

****

In our GSE/Agency business, we had a very strong fourth quarter, originating $1.5 billion of new loans. These numbers include a few large deals in December that were accelerated in order to close by year-end, resulting in a light start to 2023 with approximately $150 million of originations in January. However, ***our pipeline remains strong, giving us confidence in our ability to produce similar volumes in 2023. Additionally, we have a strategic advantage in that we focus on the workforce housing part of the market and have a large multifamily balance sheet loan book that naturally feeds our Agency business***. In fact, we are one of the leading Agency lenders in the achievement of affordable housing goals, and as a result, we will continue to be viewed very favorably by the agencies. And again, this Agency business offers a premium value, and it requires limited capital and generates significant, long-dated, predictable income streams and produces significant annual cash flow.

(Emphasis added).

485. The statements identified the immediately preceding paragraph are false and misleading because Kaufman knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In addition, as corroborated by FE1, FE2, and FE11, the Company abandoned its stated standards of underwriting its Structured loans for Agency takeout. As described in Section V.F., corroborated by the accounts of FE1, FE6, and FE8,

shifts in economic and market conditions had already placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, ineligible for Agency takeout, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss.

486. Next, Kaufman knew but failed to disclose that the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines. As a result, the Company's distributable earnings were likewise artificially inflated and materially misleading.

487. Lastly, because Kaufman chose to speak about how rising interest rates were having a positive impact on the Company's earnings, he had a duty to disclose that described positive impact was unsustainable; rising interest rates significantly increased the risk that the vast majority of ABR's portfolio would be unable to make their loan payments and, in fact, as corroborated by FE6 and FE8, many borrowers were already delinquent, negatively impacting the Company's net interest income.

488. During his prepared remarks for the 4Q22 Earnings Call, Defendant Elenio stated, in relevant part, that:

> [W]e had another exceptional quarter producing distributable earnings of $114 million or $0.60 per share. ***We also had a record year with distributable earnings of $2.23 per share in 2022, a 11% increase over our 2021 results.*** These results translated into industry-high ROEs of approximately 18% in 2022, allowing us to increase our dividend 3x to an annual run rate of $1.50 a share, reflecting a dividend-to-earnings ratio of around 67% for the fourth quarter and 70% for the full year 2022.

****

> Our overall net interest spreads in our core assets, excluding the $8 million of default interest we collected in the fourth quarter, increased to 2.11% this quarter compared to $2.08 last quarter, and our overall spot net interest spreads were up to 1.92% at December 31 from 1.82% at September 30, again, mostly due to the positive effect of rising rates on our floating rate loan book and higher spreads in our new originations. Lastly, we believe it's important to emphasize some of ***the significant advantages of our business model, which gives us comfort in our ability to continue to generate high-quality, long-dated recurring earnings in the future. One of these features is the continued growth we'll see in our net interest income spreads as rates rise in our floating rate loan book***. In fact, all things remaining equal, a 50 basis point increase in rates, 20 basis points of which has already occurred since year-end, would produce approximately $0.05 a share annually in additional earnings.

(Emphasis added).

489. The statements identified in the immediately preceding paragraph are false and misleading because Defendant Elenio knew but failed to disclose that the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines. As a result, the Company's distributable earnings were likewise artificially inflated and materially misleading. Additionally, because Elenio chose to speak about how rising interest rates were having a positive impact on the Company's earnings, he had a duty to disclose that described positive impact was unsustainable; rising interest rates significantly increased the risk that the vast majority of ABR's portfolio would be unable to make their loan payments and, in fact, as corroborated by FE6 and FE8, many borrowers were already delinquent, negatively impacting the Company's net interest income.

490. During the Question-and-Answer portion of the 4Q22 Earnings Call, analyst Richard Barry Shane, JPMorgan Chase & Co, asked:

> I apologize if this is redundant, as like many of my peers, bouncing around between calls this morning. Just want to talk a little bit about the migration between the

> Structured Business and the Agency business to the extent historically you've put loans on balance sheet, worked with borrowers to complete the projects and then securitized those or sold them to the agencies. I'm curious if you think in this environment, there is -- how that compares to other commercial mortgage REIT models where the ultimate takeout is in the private term markets as opposed to the government term markets.

491. To which Defendant Kaufman responded:

> So as you know, ***our business model on every bridge loan we do is for an Agency takeout.*** That's how we're built. That's how we're structured. That's how the economics of the firm really flows, and that's the value of our franchise. ***So each and every loan that's in our portfolio is underwritten accordingly.*** So in this kind of yield environment, when you have an inverted yield curve, many of the borrowers have a decision to make. Do they pay higher interest costs when their caps burn off? Can they cash in their caps and use that as equity and recapitalize some of their assets? Go with a fixed rate? If you're floating rate individual, you're paying anywhere between low of 8% and a high of 9.5%. And you factor in the capital cost of cap costs, you may have a great opportunity to go into a 10-year fixed rate.
>
> And we were putting people into 10-year fixed rates in low 5s on an [ IL ] basis. And the savings are so considerable, and the stability is so significant that people are willing to come out of pocket with cash, lower their principal balance, and go into Agency debt. In certain of those circumstances, we layered on some pref and some mezz, which has been very accretive for us as well. So that's our business model. It works very, very well. Some borrowers like to ride it out, other borrowers are more conservative. So it's a whole mixture. But unlike our competitors, ***our model is built in that manner. It's multifamily debt. It's Agency eligible. And that's one of the primary exits every time we do a loan***.
>
> (Emphasis added).

492. The statements identified the immediately preceding paragraphs are false and misleading because Kaufman knew but failed to disclose that the Company had already substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In particular, as corroborated by FE1, FE2, and FE11, the Company had already abandoned its stated standards of

underwriting its Structured loans for Agency takeout. As described in Section V.F., corroborated by the accounts of FE1, FE6, and FE8, shifts in economic and market conditions had already placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, ineligible for Agency takeout, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss.

493. During the 4Q22 Earnings Call, analyst Jason Sabshon with KBW posed the following question:

> We're starting to see a few cases of what looks like strategic defaults from borrowers in order to extract concessions from lenders since they know that lenders don't want a foreclosure on their hands. For example, Blackstone did this large multifamily deal in New York that said special servicing. And we know that Arbor's borrower relationships are unique and to be repeat borrowers, but can you comment on whether you're seeing this trend at all?

494. To which Kaufman responded:

> It's definitely a trend in the market. And in a competitive lending environment, many lenders strip away certain structures on their loan. And ***without those structures on the loan, if the asset value is close to the debt and the lenders don't want to take back those assets, it gives a lot of strategic advantage to the borrowers if they don't care about their profile. For us, we have a long history of originating loans, and we have tremendous structure on our loans within the industry.***
>
> ***We're treated a lot differently than other people because we're very prudent when we made these loans***, and the borrowers need to come work with us for a variety of reasons, one of them is the structure on loans, the second is the number of loans we do with particular borrowers, and the asset class itself. So it is very common in today's environment that if the borrowers don't want to support the loans, they're going to hand back their keys because they have no economic incentive. And if you're a Blackstone, it doesn't affect your reputation.
>
> ***In our case, it's just very, very different. We're involved – I'm involved every day with our borrowers. And they come to the table -- if they have to come to the table, and if they're willing to be reasonable, we've been able to work out good solutions. Keep in mind that we have a deep and seasoned asset management group, and we're well positioned.*** And if we have to, we will take back an asset.

We haven't had to do it, but we always have that skillset and capability, and take back that asset, manage it, capitalize it, and continue with our remedies against those borrowers. We haven't been in that position. We've been well positioned. And so far, we've done extraordinarily well in working with our borrower base.

(Emphasis added).

495. The statements identified the immediately preceding paragraphs are false and misleading because Kaufman knew but failed to disclose that the Company had already substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of numerous former employees. As described in Section V.F., corroborated by the accounts of FE1, FE6, and FE8, shifts in economic and market conditions had already placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged, inexperienced, and unincentivized syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss due to loan restructuring or modification on less favorable terms for the Company or impairment upon default.

496. Analyst Crispin Elliot Love, Piper Sandler & Co., asked in relevant part:

On maintaining the dividend in the quarter, can you speak to the key reasons why the Board chose to do that after, I believe, 10 consecutive increases. Just on the surface, looking at your results, which are really strong with GAAP and core earnings [indiscernible] the dividend. It would have seemed like a dividend increase would make sense, but I'm just curious how the Board thinks about that. And does that say anything about the cautious outlook?

497. To which Defendant Elenio responded:

I think our view is, as you know, ***we have a lot of cushion and easily could have just done it again.*** But we look at when you come into these markets, and we've been, as Ivan in his prepared remarks, ***we've been strategically looking over the last 18 months at what we think would be a challenging recession. We think our***

> ***assets in our portfolio are in great shape. We're in the right asset class. We have a lot of structure.*** We do a lot of deals with repeat borrowers.
>
> Having said that, when you come into challenging environments, cash and liquidity is crucial. And we've been – we've done a great job of accumulating -- of really stockpiling a war chest of cash. And at this point, we just don't see a lot of value in increasing that dividend today. Now that may change. We may see where our earnings go, and we'll continue to evaluate it with the Board on a quarterly basis. But again, raising it 3 times this year, 10 of the last 11 quarters, and when I look at the peer group, there's, I think, only 1 peer group that actually -- 1 person in our peer group that actually raised their dividend -- it was nominal -- over the last 3 years. So we just feel like the credit isn't there at this point, and we'll continue to evaluate it.
>
> (Emphasis added).

498. The statements identified the immediately preceding paragraph are false and misleading because Elenio knew but failed to disclose that the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of numerous former employees. As described in Section V.F., corroborated by the accounts of FE1, FE6, and FE8, shifts in economic and market conditions had already placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged, inexperienced, and unincentivized syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss due to loan restructuring or modification on less favorable terms for the Company or impairment upon default. As a result, contrary to Elenio's representations, the Company's loan portfolio was *not* "in great shape" and did *not* have "a lot of structure," and the asset class underlying ABR's portfolio could not reasonably be considered "right."

## I. 1Q23

499. On May 5, 2023, ABR filed with the SEC its quarterly report for the three-month period ended March 31, 2023 on Form 10-Q ("1Q23 10-Q"), signed and certified by Defendants Kaufman and Elenio.

500. The Company reported a net income of $102.2 million for 1Q23, compared to a net income of $79.9 million for the quarter ended March 31, 2022. For 1Q23, ABR reported net income attributable to common stockholders of $84.3 million, or $0.46 per diluted common share, compared to a net income of 64.1 million, or $0.40 per diluted common share for the quarter ended March 31, 2022. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a $22.5 million provision for loan losses associated with CECL.

501. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Three Months Ended March 31, 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Land | Multifamily | Office | Retail | Commercial | Single-Family Rental | Other | Total |
| Allowance for credit losses: | | | | | | | | |
| Beginning balance | $ 78,068 | $ 37,961 | $ 8,162 | $ 5,819 | $ 1,700 | $ 781 | $ 68 | $ 132,559 |
| Provision for credit losses (net of recoveries) | 18 | 20,387 | (56) | — | — | 192 | (23) | 20,518 |
| Ending balance | $ 78,086 | $ 58,348 | $ 8,106 | $ 5,819 | $ 1,700 | $ 973 | $ 45 | $ 153,077 |

502. In addition, under the "Non-GAAP Financial Measures", the 1Q23 10-Q reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $122.2 million, or $0.62 per diluted common share, compared to $92.9 million, or $0.55 per diluted common share for the quarter ended March 31, 2022.

503. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I.,

Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

504. The 1Q23 10-Q provided under "Allowance for Credit Losses", a "summary of [ABR's] non-performing loans by asset class [] as follows (in thousands):"

| | March 31, 2023 | | | December 31, 2022 | | |
|---|---|---|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Multifamily | $ 2,605 | $ — | $ 2,605 | $ 2,605 | $ — | $ 2,605 |
| Retail | 3,445 | — | 3,445 | 3,445 | — | 3,445 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Total | $ 7,750 | $ — | $ 7,750 | $ 7,750 | $ — | $ 7,750 |

505. The statements identified in the immediately preceding paragraph are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As set forth in Section V.E., corroborated by numerous former employee accounts, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. As described in further detail in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that

improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

506. Under the Company's "Concentration of Credit Risk", the 1Q23 10-Q stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.
>
> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

507. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at March 31, 2023 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| **Asset Class / Risk Rating** | **2023** | **2022** | **2021** | **2020** | **2019** | **Prior** | **Total** |
| Multifamily: | | | | | | | |
| Pass | $ 22,360 | $ 549,835 | $ 268,328 | $ 3,155 | $ — | $ 20,300 | $ 863,978 |
| Pass/Watch | 160,465 | 2,781,244 | 3,236,800 | 303,109 | 203,354 | 22,050 | 6,707,022 |
| Special Mention | — | 1,322,873 | 2,884,543 | 51,175 | 51,785 | 27,194 | 4,337,570 |
| Substandard | — | 97,218 | 259,302 | — | 10,565 | 32,500 | 399,585 |
| Total Multifamily | $ 182,825 | $ 4,751,170 | $ 6,648,973 | $ 357,439 | $ 265,704 | $ 102,044 | $ 12,308,155 |

508. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 77% to its total multifamily asset class.

509. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants falsified and/or manipulated property appraisals so they would purport to comply with the Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

510. That same day, the Company issued a press release entitled, "Arbor Realty Trust Reports First Quarter 2023 Results and Increases Dividend to $0.02 to $0.42 per Share" ("1Q23 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Defendant Elenio.

511. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.46 per diluted common share" and "Distributable earnings of $0.62 per diluted common share, well in excess of our current dividend, representing a 68% payout ratio."

512. The 1Q23 Earnings Release provided that "Arbor reported net income for the quarter of $84.3 million, or $0.46 per diluted common share, compared to net income of $64.1 million, or $0.40 per diluted common share for the quarter ended March 31, 2022. Distributable earnings for the quarter was $122.2 million, or $0.62 per diluted common share, compared to $92.9 million, or $0.55 per diluted common share for the quarter ended March 31, 2022."

513. In addition, the 1Q23 Earnings Release reported that:

> During the first quarter of 2023, the Company ***recorded a $20.5 million provision for loan losses associated with CECL***. At March 31, 2023, the Company's ***total allowance for loan losses was $153.1 million***. The Company had ***four non-performing loans with a carrying value of $7.7 million***, before related loan loss reserves of $5.1 million, which was unchanged from December 31, 2022.

(Emphasis added).

514. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

515. In addition, the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks

of loss. As described in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

516. Later that day, May 5, 2023, the Company hosted an investor conference call to discuss the financial results for the first quarter of 2023 ("1Q23 Earnings Call"). During the call, Defendant Elenio discussed loan loss reserves, stating:

> ***We also recorded an additional $20 million in CECL reserves on our balance sheet loan book during the quarter as a result of using more conservative assumptions in our model due to a decline in the macroeconomic outlook for commercial real estate***. These reserves are general in nature and do not affect distributable earnings as we have not experienced any realized losses this quarter.
>
> ***Our balance sheet loan book continues to perform well in this market with no increases in default or delinquencies in the first quarter***. And as Ivan mentioned earlier, ***we believe we are well positioned given our multifamily focus***, strong liquidity position and our best-in-class dedicated asset management team with tremendous experience ***giving us confidence in our ability to successfully manage through this cycle***.
>
> (Emphasis added).

517. During the Question-and-Answer portion:

> **Crispin Elliot Love** Piper Sandler & Co., Research Division – Director & Senior Research Analyst: My first one is on credit. I'm just curious if you'd be able to share some of the underlying credit stats for the CLOs structured loan book and the Fannie loss share. I'm just curious how they're faring in expectations over the near to intermediate term?

**Paul Anthony Elenio** Arbor Realty Trust, Inc. – Executive VP & CFO: Yes, sure. So as you saw, Crispin, we were certainly more conservative this quarter with our CECL reserves. As you know, those CECL reserves don't really translate always into realized losses. So we've got some specific reserves against some balance sheet assets that we've had for a while, some legacy assets. ***We've not seen a significant amount of stress, a little bit of stress. We've had a little bit of a migration some loans from past watch to special mention.***

***But again, special mention is not a category that means to us that we're going to have a loss. So there's going to be a default imminent. It's just changes in where maybe values have gone or where interest rates have gone. So overall, I think the balance sheet book is holding up well in this market***. We do expect the market to be challenging over the next few quarter.

As Ivan said, we think the bottom is near, but it will take time to rebound, but it's been performing well. ***We've put some CECL reserves away. But we're not seeing really a lot of stress on the balance sheet side and on the CLO side as well.*** On the Agency side, we do have as you know, loss share component with Fannie Mae. We saw a little bit of a tick up in delinquencies this quarter, but not significant and things move in and out all the time.

We've put a couple of million more in specific reserves on our books this quarter related to our agency book. But for the most part, things are pretty stable. ***We haven't seen a tremendous move negatively on the credit of either side of our portfolio, both the balance sheet or the Agency***. Ivan, would you say that's accurate?

**Ivan Paul Kaufman** Arbor Realty Trust, Inc. – Chairman, President & CEO: Yes, I would say that's accurate. The one thing that we have seen, which is worth noting because I think it's a transitory and work itself out. We're still seeing in some of the jurisdictions, people having tough time affecting their tenants really, really long. You'd think with COVID, it's all behind us. It's not. ***So you're seeing economic occupancy a lot lower, which is putting a lot of stress on our borrowers because they don't have the income to support their debt service and they're coming out of pocket, which they should and they will***.

And that's causing some of our 30- and 60-day delinquencies on the agency side to pop up. We think that we're 50%, 60% [indiscernible] in the back end of that as the court systems are loosening up. But there are some jurisdictions who are just not moving quickly. And it's not fair to the landlords to allow tenants to stay in their property for years and not pay rent and not be able to evict them.

So that has caused a little bit of a tick up in delinquencies. Our borrowers are holding on. They're committed to their assets. They're struggling, but they're getting there. But I think the worst is over on that. I think that we will turn the corner on those kind of things, but people don't really talk about that, but we see it in fund center. We see it in certain specific geographic locations. And we see it if a

borrower has 5 or 6 or 8 or 10 properties across his portfolio, he's dealing with that. ***And that will work itself out over time because the value is still in the real estate. The operator is a good real estate. They've dipped into a pocket of good deal and they're looking to solve those problems they're solvable over time, and we're working with a lot of these borrowers to get through some of those issues.***

(Emphasis added).

518. During the Question-and-Answer portion:

**Richard Barry Shane** JPMorgan Chase & Co, Research Division – Senior Equity Analyst: First of all, a topic we've been raising throughout earnings season is related to repurchases. And so I want to acknowledge the commitment to buying back shares in the context of what's going on in the market. That said, we've had a number of questions, and I think it's a very fair point related to interest rate caps and extensions on loans. If you guys could just walk through a little bit given the impact of higher rates on borrowers the magnitude or the coverage your borrowers have in terms of interest rate caps. And if you could provide some information in terms of the tenure of those caps versus the tenure of the fully extended structured portfolio?

**Ivan Paul Kaufman** Arbor Realty Trust, Inc. – Chairman, President & CEO: Sure. First of all, everything is on a case-to-case basis and what's unique about all that's relative to other lenders, which we compete a bit consistently, is ***we have a lot of structure on our loans, and it's just not making the real estate loan with no responsibility to the borrower. So in many cases, there's an obligation by the borrower to buy interest rate caps, to refund the interest and do things of that nature***.

It's been actually a great opportunity for us because 6 months ago, 9 months ago with the inverted yield curve, the cost of caps and the negative carry, we've had a lot of people say, okay, it doesn't really pay to pay 9% or 8% to buy cap and have negative carry and they've elected to actually pay down their loans and convert themselves into Agency loans, which in today's market, you can borrow between 4.75% and 5.5%. And that's been very, very, very effective for us.

We do monitor very closely any caps that are expiring and we work with the borrowers to either put new caps on or to figure out alternatives in order to make sure that they're in a good position. So there's no one specific answer to that because it's case by case. Management works at it very intensively. And I actually am very involved in that as well. So we deal with that. ***Many of our borrowers have multiple loans with us. And it's carefully crafted for each situation***.

(Emphasis added).

519. The statements identified the immediately preceding paragraphs are false and misleading because Kaufman knew but failed to disclose that the Company had already substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In particular, as corroborated by FE1, FE2, and FE11, the Company had already abandoned its stated standards of underwriting its Structured loans for Agency takeout. As described in Section V.F., corroborated by the accounts of FE1, FE6, and FE8, shifts in economic and market conditions had already placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, ineligible for Agency takeout, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss.

### J. 2Q23

520. On July 28, 2023, ABR filed with the SEC its quarterly report for the three-month period ended June 30, 2023 on Form 10-Q ("2Q23 10-Q"), signed and certified by Kaufman and Elenio.

521. The Company reported a net income of $93.3 million for 2Q23, compared to a net income of $88.1 million for the quarter ended June 30, 2022. For 2Q23, ABR reported net income attributable to common stockholders of $76.2 million, or $0.41 per diluted common share, compared to a net income of $69.9 million, or $0.41 per diluted common share for the quarter ended June 30, 2022. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a $13.9 million provision for loan losses associated with CECL.

522. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Three Months Ended June 30, 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Land | Multifamily | Office | Retail | Commercial | Single-Family Rental | Other | Total |
| Allowance for credit losses: | | | | | | | | |
| Beginning balance | $ 78,086 | $ 58,348 | $ 8,106 | $ 5,819 | $ 1,700 | $ 973 | $ 45 | $ 153,077 |
| Provision for credit losses (net of recoveries) | (184) | 15,947 | 140 | — | — | 104 | (30) | 15,977 |
| Ending balance | $ 77,902 | $ 74,295 | $ 8,246 | $ 5,819 | $ 1,700 | $ 1,077 | $ 15 | $ 169,054 |

523. In addition, under the "Non-GAAP Financial Measures", the 2Q23 10-Q reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $114.0 million, or $0.57 per diluted common share, compared to $93.7 million, or $0.52 per diluted common share for the quarter ended June 30, 2022.

524. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

525. The 2Q23 10-Q provided under "Allowance for Credit Losses", a "summary of [ABR's] non-performing loans by asset class [] as follows (in thousands):"

| | June 30, 2023 | | | December 31, 2022 | | |
|---|---|---|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Multifamily | $ 119,291 | $ 116,686 | $ 2,605 | $ 2,605 | $ — | $ 2,605 |
| Retail | 3,445 | — | 3,445 | 3,445 | — | 3,445 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Total | $ 124,436 | $ 116,686 | $ 7,750 | $ 7,750 | $ — | $ 7,750 |

526. The statements identified in the immediately preceding paragraph are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As set forth in Section V.E., corroborated by numerous former employee accounts, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. As described in further detail in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

527. Under the Company's "Concentration of Credit Risk", the 2Q23 10-Q stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower

strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

528. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at June 30, 2022 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset Class / Risk Rating | 2023 | 2022 | 2021 | 2020 | 2019 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 208,351 | $ 191,850 | $ 249,714 | $ 11,000 | $ — | $ 20,300 | $ 681,215 |
| Pass/Watch | 493,020 | 2,685,299 | 2,741,640 | 121,870 | 93,235 | 7,194 | 6,142,258 |
| Special Mention | — | 1,624,051 | 2,835,865 | 196,825 | 161,885 | 21,700 | 4,840,326 |
| Substandard | — | 171,821 | 237,737 | 24,100 | — | 52,450 | 486,108 |
| Doubtful | — | — | 2,605 | — | 9,765 | — | 12,370 |
| Total Multifamily | $ 701,371 | $ 4,673,021 | $ 6,067,561 | $ 353,795 | $ 264,885 | $ 101,644 | $ 12,162,277 |

529. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 77% to its total multifamily asset class.

530. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its

underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants falsified and/or manipulated property appraisals so they would purport to comply with the Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

531. That same day, the Company issued a press release entitled, "Arbor Realty Trust Reports Second Quarter 2023 Results and Increases Quarterly Dividend to $0.43 per Share" ("2Q23 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Elenio.

532. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.41 per diluted common share" and "Distributable earnings of $0.57 per diluted common share, well in excess of our current dividend, representing a 75% payout ratio."

533. The 2Q23 Earnings Release provided that "Arbor reported net income for the quarter of $76.2 million, or $0.41 per diluted common share, compared to net income of $69.9 million, or $0.41 per diluted common share for the quarter ended June 30, 2022. Distributable earnings for the quarter was $114.0 million, or $0.57 per diluted common share, compared to $93.7 million, or $0.52 per diluted common share for the quarter ended June 30, 2022."

534. In addition, the 2Q23 Earnings Release reported that:

> During the second quarter of 2023, the Company ***recorded an $16.0 million provision for loan losses associated with CECL***. At June 30, 2023, the Company's ***total allowance for loan losses was $169.1 million***. The Company ***had seven non-performing loans with a carrying value of $122.4 million***, before loan loss reserves of $10.1 million, compared to four loans with a carrying value of $7.7 million, before loan loss reserves of $5.1 million as of March 31, 2023.
>
> (Emphasis added).

535. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

536. In addition, the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As described in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

537. Later that day, on July 28, 2023, ABR hosted an investor conference call. In pertinent part, Kaufman stated as follows:

> ***And despite being a very challenging environment over the last several quarters, we've managed to maintain our book value while we recorded reserves for potential future losses***, which clearly differentiates us from every one of our peers. As we've discussed many times, ***we've been laser-focused over the last 2 years and preparing for what we felt would be a very challenging recessionary environment***.
> . . .
>
> In fact, ***unlike others in this space, we've been conducting ourselves as if we have been in a recession for over a year now***. And as a result, one of our primary focus has been and continues to be preserving and building up a strong liquidity position. We are very pleased to report that we currently have approximately $1 billion in cash, which gives us a tremendous amount of flexibility to manage through this downturn and provide us with the unique ability to take advantage of the opportunities that will exist in this environment to generate superior returns on our capital.
>
> . . .
>
> There continues to be a significant amount of volatility in the market and we are well aware of the challenges that lie ahead. We feel we are right in the thick of this dislocation and are operating our business with the expectation that the next 2 to 3 quarters will be the most challenging part of the cycle. As in the case with any real estate cycle, there will be issues and challenges to contend with, some of which will be a high touch and require tremendous amount of discipline and expertise.
>
> . . .
>
> ***We are extremely well positioned compared to our peers given our multifamily-centric portfolio***, our asset management skills and tenured senior management experience with a track record of managing through multiple cycles ***and the strength of our balance sheet*** and versatility of our franchise.
>
> . . .
>
> ***In our balance sheet lending business, we remain very selective, focusing mainly on converting on multifamily bridge loans into agency product, allowing us to recapture a substantial amount of our invested capital and produce significant long-dated income streams***. In the second quarter, we continued to have success in this area with another $685 million of balance sheet runoff, $435 million or 64%, which was recaptured into new agency loan originations. As a result, we're able to recoup $125 million of capital and continue to build out our cash position, which again currently sits at approximately $1 billion.

. . .

In our GSE/Agency business, we had an exceptionally strong second quarter, originating $1.4 billion of loans, and our pipeline remains elevated. Clearly, with the continued inverted yield curve, the agencies are effectively the only game in town, which gives us confidence in our ability to continue to produce strong origination volumes for the balance of the year.

. . .

***We also have a strategic advantage in that we*** focus on the workforce housing part of the market and of ***a large multifamily balance sheet book with -- that naturally feeds our Agency business.*** And again, this Agency business offers a premium value as it requires limited capital and generates significant long-dated predictable income streams and produces significant annual cash flow.

. . .

**Steven Cole Delaney** JMP Securities LLC, Research Division – MD, Director of Mortgage & Real Estate Finance Research & Equity Research Analyst: Yes. I mean the geo sounds good. Is it an interest rate problem? I mean is people just behind there? Is it cash flow or just leasing problem?

**Ivan Paul Kaufman** Arbor Realty Trust, Inc. – Chairman, President & CEO: Let me give a little bit of a view on it. I think generally, in particular with the assets we're talking about is you often have underperforming sponsors. The underperforming sponsors, it catches up to them a little bit. So when you see stress in the portfolio like we're seeing, it's a fact that the sponsors are not executing along their plan. And that's one part.

. . .

The second part is that we are in the cycle a long period of time and these elevated interest rates do put stress on these assets. The rates are up anywhere between 10% to 100%, so they run into payment issues and often they're late in the payment, trying to raise additional capital and try and get them in a proper position. But what we're seeing most of all with a stress on some of these loans, a lot of it is execution.

. . .

I mean there are other factors as well: elevated interest rates, increased insurance costs and increased taxes and increased labor costs. So it's a combination of all. But generally, if you have good operators, they're able to manage effectively. The poor operator catches up with them a little bit.

538. The statements identified the immediately preceding paragraphs are false and misleading because Kaufman knew but failed to disclose that the Company had already substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In particular, as corroborated by FE1, FE2, and FE11, the Company had already abandoned its stated standards of underwriting its Structured loans for Agency takeout. As described in Section V.F., corroborated by the accounts of FE1, FE6, and FE8, shifts in economic and market conditions had already placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, ineligible for Agency takeout, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss.

### K. 3Q23

539. On October 27, 2023, ABR filed with the SEC its quarterly report for the three-month period ended September 30, 2023 on Form 10-Q ("3Q23 10-Q"), signed and certified by Defendants Kaufman and Elenio.

540. The Company reported a net income of $95.1 million for 3Q23, compared to a net income of $79.1 million for the quarter ended September 30, 2022. For 3Q23, ABR reported net income attributable to common stockholders of $77.9 million, or $0.41 per diluted common share, compared to a net income of $62.7 million, or $0.36 per diluted common share for the quarter ended September 30, 2022. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a $18.7 million provision for loan losses associated with CECL.

541. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Three Months Ended September 30, 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Multifamily | Land | Office | Retail | Commercial | Single-Family Rental | Other | Total |
| Allowance for credit losses: | | | | | | | | |
| Beginning balance | $ 74,295 | $ 77,902 | $ 8,246 | $ 5,819 | $ 1,700 | $ 1,077 | $ 15 | $ 169,054 |
| Provision for credit losses (net of recoveries) | 14,884 | 60 | (76) | — | — | 162 | (15) | 15,015 |
| Ending balance | $ 89,179 | $ 77,962 | $ 8,170 | $ 5,819 | $ 1,700 | $ 1,239 | $ — | $ 184,069 |

542. In addition, under the "Non-GAAP Financial Measures", the 3Q23 10-Q reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $112.2 million, or $0.55 per diluted common share, compared to $105.1 million, or $0.56 per diluted common share for the quarter ended September 30, 2022.

543. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

544. The 3Q23 10-Q provided under "Allowance for Credit Losses", a "summary of [ABR's] non-performing loans by asset class [] as follows (in thousands):"

| | September 30, 2023 | | | December 31, 2022 | | |
|---|---|---|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Multifamily | $ 152,717 | $ 122,847 | $ 29,870 | $ 2,605 | $ — | $ 2,605 |
| Retail | 3,445 | — | 3,445 | 3,445 | — | 3,445 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Total | $ 157,862 | $ 122,847 | $ 35,015 | $ 7,750 | $ — | $ 7,750 |

545. The statements identified in the immediately preceding paragraph are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As set forth in Section V.E., corroborated by numerous former employee accounts, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. As described in further detail in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

546. Under the Company's "Concentration of Credit Risk", the 3Q23 10-Q stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower

strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

547. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at September 30, 2023 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset Class / Risk Rating | 2023 | 2022 | 2021 | 2020 | 2019 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 97,186 | $ 131,266 | $ 97,269 | $ 2,010 | $ — | $ 20,300 | $ 348,031 |
| Pass/Watch | 673,165 | 2,378,519 | 3,015,502 | 81,560 | 112,416 | 58,394 | 6,319,556 |
| Special Mention | 799 | 1,830,803 | 2,353,938 | 219,050 | 140,685 | — | 4,545,275 |
| Substandard | — | 290,492 | 153,697 | 24,099 | — | — | 468,288 |
| Doubtful | — | — | 13,930 | — | 9,765 | — | 23,695 |
| Total Multifamily | $ 771,150 | $ 4,631,080 | $ 5,634,336 | $ 326,719 | $ 262,866 | $ 78,694 | $ 11,704,845 |

548. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 78% to its total multifamily asset class.

549. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1,

FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants falsified and/or manipulated property appraisals so they would purport to comply with the Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

550. That same day, the Company issued a press release entitled, "Arbor Realty Trust Reports Third Quarter 2023 Results and Declares Dividend of $0.43 per Share" ("3Q23 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Defendant Elenio.

551. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.41 per diluted common share" and "Distributable earnings of $0.55 per diluted common share, well in excess of our current dividend, representing a 78% payout ratio."

552. The 3Q23 Earnings Release provided that, "Arbor reported net income for the quarter of $77.9 million, or $0.41 per diluted common share, compared to net income of $62.7 million, or $0.36 per diluted common share for the quarter ended September 30, 2022. Distributable earnings for the quarter was $112.2 million, or $0.55 per diluted common share,

compared to $105.1 million, or $0.56 per diluted common share for the quarter ended September 30, 2022."

553. In addition, the 3Q23 Earnings Release reported that:

> During the third quarter of 2023, the Company ***recorded a $15.0 million provision for loan losses associated with CECL***. At September 30, 2023, the Company's ***total allowance for loan losses was $184.1 million***. The Company had ***twelve non-performing loans with a carrying value of $137.9 million***, before related loan loss reserves of $12.6 million, compared to seven loans with a carrying value of $122.4 million, before loan loss reserves of $10.1 million at June 30, 2023.

(Emphasis added).

554. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

555. In addition, the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As described in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to

keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

556. Later that day, ABR hosted a conference call. Kaufman stated in pertinent part as follows:

> Additionally and very significantly despite being in a very challenging environment over the last several quarters, ***we've managed to maintain our book value while reporting reserves with potential future losses***, which clearly differentiates us from every one of our peers.
>
> . . .
>
> In fact, we are one of the only companies in our space who have experienced significant book value appreciation over the last 3 years with roughly 40% growth from around $9 a share to nearly $13 a share. As we discussed on our last call, we feel we are right in the thick of this dislocation. Operating our business with the expectation that the next 2 or 3 quarters will be the most challenging part of this cycle. ***We have been laser focused over the last 2 years preparing for this environment***. One of our primary focuses has been and continues to be preserving and building up a strong liquidity position.
>
> . . .
>
> This is an extremely challenging environment, and I'm very pleased with the level of success we've had to date in managing through this downturn, which is a real testament to the quality of our franchise and the extraordinary efforts being put forth by our entire organization. As we have said before, we feel ***we are very well positioned compared to our peers given our*** strong liquidity position, ***multifamily-centric portfolio***, the depth and skill of our management team ***and the strength of our balance sheet*** and the versatility of franchise. We also believe we are uniquely positioned to step back into the lending market and done some very accretive opportunities to continue to grow our platform. While others in the space will be dealing with significant internal issues, we feel we are well positioned which allows us to reenter the lending market at a time when there was a great opportunity to put some of the high-quality loans with attractive returns while the competition is less active.
>
> . . .
>
> We're also the only company in this space that has been able to consistently grow our dividend with approximately 40% growth over the last 3 years, all while maintaining the lowest dividend payout ratio in the industry. Just as importantly, in a time of tremendous test, ***we've managed to maintain a book value of our***

***according reserves for future losses***, which clearly differentiates us from our peers. And we believe our diverse business model uniquely positions us as one of the only companies in the space with the ability to preserve our book value and continue to provide a very stable protected dividend even in this extremely challenging environment.

. . .

***In our balance sheet lending business, we remain focused on converting on multifamily bridge loans into agency product allow us to recapture a substantial amount of our invested capital and produce significant long-dated constraints***. In the third quarter, we continued to have success in this area with another $665 million of balance sheet runoff, $350 million or 53%, which was captured into new agency loan originations. As a result, we're able to recoup approximately $100 million of capital and continue to build up our cash position, which again currently sits at around $1 billion. And again, we're excited about the opportunities. We think we'll be -- available to us over the next 3 to 6 months to reenter the market, grow our balance sheet loan book and generate very attractive returns on our capital while continuing to build up our pipeline for future Agency Business.

. . .

**Stephen Albert Laws** Raymond James & Associates, Inc., Research Division – Research Analyst: Congrats on the solid quarter in a very difficult environment. Ivan, I wanted to start, can we talk about -- you mentioned the next 2 to 3 quarters being most challenging. I know you said something similar to last quarter. When you look at the fourth quarter '21 origination volume, you had a pretty big quarter. 2-year loans would be hitting original maturity dates next quarter. So can you talk about how many of those have caps that might expire given this outlook increased since the last quarter, how does that impact your expected stress you think you may see in the next couple of months given where rates are? And maybe at a more detailed level, how many of those borrowers do you think are on track with their business plan? How many need more time versus how many have a real cap rate issue around the rate move?

. . .

**Ivan Paul Kaufman** Arbor Realty Trust, Inc. – Chairman, President & CEO: Yes. Most of our loans are 3-year loans with extensions, it's not 2-year loans. Just a correction on that comment. ***It's an ongoing process. We don't wait until the expiration of a rate cap or we don't wait for loans. People have come to us, we're very proactive.*** I think the biggest risks other than the rate cap which is a true risk, and that's just an economic issue because, of course, the new rate cap as a state dollar amount. For us, the real concern is performance and making sure that the assets are being managed. A lot of the bridge assets required execution to get to

> their business plan. There was a lot of upside in the rents and unit turns and getting them to market.
>
> . . .
>
> ***And I think, if anything, is what we see in the industry is the lack of execution, which creates an economic risk for the borrowers and not getting to their numbers. So we're putting a lot of time and attention to managing these assets, staying on top of the bars, working with them to change management companies and recapitalize their deals well ahead of time. So it's an ongoing process. It's not get to the cliff and deal with it then.***
>
> **Jay McCanless** Wedbush Securities Inc., Research Division – Senior Vice President of Equity Research: The first question I had, if rates stay at these levels or even higher into '24 and '25, could you talk about what you think could potentially happen with the loan book?
>
> **Ivan Paul Kaufman** Arbor Realty Trust, Inc. – Chairman, President & CEO: Yes. I mean rates are clearly at a very elevated level, and it's put a lot of stress on people being able to exit into the fixed rate market when rates were in the 3s. It was already stressful and borrowers, and ***we were encouraging borrowers to convert***. The short-term rates have gone up a little bit, but ***they're maintaining it at these levels***. Clearly, it's an elevated stress level. We're thinking we're going to stay at these levels for the next three quarters and are planning accordingly. But make no mistake about it. That's distress in the system.
>
> . . .
>
> People, when they have their business plan, they exit to a fixed rate, and it was anticipated in their minds the tenure would be around 3, [ 3.50 ]. Now it's getting close to 5 sort of opportunity to exit is much more difficult. ***So they've got to bring more capital to the table or bring more capital to able to carry their assets. That's as simple as it is, and that's just stressing the [asset]***.

557. The statements identified the immediately preceding paragraphs are false and misleading because Kaufman knew but failed to disclose that the Company had already substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In particular, as

corroborated by FE1, FE2, and FE11, the Company had already abandoned its stated standards of underwriting its Structured loans for Agency takeout. As described in Section V.F., corroborated by the accounts of FE1, FE6, and FE8, shifts in economic and market conditions had already placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, ineligible for Agency takeout, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss.

## L. 4Q23

558. On February 20, 2024, ABR filed with the SEC its annual report for the fiscal year ended December 31, 2023 on Form 10-K ("FY23 10-K"), signed and certified by Defendants Kaufman and Elenio.

559. The Company reported a net income of $400.6 million for FY23, compared to a net income of $353.8 million for the fiscal year ended December 31, 2022. For FY23, ABR reported net income attributable to common stockholders of $330.1 million, compared to a net income of $284.8 million for the fiscal year ended December 31, 2022. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a $73.4 million provision for loan losses associated with CECL for FY23, compared to a provision of $21.1 million for the fiscal year ended December 31, 2022.

560. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Year Ended December 31, 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Multifamily | Land | Retail | Commercial | Single- Family Rental | Office | Other | Total |
| Allowance for credit losses: | | | | | | | | |
| Beginning balance | $ 37,961 | $ 78,068 | $ 5,819 | $ 1,700 | $ 780 | $ 8,162 | $ 69 | $ 132,559 |
| Provision for credit losses (net of recoveries) | 72,886 | (10) | (2,526) | — | 844 | (2,320) | (69) | 68,805 |
| Charge-offs | — | — | — | — | — | (5,700) | — | (5,700) |
| Ending balance | $ 110,847 | $ 78,058 | $ 3,293 | $ 1,700 | $ 1,624 | $ 142 | $ — | $ 195,664 |

561. In addition, under the "Non-GAAP Financial Measures", the FY23 10-K reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $452.5 million, or $2.25 per diluted common share, compared to $405.7 million, or $2.23 per diluted common share for the fiscal year ended December 31, 2022.

562. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

563. The FY23 10-K provided under "Allowance for Credit Losses", a "summary of [ABR's] non-performing loans by asset class [] as follows (in thousands):"

| | December 31, 2023 | | | December 31, 2022 | | |
|---|---|---|---|---|---|---|
| | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due | UPB | Less Than 90 Days Past Due | Greater Than 90 Days Past Due |
| Multifamily | $ 271,532 | $ — | $ 271,532 | $ 2,605 | $ — | $ 2,605 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Retail | 920 | — | 920 | 3,445 | — | 3,445 |
| Total | $ 274,152 | $ — | $ 274,152 | $ 7,750 | $ — | $ 7,750 |

564. The FY23 10-K also provided that:

> In this challenging economic environment, we have recently experienced late and partial payments on certain loans in our structured portfolio. At December 31, 2023, these loans included twenty-four multifamily bridge loans with an aggregate UPB of $956.9 million that were 60 days or less past due. We are recognizing income on these loans to the extent cash is received. These loans include one specifically reserved loan with a $3.0 million loan loss reserve and a UPB of $32.6 million.

