**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LOIS MARTIN, individually and on behalf of all others similarly situated,<br>*Plaintiffs*,<br><br>v.<br><br>ARBOR REALTY TRUST, INC., IVAN KAUFMAN, and PAUL ELENIO,<br>*Defendants*. | Civil Action No.: 1:24-cv-05347-PKC-LKE<br><br>Oral Argument Requested |

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Andrew J. Levander
Neil A. Steiner
Angela M. Liu
DECHERT LLP
Three Bryant Park
1095 Sixth Avenue
New York, NY 10036
Tel: (212) 698-3500
andrew.levander@dechert.com
neil.steiner@dechert.com
angela.liu@dechert.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page(s)**


PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 2

A. The Parties ........ 2

B. Arbor's Business Structure ........ 3

C. Arbor's Underwriting and Loan Ratings System ........ 4

D. Arbor's Disclosure of Non-Performing Loans ........ 5

E. Arbor's Extensive Further Disclosures ........ 6

F. Short Seller Reports ........ 7

G. This Litigation ........ 7

ARGUMENT ........ 8

I. PLAINTIFFS FAIL TO PLEAD A FALSE OR MISLEADING STATEMENT OR OMISSION ........ 8

A. Plaintiffs Rely On Unreliable Sources In Attempting To Plead An Actionable Statement ........ 9

B. Plaintiffs Fail To Establish That Defendants' Statements Regarding Arbor's Reserving Practices Are False Or Misleading Or Contained Omissions ........ 10

C. Allegations About Statements Relating to Internal Controls Are Insufficient ........ 14

II. PLAINTIFFS FAIL TO PLEAD ALLEGATIONS THAT GIVE RISE TO A STRONG INFERENCE OF SCIENTER ........ 15

A. Plaintiffs' Motive Allegations Weigh Against An Inference Of Scienter ........ 16

B. Plaintiffs Fail To Allege Conscious Misbehavior Or Recklessness ........ 17

III. PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ........ 22

IV. PLAINTIFFS FAIL TO PLEAD SCHEME LIABILITY ........ 24

V. PLAINTIFFS FAIL TO PLEAD A SECTION 20(a) CLAIM ........ 25

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)....16

*Arora v. HDFC Bank Ltd.*,
671 F. Supp. 3d 305 (E.D.N.Y. 2023) ....15

*In re AT&T DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020)....24, 25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)....24

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021)....8

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed Home Loan Mortg. Corp.*,
543 Fed. App'x 72 (2d Cir. 2013)....22, 23, 24

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008)....22

*Coronel v. Quanta Capital Holdings Ltd.*,
2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ....18

*Defeo v. IonQ, Inc.*,
2025 WL 1035292 (4th Cir. Apr. 8, 2025) ....23

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ....21

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)....9, 17

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....23

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)....8

*In re EHang Holdings Ltd. Sec. Litig.*,
646 F. Supp. 3d 443 (S.D.N.Y. 2022)....9

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011)....................11, 12

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)....................11, 12

*Francisco v. Abengoa, S.A.*,
559 F. Supp. 3d 286 (S.D.N.Y. 2021)....................25

*Frederick v. Mechel OAO*,
475 F. App'x 353 (2d Cir. 2012) ....................21

*Harris v. AmTrust Fin. Servs., Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015)....................7, 9, 14, 20

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ....................17

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivative Litig.*,
859 F. Supp. 2d 572 (S.D.N.Y. 2012)....................8

*Janbay v. Canadian Solar, Inc.*,
2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ....................10

*Janus Capital Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)....................25

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)....................16, 17

*Lachman v. Revlon, Inc.*,
487 F. Supp. 3d 111 (E.D.N.Y. 2020) ....................8, 17, 21, 25

*In re Lehman Bros. Sec. & Erisa Litig.*,
2013 WL 3989066 (S.D.N.Y. July 21, 2013) ....................10

*Lentell v. Merrill Lynch & Co, Inc.*,
396 F.3d 161 (2d Cir. 2005)....................24

*In re Liberty Tax, Inc. Sec. Litig.*,
435 F. Supp. 3d 457 (E.D.N.Y. 2020) ....................15

*Lipow v. Net1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015)....................21

*Loc. No. 38 Int'l Bhd. Of Elec. Workers Pension Fund v. Am. Express Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010)....................17

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020)....................10, 17, 18

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ....................24

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
568 F. Supp. 2d 349 (S.D.N.Y. 2008)....................2

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ....................23, 24

*In re MRU Holdings Sec. Litig.*,
769 F. Supp. 2d 500 (S.D.N.Y. 2011)....................17

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*,
2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)....................14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)....................11

*In re Omnicom Group, Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)....................22

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
11 F. 4th 90 (2d Cir. 2021) ....................25

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)....................9

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009)....................17, 22

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996)....................10

*Saraf v. Ebix, Inc.*,
2023 WL 4561655 (S.D.N.Y. July 17, 2023) ....................24

*Tabor v. Bodison Biotech, Inc.*,
579 F. Supp. 2d 438 (S.D.N.Y. 2008)....................8

*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*,
675 F. Supp. 3d 274 (E.D.N.Y. 2023) ....................21

*Tellabs, Inc. v. Makor Issues & Rts.*,
551 U.S. 308 (2007)....................2, 15, 16

*Tian v. Peloton Interactive, Inc.*,
2025 WL 510043 (E.D.N.Y. Feb. 14, 2025)....................13

*In re UBS AG Sec. Litig.*,
2012 WL 4471265 (S.D.N.Y Sept. 28, 2012)....................19

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ....................23

*Woolgar v. Kingstone Cos.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020).................... *passim*

*Zech Cap. LLC v. Ernst & Young Hua Ming*,
636 F. App'x 582 (2d Cir. 2016) ....................9, 16

*Zhong Zheng v. Pingtan Marine Enter. Ltd.*,
379 F. Supp. 3d 164 (E.D.N.Y. 2019) ....................21, 22

**Statutes**

15 U.S.C.A. § 78u-4(b)(1)(B)....................9

**Other Authorities**

Federal Rule of Evidence 201....................2

## PRELIMINARY STATEMENT

Plaintiffs' amended class action complaint (the "Amended Complaint" or "AC") is premised entirely on the improbable and unsubstantiated theory that Arbor Realty Trust, Inc. ("Arbor" or the "Company"), a successful real estate investment trust ("REIT"), has engaged for years in substandard lending practices and portrayed its financial health as stronger than it is. According to Plaintiffs, the Company, its Chief Executive Officer, Ivan Kaufman, and Chief Financial Officer, Paul Elenio, intentionally deceived investors by erroneously describing the Company's underwriting standards and internal processes for protecting against risk in its public filings throughout the three-year putative Class Period (the "Class Period"). This theory has been propagated for years in reports issued by short sellers of the Company's common stock, to no avail. It fares no better in the form of a securities fraud complaint.

