**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LOIS MARTIN, Individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARBOR REALTY TRUST, INC., IVAN KAUFMAN, and PAUL ELENIO,<br><br>Defendants. | Case No. 1:24-cv-05347-PKC-LKE |

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Adam M. Apton
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, N.Y. 10004
(212) 363-7500
(212) 363-7171 (fax)

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. BACKGROUND FACTS ..... 3

A. Arbor Realty Trust. ..... 3

B. Defendants' Fraudulent Misrepresentations. ..... 3

C. Plaintiffs' Damages. ..... 4

III. LEGAL STANDARD ..... 5

IV. ARGUMENT ..... 5

A. Plaintiffs' Complaint Is Not a "Puzzle Pleading". ..... 6

B. The Complaint Adequately Pleads Material Misstatements. ..... 7

1. Kaufman Repeatedly Lied about Arbor's "Agency Take-Out" Model. ..... 7

2. Defendants' Quarterly Reports Concealed Arbor's Reckless Underwriting Practices and Credit Losses. ..... 13

C. Plaintiffs Adequately Plead a Strong Inference of Scienter. ..... 17

D. Plaintiffs Adequately Plead Loss Causation. ..... 22

E. Defendants Are Liable as "Control Persons" under Section 20(a) of the Exchange Act. ..... 26

V. CONCLUSION ..... 27

# TABLE OF AUTHORITIES

**Cases**

*Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*,
651 F. Supp. 2d 155 (S.D.N.Y. 2009) .......... 22

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
19 F.4th 145 (2d Cir. 2021) .......... 1, 26

*In re Ambac Fin. Group, Inc.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010) .......... 2, 9

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) .......... 22

*Anschutz Corp. v. Merrill Lynch & Co.*,
758 F. Supp. 2d 799 (N.D. Cal. 2011) .......... 22

*In re AppHarvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. July 31, 2023) .......... 6

*ATSI Communs., Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) .......... 5

*In re Axsome Therapeutics, Inc. Sec. Litig.*,
No. 22 Civ. 3925 (LGS), 2025 U.S. Dist. LEXIS 61068 (S.D.N.Y. Mar. 31, 2025) .......... 11

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .......... 9

*Bell Atl. Corp. v. Twombly*,
127 S. Ct. 1955 (2007) .......... 5

*In re Bradley Pharm., Inc. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006) .......... 25

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002) .......... 9, 10

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
No. 17 Civ. 1580 (LGS), 2020 U.S. Dist. LEXIS 49786 (S.D.N.Y. Mar. 23, 2020) .......... 24

*In re CIT Grp. Inc. Sec. Litig.*,
No. 08 Civ. 6613 (BSJ), 2010 U.S. Dist. LEXIS 57467 (S.D.N.Y. June 10, 2010) .......... 10

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010) .......... 20

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .......... 15

*Crago v. Charles Schwab & Co.*,
No. 16-cv-03938-RS, 2017 U.S. Dist. LEXIS 215871 (N.D. Cal. Dec. 5, 2017) .......... 21

*Dodona I, LLC v. Goldman, Sachs & Co.*,
847 F. Supp. 2d 624 (S.D.N.Y. 2012) .......... 12

*In re Dynex Capital, Inc.*,
No. 05 Civ. 1897, 2009 U.S. Dist. LEXIS 96527 (S.D.N.Y. Oct. 19, 2009) .......... 20

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
551 F.Supp.2d 210 (S.D.N.Y. 2008) .......... 20

*EP MedSystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000) .......... 16

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
No. 14 Civ. 0950 (LAK)(AJP), 2015 U.S. Dist. LEXIS 5999 (S.D.N.Y. Jan. 20, 2015).......... 22

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .......... 2, 9, 15

*Fryman v. Atlas Fin. Holdings, Inc.*,
No. 18-cv-01640, 2022 U.S. Dist. LEXIS 70597 (N.D. Ill. Apr. 18, 2022).......... 16

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) .......... 5, 9

*In re Glob. Crossing, Ltd. Sec. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004) .......... 26

*Gormley v. Magicjack Vocaltec Ltd.*,
220 F. Supp. 3d 510 (S.D.N.Y. 2016) .......... 23

*Guozhang Wang v. Cloopen Grp. Holding Ltd.*,
661 F. Supp. 3d 208 (S.D.N.Y. 2023) .......... 27

*Heller v. Goldin Restructuring Fund, L.P.*,
590 F. Supp. 2d 603 (S.D.N.Y. 2008) .......... 18

*Hill v. State St. Corp.*,
No. 09cv12146, 2011 U.S. Dist. LEXIS 85128 (D. Mass. Aug. 3, 2011)................................ 15

*In re IndyMac Mortg.-Backed Sec. Litig.*,
718 F. Supp. 2d 495 (S.D.N.Y. 2010) ........................................................................... 2, 10

*Kusnier v. Virgin Galactic Holdings, Inc.*,
639 F. Supp. 3d 350 (E.D.N.Y. 2022) ................................................................................ 7

*Lapin v. Goldman Sachs*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006) ......................................................................... 15, 25

*In re Lottery.com, Inc. Sec. Litig.*,
715 F. Supp. 3d 506 (S.D.N.Y. 2024) ................................................................................ 6

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ....................................................................................... 23, 27

*In re MBIA, Inc., Securities Litigation*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010) ......................................................................... 19, 20

*In re Merck & Co., Sec., Derivative & "ERISA" Litig.*,
No. 1658 (SRC), 2011 U.S. Dist. LEXIS 87578 (D.N.J. Aug. 8, 2011) ................................. 26

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) ............................................................................................... 9

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ................................................................................ 7

*In re Moody's Corp. Sec. Litig.*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009) .............................................................................. 26

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
No. 08 CV 8781 (HB), 2010 U.S. Dist. LEXIS 32058 (S.D.N.Y. Mar. 31, 2010) ................. 10

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ................................................................................. 10, 11, 17

*In re Openwave Sys. Sec. Litig.*,
528 F. Supp. 2d 236 (S.D.N.Y. 2007) .............................................................................. 26

*Pub. Emples. Ret. Sys. of Miss. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ............................................................................................ 24

*Ray v. StoneCo Ltd.*,
No. 1:21-cv-9620-GHW, 2024 U.S. Dist. LEXIS 175229 (S.D.N.Y. Sep. 25, 2024) ......... 9, 23

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ........................................................................................ 21

*RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*,
185 F. Supp. 2d 389 (S.D.N.Y. 2002) ........................................................................... 16

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
968 F.3d 204 (2d Cir. 2020) ................................................................................... 10, 17

*Sharette v. Credit Suisse Int'l*,
127 F. Supp. 3d 60 (S.D.N.Y. 2015) ............................................................................... 7

*In re Signet Jewelers Ltd. Sec. Litig.*,
No. 16 Civ. 6728 (CM) (RWL), 2019 U.S. Dist. LEXIS 114695 (S.D.N.Y. July 10, 2019) ... 24