565. The statements identified in the immediately preceding paragraph are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As set forth in Section V.E., corroborated by numerous former employee accounts, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. As described in further detail in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

566. Under the Company's "Concentration of Credit Risk", the FY23 10-K stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

> Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

567. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at December 31, 2023 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset Class / Risk Rating | 2023 | 2022 | 2021 | 2020 | 2019 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 80,814 | $ 53,316 | $ 26,185 | $ 2,010 | $ 4,598 | $ 20,300 | $ 187,223 |
| Pass/Watch | 317,358 | 2,561,938 | 2,223,155 | 119,860 | 84,600 | 58,044 | 5,364,955 |
| Special Mention | 24,424 | 1,762,539 | 2,631,689 | 180,750 | 140,685 | 350 | 4,740,437 |
| Substandard | — | 435,878 | 322,987 | 8,006 | — | — | 766,871 |
| Doubtful | — | — | 13,930 | 14,800 | 9,765 | — | 38,495 |
| Total Multifamily | $ 422,596 | $ 4,813,671 | $ 5,217,946 | $ 325,426 | $ 239,648 | $ 78,694 | $11,097,981 |

568. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 80% to its total multifamily asset class.

569. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants falsified and/or manipulated property appraisals so they would purport to comply with the

Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

570. The FY23 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***Risks Related to Our Financing and Hedging Activities.*** We finance a significant amount of our loans and investments through a variety of means, including CLOs, securitizations, credit facilities, equity capital, senior and convertible debt instruments, and other structured financings. These vehicles may contain restrictive covenants and may require us to provide additional collateral or repurchase assets if the value of pledged assets, some of which we guarantee, decline in value. If we are unable to acquire eligible investments, find suitable replacement investments and access financing sources on favorable terms, or at all, we may not be able to obtain the level of leverage necessary to optimize our return on investment and cash available for distribution to our stockholders may decline.

571. The statements identified in the immediately preceding paragraphs are false and misleading because they presented the risks of non-performance or delinquency under the Company's CLOs as a future possibility when, in fact, these risks were actual and had already come to fruition. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had already substantially deviated from its underwriting standards and guidelines to drive up loan volume during the years 2021 and 2022, resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. Most of the Company's bridge loans (approximately two-thirds), originated under sub-par lending practices, were packaged into ABR's

CLO pools in violation of the representations and warranties made when ABR securitized the loans. Because of the terms and tranches of the CLOs, ABR was forced to shoulder the burden of the losses associated with the underlying assets' underperformance and borrowers' delinquency or non-performance, in part, through billions of dollars of loan modifications on less favorable terms.

572. The FY23 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***Loan repayments are less likely in a volatile market environment***. Loan repayments are a significant source of liquidity for us. If borrowers are unable to refinance loans at maturity, the loans could go into default and the liquidity that we expect to receive from such repayments may not be available. Further, in the event the commercial real estate finance market deteriorates, borrowers that have extension rights will be more likely to exercise such rights, which will further delay our ability to access liquidity through repayments.

573. The statements identified in the immediately preceding paragraph are false and misleading because they presented the risks of non-performance or default stemming from a decline in economic conditions as a future possibility when, in fact, these risks were actual and had already come to fruition. As described in Section V.F., corroborated by the accounts FE6 and FE8, borrowers were already struggling to make loan payments by October 2022, and as corroborated by FE1, FE2, FE11, and FE12, refinancing at maturity, or Agency takeout, was not option due to the Company's substantial deviation from its underwriting standards, as described in Section V.E.

574. The FY23 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***We may be unable to invest excess capital on acceptable terms, or at all, which would adversely affect our operating results***. We may not be able to identify investments that meet our investment criteria and we may not be successful in closing the investments that we do identify. In addition, the investments that we fund with our capital may not produce a satisfactory return on capital, which would adversely affect our operating results.

575. The statements identified in the immediately preceding paragraph are false and misleading because they presented the risk of investing in assets that did not meet the Company's "investment criteria" as a future possibility when, in fact, these risks were actual and had already come to fruition. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination.

576. The FY23 10-K also purported to warn of various "Risks Related to [ABR's] Business" that "may" or "could" adversely affect the Company including, *inter alia*:

> ***Volatility in values of multifamily and commercial properties may adversely affect our loans and investments***. …In the event a property's net operating income decreases, a borrower may have difficulty repaying our loan, which could result in losses to us. In addition, decreases in property values reduce the value of the collateral and the potential proceeds available to a borrower to repay our loans, which could negatively impact our operating results…

577. The statements identified in the immediately preceding paragraph are false and misleading because they presented the risk of declining NOIs and property values as a future possibility when, in fact, these risks were actual and had already come to fruition. As set forth in Section V.F. and V.G., corroborated by FE6, FE8, and FE12, rising operating costs, declining rent growth, inflation, and declining property valuations were already having a negative impact on borrowers' NOIs and declining property values were already having a negative impact on the Company's ability to restructure or modify non-performing or defaulted loans on favorable terms. Indeed, FE12 describes detailed efforts by the Company to artificially drive up property values to avoid losses or impairment.

578. The FY23 10-K, when discussing "Inflation" provided that, "Currently, rising interest rates will positively impact our net interest income since our structured loan portfolio exceeds our corresponding debt balances and the vast majority of our loan portfolio is floating-rate based on SOFR or LIBOR."

579. The statements identified in the immediately preceding paragraph are false and misleading because they omitted material adverse information concerning the negative impacts rising interest rates were already having on the Company's Structured loan portfolio. Because ABR chose to speak about how rising interest rates were having a positive impact on the Company's earnings, it had a duty to disclose that described positive impact was unsustainable; rising interest rates significantly increased the risk that the vast majority of ABR's portfolio would be unable to make their loan payments and, in fact, as corroborated by FE6 and FE8, many borrowers were already delinquent, negatively impacting the Company's net interest income.

580. When discussing the Company's "Real Estate Values and Credit Risk," the FY23 10-K provided that:

> Commercial mortgage assets may be viewed as exposing an investor to greater risk of loss than residential mortgage assets since such assets are typically secured by larger loans to fewer obligors than residential mortgage assets. Multifamily and commercial property values, net operating income derived from such properties, and borrowers' credit ratings are subject to volatility and ***may be*** negatively affected by a number of factors, including, but not limited to, events such as natural disasters and pandemics, acts of war, terrorism, local economic and/or real estate conditions (such as industry slowdowns, oversupply of real estate space, occupancy rates, construction delays and costs) and other macroeconomic factors beyond our control. The performance and value of our loan and investment and servicing portfolios depend on the borrowers' ability to operate the properties that serve as collateral so that they produce adequate cash flow to pay their loans. ***We attempt to mitigate these risks through our underwriting and asset management processes. Our asset management team reviews our portfolios consistently and is in regular contact with borrowers to monitor the performance of the collateral and enforce our rights as necessary***.

(Emphasis added).

581. This statements identified in the immediately preceding paragraph are false and misleading because the Company failed to disclose that it had already substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. As described in further detail in Sections V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses in internal controls concerning its concentration of risk, including asset management, to keep its risk of loss from surfacing throughout the Class Period.

582. That same day, the Company issued a press release entitled, "Arbor Realty Trust Reports Fourth Quarter and Full Year 2023 Results and Declares Dividend of $0.43 per Share" ("4Q23 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Defendant Elenio.

583. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.48 per diluted common share" and "Distributable earnings1 of $0.51, or $0.54 per diluted common share excluding a $7.0 million realized loss on an office property that was previously reserved for."

584. The 4Q23 Earnings Release provided that:

> Arbor reported net income for the quarter of $91.7 million, or $0.48 per diluted common share, compared to net income of $88.2 million, or $0.49 per diluted common share for the quarter ended December 31, 2022. Net income for the year was $330.1 million, or $1.75 per diluted common share, compared to $284.8 million, or $1.67 per diluted common share for the year ended December 31, 2022. Distributable earnings for the quarter was $104.1 million, or $0.51 per diluted common share, compared to $114.0 million, or $0.60 per diluted common share for the quarter ended December 31, 2022. Distributable earnings for the year was

$452.5 million, or $2.25 per diluted common share, compared to $405.7 million, or $2.23 per diluted common share for the year ended December 31, 2022.

585. In addition, the 4Q23 Earnings Release reported that:

> During the fourth quarter of 2023, the Company ***recorded a $17.3 million provision for loan losses associated with CECL***, which was net of $4.8 million of loan loss recoveries. At December 31, 2023, the Company's ***total allowance for loan losses was $195.7 million***. The Company had ***sixteen non-performing loans with a carrying value of $262.7 million***, before related loan loss reserves of $27.1 million, compared to twelve loans with a carrying value of $150.5 million, before loan loss reserves of $12.6 million at September 30, 2023.

(Emphasis added).

586. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

587. In addition, the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As described in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to

keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

588. Later that same day, Kaufman participated in an earnings conference call. In pertinent part, he stated as follows:

> **Kaufman**: Additionally and very significantly, we're able to maintain our book value of our recording reserves for potential future losses, which clearly differentiates us from everyone in the space. In fact, as Paul will discuss in more detail later, ***we generated GAAP earnings in excess of our dividend in 2023 despite recording approximately $90 million reserves*** and our distributable earnings were also well in excess of our dividend, providing one of the best dividend coverages ratios in the industry.
>
> . . .
>
> **Kaufman**: On our last call, we gave guidance at the fourth quarter of last year and the first quarter and second quarter of this year would be the most challenging part of the cycle. We are in a period of peak stress and expect the next 2 quarters to be challenging, if not more challenging than the fourth quarter. As a result of this environment, we are experiencing elevated delinquencies. ***One of the many reasons this is occurring is certain borrowers are taking the position that they will default first and negotiate second, which is not a strategy that works well with us***.
>
> . . .
>
> ***Second, borrowers need to bring capital to the table to rightsize their deals and raising capital is a lengthy process in today's climate. Therefore, you will see defaults rise initially until able to raise additional capital and then deals will often be recapped***.

589. The statements identified the immediately preceding paragraphs are false and misleading because Kaufman knew but failed to disclose that the Company had already substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11. In particular, as

corroborated by FE1, FE2, and FE11, the Company had already abandoned its stated standards of underwriting its Structured loans for Agency takeout. As described in Section V.F., corroborated by the accounts of FE1, FE6, and FE8, shifts in economic and market conditions had already placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, ineligible for Agency takeout, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss.

### M. <u>1Q24</u>

590. On May 3, 2024, ABR filed with the SEC its quarterly report for the three-month period ended March 31, 2024 on Form 10-Q ("1Q24 10-Q"), signed and certified by Defendants Kaufman and Elenio.