Far from providing plausible support that the Company was abandoning its underwriting practices or attempting to conceal its losses by understating its loss reserves, the 224-page Amended Complaint relies exclusively on conclusory and contradictory allegations from two sets of unreliable sources: (i) unsubstantiated and self-serving short seller reports drafted and distributed by a party with a financial incentive to denigrate Arbor in hopes of driving down its stock price; and (ii) purported recollections of former lower-level employees without direct knowledge of the processes and events at issue and whose statements belie the very allegations they are offered to support. Plaintiffs also ignore (i) that Arbor's longstanding independent auditor, Ernst & Young ("E&Y"), issued unqualified audit opinions on the Company's financial statements year-after-year in the face of the short seller reports and never required restatements of any financial statements; (ii) the extensive risk disclosures in Arbor's public filings; and (iii) Arbor's resilience and success navigating through the volatile post-pandemic financial environment as

interest rates were increased to stave off inflationary pressures stemming from pandemic-era policies, which caused challenges throughout the industry.

The Amended Complaint should be dismissed with prejudice for at least the following reasons: ***First***, Plaintiffs do not allege an actionable misstatement or omission. Instead, they base their allegations on unreliable short seller reports, which courts regularly discredit. Indeed, courts routinely reject claims based on conclusory allegations, management's opinions regarding loss reserves, and immaterial puffery. *See infra* § I. ***Second***, Plaintiffs do not plead facts giving rise to a "strong inference" of fraudulent intent, *i.e.*, scienter. Plaintiffs' allegations are far more consistent with the competing inference that Defendants did not commit fraud. Dismissal is mandated for that independent reason. *See infra* § II. ***Third***, the Amended Complaint fails to plead loss causation, *i.e.*, that the alleged misstatements caused Plaintiffs' losses. *See infra* § III. ***Fourth***, Plaintiffs do not plead scheme liability. *See infra* § IV. ***Finally,*** their Section 20(a) claim likewise fails because Plaintiffs fail to plead an underlying Section 10(b) claim and because they fail to plead "culpable participation" by Mr. Kaufman or Mr. Elenio in any alleged fraud. *See infra* § V.

## FACTUAL BACKGROUND[1]

### A. The Parties

Arbor, formed in 2003, is a REIT incorporated in Maryland. AC ¶¶ 22, 57. The individual defendants, Ivan Kaufman and Paul Elenio, served as Arbor's CEO and CFO, respectively, during the Class Period. AC ¶¶ 23, 25. Lead Plaintiff David Hawkins is the owner of 16,000 shares of

[1] This factual background is drawn from documents that may be considered on this motion, including documents referenced in the Amended Complaint, documents integral to it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence. *See Tellabs, Inc. v. Makor Issues & Rts.*, 551 U.S. 308, 322 (2007); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 352 n.1 (S.D.N.Y. 2008). This memorandum also presents information drawn from certain short seller reports cited in the Amended Complaint solely for the purpose of this motion, and Defendants do not concede that those reports are accurate or complete. Exhibit references ("Ex.") refer to exhibits in the Declaration of Angela M. Liu, filed with this motion. Unless otherwise indicated, all emphasis in text and case citations has been added and internal citations have been omitted.

Arbor common stock, which he claims to have purchased between May 2021 and July 2024 and to have suffered roughly $67,592 in damages as a result.[2] ECF No. 7-2.

**B. Arbor's Business Structure**

Arbor currently operates through two primary business segments: a Structured Loan Origination and Investment Business (the "Structured Business") and an Agency Loan Origination and Servicing Business (the "Agency Business"). AC ¶ 58. Through its Structured Business, Arbor invests in a diversified portfolio of structured finance assets in the multifamily, single-family rental, and commercial real estate markets, consisting primarily of bridge and mezzanine loans. AC ¶ 63; Ex. 1, FY23 10-K at 2. Arbor's proven business model for its Structured Business involves writing bridge loans, typically two-to-three-year floating interest rate loans, providing resources to allow borrowers time to improve or develop commercial properties. *See* AC ¶¶ 64-65; Ex. 1, FY23 10-K at 2-3. Generally, the Structured Business grows Arbor's loan portfolio, which provides a pipeline to growth in its Agency portfolio. AC ¶ 115. The primary goal of the bridge lending business is to support the improvement and, ultimately, the stabilization of commercial, often multifamily, properties so that they meet the high qualification criteria for Agency takeout. AC ¶ 166 ("[O]ur business model on every bridge loan we do is for an Agency takeout."); Ex. 1, FY23 10-K at 2-3. Arbor seeks to identify the right opportunities, with the right plan and the necessary discipline, to unlock the value in a property. *See* Ex. 1, FY23 10-K at 3. The Structured Business model is inherently high-risk, as Arbor clearly and accurately discloses. *See* Ex. 2, FY21 10-K at 23-24.

Through its Agency Business, Arbor originates, sells, and services a range of multifamily finance products through certain government-sponsored entities, like Fannie Mae and Freddie

---

[2] Additional named Plaintiff is Lois Martin, who also claims to have purchased Arbor's common stock during the Class Period and to have suffered damages as a result. AC ¶ 21; ECF No. 1-1.

Mac. AC ¶ 59. Arbor, one of a select group of approved designated underwriters for such government-sponsored programs, helps to serve the public policy goal of addressing affordable housing needs in the United States. *See* AC ¶ 60; Ex. 1, FY23 10-K at 2, 4, 23.

### C. Arbor's Underwriting and Loan Ratings System

Arbor's underwriters perform due diligence on proposed transactions to determine the potential loan's conformity with Arbor's guidelines, which include items like the borrower's background, property values, potential revenue growth, property location, and third-party appraisals. *See* Ex. 2, FY21 10-K at 6-7. For each loan and investment Arbor makes, it assigns a credit risk ranking of pass, pass/watch, special mention, substandard or doubtful, with a pass being the lowest risk and a doubtful being the highest risk. *See* AC ¶ 173; Ex. 3, Q1 2021 10-Q at 10. Arbor explained in its SEC filings that it expected its pass, pass/watch, and special mention loans to make both principal and interest payments on time but was upfront that it expected its substandard loans to require a modification and its doubtful loans to be at risk of underperforming. *See* Ex. 3, Q1 2021 10-Q at 10; Ex. 4, Q1 2022 10-Q at 10; Ex. 5, Q1 2023 10-Q at 10.