*In re Signet Jewelers Ltd. Sec. Litig.*,
No. 16 Civ. 6728 (CM), 2018 U.S. Dist. LEXIS 199809 (S.D.N.Y. Nov. 26, 2018) ............. 24

*In re Silvercorp Metals, Inc. Sec. Litig.*,
26 F. Supp. 3d 266 (S.D.N.Y. 2014) ............................................................................. 21

*Stichting Pensioenfonds ABP v. Merck & Co.*,
No. 05-5060 (SRC), 2012 U.S. Dist. LEXIS 113813 (D.N.J. Aug. 1, 2012) .......................... 16

*Stone v. Life Partners Holdings, Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014) ........................................................................... 22

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021) ........................................................................................ 10

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2007) ........................................................................... 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................................ 17, 18, 21

*Tian v. Peloton Interactive, Inc.*,
No. 23-CV-4279 (MKB), 2025 U.S. Dist. LEXIS 27280 (E.D.N.Y. Feb. 14, 2025)............... 12

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)....................................................................................................... 17

*In re Vale S.A. Sec. Litig.*,
No. 19 CV 526 (RJD) (SJB), 2020 U.S. Dist. LEXIS 91150 (E.D.N.Y. May 20, 2020) ........... 7

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005) .......... 12

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003) .......... 7

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) .......... 7, 23

*In re XL Fleet Corp. Sec. Litig.*,
No. 21 Civ. 2002 (LGS), 2022 U.S. Dist. LEXIS 29255 (S.D.N.Y. Feb. 17, 2022) ................ 11

*Youngers v. Virtus Inv. Partners Inc.*,
228 F. Supp. 3d 295 (S.D.N.Y. 2017) .......... 23

*Zola v. TD Ameritrade, Inc.*,
172 F. Supp. 3d 1055 (D. Neb. 2016) .......... 20, 22

**Statutes**

15 U.S.C. §78u-4 .......... 1

## I. INTRODUCTION

Plaintiffs allege violations under the Securities Exchange Act of 1934 as modified by the Private Securities Litigation Reform Act of 1995. 15 U.S.C. §78u-4 ("PSLRA"). While the PSLRA carries special pleading standards for fraud claims, these standards are not meant to create a near-impossible hurdle for plaintiffs to overcome, as Defendants would lead this Court to believe. The PSLRA does not turn the motion to dismiss into a trial by papers. All factual allegations in the complaint are still required to be accepted as true and common-sense inferences should not be disregarded. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021) (emphasizing that courts "must be careful not to mistake heightened pleading standards for impossible ones"). With that, it takes little to see that Plaintiffs have adequately stated a claim for relief under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5(b).

Plaintiffs, led by David Hawkins and Lois Martin, bring this securities fraud class action to hold Arbor Realty Trust, Inc. ("Arbor"), its CEO Ivan Kaufman, and CFO Paul Elenio accountable for a brazen scheme to deceive investors by misrepresenting Arbor's underwriting standards, internal controls, and loan loss reserves during the Class Period (May 7, 2021, to July 11, 2024). Plaintiffs' complaint meticulously alleges how Defendants abandoned conservative lending practices, manipulated loan valuations, and concealed material weaknesses to inflate Arbor's stock price, which peaked at $20.73 per share before plummeting to less than $13 per share as the truth about Defendants' reckless lending practices and loan losses emerged with reports that Arbor was under investigation by the FBI and DOJ. Defendants' deception and reckless disregard for the truth caused hundreds of millions of dollars in investor losses.

Defendants are attempting to avoid liability for these losses. Though their motion to dismiss contains a litany of different arguments, none has merit. The fact of the matter is that

Plaintiffs' allegations are well-sourced from SEC filings, analyst reports, and a dozen former Arbor employees with direct knowledge about Defendants' responsibility for the reckless underwriting practices that gave rise to the credit losses at the heart of this case. They detail how Arbor originated extreme volumes of loans in the wake of Covid-19 while interest rates were virtually non-existent, recklessly relaxed (and in some cases eliminated) lending requirements that had historically embodied the company's conservative underwriting standards, and then witnessed firsthand Defendants Kaufman and Elenio conceal the credit losses that ensued once these loans started to default.

Plaintiffs' case resembles in many ways the lawsuits that emerged in the wake of the subprime mortgage crisis in 2008 and 2009. Like the defendants in those cases, Defendants here misrepresented the reckless nature of their underwriting practices and then tried to conceal the fallout once the loans started defaulting. *See*, *e.g.*, *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190 (S.D.N.Y. 2010) ("Defendants denied that E*TRADE's real estate loan portfolio had become more risky—even though it is alleged that the risks had increased."); *In re Ambac Fin. Group, Inc.*, 693 F. Supp. 2d 241, 270, 276 (S.D.N.Y. 2010) (materially misleading to state that an underwriter has "maintained the same conservative standards over the years" while simultaneously lowering the underwriting standards); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 509 (S.D.N.Y. 2010) (confidential witnesses reported that lender "'embarked on a path of aggressive growth,' and 'routinely [made] loans' . . . with 'little, if any, review of borrower qualifications'" and loans defaulted in large numbers). Defendants' motion to dismiss should be denied so Plaintiffs can move forward with their case.

## II. BACKGROUND FACTS

### A. Arbor Realty Trust.

Arbor, a Maryland-based real estate investment trust, operates through two segments: the Structured Business, which originates bridge loans primarily for multifamily properties; and the Agency Business, which handles government-backed loans through Fannie Mae, Freddie Mac, and other entities. ¶¶58-63.[1] Defendants Kaufman, Arbor's CEO, President, and Chairman, and Elenio, its CFO and Head of Investor Relations, controlled the company's operations and public disclosures, repeatedly touting Arbor's "conservative loan-underwriting standards," "effective internal controls," and robust financial health in SEC filings and earnings calls. ¶¶23-30; *see also* ¶¶86-96. Arbor's primary business strategy was to originate loans through its Structured Business segment and then ultimately transfer (or "take-out") the loans to a government-backed agency while continuing to service them. *See* ¶¶72-74. Defendant Kaufman, in particular, frequently promoted Arbor to investors and analysts by touting its "agency take-out" model as a key competitive advantage. *See*, *e.g.*, ¶¶112-16.

### B. Defendants' Fraudulent Misrepresentations.

Plaintiffs allege that Arbor secretly abandoned its stated conservative underwriting standards, approving high-risk bridge loans to unqualified borrowers, often syndication groups with poor creditworthiness, low debt service coverage ratios, and high loan-to-value ratios. ¶¶10, 29-39. The poor quality of these loans meant that they did not qualify for agency take-over. ¶¶145-48; *see also*, *e.g.*, ¶¶424-25. Consequently, Arbor's reckless lending destroyed its supposed "agency take-out" model business strategy. ¶¶112-46. This proved extremely detrimental for

---

[1] Citations to "¶¶__" refers to Plaintiffs' Amended Complaint for Violations of the Federal Securities Laws, Dkt. No. 26.