591. The Company reported a net income of $73.2 million for 1Q24, compared to a net income of $102.2 million for the quarter ended March 31, 2023. For 1Q24, ABR reported net income attributable to common stockholders of $57.9 million, or $0.31 per diluted common share, compared to a net income of $84.3 million, or $0.46 per diluted common share for the quarter ended March 31, 2023. Under the Company's "provision for credit losses (net of recoveries)," ABR reported a $19.1 million provision for loan losses associated with CECL.

592. Under the Company's "Allowance for Credit Losses", ABR provided "a summary of the changes in the allowance for credit losses [] as follows (in thousands):"

| | Three Months Ended March 31, 2024 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Multifamily | Land | Retail | Single-Family Rental | Commercial | Office | Other | Total |
| Allowance for credit losses: | | | | | | | | |
| Beginning balance | $ 110,847 | $ 78,058 | $ 3,293 | $ 1,624 | $ 1,700 | $ 142 | $ — | $ 195,664 |
| Provision for credit losses (net of recoveries) | 16,652 | 62 | — | 1,113 | — | (49) | — | 17,778 |
| Charge-offs | (1,500) | — | — | — | — | — | — | (1,500) |
| Ending balance | $ 125,999 | $ 78,120 | $ 3,293 | $ 2,737 | $ 1,700 | $ 93 | $ — | $ 211,942 |

593. In addition, under the "Non-GAAP Financial Measures", the 1Q24 10-Q reported that the Company's distributable earnings, defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such as … CECL provisions for credit losses…," was $96.7 million, or $0.47 per diluted common share, compared to $122.2 million, or $0.62 per diluted common share for the quarter ended March 31, 2023.

594. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

595. The 1Q24 10-Q provided under "Allowance for Credit Losses", a "summary of [ABR's] non-performing loans by asset class [] as follows (in thousands):"

| | March 31, 2024 | | | December 31, 2023 | | |
|---|---|---|---|---|---|---|
| | UPB | 61 - 90 Days Past Due | Greater Than 90 Days Past Due | UPB | 61 - 90 Days Past Due | Greater Than 90 Days Past Due |
| Multifamily | $ 462,207 | $ — | $ 462,207 | $ 271,532 | $ — | $ 271,532 |
| Commercial | 1,700 | — | 1,700 | 1,700 | — | 1,700 |
| Retail | 920 | — | 920 | 920 | — | 920 |
| Total | $ 464,827 | $ — | $ 464,827 | $ 274,152 | $ — | $ 274,152 |

596. Under "Other Non-accrued Loans," the 1Q24 10-Q went on to report, in relevant part, that:

> In this challenging economic environment, we have recently experienced late and partial payments on certain loans in our structured portfolio. At March 31, 2024 and December 31, 2023, these loans included twelve and twenty-four multifamily bridge loans with a total UPB of $489.4 million and $956.9 million, respectively, that were 60 days or less past due. We are recognizing income on these loans only to the extent cash is received. This decrease was due to $174.9 million of loans

> progressing to greater than 60 days past due and $712.9 million of loans that were modified and are now performing in accordance with the terms of their modifications, including bringing the loans current by paying past due interest owed … partially offset by an additional $420.3 million of loans in the first quarter of 2024 that are now less than 60 days past due and are recently experiencing late and partial payments.

597. The statements identified in the immediately preceding paragraph are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As set forth in Section V.E., corroborated by numerous former employee accounts, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. As described in further detail in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

598. Under the Company's "Concentration of Credit Risk", the 1Q24 10-Q stated, in relevant part, that:

> We assign a credit risk rating of pass, pass/watch, special mention, substandard or doubtful to each loan and investment, with a pass rating being the lowest risk and a doubtful rating being the highest risk. Each credit risk rating has benchmark guidelines that pertain to debt-service coverage ratios, LTV ratios, borrower strength, asset quality, and funded cash reserves. Other factors such as guarantees, market strength, and remaining loan term and borrower equity are also reviewed and factored into determining the credit risk rating assigned to each loan. This

metric provides a helpful snapshot of portfolio quality and credit risk. All portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed, however, we maintain a higher level of scrutiny and focus on loans that we consider 'high risk' and that possess deteriorating credit quality.

Generally speaking, given our typical loan profile, risk ratings of pass, pass/watch and special mention suggest that we expect the loan to make both principal and interest payments according to the contractual terms of the loan agreement. A risk rating of substandard indicates we anticipate the loan may require a modification of some kind. A risk rating of doubtful indicates we expect the loan to underperform over its term, and there could be loss of interest and/or principal. Further, while the above are the primary guidelines used in determining a certain risk rating, subjective items such as borrower strength, market strength or asset quality may result in a rating that is higher or lower than might be indicated by any risk rating matrix.

599. The Company also provided "[a] summary of the loan portfolio's internal risk ratings and LTV ratios by asset class at March 31, 2024 [] as follows ($ in thousands)" including, *inter alia*, the "Multifamily" asset class:

| | UPB by Origination Year | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset Class / Risk Rating | 2024 | 2023 | 2022 | 2021 | 2020 | Prior | Total |
| Multifamily: | | | | | | | |
| Pass | $ 36,060 | $ 92,062 | $ 52,027 | $ 8,835 | $ 2,010 | $ 24,879 | $ 215,873 |
| Pass/Watch | 36,501 | 319,437 | 2,336,702 | 1,846,835 | 119,860 | 113,100 | 4,772,435 |
| Special Mention | 9,069 | 3,014 | 1,771,071 | 2,787,716 | 28,250 | 167,229 | 4,766,349 |
| Substandard | — | 21,100 | 467,123 | 151,612 | 8,006 | 350 | 648,191 |
| Doubtful | — | — | 4,800 | 174,235 | 14,800 | 9,765 | 203,600 |
| Total Multifamily | $ 81,630 | $ 435,613 | $ 4,631,723 | $ 4,969,233 | $ 172,926 | $ 315,323 | $ 10,606,448 |

600. In addition, the Company assigned a weighted average Last Dollar LTV Ratio of 84% to its total multifamily asset class.

601. The statements identified in the immediately preceding paragraphs are false and misleading because the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing ABR to artificially inflate the quality of its loan book and minimize its risk of loss. As set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11, the Company had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally

unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination. In particular, as corroborated by the accounts of FE2, FE3, and FE10, Defendants falsified and/or manipulated property appraisals so they would purport to comply with the Company's underwriting policies, resulting in artificially low LTV ratios. As described in further detail in Section V.F. and V.G., corroborated by the accounts of FE3, FE6, FE7, FE8, and FE12, Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period. As a result, Defendants knew but did not disclose the material weaknesses in the Company's internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process.

602. That same day, the Company issued a press release entitled, "Arbor Realty Trust Reports First Quarter 2024 Results and Declares Dividend of $0.43 per Share" ("1Q24 Earnings Release"), filed with the SEC as Exhibit 99.1 to Form 8-K, signed by Defendant Elenio.

603. The press release provided "Company Highlights" stating, in relevant part, "GAAP net income of $0.31 per diluted common share" and "Distributable earnings of $0.47, or $0.48 per diluted common share, excluding a $1.6 million realized loss on non-performing loan that was previously reserved for."

604. The 1Q24 Earnings Release provided that, "Arbor reported net income for the quarter of $57.9 million, or $0.31 per diluted common share, compared to net income of $84.3 million, or $0.46 per diluted common share for the quarter ended March 31, 2023. Distributable earnings for the quarter was $96.7 million, or $0.47 per diluted common share, compared to $122.2 million, or $0.62 per diluted common share for the quarter ended March 31, 2023."

605. In addition, the 1Q24 Earnings Release reported that:

> During the first quarter of 2024, the Company ***recorded a $17.8 million provision for loan losses associated with CECL***. At March 31, 2024, the Company's ***total allowance for loan losses was $211.9 million***. The Company had ***twenty-one non-performing loans with a UPB of $464.8 million,*** before related loan loss reserves of $32.9 million, compared to sixteen loans with a carrying value of $274.2 million, before loan loss reserves of $27.1 million at December 31, 2023.

(Emphasis added).

606. The statements identified in the immediately preceding paragraphs are false and misleading because the Company violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses. As set forth in greater detail in Section V.I., Defendants manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines resulting in an influx of multifamily bridge loans that were structurally unsound and at material risk of non-performance or default, as set forth in Section V.E., corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.

607. In addition, the Company failed to disclose material weaknesses in its internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As described in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Section V.H., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

608. On February 16, 2024, the Company hosted an investor conference call to discuss the financial results for the fourth quarter and fiscal year ended December 31, 2023 ("4Q23 Earnings Call"). During the call, when discussing the $1.9 billion in loan modifications completed by the Company, Defendant Kaufman declared that, "***[t]he short-term nature of having a delinquent loan will not impact our decision-making process to achieve the correct economic result on the transaction***."

609. Kaufman went on to add that:

> We have also been highly effective in refinancing deals through our agency business as well as ***leveraging our long-term standing relationships from many quality sponsors to step in to take over assets that are underperforming and assume our debt***. This is a difficult and complicated work in an extremely challenging environment. And I can't tell you enough about the efforts put forth by our entire organization and successfully managing through the teeth of this dislocation.

610. When discussing the Company's Agency business, Defendant Kaufman stated that, "***Despite the current rate environment, we continue to maintain a large pipeline and we are not seeing significant fallout in this market, rather deals are just being pushed out further***" and touted that "***we have also done a great job in converting our balance sheet loans into agency product***."

611. During the call, Defendant Elenio addressed the Company's delinquent or non-performing loans stating:

> Our nonperforming loan numbers are now $465 million this quarter, due to approximately $175 million of loans progressing from less than 60 days delinquent to greater than 60 days past due and roughly $15 million of net new additions for the quarter. The less than 60 days past due loans or our nonaccrual loans came down to $489 million this quarter, mostly due to $713 million of loans being successfully modified as I mentioned earlier, combined with $175 million of loans moving to 60-plus days delinquent, which was partially offset by approximately $420 million of new loans this quarter that we did not accrue interest on. So in summary, our total delinquencies are down 23% from $1.23 billion last quarter to $954 million

> this quarter, which is significant progress, again, due to the tremendous success we had in modifying and resolving loans and our continued strong collection efforts.