Each quarter, Arbor provided a detailed chart of its loan portfolio's internal risk ratings and LTV ratios, which explained the value of all loans subject to the different risk rankings for each of Arbor's asset classes. *See, e.g.*, Ex. 3, Q1 2021 10-Q at 11; Ex. 5, Q1 2023 10-Q at 11. Arbor reported its allowance for credit losses, which detailed the expected losses relating to underperforming or nonperforming loans. *See, e.g.*, Ex. 3, Q1 2021 10-Q at 12. Arbor also reported its current expected credit loss ("CECL"), which includes unfunded loan commitments. *Id.* At the beginning of the Class Period, Arbor was extremely busy managing a surge in demand, driven by historically low interest rates. *See* AC ¶ 97; Ex. 2, FY21 10-K at 37. As the COVID-19 pandemic continued, Arbor explained that its estimate for credit loss allowances "was based on a reasonable and supportable forecast period that was adjusted for the expectations that the markets we operate

in will experience declines in economic conditions, increases in unemployment rates and other market driven factors largely the result of the COVID-19 pandemic that will likely impact loan delinquencies, modifications and potential risk of loss." Ex. 3, Q1 2021 10-Q at 12; *see also* Ex. 4, Q1 2022 10-Q at 12.

**D. Arbor's Disclosure of Non-Performing Loans**

As borrowers were affected by rising interest rates, Arbor was fully transparent in disclosing its non-performing loans and simplified its financial disclosures to stockholders. Arbor reported its non-performing loans in its SEC filings under its allowance for credit losses section. AC ¶ 194. Arbor classified its non-performing loans by length of time past due and, throughout most of the Class Period, divided the non-performing loans into two columns: one titled "Less Than 90 Days Past Due"; the other "Greater Than 90 days Past Due." AC ¶ 194. Although the first column was titled "Less than 90 Days Past Due," when it reported loans in 2023, Arbor made it clear to investors that it included only loans that were at least 60 days past due. *See* AC ¶ 197; Ex. 5, Q1 2023 10-Q at 48 (clarifying that loans are classified as non-performing once contractual payments reach 60 days past due); Ex. 1, FY23 10-K at 37, 64, 71 (same, and noting amount of loans that were 60 days or less past due). To further clarify, in its 10-Q for the period ending March 31, 2024, Arbor changed the column title from "Less than 90 Days Past Due" to "61-90 Days Past Due." Ex. 6, Q1 2024 10-Q at 12.

In addition to non-performing loans, Arbor explained that if it determines that it likely will be unable to collect amounts due according to the contractual terms of a loan, then the Company "may amend or modify loans that involve other-than-insignificant payment delays and provide interest rate reductions and/or extend the maturity dates for borrowers experiencing financial difficulty based on specific [] circumstances." *See* Ex. 7, FY22 10-K at 13. Arbor reported all modified loans throughout each quarter and year. *See, e.g.*, Ex. 2, FY21 10-K at 72.

### E. Arbor's Extensive Further Disclosures

Throughout the Class Period, Arbor issued quarterly and annual reports with financial statements and accompanying metrics, prepared in accordance with generally accepted accounting principles ("GAAP"). Arbor's annual financial statements were audited and approved by its independent auditor, E&Y, which found that "the consolidated financial statements present fairly, in all material respects, the financial position of the Company[,] and the results of its operations and its cash flows[.]" Ex. 2, FY21 10-K at 51; Ex. 7, FY22 10-K at 52; Ex. 1, FY23 10-K at 48. E&Y's evaluation also included "testing internal controls over management's expected credit loss and impaired loan assessments, including testing controls over significant model assumptions and data inputs used in those assessments." *See, e.g.*, Ex. 1, FY23 10-K at 49. Year after year, E&Y concluded that Arbor "maintained, in all material respects, effective internal control over financial reporting[.]" Ex. 2, FY21 10-K at 118; Ex. 7, FY22 10-K at 119; Ex. 1, FY23 10-K at 114.

In each of its annual reports during the Class Period, Arbor expressly detailed approximately twenty pages of risk factors on a wide range of topics. *See* Ex. 2, FY21 10-K at 12-33; Ex. 7, FY22 10-K at 12-33; Ex. 1, FY23 10-K at 11-30.[3] These risk factors and other portions of Arbor's filings contained explicit risks relating to the Company's competition, underwriting practices, and loss reserves. For example, Arbor thoroughly and repeatedly disclosed the competitive nature of its business and its methodology for finding and funding loans. *See* Ex. 2, FY21 10-K at 17; Ex. 7, FY22 10-K at 16; Ex. 1, FY23 10-K at 15 ("Our business is highly competitive. *Competition may cause us to accept economic or structural features in our investments [] that we would not have otherwise accepted[.]*"); Ex. 2, FY21 10-K at 9 (explaining process for handling changes in interest rates). And as interest rates rose, Arbor repeatedly warned

[3] Each of its quarterly reports incorporated the risk factors laid out in its previous annual report. *See* Ex. 3, Q1 2021 10-Q at 57; Ex. 4, Q1 2022 10-Q at 55; Ex. 5, Q1 2023 10-Q at 56.

that loan loss reserves are inherently uncertain and difficult to estimate in a turbulent economic environment. *See* AC ¶ 354; Ex. 7, FY22 10-K at 15. Arbor also informed investors that its business was susceptible to, and had already experienced, "increased payment delinquencies and defaults and increased loan modifications and foreclosures[.]" Ex. 2, FY21 10-K at 37; Ex. 1, FY23 10-K at 35. Arbor also warned that its "underwriting criteria may not always protect against loan defaults." Ex. 7, FY22 10-K at 18. Arbor disclosed that if economic conditions deteriorate or if a turbulent economic environment arises, Arbor would likely experience: (i) increases in loan loss reserves and other impairments; (ii) difficulty estimating loan loss reserves; and (iii) a decline in loan repayments. *See* Ex. 2, FY21 10-K at 12; Ex. 1, FY23 10-K at 11.

### F. Short Seller Reports

On November 16, 2023, Viceroy Research Group ("Viceroy") published a short seller report about Arbor, noting that "Viceroy is short Arbor Trust Realty," meaning Viceroy would profit if Arbor's stock fell. AC ¶ 228; Ex. 8, 11/16/2023 Viceroy Report at 1; *see also Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 160 n.2 (S.D.N.Y. 2015) (explaining significance of "short" positions). Viceroy published dozens more short seller reports, but of those subsequent short reports, Plaintiffs cite only a few. *Infra* § III. Each report admitted that it was the author's opinion, based on publicly available facts, and that the author would profit if the stock dropped. AC ¶ 225; Ex. 9, 12/5/2023 Viceroy Report at 5; Ex. 10, 5/9/2024 Viceroy Report at 14.

### G. This Litigation

This litigation was originally commenced on July 31, 2024, *see* ECF No. 1, and the Amended Complaint was filed on January 21, 2025, *see* ECF No. 26. The Amended Complaint alleges that Defendants made false and misleading statements in the Company's SEC filings by understating its loss reserves, which caused it to overstate its net income in violation of GAAP; misrepresenting its performance by abandoning its underwriting standards and omitting the

resulting material risks related to non-performance or default of underlying bridge loans; and misrepresenting its performance by failing to disclose internal control weaknesses. *See* AC ¶¶ 253-612. As explained below, Plaintiffs fail to state a claim under any theory.