Arbor. Instead of placing the loans with agencies and generating servicing revenue, Arbor was left with hundreds of millions of dollars of nonperforming loans on its books. ¶¶190, 212-13. Twelve former employees spanning multiple levels of Arbor's organizational hierarchy corroborate these allegations, detailing how Kaufman and his subordinates pressured staff to approve dubious loans and manipulate loan ratings to conceal compliance issues. ¶¶32-55, 121-155, 185-189. For example, FE2, an underwriter, recalled Kaufman approving loans via iPhone emails and bypassing due diligence, while FE4 explained that loans were approved routinely despite inadequate financial metrics. ¶¶123, 128. FE10 reported that appraisers were coerced to inflate property values, enabling Arbor to understate its credit losses and artificially boost net income from $121.1 million in 2019 to $330.1 million in 2023. ¶¶3, 136-138. FE7, who reported to Elenio, described quarterly risk rating meetings where loan valuations and ratings were manipulated to hide nonperforming loans. ¶¶168-169, 189, 193-194. FE12 corroborated these allegations and recalled participating in emergency calls with Kaufman and other members of executive management to artificially prevent loans from going into default. ¶¶176-182.

### C. Plaintiffs' Damages.

The truth about Arbor's fraudulent practices emerged through a series of corrective disclosures, each triggering significant stock price declines. The corrective disclosures consisted of several exposés published by Viceroy Research Group (best known for its investigation into the massive accounting fraud that occurred at Wirecard which led to arrests, indictments, and prison sentences). ¶¶225-27. The first report, dated November 16, 2023, concluded that Arbor's loan portfolio was distressed due to rising interest rates, declining property values, and overstated collateral, causing an 11.56% stock price drop from $13.84 to $12.24 per share. ¶¶228-32, 634. On December 5, 2023, Viceroy published another report detailing additional delinquencies and

poor debt service coverage ratios for properties in Jacksonville, Florida, leading to a 5.12% drop from $13.86 to $13.15 per share. ¶¶233-38, 636. On May 9, 2024, Viceroy published yet another report focused on foreclosed assets through off-balance sheet entities, resulting in a 4.9% drop from $13.50 to $12.84 per share. ¶¶244-45, 639. Finally, on July 12, 2024, *Bloomberg* reported that the Manhattan U.S. Attorney's Office and FBI were investigating Arbor's lending practices and loan book performance, causing a 17.33% plunge from $15.53 to $12.89 per share. ¶¶246-47, 640. Logically, the news about the FBI and DOJ investigations intensified for many investors the suspicions of fraud and misconduct previously created by the Viceroy reports. Subsequent inquiries into Arbor's operations have further undermined the validity of Defendants' statements about its loan portfolios and values. *See* ¶¶248-51.

## III. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (internal quotations omitted). When evaluating the complaint, the court must "draw[] all reasonable inferences in the plaintiff's favor." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). The allegations in the complaint, along with the inferences drawn therefrom, need only "'raise a right to relief above the speculative level.'" *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). Once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.*

## IV. ARGUMENT

Defendants argue that Plaintiffs fail to plead actionable misstatements, scienter, and loss causation. These arguments are baseless. Plaintiffs provide detailed FE accounts, including FE7's

senior role reporting to Elenio, and Viceroy's loan-level analyses meet PSLRA standards. ¶¶32-55, 228-251. Kaufman's and Elenio's financial motives, including Kaufman's $19.7 million in performance-based bonuses, combined with their day-to-day roles in the core operations of the company support a strong inference of scienter. ¶¶618-629. The stock price drops following adverse news about Arbor's underwriting standards and regulatory exposure establish loss causation. ¶¶634-641. Defendants' motion to dismiss should be denied.

### A. <u>Plaintiffs' Complaint Is Not a "Puzzle Pleading".</u>

While Defendants primarily take issue with the length of Plaintiffs' complaint (Defs. Br. at 8), length alone does not give rise to a credible "puzzle pleading" argument. To the contrary, Plaintiffs' complaint "'identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading. In doing so, [the complaint] describes what portion of each quotation constitutes a false representation and avoids placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts.'" *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 534 (S.D.N.Y. 2024) (quoting *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020)). Admittedly the section titled "Defendants' False and Misleading Statements" spans over 100 pages but only because Defendants' fraudulent statements occurred over a three-year period. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 240 n.5 (S.D.N.Y. July 31, 2023) ("Although it is true that Plaintiff challenges numerous statements made by Defendants, the breadth of the Operative Complaint alone does not create the type of puzzle-like complaint that warrants dismissal.").

Plaintiffs' complaint presents each misleading statement followed by a paragraph explaining why the "statements identified in the immediately preceding paragraphs are false and

misleading." *See*, *e.g.*, ¶¶254-58. Courts routinely accept this format and/or organization for allegations in securities fraud matters. *See*, *e.g.*, *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 368 (E.D.N.Y. 2022) (declining to find impermissible puzzle pleading where the plaintiff "identified specific statements (and added emphasis where challenged assertions [we]re embedded in longer passages) and followed each by a list of reasons why those statements [we]re allegedly misleading"); *In re Vale S.A. Sec. Litig.*, No. 19 CV 526 (RJD) (SJB), 2020 U.S. Dist. LEXIS 91150, at *52-53 (E.D.N.Y. May 20, 2020) (similar ); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 309 (S.D.N.Y. 2013) (similar).

### B. The Complaint Adequately Pleads Material Misstatements.

Under Rule 9(b) and the PSLRA, a plaintiff must specify the alleged statements, "identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003). To do this, a plaintiff need only plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015). As explained below, Plaintiffs readily satisfy this standard.

#### 1. Kaufman Repeatedly Lied about Arbor's "Agency Take-Out" Model.

Defendants consistently identified Arbor's "agency take-out" model as its core business strategy and key competitive advantage. *See* ¶¶7, 72-75. Loans would originate on Arbor's "structured" side of the business and then be sold to federal agencies (*e.g.*, Fannie Mae) for servicing by Arbor's "agency" business. This allowed Arbor to build a revenue "pipeline" for its Agency business. *See* ¶¶115-16. Unbeknownst to shareholders, the "agency take-out" model became infeasible during the Class Period because Arbor's loans stopped meeting federal agency standards, *i.e.*, federal agencies refused to purchase the loans that Arbor was originating. *See*

¶¶117, 145-46. First-hand accounts from nearly a dozen former employees detail the shoddy underwriting practices that led federal agencies to reject Arbor's loans and consequently break the "agency take-out" model that Defendants repeatedly touted. Chief among the problems described by these former employees was the influx of volume brought on by Covid-19 and the rise of inexperienced, risky, real estate syndicators wildly overleveraging assets that should never have been qualified for any loan in the first place. *See* ¶¶118-44 (former employee allegations explaining why loans failed to meet federal agency standards). Indeed, Arbor recruited loan officers with no experience and then instructed them to close loans without regard to historical industry standards, such as requiring minimum asset quality, supporting documents, collateral ratios, debt yields, rate caps, or credible appraisals. *See id*.