612. The statements identified in the immediately preceding paragraphs are false and misleading because Elenio knew but failed to disclose material weaknesses in the Company's internal controls concerning its reporting of delinquent or non-performing loans and the underlying risks of loss. As described in Section V.F., corroborated by the accounts of FE1, FE6, FE8, and FE12, shifts in economic and market conditions placed significant strain on the Company's portfolio, full of floating-rate loans borrowed by overleveraged and inexperienced syndicators, for over-valued and underperforming assets, resulting in delinquencies or non-performance and significantly increasing ABR's risk of loss. As described in Sections V.G through V.I., Defendants set policies and implemented practices that improperly took advantage of the Company's material weaknesses to keep its risk of loss from surfacing throughout the Class Period, concealing the true nature and strength of ABR's loan book.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

613. As alleged above, numerous facts raise a strong inference that Defendants Kaufman and Elenio knew or, at minimum, were reckless in disregarding the true facts regarding ABR's high-risk multifamily bridge loans and ever-growing position in delinquent or non-performing loans. For example, Defendants were well aware that ABR artificially inflated its profitability by building up outsized positions of structurally unsound, high-risk multifamily bridge loans, securitized through its multi-billion-dollar CLO pools, in violation of the Company's stated underwriting standards and guidelines. Defendants then knowingly manipulated the Company's net income by understating its CECL allowance in connection with these high-risk multifamily loans. Further, the Company's reclassification of hundreds of millions of dollars of unpaid balance on multifamily loans originated in FY21 to "doubtful" and redefining of non-performing loans as

"61-90 Days Past Due" in its 1Q24 10-Q, following the release of two corrective disclosures identified above, is evidence of the misleading nature of Defendants' prior reporting. In addition to the allegations set forth above, the following facts further support a strong inference of scienter.

## A. The Individual Defendants Certified ABR's Class Period Statements

614. Included as Exhibits 31 and 32 to the Company's Form 10-Qs and Form 10-Ks filed with the SEC, during the Class Period, were management certifications, pursuant to Rule 13a-14 and 15d-14 of the Exchange Act ("Exchange Act Certification") and Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C § 1350 ("SOX Certification"), signed by Defendants Kaufman and Elenio.

615. In signing the Exchange Act Certification, each of the Individual Defendants certified that:

> 1. I have reviewed this [quarterly or annually] report on [Form 10-Q or Form 10-K] for the [quarter or fiscal year] ended [] of Arbor Realty Trust, Inc.;
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report;
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under

our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

616. In signing the SOX Certification, each of the Individual Defendants certified that: "(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

## B. <u>The Individual Defendants Held Themselves Out as Knowledgeable</u>

617. The Individual Defendants knew investors and analysts were acutely interested in the Company's underwriting standards, asset management, and loan book valuation because they were repeatedly asked about such key operations throughout the Class Period during numerous investor calls and at analyst conferences. As detailed herein, the Individual Defendant consistently spoke to those subjects with authority, indicating that they either had actual knowledge of the

subject matters discussed (and thus the truthful information omitted) or were reckless to the likelihood of misleading investors by speaking with authority as to subjects about which they actually were uninformed.

### C. The Multifamily Bridge Loans Were Critical to ABR's Core Operations

618. The fraud alleged herein relates to the core business and operations of ABR, such that knowledge thereof may be imputed to the Individual Defendants. The Company's Structured Business was the primary source of its income during the Class Period. ABR's multifamily bridge loans accounted for roughly 91% of its Structured portfolio. The Company's CLOs, comprising approximately two-thirds of ABR's Structured portfolio, accounted for nearly 70% of its secured indebtedness.

619. Underwriting and asset management were essential elements of the Company's business operations. The concealment of ABR's abandonment of its conservative underwriting standards and the high-risk nature of its loan book massively affected every aspect of the Company's operations and financial disclosures. The amounts of the non-performing bridge loans were larger than all the rest of ABR's non-performing or delinquent loans. The magnitude of the troubled loan relationship and the outsized portion of ABR's Structured portfolio that it represented are additional inferences of scienter.

620. Accordingly, it is appropriate to presume that the Individual Defendants were apprised of, had access to, or had actual knowledge of all material information related to ABR's business operations and financial condition during the Class Period, including the material adverse information that was improperly withheld and/or mispresented to investors.

### D. The Individual Defendants had Financial Motive to Grow the Volume of ABR's Floating-Rate Bridge Loans and Conceal its Increasing Risk of Loss

621. The Individual Defendants were highly motivated to increase the volume of ABR's floating-rate bridge loans packaged into its CLOs to increase or, at minimum, maintain the Company's net income and distributable earnings, and remained highly motivated to conceal the risk of loss associated with these distressed loans from investors because their bonuses were directly tied to the Company's performance. For instance, Defendants manipulation of ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards and guidelines caused ABR's net income, and there thereby distributable earnings, to be artificially inflated throughout the Class Period. Defendant Kaufman's annual performance bonus hinged on the Company's distributable earnings. During the Class Period, Kaufman received no less than $19.7 million in cash bonuses. But for Defendants' fraudulent misconduct, alleged herein, Kaufman would not have received nearly $20 million in cash bonuses.

622. On April 22, 2021, the Company and Defendant Kaufman entered into a Second Amended and Restated Annual Incentive Agreement, with a term of five years and which provided him with: (1) an annual base salary of $1,200,000; (2) an annual cash bonus of $800,000; and (3) annual performance cash bonus target opportunities of $2,928,200 at target performance, $1,464,100 at threshold performance and $4,392,300 at maximum performance, with the opportunity to earn an additional $732,050 annually in the event of extraordinary performance with respect to corporate capital growth goals.

623. Under the terms of the agreement, the goals applicable to Defendant Kaufman's annual performance bonus relate to the Company's distributable earnings per share, corporate capital growth, balance sheet-management and efficiency and the relative risk of its portfolio.

624. The 2021 Incentive Agreement also provides that the value of Defendant Kaufman's annual cash bonuses and equity incentive awards will increase by 10% for each increase of 25% in the Company's GAAP equity capitalization, measured annually.

625. In accordance with the terms of the 2021 Incentive Agreement, Defendant Kaufman received a cash bonus of $5,924,350 with respect to his work on behalf of the Company in 2021. In total, Kaufman's annual compensation was $13,439,509, or 138x that of the annual compensation of ABR's median employee at $97,246. Kaufman's cash bonus tied to the Company's performance accounted for 44% of his annual compensation in 2021.

626. In accordance with the terms of the 2021 Incentive Agreement, Defendant Kaufman received a cash bonus of $6,516,785 with respect to his work on behalf of the Company in 2022. In total, Kaufman's annual compensation was $10,574,016, or 105x that of the annual compensation of ABR's median employee at $100,922. Kaufman's cash bonus tied to the Company's performance accounted for 62% of his annual compensation in 2022.

627. In accordance with the terms of the 2021 Incentive Agreement, Defendant Kaufman received a cash bonus of $7,265,264 with respect to his work on behalf of the Company in 2023. In total, Kaufman's annual compensation was $12,399,811, or 120x that of the annual compensation ABR's median employee at $103,627. Kaufman's cash bonus tied to the Company's performance accounted for 58% of his annual compensation in 2023.

628. In addition to Defendant Elenio's 50% base salary increase to $750,000 in 2021, the Company also provides annual incentive awards. When discussing annual incentive awards,

the Company's 2021 Proxy Statement, filed with the SEC on April 18, 2022, provides, in relevant part that:

> We aim to promote a pay-for-performance culture, with a substantial portion of total compensation being 'at risk.' The annual incentive award may be in the form of cash, stock-based awards or a combination thereof …
>
> The Compensation Committee believes that the structure and ultimate payout amounts of the incentive awards are appropriate to attract, retain and reward the [named executive officers] NEOs, are competitive with those offered by our peers, provide a strong, long-term performance and retention incentive, support a pay-for-performance culture and increase each NEO's vested interest in the Company.
>
> The Compensation Committee determines the annual incentive awards of the NEOs in amounts relative to each individual's contributions and responsibilities. Individuals with increased ability to directly impact our performance were allocated larger awards because they bear a greater proportion of the risk that compensation will decrease if we do not perform as expected.

629. Under the Company's annual incentive awards, Defendant Elenio received a cash bonus of $1,100,000 with respect to his work for the Company in 2021; $1,100,000 in 2022; and $1,400,000 in 2023. In total, Defendant Elenio's annual compensation was $2,232,200 in 2021; $2,356,575 in 2022; and $2,651,526 in 2023. Accordingly, Elenio's cash bonus tied to the Company's performance accounted for 49% of his annual compensation in 2021; 46% in 2022; and 53% in 2023.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

630. During the Class Period, ABR securities traded publicly on the NASDAQ. The market for ABR securities was open, well-developed and efficient at all relevant times.

631. Throughout the Class Period, ABR's securities price was artificially inflated because of Defendants' materially false and misleading statements identified in this Complaint. Indeed, Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as fraud or deceit on Class Period purchasers and/or acquirers of ABR securities, by failing to disclose and/or misrepresenting the adverse facts detailed herein. By issuing materially

false and misleading underwriting and loan performance statements, among other adverse facts detailed herein, Defendants presented a false and/or misleading picture of ABR's business and operations. Defendants' false and misleading statements alleged herein had the intended effect and caused ABR securities to trade at artificially inflated levels throughout the Class Period, with ABR securities reaching as high as $20.73.

632. Reasonably relying on the integrity of the market price for ABR securities and market information relating to ABR's business and operations, Plaintiffs and other members of the Class purchased or otherwise acquired ABR securities at artificially inflated prices. When Defendants' prior misrepresentations and omissions were disclosed and became apparent to the market, the price of ABR securities fell precipitously as the prior artificial inflation dissipated. As a result of their purchases or acquisitions of ABR securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, which were proximately caused by Defendants materially false and misleading statements made to the investing public.

633. Indeed, as described in detail above and highlighted below, when the truth about the Company leaked out through a series of partial corrective disclosures, the inflation that was a direct result of Defendants' Class Period misrepresentations and omissions was eliminated as ABR's securities reacted to information in the market.

634. For example, on November 16, 2023, Viceroy published a report concluding that, after reviewing hundreds of ABR's individual loans at severe risk due to rising interest rates, declining property values, and impending maturity dates without asset rehabilitation, the Company's entire loan book was distressed, and its underlying collateral was vastly overstated. On this news, ABR's securities price dropped from $13.84 per share on November 15, 2023 to $12.24 per share on November 16, 2023, or 11.56%.

635. Analysts and the media also reacted to these revelations. For example, on November 16, 2023, the real estate news outlet, The Real Deal, published an article entitled, "Arbor stock falls after short-seller report," noting that Viceroy's report of the Company's "reliance on making high-risk multifamily bridge loans … vulnerable to a wave of defaults" had "wiped out the year-to-date gain in Arbor's stock."