## ARGUMENT

As an initial matter, Plaintiffs' 224-page Amended Complaint is a textbook puzzle pleading. It is filled with "large block quotes from SEC filings and press releases," which are "followed by generalized explanations of how the statements were false or misleading," so it does not "satisfy the heightened pleading requirements" of the PSLRA. *Tabor v. Bodison Biotech, Inc.*, 579 F. Supp. 2d 438, 543 (S.D.N.Y. 2008). Plaintiffs did nothing besides group the statements into fiscal quarters, bolding and italicizing chunks here and there. *See, e.g.*, AC ¶¶ 393, 395, 405, 424, 458. This fails to meet the PSLRA's specificity requirements, wastes judicial resources, and undermines notice—and warrants dismissal. *See In re ITT Educ. Servs., Inc. Sec. & S'holder Derivative Litig.*, 859 F. Supp. 2d 572, 577 (S.D.N.Y. 2012); *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 479 (S.D.N.Y. 2021). In any event, the Amended Complaint should also be dismissed for Plaintiffs' failure to plead an actionable statement, scienter, or loss causation.

### I. PLAINTIFFS FAIL TO PLEAD A FALSE OR MISLEADING STATEMENT OR OMISSION

Plaintiffs' Section 10(b) claim should be dismissed because Plaintiffs fail to allege with particularity any materially false or misleading statements or omission. *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 127 (E.D.N.Y. 2020) ("A complaint alleging securities fraud must . . . satisfy the heightened pleading requirements of [Rule] 9(b) and the PSLRA by stating with particularity the circumstances constituting the fraud."). To meet this requirement, "the complaint must specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d

187, 196 (2d Cir. 2009); 15 U.S.C.A. § 78u-4(b)(1)(B). Further, "plaintiffs cannot rest on their say-so that these statements are fraudulent; they must explain why." *Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004). Here, Plaintiffs attempt to allege that two main categories of statements are false or misleading: (1) statements relating to Arbor's underwriting standards and the purported understatement of its loss reserves due to nonperforming loans, which caused it to overstate its net income in violation of GAAP, *see, e.g.*, AC ¶ 258; and (2) purported internal control weaknesses, *see, e.g.*, AC ¶ 211. But Plaintiffs tether these allegations to unreliable sources, who offer nothing but conclusory allegations, and thereby fail to meet the high pleading standards of the PSLRA.

### A. Plaintiffs Rely On Unreliable Sources In Attempting To Plead An Actionable Statement

Plaintiffs' conclusory allegations rely entirely on self-serving short seller reports and generic statements from low-level, short-term former employees. This undermines the entire Amended Complaint. Recognizing that short sellers "have an obvious motive to exaggerate the infirmities of the securities in which they speculate," *In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 459 (S.D.N.Y. 2022), courts "critically analyze" their allegations, *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023), and routinely dismiss complaints like Plaintiffs' that rely "almost entirely on a negative report published by a short seller," *Harris*, 135 F. Supp. 3d at 159. The resulting allegations amount to nothing but "fraud by hindsight," which the "Second Circuit has firmly rejected." *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 223 (S.D.N.Y 2020); *Zech Cap. LLC v. Ernst & Young Hua Ming*, 636 F. App'x 582, 585 (2d Cir. 2016).

Courts also do not credit allegations from former employees ("FEs," or sometimes referred to as confidential witnesses, or "CWs") when they are "insufficiently described" or when their "descriptions do not suggest that they had been in position to know the facts attributed to them."

*Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 798-99 (S.D.N.Y. 2020) (listing cases). Here, no FE was in a position to speak on Arbor's overall underwriting or loss reserve practices. *See Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *8 (S.D.N.Y. Mar. 28, 2013) ("[S]econd-hand information [] undermines the likelihood that [CWs] had personal knowledge of the allegations."). For example, Plaintiffs rely on FE2, a low-level underwriter far removed from the Individual Defendants, to claim that the Company abandoned its underwriting standards and manipulated its CECL allowances. *See* AC ¶¶ 142, 269. But Plaintiffs provide no basis "to infer a wholesale abandonment of underwriting standards at [Arbor] during the relevant time period." *In re Lehman Bros. Sec. & Erisa Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (discrediting CWs who were low level underwriters). Plaintiffs also rely on multiple unidentified investment analysts (FE5, FE10, FE6, and FE11) and a Vice President of Structured Asset Management (FE3) to support the same assertions as well as those about Arbor's underwriting policies and procedures, despite having *no* underwriting involvement or experience. *See* AC ¶¶ 262, 269, 286. Further, several FE allegations conflict with one another or are based on hearsay. AC ¶ 189. For example, FE7, the only witness alleged to have reported to Mr. Elenio, describes what supposedly happened at quarterly rating meetings that Plaintiffs concede "FE7 did not attend[.]" *Id.*

This Court should not credit the self-serving short seller reports or repackaged secondhand recollections provided by the former employees. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996) ("Plaintiffs do not . . . enjoy a license to base claims of fraud on speculation and conclusory allegations."); *Infra* § II.B.

### B. Plaintiffs Fail To Establish That Defendants' Statements Regarding Arbor's Reserving Practices Are False Or Misleading Or Contained Omissions

Plaintiffs allege that each instance of Arbor's reporting of its "Allowance for Credit Losses" was false and misleading because it "violated GAAP by reporting a net income that was

artificially inflated by understating its allowance for credit losses" and "manipulated [its loss allowance] by not recording a sufficient or reasonable increase of those reserves to account for the Company's violations of its stated underwriting standards" due to unsound or non-performing loans. *See, e.g.*, AC ¶¶ 258, 267, 280-82. Plaintiffs' conclusory allegations are insufficient.

### 1. Statements Regarding Loss Reserves Are Inactionable Opinions

"As an initial matter, loss reserves are statements of opinion." *Woolgar*, 477 F. Supp. 3d at 222. "[D]etermining the adequacy of loan loss reserves is not a matter of objective fact," but rather, "reflect[s] management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) *abrogated on other grounds by Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184-89 (2015). And a statement of opinion is actionable only if it is "subjectively false—the speaker does not believe what [he] says—or objectively false—the speaker misrepresents or omits existing material facts in support of [his] belief." *Woolgar*, 477 F. Supp. 3d at 224. Accordingly, Plaintiffs must establish either that "Defendants thought the reserves were inadequate" or that the Company was "aware of the need to make [] increases to the reserves." *Id.* at 226. Further, Plaintiffs cannot simply assert that a particular statement is false or misleading; rather, "they must demonstrate with specificity why and how that is so." *Id.*

Here, Plaintiffs claim that Defendants overestimated the value of several loans and consequently understated the Company's loss reserves.[4] As Arbor disclosed, however, its credit