Even though Arbor's "agency take-out" model was no longer viable, Defendants repeatedly broadcasted it to investors and analysts as the key to their success. The following examples illustrate the emphasis Defendants placed on the model and the degree to which they concealed the fact that the model was already defunct:

- "[O]ur ***high-quality balance sheet portfolio*** . . . create a substantial pipeline of ***future GSE agency origination volumes and long-dated servicing revenues***" and "one of the other things we're going to focus on ***very, very, very precisely*** is that for the loans we do put on our balance sheet, ***we're going to try and turn them as much as we can into agency*** and pick up the back end fees and reduce our risk on some of the loans on our books." ¶¶272, 275 (Kaufman, 1Q21 Earnings Call, May 7, 2021).

- "I want to ***emphasize the significant value of our balance sheet business***, which not only generates strong levered returns on our capital, but very importantly, ***these investments also provide us the future agency and private-label transactions with long-dated income streams***." ¶323 (Kaufman, 3Q21 Earnings Call, Oct. 29, 2021).

- "***So for those products that were put on a year ago, 1.5 years ago, I think we're going to see some real movement, which is going to help maintain our Agency volumes***" and "***every bridge loan is underwritten to agency execution and final takeout***." ¶¶420, 424 (Kaufman, 2Q22 Earnings Call, July 29, 2022).

- "We have also placed a heavy focus on converting our multifamily bridge loan runoff into agency loans, which is a critical part of our business strategy, as our Agency Business is capital-light and produces significant additional long-dated income streams . . . we have a strategic advantage in that we focus on the workforce housing part of the market, and have ***a large multifamily balance sheet loan book that naturally feeds our Agency Business***." ¶446 (Kaufman, 3Q22 Earnings Call, Nov. 4, 2022).

- "So as you know, ***our business model on every bridge loan we do is for an Agency takeout***. That's how we're built. That's how we're structured. That's how the economics of the firm really flows, and that's the value of our franchise. ***So each and every loan that's in our portfolio is underwritten accordingly***. . . . But unlike our competitors, ***our model is built in that manner. It's multifamily debt. It's Agency eligible. And that's one of the primary exits every time we do a loan***." ¶491 (Kaufman, 4Q22 Earnings Call, Feb. 17, 2023).

- "***In our balance sheet lending business, we remain very selective, focusing mainly on converting on multifamily bridge loans into agency product, allowing us to recapture a substantial amount of our invested capital and produce significant long-dated income streams***. . . . We also have a strategic advantage in that we focus on the workforce housing part of the market and of a large multifamily balance sheet book with -- ***that naturally feeds our Agency business***." ¶537 (Kaufman, 2Q23 Earnings Call, Jul. 28, 2023).

"Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)). A misstatement or omission is material if "a reasonable investor would have considered [it] significant in making investment decisions." *Ganino*, 228 F.3d at 161-62 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). Unquestionably, Arbor's reckless underwriting posed a critical threat to the company's "agency take-out" model, such that the above statements made by Kaufman to analysts and investors during earnings conference calls were materially misleading. *See Ray v. StoneCo Ltd.*, No. 1:21-cv-9620-GHW, 2024 U.S. Dist. LEXIS 175229, at *37-38 (S.D.N.Y. Sep. 25, 2024) (statements about "improving the Credit Product's scoring system" misleading where confidential witnesses alleged that defendants had "lowered borrowing standards"); *Freudenberg*, 712 F. Supp. 2d at 190 ("Defendants denied that E*TRADE's real

estate loan portfolio had become more risky—even though it is alleged that the risks had increased."); *In re Ambac Fin. Group, Inc.*, 693 F. Supp. 2d at 270, 276 (holding that it is materially misleading to state that an underwriter has "maintained the same conservative standards over the years" while simultaneously lowering the underwriting standards); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2010 U.S. Dist. LEXIS 32058, at *21-22 (S.D.N.Y. Mar. 31, 2010) (sustaining claims that lender misstated underwriting practices where "details of aggressive loan underwriting practices [were] described by a former [] employee," and loans suffered widespread credit impairments); *In re CIT Grp. Inc. Sec. Litig.*, No. 08 Civ. 6613 (BSJ), 2010 U.S. Dist. LEXIS 57467, at *8-9 (S.D.N.Y. June 10, 2010) (sustaining claims where defendants "tout[ed] ... CIT's conservative lending standards" while failing to disclose lowering of underwriting standards.); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d at 509 (sustaining claims where CWs reported that lender "'embarked on a path of aggressive growth,' and 'routinely [made] loans' . . . with 'little, if any, review of borrower qualifications'" and loans defaulted in large numbers).

Defendants "did more than just offer rosy predictions" and instead provided investors with a false sense of security and misleading description about Arbor's "agency take-out" model. *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 169 (2d Cir. 2021) (internal quotations omitted); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (holding that defendants offered more than just rosy predictions when they "stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"). Defendants failed to comply with black-letter law requiring them to "speak truthfully and accurately" once they "choos[e] to speak" on a particular topic. *See Caiola*, 295 F.3d at 331; *see also Setzer v. Omega Healthcare Inv'rs,*

*Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020) ("by putting Orianna's rental payments 'in play,' Defendants were required to speak accurately and completely").

Defendants disregard these points and instead argue that Plaintiffs' allegations are categorically inactionable because they are based "entirely" on "short seller reports" and "generic statements from low-level" former employees. Defs. Br. at 9-10. Defendants are incorrect. Plaintiffs rely on a dozen different confidential witnesses spanning various levels of seniority and dates within the Class Period. ¶¶32-55. "As a general matter, the PSLRA does not require confidential sources to be named in the complaint. A complaint may rely on information from confidential witnesses if 'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Blanford*, 794 F.3d at 305 (quoting *Novak*, 216 F.3d at 314).

Plaintiffs' former employees all held positions establishing their professional awareness about Arbor's underwriting practices; for example, FE12 was a Director on the Structured Asset Management team who worked at Arbor for almost a year during the Class Period, thereby establishing their familiarity with the subject matter attributed to them. ¶¶54-55. Likewise, FE2 was an underwriter on Arbor's Agency and Structured Asset Management teams for almost 18 months during the Class Period, thereby showing their professional awareness of Arbor's underwriting practices in both businesses. ¶¶34-35. Plaintiffs' foundational allegations for these and the remaining ten witnesses meet (or exceed) the requirements to have their information credited at the pleading stage. *See In re Axsome Therapeutics, Inc. Sec. Litig.*, No. 22 Civ. 3925 (LGS), 2025 U.S. Dist. LEXIS 61068, at *9 (S.D.N.Y. Mar. 31, 2025) (confidential witness statement accepted as true at pleading stage when sufficiently described); *In re XL Fleet Corp. Sec. Litig.*, No. 21 Civ. 2002 (LGS), 2022 U.S. Dist. LEXIS 29255, at *15-16 (S.D.N.Y. Feb. 17,

2022) (crediting confidential witness allegations where complaint established foundation for knowledge and allegations were corroborated by short seller report).