636. On December 5, 2023, Viceroy published a follow-up report tracking the underlying asset delinquencies and DSCRs of a specific portfolio of Jacksonville, FL properties. Viceroy reported "[w]histleblowers have reached out to Viceroy en-masse to provide evidence and public citations of current, distressed Arbor deals and underlying assets. … the information asymmetry between real estate industry professionals and Arbor's investors is vast." In response, ABR's securities price declined from $13.86 per share on December 4, 2023 to $13.15 per share on December 6, 2023, or 5.12%.

637. During the Company's Q4 2023 Earnings Call, held on February 16, 2024, Defendant Kaufman addressed the Viceroy reports and their impact on ABR securities price during his prepared remarks stating, in relevant part:

> Lastly, I would like to spend some time talking about the short reports that have been written on our company. On our loyal investors base to understand that these reports are written in a way that is purposely designed to drive down the company's stock price to achieve the desired goal of profit from a short position. … We urge our long-term shareholders to ignore these one-sided self-motivated reports and focus only on our results and public disclosures and the fact that we've consistently outperformed our peers.

638. On May 8, 2024, the Company issued a press release entitled, "Arbor Realty Trust Points to its Public Disclosures and Strong Performance in Light of Continued Negative Press from Short Interest." The press release came just days after ABR released its Q1 2024 Earnings Release and filed its Q1 2024 10-Q on May 3, 2024, and when addressing its investors, the Company, stated "[a]s you may be aware, Arbor has been, and continues to be the subject of certain

'reports' by short sellers … we anticipate more of these short seller 'reports' in the near future, which may also be featured in the press." The press release went on to say that "instead of responding to each article that cites these 'reports,' we want to reiterate that we stand by Arbor's detailed filings, audited financial statements and the comments made on our earnings call. Rather than relying on short seller 'reports,' or press articles, we encourage everyone to carefully review our comprehensive public statements and disclosures."

639. The following day, May 9, 2024, Viceroy published another report accusing ABR and its executives of "fraud." The report described a scheme whereby ABR financed purchases of assets from its own foreclosures, with ABR loans, via off-balance sheet entities run by former ABR associates, and entirely financed with ABR equity capital, which allowed ABR to avoid writing down its loans. In response, ABR's securities price declined from $13.50 per share on May 8, 2024 to $12.84 per share on May 9, 2024, or 4.9%.

640. Then, on July 12, 2024, after the markets opened, Bloomberg reported ABR was being probed by the DOJ and FBI regarding the Company's lending practices and claimed performance of its loan book. ABR confirmed the ongoing investigation in its response to Bloomberg stating that the Company routinely cooperates with regulatory inquiries and is confident that its conduct is proper. On this news, ABR's securities price declined from $15.53 per share on July 11, 2024 to $12.89 per share on July 12, 2024, or 17.33%.

641. That same day, July 12, 2024, analyst Piper Sandler covered the developing news of the ongoing regulatory investigation issuing a report entitled, "Arbor Realty Trust, Inc. (ABR), Underweight, Stock Down 15%+ on Media Reporting DOJ & FBI Investigation; Arbor Responds." The report noted that "[w]hile there has been no further detail or comments from the DOJ or FBI, Arbor has traded down ~17% intraday and as much as 20% at its lows."

642. The drastic and continuing decline in the price of ABR securities was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the price of ABR's securities negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## IX. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET DOCTRINE

643. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants publicly made false and misleading statements and/or failed to disclose material facts during the Class Period;

(b) Defendants' misrepresentations and/or omissions made during the Class Period were material;

(c) ABR securities traded in an efficient market;

(d) Defendants' misrepresentations and/or omissions pleaded herein would tend to induce a reasonable investor to misjudge the value of ABR securities; and

(e) Plaintiffs and other members of the Class purchased or otherwise acquired ABR securities between the time Defendants made the alleged false and misleading statements and/or failed to disclose material information and the time the truth was disclosed and/or risks materialized, without knowledge of the misrepresented or omitted material facts.

644. At all relevant times, the market for ABR's securities was an efficient market for the following reasons, among others:

(a) ABR's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, ABR filed periodic public reports with the SEC;

(c) ABR regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, publications on its website and other public Internet sites, and through other wide-ranging public disclosures, such as through conference calls, communications with the financial press and other similar reporting services; and

(d) ABR was followed by at least six securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

645. As a result of the foregoing, the market for ABR securities reasonably and promptly digested current information regarding ABR from all publicly available sources and reflected such information in the price of ABR securities. All purchasers and acquirers of ABR securities during the Class Period suffered similar injury through their purchase and/or acquisition of ABR securities at artificially inflated prices, and a presumption of reliance applies.

646. Further, at all relevant times, Plaintiffs and other members of the Class relied on Defendants to disclose material information as required by law. Plaintiffs and other Class members would not have purchased or otherwise acquired ABR securities at artificially inflated prices if Defendants had timely disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning ABR and its

business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153 (1972).

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

647. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements alleged herein can be characterized as a forward-looking statement. Rather, each of the alleged false and misleading statements are historical statements or statements that relate to then-existing facts and conditions, including *inter alia*, statements about ABR's present business and operations, its present financial condition, and its internal controls.

648. To the extent any of the alleged false and misleading statements may be construed as forward-looking, those statements were not identified as "forward-looking statements" when made, nor were they accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding ABR's risk controls and underwriting standards, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by ABR were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

649. To the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or

the forward-looking statement was authorized and approved by an executive officer of ABR who knew that the statement was false and/or materially misleading when made.

## XI. CLASS ALLEGATIONS

650. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired ABR securities between May 7, 2021 and July 11, 2024, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are: (a) Defendants and their immediate families; (b) current and former officers and directors of ABR and their immediate families; (c) any entity that has entered into a stockholder agreement or co-venture agreement with ABR; (d) each of the foregoing persons' legal representatives, heirs, agents, affiliates, successors or assigns, and any entity controlled, majority-owned or wholly owned, or affiliated with any of the above persons who purchased or otherwise acquired ABR securities during the Class Period; and (e) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof.

651. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ABR securities were heavily traded on the NASDAQ, which is indicia of its broad ownership. Indeed, ABR indicated that "on February 2, 2024, there were approximately 136,882 record holders of our common stock…" *See* ABR's FY 2023 10-K at p.31, filed on February 20, 2024. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds, if not thousands, of members of the Class. Class members who purchased ABR securities may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of the instant action using a form of notice similar to that customarily used in

securities class actions. Accordingly, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

652. Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of the federal securities laws, as complained of herein.

653. Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Plaintiffs have no interest that conflicts with those of the Class.

654. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts, as alleged herein;

(b) Whether the Defendants made statements to the investing public during the Class Period that were false and/or materially misleading;

(c) Whether Defendants acted with the requisite state of mind;

(d) Whether the price of ABR securities were artificially inflated during the Class Period;

(e) Whether the losses alleged by Plaintiffs and other members of the Class were caused by Defendants' wrongful acts; and

(f) The extent of damage sustained by members of the Class and the appropriate way to measure damages.

655. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Additionally, the damage suffered by some individual Class members maybe relatively small so that the burden and expense of individual litigation may make it impossible for such members to individually redress the wrongs done to them. Plaintiffs do not foresee any difficulty in the management of this action as a class action.

## XII. CLAIMS FOR RELIEF

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

***(Against All Defendants)***

656. Plaintiffs incorporate and re-allege each and every allegation set forth above as if fully set forth herein.

657. This Count is asserted on behalf of all members of the Class against Defendants ABR, Kaufman, and Elenio for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

658. During the Class Period, Defendants disseminated or approved the false and misleading statements pleaded herein, which they knew were, or recklessly disregarded as, false and misleading in that they contained misrepresentations and/or failed to disclose material information necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

659. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c)

engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquirers of ABR securities during the Class Period.

660. Defendants, individually and in concert, directly and/or indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various false and misleading statements and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of ABR securities, which were intended to, and did: (a) deceive the investing public, including Plaintiffs and the other members of the Class, regarding, among other things, ABR's business and operations; (b) artificially inflate and maintain the market price of ABR securities; and (c) cause Plaintiffs and the other members of the Class to purchase or otherwise acquire ABR securities at artificially inflated prices, and to suffer losses when the true facts became known.

661. Defendants ABR, Kaufman, and Elenio are liable for all materially false and misleading statements made during the Class Period, as alleged above.

662. As described herein, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate reckless disregard. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of ABR securities, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

663. Plaintiffs and other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ABR securities, which inflation was removed from its price when the true facts and/or materialized risks became known. Plaintiffs and other members of the Class would not have purchased ABR securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' misrepresentations and/or omissions.

664. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchase or other acquisition of ABR securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act

***(Against the Individual Defendants)***

665. Plaintiffs incorporate and re-allege each and every allegation set forth above as if fully set forth herein.

666. This Count is asserted on behalf of all members of the Class against Defendants Kaufman and Elenio for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

667. As detailed herein, as executive officers of ABR, each Individual Defendant was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act. As senior officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to, among other things, ABR's business and operations, and internal controls, and to promptly correct any public statements issued by the Company which had become false and misleading and/or omitted material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading.

668. Because of their positions of control and authority as senior officers of ABR, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause ABR to engage in the wrongful conduct complained of herein. Because of their positions of control and authority as senior officers of ABR, each of the Individual Defendants were able to and did control, directly or indirectly, the content of the public statements made by ABR during the Class Period, including its materially false and misleading statements, thereby causing the dissemination of the misrepresentations and omissions alleged herein.

669. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Kaufman and Elenio had direct involvement in the day-to-day operations of ABR, in reviewing and managing its regulatory and legal compliance, and its accounting and reporting functions. The Individual Defendants signed the Company's SEC filings during the Class Period; certified and approved the false and misleading statements disseminated by ABR during the Class Period; and were directly involved in providing false and misleading information to the investing public during the Class Period. As a result, Defendants Kaufman and Elenio together and individually, were controlling persons of ABR within the meaning of Sections 20(a) of the Exchange Act.

670. As set forth above, ABR violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by its fraudulent acts and material omissions alleged herein. By virtue of their positions as controlling persons of ABR, and as a result of their own aforementioned conduct, Defendants Kaufman and Elenio are liable pursuant to Section 20(a) of the Exchange

Act, jointly and severally with, and to the same extent as, ABR is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class, who purchased or otherwise acquired ABR securities.

671. As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchase or other acquisition of ABR securities during the Class Period.

## XIII. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. Declaring the instant action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein, and certifying Plaintiffs as class representatives and Plaintiffs' counsel as Class Counsel;

B. Awarding all damages and other remedies available under the Exchange Act in favor of Plaintiffs and the other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XIV. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

//

//

//

Dated: January 21, 2025

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*<u>/s/ Adam M. Apton</u>*
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Lead Counsel for Plaintiffs and the Class*