---

[4] Plaintiffs also allege that Defendants overestimated the value of the loans by manipulating property appraisals. *See* AC ¶ 262. Plaintiffs rely on their account of FE2 and FE10's statements that "appraisers were putting whatever number [Arbor] wanted." AC ¶ 136. However, FE10 explained that Arbor "worked with pretty much all national appraisers." AC ¶ 138. It is implausible that every national third-party appraiser would have "put[] whatever number [Arbor] wanted." AC ¶ 136. Further, Plaintiffs fail to allege that Arbor "pressured appraisers to give inflated assessments of property underlying [any loan at issue] or that any appraiser actually inflated an assessment of [any of the properties at issue]." *Footbridge v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *13 (S.D.N.Y. Sept. 28, 2010). Plaintiffs also criticize Arbor's use of appraiser BBG, but admit that Arbor stopped using BBG even before it was publicized that Freddie Mac was reviewing the firm. AC ¶¶ 138-40.

rating system involved a multitude of factors, including "subjective" ones, that "may result in a rating that is higher or lower" than might otherwise be expected. *See* Ex. 2, FY21 10-K at 68; *Footbridge Ltd.*, 2010 WL 3790810, at *12 (finding allegations that defendants "were *too* flexible in the[ir] underwriting decisions" are "insufficient"). Rather than evidence "manipulat[ion] of property appraisals," AC ¶ 136, Plaintiffs' allegations show that Defendants followed sound business practices by relying on appraisers and Arbor executives' years of experience to estimate loss reserves that are "particularly difficult to estimate," *see* Ex. 2, FY21 10-K at 15; *Fait*, 655 F.3d at 113. And Plaintiffs' assertions regarding the loss reserves "are undermined by the fact that its independent auditor" reviewed its financial statements and issued an "unqualified" opinion. *Woolgar*, 477 F. Supp. 3d at 228-29. Further, E&Y expressly noted that they reviewed Arbor's allowance for credit losses, deeming that topic a "Critical Audit Matter," which "involved a high degree of subjectivity." Ex. 2, FY21 10-K at 52; Ex. 2, FY23 10-K at 49. Nor can Plaintiffs point to any restatement or radical inconsistency regarding any of the contingency reserves.

### 2. Statements Regarding Underwriting Standards, Which Purportedly Led To Understating Loss Reserves, Are Inactionable

Additionally, to the extent that Plaintiffs allege that Defendants omitted information about the Company's underwriting practices, which led to understating loss reserves and the related risks, those allegations also fail. *See, e.g.*, AC ¶¶ 262, 273, 276, 286. "To sufficiently allege [omission], a plaintiff must identify particular (and material) facts going to the basis for the [speaker's] opinion—facts about the inquiry the [speaker] did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Woolgar*, 477 F. Supp. 3d at 223. It is insufficient simply to plead that the defendants "kn[ew], but fail[ed] to disclose, some fact cutting the other way," because "[a] reasonable investor does not expect that *every* fact known to [a

speaker] supports its opinion statement." *Id.* at 224.

Here, Plaintiffs have not alleged any "particular (and material) facts" whose omission makes any of Defendants' statements false. For example, any effort to plead a deviation from underwriting standards that would affect the loan loss reserves by pointing to the modification of the criteria for classifying nonperforming loans is unavailing. *See, e.g.*, AC ¶ 193. As Plaintiffs concede, Arbor made extensive disclosures with respect to its nonperforming loans, including the timeframe during which loans would be considered past due. For most of the Class Period, Arbor's chart summarizing its non-performing loans showed two columns: one titled "Less Than 90 Days Past Due"; the other "Greater Than 90 days Past Due." *See, e.g.*, AC ¶¶ 195-97. Arbor provided further clarifications to investors on several other occasions, including during investor and earnings calls. AC ¶¶ 197, 210, 213; *see Tian v. Peloton Interactive, Inc.*, 2025 WL 510043, at *9 (E.D.N.Y. Feb. 14, 2025) ("[P]laintiffs may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud."). Indeed, Defendants fully disclosed its risk ranking methodology and loss reserves calculation. And their statements included numerous disclosures, informing investors about the risks associated with Arbor's business. *See, e.g.*, Ex. 2, FY21 10-K at 15-16 ("Loan loss reserves are particularly difficult to estimate in a turbulent economic environment."); *id.* at 17 ("Competition may cause us to accept . . . investments . . . that we would not have otherwise accepted[.]"*)*; *id.* at 18 ("Properties may fail to perform as expected."). Accordingly, Plaintiffs have not pled omission.[5]

### 3. Statements Regarding Purported GAAP Violations Are Inactionable

Relying on more unsupported generalizations, Plaintiffs contend that Arbor's financial

[5] Plaintiffs' argument that because Defendants "chose to speak about how rising interest rates were having a positive impact," they were required to disclose that rising interest rates could also harm the Company also fails. In fact, however, Defendants repeatedly disclosed that "changes in interest rates [] could harm our operations." *See, e.g.*, Ex. 2, FY21 10-K at 12.

statements "violated GAAP by reporting a net income that was artificially inflated by understating its allowance for credit losses." AC ¶¶ 606-07. Plaintiffs make a conclusory assertion that Arbor violated FASB Accounting Standards Update 2016-13, Financial Instruments – Credit Losses (Topic 326), but just mention it twice in passing without any support. It is "well-settled that GAAP provisions are subject to interpretation and tolerate a range of reasonable treatments, leaving the choice among alternatives to management." *Harris*, 135 F. Supp. 3d at 171; *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *11 (S.D.N.Y. Sept. 30, 2016) (finding allegations that a company failed to record impairments to be "nothing more than disagreement" with "accounting judgments").

These allegations at most amount to disagreement with management's reserve estimate, which is not actionable. *Harris*, 135 F. Supp. 3d at 171 ("Disagreement with [Company]'s judgment calls is insufficient to allege that [Company] misstated facts in its consolidated financial statements in violation of § 10(b) of the Exchange Act[.]"). This is especially so here, where Plaintiffs cannot point to a single restatement or negative finding by Arbor's independent auditors, much less a specific factual allegation about a particular credit loss disclosure. *Id.* at 172.

### C. Allegations About Statements Relating to Internal Controls Are Insufficient

Plaintiffs' challenges to certain statements related to the effectiveness of Arbor's internal controls likewise fail. Plaintiffs allege that Defendants' statements regarding Arbor's Concentration of Credit Risk and reporting of delinquent loans are false and misleading because "the Company failed to disclose material weaknesses in its internal controls concerning its concentration of risk causing [Arbor] to artificially inflate the quality of its loan book and minimize its risk of loss" and implemented policies taking advantage of the material weaknesses. *See, e.g.*, AC ¶¶ 262, 286. But Plaintiffs ignore that neither E&Y nor regulators have identified a material weakness. *See, e.g.*, Ex. 2, FY21 10-K at 118 (E&Y opining that Arbor "maintained, in all material

respects, effective internal control over financial reporting"); Ex. 7, FY22 10-K at 119. Indeed, E&Y's audit "included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk[.]" Ex. 2, FY21 10-K at 118. That fact alone defeats Plaintiffs' arguments here. *See Woolgar*, 477 F. Supp. 3d at 230.