Defendants also mischaracterize Plaintiffs' allegations by arguing that the complaint fails to specify the amount by which Arbor misstated its loss reserves. Defs. Br. at 11-12. While discovery may ultimately yield this information, it is not necessary for present purposes. Plaintiffs' core allegation is that Defendants (namely Kaufman) misrepresented Arbor's underwriting practices; specifically, they claimed that all of Arbor's loans were underwritten for "agency take-out" when in fact they were not. *See*, *e.g.*, ¶¶424-25 (Kaufman: "every bridge loan is underwritten to agency execution and final takeout"). Plaintiffs do not need to quantify Arbor's misstated loss reserves to establish that this representation was false (or, at minimum, materially misleading). Further, Defendants' only legal authority in support of this argument does not change the outcome on this point. In *Tian v. Peloton Interactive, Inc.*, No. 23-CV-4279 (MKB), 2025 U.S. Dist. LEXIS 27280 (E.D.N.Y. Feb. 14, 2025), the plaintiffs failed to adequately allege falsity over statements about a product recall. That bears no resemblance to the facts at hand where Defendants knowingly engaged in reckless underwriting for hundreds of millions of dollars in loans while at the same time falsely telling public investors that they were adhering to the same conservative lending practices that had been in place years earlier.

Finally, while Defendants note that they warned of potential risks to Arbor's business (*see* Defs. Br. at 13 n.5, 24 n.9), "to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 647 (S.D.N.Y. 2012) (rejecting "boilerplate disclosures" because "generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks").

Defendants' direct participation in the reckless underwriting practices described by Plaintiffs' confidential witnesses renders their risk warnings immaterial and therefore insufficient to insulate them from liability.

**2. Defendants' Quarterly Reports Concealed Arbor's Reckless Underwriting Practices and Credit Losses.**

In January 2020, Arbor adopted FASB Accounting Standard 2016-13 titled, *Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"). ¶216. ASU 2016-13 requires companies to account for expected credit losses when reporting net income. *See* ¶¶217-18. Arbor did not adhere to this accounting rule and, in turn, provided investors and analysts with inflated earning reports in its quarterly reports and earnings announcements. *See*, *e.g.*, ¶¶253-57 (1Q21 SEC filing); ¶¶263-66 (1Q21 press release). Relatedly, Arbor's quarterly reports also contained materially misleading risk ratings for its loan portfolios by, for example, falsely classifying them as "pass" (the highest/safest rating) instead of "doubtful" (the lowest/riskiest rating). *See*, *e.g.*, ¶¶259-60 (1Q21 SEC filing).

These allegations are supported by former, high-level Arbor employees who had direct communication with executive management (including Defendants Kaufman and Elenio). FE8, a Senior Vice President in Structured Asset Management who attended Arbor's quarterly rating meetings, explained that the absence of rate caps caused debt service coverage ratios and yields to decline dramatically once interest rates rose in 2022. ¶152; *see also* ¶162 (showing debt service coverage ratios below 1x). Arbor artificially prevented these loans from defaulting by using "interest" and "construction" reserve money on the loans to make payments. ¶¶153-54. According to FE12, a Director in Structured Asset Management, attended calls with Kaufman where he instructed employees to make loans current using these maneuvers. ¶¶155-57. Conditions did not

improve—but instead worsened—into 2024 as appraisal values started to sink below loan values, *i.e.*, the underlying properties were worth less than Arbor's loan balances. ¶¶158-61. Arbor routinely pushed back against the appraisal values and successfully manipulated the ultimate valuation reports. *See* ¶¶176-78. According to FE12, Kaufman knew about the appraisal manipulation because he was present during calls when it was discussed with other senior executives on specific properties. *See* ¶¶179-81 (describing calls concerning Atlanta, Georgia, property with Defendant Kaufman, Colin Chaudhuri, Arbor's Head of Valuations and Asset Management, Danny van der Reis, EVP of Servicing and Asset Management, and others).

Defendants Kaufman and Elenio also discussed loan ratings during quarterly meetings with the entire Structured Asset Management team. ¶185. These meetings were in addition to monthly rating meetings. According to FE3, an Assistant Vice President in Structured Asset Management, Kaufman and Elenio received spreadsheets with proposed ratings and valuations in advance of each quarterly meeting. ¶185. The spreadsheets were generated by asset managers and supervising Vice Presidents. ¶184. The ratings in the spreadsheets were frequently altered in response to pressure from senior management to assign more favorable ratings. ¶186. According to FE12, management would override the ratings during the quarterly rating meetings attended by Kaufman and Elenio. ¶¶187-88; *see also* ¶189 (describing questions prepared for quarterly rating meetings and preliminary rating meetings attended by Elenio, auditors, and accounting employees). FE12 provided the Atlanta, Georgia, property, named Generations, as an example where a rating was generated by Arbor's internal algorithm but then manually changed by Louis Sarube, SVP and Managing Director in Structured Asset Management, during a quarterly rating meeting attended by Kaufman and Elenio. ¶188. Although Arbor was facing a crisis, it publicly told investors and analysts that only 0.7% to 4.0% of its loan book was "substandard" and a mere 0.1% was

"doubtful." ¶190. Arbor only came clean after Viceroy started reporting on its portfolio. ¶191 (increasing "doubtful" multifamily loans from $14 million in 4Q23 to $175 million in 1Q24).

Credit quality is material information to investors in companies that provide real estate-backed credit. *See Freudenberg*, 712 F. Supp. 2d at 185-86 (concealing identity of loan originators with notoriously low standards was material to company that provided mortgage loans) (citing *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1185 (C.D. Cal. 2008)). Cases involving similar facts support Plaintiffs' argument on this point. For example, in *In re General Electric Co. Securities Litigation*, the court held that the defendant made material misrepresentations when it praised the quality of its loan portfolio while failing to disclose its many subprime and non-investment grade holdings. 857 F. Supp. 2d at 386. The court "scrutinized the surrounding context to determine what [the] compan[y] intended to convey to investors," and determined that defendant's description of its loan portfolio as "great" and of "really high quality" was materially misleading. *Id.* at 387 (citing *Hill v. State St. Corp.*, No. 09cv12146, 2011 U.S. Dist. LEXIS 85128, at *54-55 (D. Mass. Aug. 3, 2011) (determining that when [defendant] praised certain investments as "high quality" it could plausibly be read as a (misleading) representation as to "the relative safety of investing in [the company's] stock")). This case is directly applicable because Defendants provided investors with false assurances concerning the health of its loan portfolio and amount of estimated credit losses, which created an artificially inflated picture of Arbor's finances and operations. *See also Lapin v. Goldman Sachs*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (denying motion to dismiss where defendant claimed that "integrity was 'at the heart' of its business and attempted to distinguish itself from other institutions based on its 'truly independent investment research' while [defendant] allegedly knew the contrary was true").