Plaintiffs' allegations also fail because they "neither describe the internal controls that [the company] had in place, nor explain *how or why they were deficient in a way that enabled the* [*harm*] *to occur*." *Arora v. HDFC Bank Ltd.*, 671 F. Supp. 3d 305, 315 (E.D.N.Y. 2023). Although Plaintiffs provide conclusory allegations about Arbor's internal controls, *see* AC ¶¶ 168-69, 193-94, they fail to explain how or why the controls were deficient. Instead, they rely solely on the allegations contained in the short seller reports and conclusory conjecture from FEs. *See, e.g.*, AC ¶¶ 176-82 (allegations relying upon information from FE12); 190-91 (allegations relying upon information from short seller reports); *see supra* § I.A. These are not appropriate bases for falsity. Moreover, even if Plaintiffs allegations were sufficient (they are not), statements concerning "internal controls are puffery" because they are "too general to cause a reasonable investor to rely upon" them. *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 467 (E.D.N.Y. 2020).

## II. PLAINTIFFS FAIL TO PLEAD ALLEGATIONS THAT GIVE RISE TO A STRONG INFERENCE OF SCIENTER

To plead scienter, Plaintiffs must "state with particularity facts giving rise to a strong inference of [scienter,]" *Tellabs, Inc. v. Makor Issues & Rts.*, 551 U.S. 308, 321 (2007), which is "a mental state embracing intent to deceive, manipulate, or defraud." *Id.* at 319. This sets a high bar. The "inference of scienter must be more than merely reasonable or permissible—it must be cogent and compelling." *Id.* at 324. "The strength of an inference cannot be decided in a vacuum," so courts "must consider plausible, nonculpable explanations for the defendant[s'] conduct." *Id.* at

323-24. Because the scienter "inquiry is inherently comparative," *id.* at 323, it "does not require a court to draw all inferences in plaintiff[s'] favor," *Zech Cap.*, 636 F. App'x at 585.

"A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Plaintiffs can establish a strong inference of scienter only "(a) by alleging [] that defendants had both motive and opportunity to commit fraud, or (b) by alleging [] strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). Here, Plaintiffs' allegations do not establish a plausible inference of scienter, let alone one that is "powerful" and "compelling." *Tellabs*, 551 U.S. at 323-24.

### A. Plaintiffs' Motive Allegations Weigh Against An Inference Of Scienter

It is well established that "[m]otives that are generally possessed by most corporate directors and officers" cannot establish scienter; instead, plaintiffs must allege facts showing that the individual defendants received a "concrete and personal benefit from making their alleged misrepresentations." *Kalnit*, 264 F.3d at 139. Typically, plaintiffs allege "unusual insider trading activity during the class period" and argue that the individual defendants cashed out before the market uncovered the fraud. *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). There are no allegations of unusual trading here. The Individual Defendants have been at the Company's helm since it was founded in 2003, and they remain there. And they collectively own millions of shares of Arbor's common stock. *See* Ex. 11, Kaufman Form 4; Ex. 12, Elenio Form 4.

Plaintiffs nakedly assert that the "Individual Defendants had Financial Motive" to commit fraud, AC ¶¶ 621-629, but support this only by pleading that the Individual Defendants' "bonuses were directly tied to the Company's performance." *Id.* ¶ 621. Second Circuit precedent forecloses this argument. *See Acito*, 47 F.3d at 54; *Kalnit*, 264 F.3d at 140 (finding allegation motivated by compensation "insufficient because such a desire can be imputed to all corporate officers"). "If

scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Kalnit*, 264 F.3d at 140; *see also Woolgar*, 477 F. Supp. 3d at 233-34. Plaintiffs' motive allegations fail.

### B. Plaintiffs Fail To Allege Conscious Misbehavior Or Recklessness

Because Plaintiffs failed to plead motive, they "bear[] a correspondingly greater burden in alleging conscious misbehavior or recklessness." *Long Miao*, 442 F. Supp. 3d at 805. To succeed, they must plead conduct that was "highly unreasonable" and constituted an "extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). In sum, Plaintiffs must "specifically allege" that defendants had "knowledge of facts or access to information contradicting their public statements." *Lachman*, 487 F. Supp. 3d at 137. And "where Plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *In re DraftKings*, 650 F. Supp. 3d at 177. Plaintiffs utterly fail to meet these exacting standards.

#### 1. Almost All Allegations Come From Former Employees Who Had No Direct Contact With The Individual Defendants

Plaintiffs again rely on FEs who may have negative views of the company and "axes to grind." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007); *see also In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) (discounting confidential witness allegations related to loan originations). And, aside from FE7, there are no allegations that any of the former employees reported to the Individual Defendants. FEs "employed in rank-and-file positions" rarely will be able to comment credibly on upper management's mental state. *See Loc. No. 38 Int'l Bhd. Of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (discounting allegations from CWs who did not report to executive leadership).

And when a "complaint relies on information from a CW to establish scienter, [it] must describe the nature of the CW's contact with the individual defendants that would be probative of defendants' mental state." *Long Miao*, 442 F. Supp. 3d at 799 n. 19. "[G]eneric and conclusory allegations" from CWs who had little contact with the Individual Defendants cannot satisfy the PSLRA. *See Woolgar*, 477 F. Supp. 3d at 218-20. Here, "[t]he majority of the CWs are not alleged to have had any direct contact with the Individual Defendants at all, let alone know what information they possessed," so these "CWs' allegations" are "insufficient." *Id.* at 219-20.

### 2. Allegations Attempting To Invoke Direct Contact Fail To Plead Defendants Had Contradictory Information At The Time They Made An Alleged Misstatement

No allegation supports that the Individual Defendants knew about any contradictory information when they made the purportedly false statements or that they intentionally ignored such information. *See, e.g.*, *Woolgar*, F. Supp. 3d at 237 (concluding that despite six CWs, Plaintiffs failed to plead that "Defendants were aware of any specific, contradictory information at the time they made the allegedly false and misleading statements"). Because the Amended Complaint "alleges no specific facts demonstrating that Defendants possessed . . . information contradicting their statements, fraud has not been shown." *Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656, at *27 (S.D.N.Y. Jan. 26, 2009).

As explained above, although FE7 allegedly reported to Mr. Elenio, FE7's sparse factual allegations at most establish that the Structured team held quarterly risk rating meetings, which the Individual Defendants attended. AC ¶ 189. FE3 alleges the same, AC ¶ 185, while FE4 alleges that potential deals were submitted to the credit committee, on which the Individual Defendants sat, AC ¶ 128. But nowhere do Plaintiffs allege that the Individual Defendants received specific information contradicting their purportedly false statements at these meetings or in committee reports. *See Woolgar*, 477 F. Supp. 3d at 238 ("[A]lthough [FEs] reference[] . . . reports and

meetings, the Complaint does not plausibly allege what information was actually included in those reports or discussed at those meetings."). Nor does it explain "how such information contradicted" the Individual Defendants' "public statements." *Id.* at 220. On top of this, FE7, the most senior former employee, "did not [even] attend the quarterly rating meetings." AC ¶ 189. And "the mere fact that . . . Defendants attended meetings where [CWs'] reports were discussed is insufficient to demonstrate that they knew, reasonably believed, or were in reckless disregard of facts that rendered their statements inaccurate." *Woolgar*, 477 F. Supp. 3d at 239 n. 21.