In response to these allegations, Defendants appear to take the position that absent a restatement to Arbor's financial statements or an objection from the company's auditor, Plaintiffs cannot demonstrate "falsity" at the pleading stage. Defs. Br. at 13-14. Defendants have no legal support for this argument. To the contrary, courts recognize that a "restatement" is ***not*** required to show falsity. *See Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-cv-01640, 2022 U.S. Dist. LEXIS 70597, at *54 (N.D. Ill. Apr. 18, 2022) ("While a restatement of financials is further evidence of materiality in a Rule 10b-5 falsity claim, that does not mean that a restatement is required to show falsity.") (internal citations and quotations omitted). If Defendants' statement of the law were correct, then bad actors could easily insulate themselves from liability simply by refusing to admit fault. Instead, what drives the element of falsity is the divergence between Defendants' public statements and the true state of affairs existing at the time. *See Stichting Pensioenfonds ABP v. Merck & Co.*, No. 05-5060 (SRC), 2012 U.S. Dist. LEXIS 113813, at *14 (D.N.J. Aug. 1, 2012). This necessarily boils down to a question of materiality, *i.e.*, the likelihood that a particular statement could or would mislead a reasonable investor. That is a "mixed question of law and fact, and the delicate assessments of the inference a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 875 (3d Cir. 2000).

"[W]hether an alleged misrepresentation or omission is material necessarily depends on all of the relevant circumstances of the case, and materiality is a mixed question of both law and fact." *RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*, 185 F. Supp. 2d 389, 400 (S.D.N.Y. 2002). Publicly, Defendants provided investors with financial statements and loan ratings while, internally, manipulating the underlying loan data (by, for example, artificially preventing loans from going into default or reaching nonperforming status). This created a material difference

between the state of affairs that truthfully existed at the time and the impression being conveyed to investors publicly. *See In re XL Fleet Corp. Sec. Litig.*, 2022 U.S. Dist. LEXIS 29255, at *12-15 (holding "sales pipeline and revenue figures" misleading because "pipeline was materially overstated due to data manipulation"); *see also Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 546 (S.D.N.Y. 2017) (" . . . the inclusion of nonmonetary transactions as revenue in the financial statements, and the statements that nonmonetary transactions were evaluated using ASC 845, were false and misleading statements of objective fact."). While Defendants dispute the premise of this allegation, liability should follow so long as a material difference exists between what they told investors and the true facts that existed at the time. That issue should not be decided at the pleading stage. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *see also Ganino*, 228 F.3d at 162 (dismissal appropriate only where omission is "so obviously unimportant . . . that reasonable minds could not differ on the question of their importance").

### C. **Plaintiffs Adequately Plead a Strong Inference of Scienter.**

To plead scienter, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Novak*, 216 F.3d at 315. Courts must conduct the scienter analysis "holistically" to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). "In this Circuit, plaintiffs can satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer*, 968 F.3d 204 at 212. Scienter is alleged if a "reasonable person would deem the inference of scienter…at least as compelling as any opposing inference one could draw from the facts

alleged." *Tellabs,* 551 U.S. at 324-26. The inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences;" rather, the inference of scienter need only be ***equally plausible*** as any non-culpable inference. *Id.* at 324. If the inferences for and against scienter are in "equipoise," the complaint survives. *Id.* at 331.

Plaintiffs sufficiently allege strong circumstantial evidence of conscious misbehavior or recklessness by showing that "[D]efendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306. Where a plaintiff alleges defendants "had knowledge of facts . . . that explicitly contradicted their public statements . . . [t]hese allegations alone are enough to satisfy the pleading requirement for scienter." *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008). Plaintiffs satisfy that standard here where the allegations show that Defendants endorsed Arbor's reckless underwriting practices and then concealed the company's growing credit losses. *See* ¶613.

Plaintiffs rely on first-hand accounts from former employees to show that:

- Kaufman personally signed-off on all loans originated by Arbor (¶123);
- Kaufman and the rest of Arbor's Credit Committee instructed its underwriters to "find ways" to close loans by disregarding certain requirements, such as minimum debt-to-credit ratios, debt service coverage ratios, debt yields, equity requirements, instituting "rate caps," and eliminating "stress testing" (¶¶125-35);
- Kaufman and Elenio attended quarterly rating meetings where they discussed the fallout created by rising interest rates and consequent need to use "interest" and "construction" reserves to artificially prevent loans from becoming nonperforming, *i.e.*, to keep the loan from exceeding 90 days in delinquent status (¶¶152-54, 157). During the quarterly rating meetings, Kaufman and Elenio also manipulated ratings for various loans to make Arbor's portfolios appear better than they truly were (¶¶185-89);
- Kaufman discussed specific loans and worked directly with borrowers to "workout" defaults by improperly borrowing money from different loan reserves (¶¶155-56);

- Kaufman participated in emergency calls with Danny van der Reis, EVP of Servicing and Asset Management, and Louis Sarube, SVP and Managing Director in Structured Asset Management, to discuss various assets including the Generations property in Atlanta, Georgia, which had a phony valuation to prevent it from becoming impaired (¶¶180-82);

- The Structured Asset Management team used appraisal companies that they knew would rubberstamp the values provided by Arbor and would change appraisal values if necessary when told to do so by members of executive management, including Colin Chaudhuri, Head of Valuations and Asset Management, and Sarah Brinkman, VP of Structured Asset Management (¶¶136-39, 176-79); and

- Arbor's executive management, including Chief Credit Officer Andrew G. Guziewicz who was on the Credit Committee with Kaufman, held weekly pipeline meetings where all "live" deals were discussed and determined that "agency take-outs" were no longer possible (¶¶141-42).

These allegations show (certainly at the pleading stage) that Defendants had knowledge of Arbor's reckless underwriting practices and growing credit losses through meetings, documents, and other interactions with various members of the Structured Asset Management team and, therefore, acted with scienter when making the public statements at issue in this action. *See Scholastic Corp.*, 252 F.3d at 76 ("access to non-public information contradicting" statements supports scienter). This is powerful evidence of scienter that courts routinely credit in sustaining scienter allegations. *See Christine Asia Co. v. Yun Ma*, 718 F. App'x 20, 22-23 (2d Cir. 2017) (scienter where executives met with government officials and discussed relevant information).

*In re MBIA, Inc., Securities Litigation*, 700 F. Supp. 2d 566 (S.D.N.Y. 2010), is instructive. In *MBIA*, the plaintiff "adequately alleged that MBIA's officers had knowledge of and access to non-public information regarding the [residential mortgage-backed securities' ("RMBS")] collateral within the [collateralized debt obligation ("CDOs")]-squared that contradicted their public statements." *Id.* at 591. The defendants in *MBIA* "repeatedly stated that MBIA carefully reviewed the collateral underlying all of its multi-sector CDOs." *Id.* Additionally, the defendants "emphasized the importance of MBIA's triple-A ratings and focused on the effects of RMBS

collateral on MBIA's liquidity." *Id.* at 593. Reviewing these statements, the court found scienter because "MBIA executives were acutely aware of the importance of RMBS to MBIA's continued creditworthiness and to concerned investors." *Id.* at 593.