In addition, most of FE7's allegations undermine Plaintiffs' theory because they demonstrate that Arbor included its external and internal auditors in risk rating discussions. For example, FE7 explains that the Company held "risk rating meetings" where FE7 would "walk through the Company's loan ratings with its internal auditors," "third-party auditors," and "[Mr.] Elenio." AC ¶ 189. In other words, Arbor's senior leadership was transparent with its independent auditor, who opined that Arbor "maintained, in all material respects, effective internal control over financial reporting" and issued an "unqualified" opinion. *See* Ex. 7, FY22 10-K at 119. That Arbor's "independent auditor" was "unable to identify any material inaccuracies or weaknesses undermines a finding of recklessness." *Woolgar*, 477 F. Supp. 3d at 238; *see also In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *18 (S.D.N.Y Sept. 28, 2012) (same).

None of the allegations from the other FEs, who did not report to and had minimal contact with the Individual Defendants, fares any better. For example, FE2, who was "tasked with underwriting for the Structured Business" for roughly three months, AC ¶ 121, alleges that he recalled confirmation emails where Mr. Kaufman appeared to have quickly approved loans because Mr. Kaufman's signature line read, "Sent from my iPhone." *Id.* ¶ 123. But nowhere does FE2 explain when he viewed the emails, which specific loans were approved (*i.e.*, if they deviated

from standards), or what information Mr. Kaufman had about the loans when he approved them. In addition, FE2 alleges that not all bridge loans could qualify for refinancing, AC ¶ 142, but he does not provide examples of specific loans or allege that the Individual Defendants were ever confronted with information about this when they were made their statements.[6] FE2's "undated" allegations also suffer from a "critical deficiency" because FE2 worked for Arbor outside the Class Period. *Woolgar*, 477 F. Supp. 3d at 221.

Similarly, FE12, who worked at Arbor for less than a year, recalled being on phone calls with Mr. Kaufman to discuss loans. AC ¶ 155. But FE12 does not provide any details explaining when those calls occurred, what was said on them, or how they provided Mr. Kaufman with facts that contradicted what he had previously said. Although FE12 recalled "thinking" decisions "were weird," AC ¶ 188, FE12 never acted on these thoughts nor confronted anyone at Arbor, much less the Individual Defendants, with contradictory information. Plaintiffs "fail[] to plead specific contradictory information that was available to any Defendant at the time they made any challenged statement." *Woolgar*, 477 F. Supp. 3d at 238.

### 3. Plaintiffs' Remaining Scattershot Scienter Arguments Fail

Unable to allege that the Individual Defendants disregarded contradictory information, Plaintiffs throw at the wall several more entirely conclusory allegations purporting to establish scienter. None sticks. Plaintiffs' allegation that Defendants violated GAAP "amounts to no more than a naked assertion devoid of further factual enhancement." *Harris*, 135 F. Supp. 3d at 172. "The Second Circuit has made clear that allegations of GAAP violations [] are insufficient to state a securities fraud claim" unless they are "coupled with evidence of corresponding fraudulent

---

[6] Notably, FE2 fails to provide examples of specific loans that could not be refinanced. Indeed, loans were refinanced during the Class Period, and FE3 acknowledges "legitimate" reasons for adjustments to risk ratings. AC ¶ 184. FE2 also only "clos[ed] about two bridge loans per month" in his three months with the Structured team. AC ¶¶ 121, 142.

intent." *Woolgar*, 477 F. Supp. 3d at 239. Likewise, Plaintiffs' allegations regarding the signing of the SOX certifications "add nothing substantial to the scienter calculus because allowing [SOX] certifications to create an inference in every case . . . would eviscerate the pleading requirements for scienter set forth in the PSLRA." *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) ("[S]igning of a SOX certification . . . is insufficient to plead scienter.").

The same holds true for Plaintiffs' core operations argument (to the extent alleged), AC ¶ 618, which cannot establish a strong inference of scienter and arguably is not even a viable theory following the PSLRA's enactment. *Zhong Zheng*, 379 F. Supp. 3d at 181; *see also Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012). And Plaintiffs' claim that the Individual Defendants must have known about the alleged fraud because of their positions is defeated by precedent holding the opposite. "Courts in [the Second] Circuit have rejected . . . attempts to hold senior officers liable based on their position . . . in the absence of specific allegations that the named defendant[s] actually received information about the fraud." *Lachman*, 487 F. Supp. 3d at 137; *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 274, 299 (E.D.N.Y. 2023).

Finally, Plaintiffs suggest that the news reports stating that Arbor was being probed by the government establish scienter. Here, too, they are wrong. "[G]overnment investigations cannot bolster allegations of scienter that do not exist." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015). Considered holistically, Plaintiffs' allegations do not give rise to any inference of scienter. Plaintiffs are not permitted "to combine inadequate allegations of motive with inadequate allegations of recklessness . . . to demonstrate scienter." *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at * 15 (S.D.N.Y. Mar. 30, 2021).

#### 4. An Inference Of Nonfraudulent Intent Is More Plausible

Plaintiffs have not established that any inference of scienter is even plausible (let alone strong), but in any event, an inference of nonfraudulent intent is far stronger under the facts alleged.

It defies common sense for Arbor intentionally to torch its long-standing reputation and undermine its business model by issuing bad loans with no exit strategy for no reason. *S. Cherry St.*, 573 F.3d at 113 (cautioning against inferring scienter when theory requires inferring that Defendant "deliberately jeopardize[d] its standing and reliability, and the viability of its business"). All Individual Defendants remain at the Company; none used any short-term boost in increased structured loan volume to cash out; no restatement has been issued; and E&Y reviewed and approved the challenged practices. *See City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (rejecting argument that "zero plus zero plus zero plus zero plus zero adds up to something"). Arbor came under fire only because short sellers wanted to see the Company fail so that they could profit. Plaintiffs have wholly failed to allege securities fraud.

## III. PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

"To plead loss causation, a plaintiff must plausibly allege . . . that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Zhong Zheng*, 379 F. Supp. 3d at 177. The disclosure, referred to as a "corrective disclosure," must reveal new facts to the market. *See In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 511-13 (2d Cir. 2010) (holding that corrective disclosures must "reveal some then-undisclosed fact" to the market); *Cent. States, Se. & Sw. Areas Pension Fund v. Fed Home Loan Mortg. Corp.*, 543 Fed. App'x 72, 75 (2d Cir. 2013) (applying *Omnicom* to motion to dismiss). These principles resolve this case. In attempting to plead loss causation, Plaintiffs pursue a corrective disclosure theory, offering short seller reports and articles merely announcing the commencement of a government investigation. None is a corrective disclosure.