As in *MBIA,* Defendants told investors that Arbor's loans were of superior quality, not exposed to the declines impacting the market, and rigorously reviewed for proper rating classifications. *See* ¶¶163-64, 168-71. In fact, Defendants repeatedly touted the conservative nature of their underwriting procedures and told investors that all of its loans were "agency eligible." *See*, *e.g.*, ¶¶165-67. This was "not an incidental policy or a spontaneous or rogue act by a [company] employee; it was the deliberate policy of [the company] itself." *Zola v. TD Ameritrade, Inc.*, 172 F. Supp. 3d 1055, 1073 (D. Neb. 2016) (scienter where defendants falsely represented that "it would abide by a duty of best execution"). Indeed, according to Defendants, "credit quality" was Arbor's utmost concern. *See* ¶¶85, 87, 91, 95-96. Thus, given Defendants' true underwriting practices, they either intentionally or with deliberate recklessness failed to tell investors of the real risks they faced from Arbor's actual (but undisclosed) credit losses. "This type of specific knowledge supports the strong inference Lead Plaintiff must establish." *MBIA*, 700 F. Supp. 2d at 591-92.[2]

*In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010), is also instructive. In *Citigroup*, the "defendants concealed from investors the scope of the risks that the subprime meltdown posed for [the company] by way of the company's CDO exposure." *Citigroup*, 753 F.

---

[2] "There is considerable authority for the proposition that a company's failure to follow an internal policy can form the basis of an inference of recklessness." *In re Dynex Capital, Inc.*, No. 05 Civ. 1897, 2009 U.S. Dist. LEXIS 96527, at *42 (S.D.N.Y. Oct. 19, 2009) (scienter where company failed to follow publicly stated underwriting policy) (internal quotations omitted). *See also Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F.Supp.2d 210, 229 (S.D.N.Y. 2008) (finding strong inference of scienter for defendant who had knowledge of undisclosed risk alert document that made earlier statements regarding the company's liquidity materially misleading).

Supp. 2d at 236. The defendants were "aware of the risks" and "knew the inputs and assumptions that went into creating these assets and thus [were] in the best position to recognize the threats they faced as the subprime mortgage market deteriorated." *Id.* at 237. The court held that the defendants were reckless "in failing to disclose [the risks] even absent knowledge that the CDO holdings would certainly suffer losses." *Id.* at 238.

Like *Citigroup*, Defendants concealed the risks that arose from their reckless underwriting. Defendants knew of the risks and were in the best position to recognize the threats surrounding their loan portfolios, given their regular involvement, participation, and oversight in the "workouts" and loan rating classification process. *See*, *e.g.*, ¶¶155-56, 180-82, 185-89. In reviewing these factors, Defendants had access to information that would have made their statements not misleading. Thus, these facts are highly indicative of scienter. *See Reese v. Malone*, 747 F.3d 557, 579-80 (9th Cir. 2014) (scienter found where defendants received a "Corrective Action Order" that contradicted the statements made by the defendants to the public.).

Motive allegations, although not required for the purposes of pleading scienter, further substantiate Plaintiffs' claims against Defendants. *See Tellabs, Inc.*, 551 U.S. at 325 (motive not required to plead scienter); *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 275 (S.D.N.Y. 2014) (motive plus recklessness "turn what might be a weak inference standing alone into a strong one"). Arbor's reckless underwriting allowed it to generate millions of dollars in revenue as its loan volume increased. *See* ¶¶147-48. Reported net income skyrocketed from $120 million in 2019 to $330 million in 2023. ¶3. Thus, the benefits generated by this company-wide scheme strengthen the inference of scienter. *See Crago v. Charles Schwab & Co.*, No. 16-cv-03938-RS, 2017 U.S. Dist. LEXIS 215871, at *15-17 (N.D. Cal. Dec. 5, 2017) (scienter where defendant engaged in scheme to increase company profits); *Zola v. TD Ameritrade, Inc.*, 172 F.

Supp. 3d 1055, 1073 (D. Neb. 2016) (scienter of TD Ameritrade was based, in part, on motive as "reflected in its alleged generation of over one billion dollars in revenue" in connection with "order routing practices"); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1033-34 (C.D. Cal. 2008) (considering "lucrative nature of ["off-label" marketing] scheme" in holding that plaintiffs had adequately pleaded scienter); *Anschutz Corp. v. Merrill Lynch & Co.*, 758 F. Supp. 2d 799, 817 (N.D. Cal. 2011) (inference of scienter premised on defendants' motive to earn millions of dollars of fees); *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 179-80 (S.D.N.Y. 2009) (scienter adequately pleaded where defendant corporations engaged in scheme in order to receive excessive fees).

With regard to Kaufman and Elenio, Arbor provided compensation packages that entitled them to lucrative bonuses depending on the company's financial performance and operational performance, including earnings. ¶¶621-23. Thus, by perpetuating Arbor's reckless underwriting practices, Kaufman secured for himself an additional $20 million in cash bonuses while Elenio received $3.6 million (in addition to their annual salaries). *See* ¶¶625-29. *See also Blanford*, 794 F.3d at 309 (scienter inferred from "[d]efendants' intent to craft a false growth story and the extraordinary opportunities for personal gain this 'growth' created for [defendants]"); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 607 (W.D. Tex. 2014) ("[i]ncentive compensation packages . . . in conjunction with other scienter allegations can be probative of an inference of scienter in extraordinary cases") (quotations omitted)).

**D. <u>Plaintiffs Adequately Plead Loss Causation.</u>**

"Allegations of loss causation, are evaluated under the notice pleading standard in Federal Rule of Civil Procedure Rule 8." *See In re Fairway Grp. Holding Corp. Sec. Litig.*, No. 14 Civ. 0950 (LAK)(AJP), 2015 U.S. Dist. LEXIS 5999, at *43 (S.D.N.Y. Jan. 20, 2015); *see also*

*Gormley v. Magicjack Vocaltec Ltd.*, 220 F. Supp. 3d 510, 517 (S.D.N.Y. 2016) ("Pleading loss causation with particularity is not required"). Thus, Plaintiffs' burden of pleading loss causation is "not a heavy one," and the complaint "must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). At the pleading stage, Plaintiffs need only allege "that the ***subject*** of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Youngers v. Virtus Inv. Partners Inc.*, 228 F. Supp. 3d 295, 299 (S.D.N.Y. 2017) (citation omitted).