**Short Seller Reports.** The short seller reports upon which Plaintiffs rely are not corrective disclosures because they do not "reveal" any previously "undisclosed fact" to the market. *Omnicom*, 597 F.3d at 511. Instead, as their own authors state, these reports are merely "opinions"

that were based "upon publicly available facts," which came from "information in the public domain" that anyone could have "access[ed]." Ex. 8, 11/16/23 Viceroy Report at 5; Ex. 9, 12/5/23 Viceroy Report at 5; Ex. 10, 5/9/24 Viceroy Report at 14. And everyone had the ability to "access any information or evidence cited in [the reports] or that [Viceroy] relied on to write [the] report[s]." *Id.* The short seller reports are thus, by their own admission, nothing more than "reports express[ing] negative opinions . . . based on information that was already publicly available," so they cannot be "corrective." *Cent. States*, 543 F. App'x at 75.[7]

On top of all this, the short seller reports suffer from other glaring issues. *First*, Viceroy "issued 32 reports relating to [Arbor's] lending practices and loan book performance" within a 13-month span. AC ¶ 251. Viceroy cried wolf for a year. Plaintiffs just cherry-picked a few reports correlated with a slight stock decline and labeled them "corrective." *Defeo v. IonQ, Inc.*, 2025 WL 1035292, at *8 (4th Cir. Apr. 8, 2025) ("[C]orrelation does not equal causation."). *Second*, Plaintiffs somehow still picked nonsensical dates. For example, Plaintiffs claim that the short seller report Viceroy published on December 5, 2023, is a corrective disclosure. AC ¶ 636. But Arbor's stock price opened and closed *at the same exact price* on December 5, 2023. Ex. 13. And the next morning, Arbor's stock price opened *higher*. *Id.*; *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Arbor's stock price recovered and increased on the days immediately following the publications of the other short seller reports,[8] undermining any notion that the market perceived the reports to reveal widespread fraud of the sort alleged. *See, e.g.*, *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197-98 (9th Cir. 2021) (finding no loss causation because the stock price "recover[ed] very shortly after" a "modest drop"). The market's general indifference is unsurprising because Viceroy

[7] Plaintiffs relied "upon the presumption of reliance established by the fraud-on-the-market doctrine." AC ¶¶ 643-44. They cannot "contend that the market is efficient for purposes of reliance and then cast that theory aside when it no longer suits their needs for purposes of loss causation." *Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013).

[8] Ex. 13, Historical Stock Prices.

is not a credible source. It has "a notorious history" of "spreading misinformation about . . . companies to make illegal and unlawful profits." *Saraf v. Ebix, Inc.*, 2023 WL 4561655, at * 7 (S.D.N.Y. July 17, 2023) (discussing injunction prohibiting Viceroy from publishing a report).

**News Articles.** The news articles reporting that Arbor was under investigation are not corrective disclosures because all they revealed to the market was that Arbor had responded in due course to a request for information from the government. AC ¶¶ 640-41. The existence of a government investigation, without more, is "insufficient to constitute a corrective disclosure for purposes of § 10(b)." *Meyer*, 710 F.3d at 1201. *See also Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("The announcement of an investigation does not reveal fraudulent practices to the market."). Indeed, the mere "announcement of an investigation reveals just that—an investigation—and nothing more." *Meyer*, 710 F.3d at 1201. Here, Plaintiffs allege only that Bloomberg stated that the government had commenced some sort of investigation. At that time and in the intervening eight months, the government itself has made no announcements nor provided any "further detail or comments." AC ¶ 641. "This is fatal under Second Circuit precedent." *Lentell v. Merrill Lynch & Co, Inc.*, 396 F.3d 161, 175 (2d Cir. 2005).[9] This case should be dismissed with prejudice.

## IV. PLAINTIFFS FAIL TO PLEAD SCHEME LIABILITY

Plaintiffs invoke the word "scheme," AC ¶ 631, but they do not plead a securities fraud scheme under Rule 10b-5. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Scheme liability must be premised on "deceptive conduct apart from misstatements and omissions." *In re AT&T DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 522 (S.D.N.Y. 2020).

[9] If Plaintiffs purport to rely on a materialization-of-the-risk theory, they cannot for multiple reasons. They never pleaded *what concealed risk* materialized. The theory appears nowhere in the loss causation section of the Amended Complaint. AC ¶¶ 630-42. It also would make no difference if they had pursued it because Arbor "made extensive disclosures" informing investors about the risks "throughout the class period." *Cent. States*, 543 Fed. App'x at 75.

Because Plaintiffs do not "plead any deceptive conduct that is separate from the inadequately pleaded misstatements and omissions[,]" there is no basis for a scheme liability claim. *Id.* at 534 (scheme liability provisions "are not backdoors" to misstatement liability); *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (no scheme liability where "incorporation of the previous 140 pages … [was] paired with [a] conclusory assertion").

## V. PLAINTIFFS FAIL TO PLEAD A SECTION 20(a) CLAIM

Plaintiffs have not pleaded an underlying violation of Section 10(b), so their Section 20(a) claim must be dismissed for this reason alone.[10] Plaintiffs also fail to plead "culpable participation" by any defendant in any fraud. *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 322 (S.D.N.Y. 2021) (noting that "because culpable participation is an element of a Section 20(a) claim, it must be pleaded with the same particularly as scienter").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiffs' Amended Complaint in its entirety with prejudice.

Respectfully submitted,

Dated: April 10, 2025

/s/ Andrew J. Levander

Andrew J. Levander (he/him)
Neil A. Steiner (he/him)
Angela M. Liu (she/her)
DECHERT LLP
1095 Sixth Avenue
New York, NY 10036
Tel: (212) 698-3500
andrew.levander@dechert.com
neil.steiner@dechert.com

*Attorneys for Defendants*

---

[10] Plaintiffs' conclusory allegations are deficient for the additional reasons that Plaintiffs do not establish that *each* defendant was the speaker of each statement, *see Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), and because they do not allege *each* defendant's knowledge of the supposed falsity of each statement, *see Lachman*, 487 F. Supp. 3d at 128.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with the word-count limit contained in Local Civil Rule 7.1(c). The foregoing document contains 8,619 words, excluding portions inapplicable to the word-count limit.

Dated: April 10, 2025
New York, New York

Respectfully submitted,

*/s/ Andrew J. Levander*

Andrew J. Levander
Neil A. Steiner
Angela M. Liu
DECHERT LLP
Three Bryant Park
1095 Sixth Avenue
New York, NY 10036
Tel: (212) 698-3500
andrew.levander@dechert.com
neil.steiner@dechert.com
angela.liu@dechert.com

*Attorneys for Defendants*