Defendants lied about Arbor's underwriting practices and then concealed the credit losses that followed. *See*, *e.g.*, ¶¶2, 112-17, 145-51. Investors started to discover the truth about Arbor's operations and finances only after research firms began reporting on the company's risky loans and increasing exposure to credit losses. *See* ¶¶225-45. With each report, Arbor's stock price declined until finally falling to less than $13 per share (roughly half of its intra-Class Period high) when *Bloomberg* reported that Arbor was under investigation by the FBI and DOJ. *See* ¶¶246-47. "[T]o show loss causation, it is enough that the loss caused by the alleged fraud results . . . through events constructively disclosing the fraud." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261-62 (2d Cir. 2016). The "fraud" in this case relates to Arbor's underwriting practices and credit losses; thus, when Arbor's stock price plummeted in response to reports about the company's reckless underwriting and nonperforming loans, the losses investors sustained were unquestionably causally related to the alleged fraud. ¶¶633-42. *See*, *e.g.*, *Ray*, 2024 U.S. Dist. LEXIS 175229, at *50-51 (loss causation adequately pleaded under "risk materialization theory" where disclosures "reveal[ed] to investors 'higher delinquencies' and 'non-performing clients,' which caused

[defendant's] stock price to fall"); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 U.S. Dist. LEXIS 199809, at *50-51 (S.D.N.Y. Nov. 26, 2018) (plaintiff adequately pleaded "materialization of a concealed risk" where "nine partial disclosures . . . slowly revealed the nature and extent of the subprime quality of Signet's loan portfolio and its inadequate reserves"). These allegations suffice for pleading purposes because, as the Second Circuit made clear in *Vivendi*, "to show loss causation, it is enough that the loss caused by the alleged fraud results from the relevant truth . . . leak[ing] out." *See Vivendi S.A.*, 838 F.3d at 261 (constructive disclosures revealed defendants' liquidity risk) (internal quotations omitted).

Defendants respond by arguing that neither the Viceroy reports nor the *Bloomberg* article can serve as a "corrective disclosure" in support of Plaintiffs' loss causation theory. Defs. Br. at 23. They are wrong. Viceroy did not merely reprint data from Arbor's SEC reports but instead somehow uncovered nonpublic underlying loan data and explained why Arbor's loan portfolios were materially riskier than Defendants represented. Reports like these that synthesize nonpublic (or not easily accessible) information are routinely allowed as "corrective disclosures." *See In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580 (LGS), 2020 U.S. Dist. LEXIS 49786, at *20-25 (S.D.N.Y. Mar. 23, 2020) (finding that a third-party's analysis of already public financial information can be a corrective disclosure); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM) (RWL), 2019 U.S. Dist. LEXIS 114695, at *50 (S.D.N.Y. July 10, 2019) ("[An analyst report] was not, as [d]efendants contend, merely a journalist's negative opinion, but an analysis of how and why [defendant company's] underlying business was weaker than most people realized [and therefore qualified as corrective]."); *see also Pub. Emples. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (finding that a WSJ article analyzing publicly available Medicare records could plausibly constitute a corrective, and not merely confirmatory, disclosure).

Likewise, the *Bloomberg* article announcing the FBI and DOJ investigation into Arbor also qualifies as a "corrective disclosure," contrary to Defendants' argument. Defs. Br. at 24. Plaintiffs' allegations are no different than the allegations in many cases that have survived motions to dismiss involving regulatory actions and/or announcements of investigations. For example, in *In re Bradley Pharm., Inc. Securities Litigation*, 421 F. Supp. 2d 822 (D.N.J. 2006), the court denied the defendants' motion to dismiss where the announcement of an SEC investigation resulted in a stock price drop, noting that "Defendants' contention that the announcement of the SEC inquiry did not satisfy *Dura*'s 'revelation of the truth' requirement fails to acknowledge the significance of the market reaction to the February 28, 2005, disclosure." *Id.* at 829. Similarly, in *Lapin v. Goldman Sachs Group, Inc.*, *supra*, the court denied the defendants' motion to dismiss where investigation announcements by the NY Attorney General, and subsequently the Justice Department and SEC, resulted in the stock price dropping from $86.06 to $77.21, or 10.3%. *Id.* at 231, 243.

Each of Plaintiffs' alleged corrective disclosures resulted in immediate and material stock drops. *See* ¶¶633-40. Defendants dispute this point by arguing that the stock price recovered after the disclosures. Defs. Br. at 23. But that argument only goes so far and is entitled to little weight at the motion to dismiss stage. Defendants publicly addressed the Viceroy reports by claiming that their conclusions were "exaggerated, [laced] with incomplete and inaccurate data, [and were] slanted only to provide a negative view on Arbor and again, purely for personal gain." ¶239. When news emerged of the FBI and DOJ investigations, however, Defendants were unable to rehabilitate the company's stock price. ¶¶246-47, 640; *see also* ¶641 (Piper Sandler reporting on "DOJ & FBI Investigation"). Arbor's stock plummeted 17.33% from $15.53 per share to $12.89 per share and stayed there for nearly two months. ¶641. The Viceroy reports created suspicion in the market,

which the *Bloomberg* article then solidified when revealing that Arbor was under federal investigation. The stock price decline that followed provides the final point necessary for Plaintiffs' loss causation theory. *See In re Merck & Co., Sec., Derivative & "ERISA" Litig.*, No. 1658 (SRC), 2011 U.S. Dist. LEXIS 87578, at *121-22 (D.N.J. Aug. 8, 2011) (7% drop in price of Merck stock supported loss causation allegations); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287 (S.D.N.Y. 2007) (announcement of "informal" SEC investigation resulted in 7.5% share price drop); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 252-53 (S.D.N.Y. 2007) (holding, inter alia, that 4.5 % drop in market price of shares in response to announcement of SEC investigation into options backdating was sufficient to allege loss causation).

### E. Defendants Are Liable as "Control Persons" under Section 20(a) of the Exchange Act.

Plaintiffs have adequately pleaded underlying primary violations, as discussed above. Thus, Defendants' motion to dismiss Plaintiffs' "control person" claims should be denied. *See Altimeo Asset Mgmt.*, 19 F.4th at 152. The only argument Defendants raise—culpable participation—does not change the outcome. Defs. Br. at 25. Kaufman and Elenio directly participated in and endorsed the reckless underwriting that led to the credit losses within Arbor's loan portfolio. *See*, *e.g.*, ¶¶155-56, 180-82, 185-89. As CEO and CFO of the company, signatories of Arbor's SEC filings, and (at least in Kaufman's case) directly responsible for making false statements during earnings calls, there should be no question that Plaintiffs overcome the "culpable participation" hurdle raised by Defendants. *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 517 (S.D.N.Y. 2009) (plaintiff satisfied culpable participation requirement where control person acted with scienter); *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 351 (S.D.N.Y. 2004) (finding allegations that a party who "'quashed' the dissent of a junior auditor

who questioned [the propriety of fraudulent accounting schemes]" to be "sufficient to satisfy the requirements of pleading actual control and culpable participation"); *see also Guozhang Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 238 (S.D.N.Y. 2023) ("Because the Complaint adequately alleges violations of Sections 11 and 10(b), it also sufficiently pleads the primary liability required to state a claim under Section 15 and Section 20, respectively. And for the reasons set forth above in connection with the scienter element of the Section 10(b) claim, the Complaint plausibly alleges the relevant parties' 'culpable participation' under Section 20.").

## V. CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.[3]

Dated: May 16, 2025

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*

[3] In the event that the Court is inclined to grant any aspect of Defendants' motion, Plaintiffs respectfully request leave to file an amended complaint to address any deficiencies in the current allegations. *See Loreley*, 797 F.3d at 191.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with the word-count limit contained in Local Civil Rule 7.1(c). The foregoing document contains 8,503 words, excluding portions inapplicable to the word-count limit. Executed this 16th day of May 2025.

*/s/ Adam M. Apton*
Adam M. Apton