UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
LOIS MARTIN, *individually and on behalf of
all others similarly situated*,

                      Plaintiff,

          - against -

ARBOR REALTY TRUST, INC. *et al.*,

                   Defendants.

-------------------------------------------------------x

**MEMORANDUM & ORDER**
24-CV-5347 (PKC) (LKE)

PAMELA K. CHEN, United States District Judge:

Plaintiff Lois Martin ("Martin"), on behalf of herself and all other persons similarly situated, brings a putative class action against Defendants Arbor Realty Trust ("ABR"), Ivan Kaufman ("Kaufman"), and Paul Elenio ("Elenio"), alleging violations of federal securities laws. (*See* Am. Compl., Dkt. 26, ¶¶ 1–2.) Defendants seek to dismiss Plaintiffs' Amended Complaint in its entirety. (Mot. to Dismiss ("MTD"), Dkt. 32.) For the reasons that follow, Defendants' motion is GRANTED.

**BACKGROUND[1]**

## I.    Factual Allegations

### A.    ABR's Business Model

ABR is a real estate investment trust and direct lender that became a publicly traded company in 2004. (Am. Compl., Dkt. 26, ¶¶ 56–57.) Kaufman is ABR's "Founder, Chief Executive Officer, President, Chairman, and voting member of the Company's Credit Committee,"

---

[1] For purposes of this Memorandum & Order, the Court assumes the truth of Plaintiffs' non-conclusory, factual allegations in the Amended Complaint. *Kiobel v. Royal Dutch Petrol. Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (first citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); and then citing *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).

and Elenio is "its Executive Vice President, Chief Financial Officer, and Head of Investor Relations." (*Id.* ¶ 2.) ABR provides "loan origination and servicing for multifamily, single-family rental . . . , and other commercial real estate assets for its own portfolio and for sale in the secondary market." (*Id.* ¶ 57.)

ABR "operates through two business segments: (1) its Agency Loan Origination and Servicing Business ('Agency Business') and (2) its Structured Loan Origination and Investment Business ('Structured Business)." (*Id.* ¶ 58.) Through its Agency Business, ABR originates "primarily fixed-rate long-term mortgages," (*id.* ¶ 5), which it then sells to government-sponsored enterprises ("GSEs")[2] as part of its "Agency loans,"[3] or pools, securitizes, and sells as part of its "Private Label loans," (*id.* ¶¶ 59, 77). ABR then services these loans. (*See id.* ¶¶ 59, 62.) "[The] Agency Business primarily generates revenue based on the gains and fees recognized from the origination and sale of mortgage loans." (*Id.* ¶ 71.)

By contrast, through its Structured Business, ABR "invests in a portfolio of structured finance assets" primarily consisting of "short-term, floating-rate loans" such as bridge loans, mezzanine loans, and junior interests in first mortgages ("Structured loans"). (*Id.* ¶¶ 63, 66.) These types of loans allow borrowers time to "transition" "non-stabilized property" through "renovations, repositioning[,] or lease-up," whereby the underlying asset accrues more value,

---

[2] These are the "Federal National Mortgage Association ('Fannie Mae') and the Federal Home Loan Mortgage Corporation ('Freddie Mac,' and together with Fannie Mae, the [GSEs]." (*See* Am. Compl., Dkt. 26, ¶ 59.)

[3] An Agency loan is a loan that is originated, sold, and serviced through the GSEs, the Government National Mortgage Association ("Ginnie Mae"), the Federal Housing Authority (the "FHA"), or the U.S. Department of Housing and Urban Development (together with Ginnie Mae and the FHA, "HUD"). (Am. Compl., Dkt. 26, ¶¶ 58–59.)

before seeking "long-term, fixed-rate financing" once the underlying asset has been "stabilized."[4] (*Id.* ¶¶ 64–66.)  ABR then pools multiple Structured loans "together into a marketable security collateralized by the pool of commercial real estate assets" in the form of collateralized loan obligations ("CLOs"), (*id.* ¶¶ 78, 80, 82), which it then sells as CLO debt securities, (*id.* ¶¶ 79–80).  ABR "create[s] income for itself through its role as portfolio manager," i.e., collecting income "earned on the underlying pool of assets"—or borrowers' loan payments—and distributing this income as periodic interest and principal to the investors who purchased the CLO debt securities. (*See id.* ¶¶ 71, 78–80.)  The CLO securitization process transfers part of the risk of loss on the underlying loans from ABR, to the CLO investors.  (*Id.* ¶ 80.)  Typically, at the end of the "transition" period, borrowers pay off their ABR-originated bridge loan with a subsequent "conventional mortgage, such as [a] GSE/[A]gency loan[,]" in a process known as a "takeout." (*Id.* ¶¶ 68–69.)  The loans held "through [ABR's] Structured Business are intended to be held-to-maturity and, accordingly, are carried at cost, net of unamortized loan origination costs and fees, loan purchase discounts, and net of the allowance for credit losses."[5]  (*Id.* ¶ 70.)

Thus, ABR's "primary business objective [is] to bring in a borrower at the acquisition or renovation stage of the underlying asset on a bridge loan originated by ABR, carry them through the transitional period, *i.e.*, to maturity of the bridge loan or upon property stabilization, and exit them with an Agency loan originated, sold, and serviced by ABR, thereby providing it with two bites at the same deal."  (*Id.* ¶ 72.)  And "by securitizing the bridge loans that [it] originate[s], ABR create[s] income for itself through its role as portfolio manager, while removing risk from

---

[4] "A multifamily property is generally considered 'stabilized' when it has a consistent occupancy rate, predictable cash flow, and a healthy net operating income." (Am. Compl., Dkt. 26, ¶ 67.)

[5] Credit losses are discussed in detail in Section I.B(3) *supra*.

its balance sheet." (*Id.* ¶ 80.)  In essence, ABR has built a pipeline from loan origination to securitization to servicing, whereby it receives loan income at each step of the pipeline while progressively reducing its risk exposure to the underlying loan/asset by leveraging third parties. (*See id.* ¶¶ 72, 80.)

ABR's pipeline relies on certain financial analyses and related representations, and the due diligence it allegedly does. (*See id.* ¶¶ 84, 115.)  To facilitate the loan origination process at the start of the pipeline, ABR maintains credit facilities[6] with so-called "warehouse lenders,"[7] that provide capital in the form of debt collateralized by the subsequently originated loans. (*Id.* ¶ 76.) If the ABR-originated loans lose value—or if the warehouse lenders lose confidence in ABR's representations regarding the soundness of the loans—ABR risks margin calls "requiring ABR to pay cash back to the warehouse lender." (*Id.*)  With regards to the takeout pipeline itself, softening in the financials of the properties underlying ABR's self-originated bridge loans may render the loans ineligible for takeout,[8] threatening ABR's longer term servicing revenue. (*See id.* ¶ 93.) Third, while the CLO process transfers some risk from ABR to investors, ABR must make

---

[6] The Amended Complaint suggests this is a "line[] of credit" for ABR. (*See* Am. Compl., Dkt. 26, ¶ 76.)

[7] A "warehouse lender" is "a financial institution, typically a commercial bank or other corporate entity, that provides various structured financial solutions – either lines of credit or repurchase agreements – to non-depository independent lenders, like ABR," which allows lenders like ABR "to fund new loans before selling them on the secondary market." (*Id.* ¶ 76.)  The warehouse lender thereby "essentially act[s] as a temporary source of capital to facilitate the loan origination process by using the originated loans as collateral for the debt incurred." (*Id.*)

[8] For example, properties where the measure of the cash flow available to pay current debt obligations ("DSCR") is below certain thresholds are ineligible for Freddie Mac or Fannie Mae fixed-rate mortgage loans. (*Id.* ¶ 93.)  And changes in property value impact loan-to-value ("LTV") ratios, which compare the amount of a loan to the value of the asset being purchased, or the percentage of a property's appraised value that is covered by its debt obligations. (*Id.* ¶¶ 87– 90.)  "Fannie Mae and Freddie Mac generally allow LTV ratios of up to 80% for multifamily financing," and Fannie Mae only allows up to 75% for refinancing. (*Id.* ¶ 93.)

"guarantees, in the form of recourse obligations upon violation of representations and warranties," which "assure[] buyers that the loans being packaged compl[y] with underwriting standards and [meet] certain criteria relevant to the riskiness of the loan, such as the borrower's creditworthiness, the ratio of the borrower's total indebtedness to income or assets, and operational performance of the underlying property." (*Id.* ¶¶ 83–84.)  Even apart from this pipeline, in the CLO context, "[i]f the assets that back the debt underperform or default, [ABR is] the last to get paid." (*Id.* ¶ 80.) Accordingly, ABR's business model relies on its "conservative underwriting standards for its Structured loans." (*Id.* ¶ 95; *see id.* ¶¶ 91–92 (quoting ABR's underwriter guidance, as provided in ABR's 2021 10-K[9]).)

### B.      Changes in the Real Estate Market

In late 2020, the multifamily real estate market, particularly in Texas, Florida, and Georgia, was flooded with inexperienced "syndicators," which are "individuals [who] pool funds from multiple small-time investors to buy properties." (*Id.* ¶¶ 97, 101.)  These syndicators "raise[d] money from a group of investors to buy a large commercial property, often an apartment complex, self-storage facility, or housing community, that they likely [could not] afford on their own." (*Id.* ¶¶ 97–98, 101–03.)  The influx of investment made the market more competitive and financing laxer, and risked overleveraging properties with bridge loans susceptible to inflation. (*Id.* ¶¶ 105–08.)  Moreover, syndicators had little incentive to maintain or improve the properties they purchased. (*Id.* ¶ 108.)  They recouped what little money they put into the purchases through acquisition and management fees, and "would suffer little to no loss if the property [was] condemned or there [was] a forced sale," "such that there was significant risk that the

---

[9]   10-Ks are public companies' annual reports.      SEC, *How to Read a 10-K*, https://www.sec.gov/answers/reada10k.htm (last accessed Mar. 10, 2026).

unincentivized and inexperienced syndicator would deprive the property of necessary rehabilitation when faced with increased operating expenses." (*Id.* ¶¶ 105–08.)  In essence, there was a significant risk the syndicators would fail to stabilize the underlying asset, which would remain ineligible for long-term, fixed rate loans.

## C.    ABR's Portfolio Grows

Despite the inherent riskiness of the market, ABR's Structured Business grew 122% between Financial Year ("FY") 2020 and FY 2021, and 19% between FY 2021 and FY 2022.  (*Id.* ¶¶ 110–11.)  "As of December 31, 2021, 91% of [ABR's] Structured loan portfolio consisted of multifamily commercial real estate assets," 12% and 19% of which were in Florida and Texas respectively.  (*Id.* ¶ 110.)  "As of December 31, 2022, 98% of ABR's Structured portfolio consisted of housing-related bridge loans, 91% of which were multifamily commercial real estate assets"; 14% and 22% of ABR's Structured loans were in Florida and Texas respectively.  (*Id.* ¶ 111.)

## D.    Financial Research Reports Question ABR's Performance

Starting in 2023, ABR became the target of a series of reports by the international financial research group Viceroy.  (*See id.* ¶¶ 225, 228.)  Between 2023 and 2024, Viceroy published a number of reports questioning the quality of ABR's loan book, including one in November 2023, which claimed that "its investigative research team had reviewed hundreds of ABR's individual loans and determined that they were all at severe risk due to rising interest rates, declining property values, and impending maturity dates without viable refinancing options anywhere."  (*Id.* ¶¶ 228–45.)  Then, on July 12, 2024, Bloomberg reported that the Manhattan U.S. Attorney's Office and the Federal Bureau of Investigation ("FBI") in New York were actively investigating ABR's operations and reporting "on the heels of short seller[10] attacks about the lender's practices and

---

[10] "A short seller speculates that a particular stock will go down in price and seeks to profit from that drop." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 160 (S.D.N.Y. 2015),

disclosures." (*Id.* ¶ 246.) After each of these reports,[11] ABR's stock price declined. (*See id.* ¶¶ 232, 238, 245, 247.)

## II.    Procedural History

On July 31, 2024, Plaintiff Lois Martin filed the Complaint as a putative class action, individually and "on behalf of all investors who purchased or otherwise acquired ABR's securities between May 2, 2021[,] to July 11, 2024, inclusive." (Compl., Dkt. 1, ¶ 1.) On November 5, 2024, the Court appointed Plaintiff David Hawkins as the lead plaintiff in this action. (11/5/2024 Dkt. Order Adopting Report & Recommendation.) On January 21, 2025, Plaintiffs filed the Amended Complaint on "behalf of a class consisting of all persons and entities who purchased or otherwise acquired ABR's securities between May 7, 2021[,] and July 11, 2024, both dates inclusive." (Am. Compl., Dkt. 26, ¶ 1.)

---

*aff'd*, 649 F. App'x 7 (2d Cir. 2016) (internal quotation marks and citation omitted). While the Amended Complaint does not identify Viceroy as a short seller, it quotes articles referring to Viceroy as such. (*See* Am. Compl., Dkt. 26, ¶ 635 (quoting The Real Deal, a "real estate news outlet").)

[11] Plaintiffs characterize the Viceroy and Bloomberg reports as "partial corrective disclosures." (*Id.* ¶ 225.) "Corrective disclosures" are considered "loss-inducing" events for purposes of establishing "loss causation," i.e., that a plaintiff's loss was caused by the defendant's actions, in a securities fraud case. *See In re UiPath, Inc. Sec. Litig.*, No. 24-CV-4702 (JPC), 2025 WL 2065093, at *18 (S.D.N.Y. July 23, 2025) ("[T]o establish loss causation, a plaintiff must allege that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Most classically, loss-inducing events take the form of corrective disclosures. A corrective disclosure is traditionally an admission by the company that one or more of its previous statements were false or misleading followed by a corrected, truthful and complete version of those statements." (internal quotation marks and citations omitted)); *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 97–99 (2d Cir. 2023) (discussing types of corrective disclosures and the mechanisms through which these revealed prior misrepresentations); *see also In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 465 (S.D.N.Y. 2022) (noting that corrective disclosures often "reveal at least part of the falsity of [a] misstatement"). "Partial corrective disclosures" are disclosures that, standing alone, cannot constitute a corrective disclosure. *See* 2 Harold S. Bloomenthal & Samuel Wolff, Sec. Law Handbook § 29:89, Westlaw SECLAW-HB (database updated Oct. 2025).

In the Amended Complaint, Plaintiffs bring two sets of claims: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against all Defendants, (Am. Compl., Dkt. 26, ¶¶ 656–64); and (2) violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Kaufman and Elenio, (*id.* ¶¶ 665–71). Defendants' motion to dismiss was fully briefed on June 16, 2025. (*See* MTD, Dkt. 32; Mem. in Opp'n MTD ("Opp'n"), Dkt. 33; Reply Supp. MTD ("Reply"), Dkt. 34.)

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *Iqbal*, 556 at 678). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). The general pleading standard does not require "detailed factual allegations," but still "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. But "[a]ny complaint alleging securities fraud must satisfy the heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rule 9(b) "by stating with particularity the circumstances constituting fraud." *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 135 (2d Cir. 2025) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)). Under that heightened standard, the plaintiff must (1) "specify each statement alleged to have been

misleading [and] the reason or reasons why the statement is misleading"; and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, i.e., scienter." *Id.* (internal quotation marks omitted); *accord* 15 U.S.C. § 78u-4(b)(1), 78u-4(b)(2).

## DISCUSSION

### I.    Plaintiffs' Section 10(b) and Rule 10b-5 Claims

#### A.    Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304–05 (2d Cir. 2015) (first two alterations in original) (quoting 15 U.S.C. § 78j(b)). "SEC Rule 10b–5 implements this provision of the Exchange Act and explicitly prohibits 'mak[ing] any untrue statement of a material fact.'" *Id.* (alteration in original) (quoting 17 C.F.R. § 240.10b–5(b)). To state a claim under Section 10(b) and Rule 10b-5, a complaint must plausibly allege: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (quoting *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013)). "[F]ailure to establish any of these elements is fatal to a Section 10(b) or Rule 10b-5 claim." *Gera v. Luthra*, No. 23-CV-5573 (OEM) (LB), 2025 WL 3818459, at *3 (E.D.N.Y. Oct. 1, 2025) (alteration in original) (quoting *Greene v. WCI Holdings Corp.*, 956 F. Supp. 509, 518 (S.D.N.Y. 1997)); *see also Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 390–91 (S.D.N.Y. 2024) (collecting cases).

9

Both false statements and material omissions can be unlawful under Section 10(b) and Rule 10b–5. *Gimpel*, 156 F.4th at 138 (noting "two actionable theories under Section 10(b) and Rule 10b–5: (1) a false statement, i.e., 'an actual statement . . . that is . . . untrue outright,' and (2) a half-truth, i.e., a 'representation[ ] that state[s] the truth only so far as it goes, while omitting critical qualifying information.'" (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016))). A false statement must be "false at the time it was made, and the plaintiff must demonstrate with specificity why the statement is false." *Id.* (citing *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004)); *see also In re Arqit Quantum Inc. Sec. Litig.*, 774 F. Supp. 3d 505, 544 (E.D.N.Y. 2025) ("A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made." (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (emphasis omitted), *aff'd*, 604 F. App'x 62 (2d Cir. 2015))). With regard to omissions, once a company "speaks on an issue or topic," it must "tell the whole truth." *Gimpel*, 156 F.4th at 139 (citations omitted).

In the context of a Section 10(b) claim, the Second Circuit has interpreted Rule 9(b) to require that a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Arqit*, 774 F. Supp. 3d at 544 (quoting *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197–98 (2d Cir. 2013)). "An alleged misrepresentation is material if 'there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock.'" *Singh*, 918 F.3d at 63 (quoting *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010)). "Such a statement must, in the view of a reasonable investor, have 'significantly altered the "total mix" of information made available.'" *Id.* (quoting *ECA*, 553 F.3d

at 197). "To determine whether a statement is misleading, [the Court's] inquiry is objective, from the perspective of a 'reasonable investor,' considering not only a statement's 'literal truth' but also its 'context and manner of presentation.'" *Id.* (quoting *Singh*, 918 F.3d at 63).

**B.      Defendants' Allegedly False Statements**

Plaintiffs allege that between 2021 and 2024, Defendants made a series of false and/or misleading statements about: (1) ABR's underwriting standards and portfolio quality, (*see, e.g.*, Am. Compl., Dkt. 26, ¶¶ 272–73); (2) ABR's internal risk controls, which provide the review infrastructure around ABR's underwriting and portfolio, (*see, e.g.*, *id.* ¶¶ 259–62); and (3) ABR's financial condition, (*see, e.g.*, *id.* ¶¶ 257–58, 265–67).[12,13]   Because, according to Plaintiffs, Defendants repeated the same types of statements throughout the relevant time frame,[14] the Court reviews only a representative sample of each type of statement.

1.      Statements Regarding ABR's Underwriting Standards and Portfolio Quality

The   first   category   of   alleged   misstatements   are   those   pertaining   to   Defendants' underwriting standards and guidelines.  Representative of this category are Defendant Kaufman's

---

[12] Although Defendants group the statements into two categories, (*see* Mem. Supp. MTD, Dkt. 32-1, at 9 (citing Am. Compl., Dkt. 26, ¶¶ 258, 211)), the Court finds that Defendants' grouping collapses distinct issues, and declines to adopt it.

[13] Both parties cite to ABR's financial disclosures with the SEC.  "In determining whether dismissal is warranted pursuant to [Rule] 12(b)(6), a court may 'consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.'" *Arqit*, 774 F. Supp. 3d at 521 (quoting *Kleinman*, 706 F.3d at 152).  The Court therefore considers these financial disclosures as incorporated by reference into the Amended Complaint.

[14] Instead of grouping the alleged false statements by type, the Amended Complaint recites each one in chronological order across each financial quarter, consuming nearly 130 of the Amended Complaint's 224 pages.  Indeed, Defendants aptly describe "Plaintiffs' 224-page Amended Complaint [as] a textbook puzzle pleading."  (*See* Mem. Supp. MTD, Dkt. 32-1, at 8.)

statements during an earnings call in the first quarter of 2021 ("1Q21"), "that 'one of [ABR's] key business strategies is the financing of our ***high-quality balance sheet portfolio***'" and that ABR's "***balance sheet loans also create a substantial pipeline of future GSE agency origination volumes and long-dated servicing revenues, further increasing our future earnings and dividends***," ("Kaufman's 1Q21 Statements").  (Am. Compl., Dkt. 26, ¶ 272 (emphasis in original).) Plaintiffs allege that, in making these statements, "Kaufman knew but failed to disclose that [ABR] had substantially deviated from its underwriting standards and guidelines to drive up loan volume resulting in an influx of structurally unsound multifamily bridge loans at material risk of non-performance and/or default from the time of origination, . . . [as] corroborated by the accounts of [nine former employees ('FEs')]."  (*Id.* ¶ 273.)  Plaintiffs further allege that, "as corroborated by FE1, FE2, and FE11, [ABR had] abandoned its stated standards of underwriting its Structured loans for Agency takeout," and that, "[a]s a result, . . . [ABR] had not [in fact] maintained a 'high-quality balance sheet portfolio[,]' and its balance sheet loans no longer supported a 'pipeline of future GSE agency origination volumes and long-dated service revenues.'"  (*Id.* ¶¶ 272–73.)

These statements do not support a Section 10(b) claim for two reasons: (1) they do not amount to actionable fraud because they are either puffery or too general; and (2) even if these statements are actionable, Plaintiffs fail to sufficiently allege the contemporary falsity of these statements.

### a)   Puffery or General Statements

Kaufman's 1Q21 Statements—touting ABR's "high-quality balance sheet portfolio" and its creation of "a substantial pipeline of future GSE agency origination volumes and long-dated servicing revenues," (*see id.* ¶ 272)—do not amount to actionable fraud.  Rather, these statements are "no more than 'puffery'" and "too general to cause a reasonable investor to rely upon them." *See ECA*, 553 F.3d at 206; *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021)

(finding "statements that the company was 'pretty confident' and 'pretty positive' about the prospect of renewing partnerships," as well as language like "stable asset quality" and "partner-centric business model [that] has been successful because it aligns [its] interests with those of [its] partners" inactionable corporate puffery); *Police & Fire Ret. Sys. Detroit v. Argo Grp. Int'l Holdings, Ltd.*, No. 22-CV-8971 (LAK), 2024 WL 5089970, at *11 (S.D.N.Y. Dec. 12, 2024) (collecting cases finding similar statements of general corporate optimism to be inactionable "puffery")[15]; *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 77 (S.D.N.Y. 2015) (concluding that characterizations of underwriting as "solid," as well as other similar representations, "are not actionable under the securities laws" because they are "merely generalizations regarding [defendant's] business practices," which the Second Circuit "'consistently [has] held to be inactionable' puffery" (citations omitted)); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 354 (S.D.N.Y. 2011) ("Defendants' statements about their 'conservative' underwriting and risk management constitute corporate puffery rather than actionable misrepresentations.").

Even Defendants' slightly more specific representations that ABR's "business model on every bridge loan . . . is for an Agency takeout . . . . So each and every loan that's in [ABR's] portfolio is underwritten accordingly," (Am. Compl., Dkt. 26, ¶ 166), thereby creating a "substantial pipeline of future GSE agency origination volumes and long-dated servicing revenues," (*id.* ¶ 272), are also mere "generalizations regarding [ABR's] business practices," *see ECA*, 553 F.3d at 206.  Indeed, "these statements d[o] not, and could not, amount to a guarantee

---

[15] While the instant case discusses real estate-based financials and alleged fraud, the Court also draws on securities fraud case law arising in both the banking and insurance contexts, as the case law itself cites these interchangeably. *See, e.g.*, *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 232 (S.D.N.Y. 2020) (citing *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, No. 14-CV-3876 (LTS), 2016 WL 1261135, at *10 (S.D.N.Y. Mar. 30, 2016)).

that [ABR's] choices would prevent failures in" its Agency takeout business model.  *See id.* ("The Company could not guarantee and did not guarantee . . . that its investment choices would yield increased future earnings." (quoting *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996))); *cf. Friedman v. Endo Int'l PLC*, No. 16-CV-3912 (JMF), 2018 WL 446189, at \*7 (S.D.N.Y. Jan. 16, 2018) (rejecting plaintiffs' allegations that defendant had "engaged in an ill-advised 'acquisition spree'" as unactionable because "[t]he securities laws . . . do not provide remedies for bad business decisions").[16]

The closest Plaintiffs come to alleging actionable false statements is their discussion of rate caps[17] for loans.  (*See* Am. Compl., Dkt. 26, ¶¶ 329–32.)  Plaintiffs point to statements Kaufman made during ABR's Third Quarter 2021 ("3Q21") Earnings Call regarding rate caps for various types of loans.  (*See id.* ¶ 330 (excerpting Kaufman's statements where he notes that rate caps have been mandatory for "floating rate" loans since the previous week, and that rate caps on portfolio loans would increase rates, which ABR "want[s] to protect . . . against" ("Kaufman's 3Q21 Statements")).)  Plaintiffs allege that these statements are false because, according to one ABR FE, "ABR stopped requiring rate caps for 'stronger performing deals' around mid- to late-2021," and, according to another FE, "in early-2022, [ABR] no longer required rate caps on any bridge loans."

---

[16] Some courts have found such statements inactionable because "the descriptive terms used in these statements, such as 'large' and 'growing' . . . are to a large extent 'neither quantifiable nor factual, but rather subject to interpretation, within reason.'"  *See Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 385 (S.D.N.Y. 2024) (quoting *In re Yunji Inc., Sec. Litig.*, No. 19-CV-6403 (LDH) (SMG), 2021 WL 1439715, at \*8 (E.D.N.Y. Mar. 31, 2021)).

[17] Rate caps "limit[] how high an interest rate can rise over a set period of time," and thus act as insurance for borrowers with floating-rate loans.  (*See* Am. Compl., Dkt. 26, ¶ 134.)  If interest rates go above the "rate cap," the "buyer of the rate cap receives payments" to cover the difference.  (*Id.*)  "[L]enders typically require borrowers to purchase rate caps before closing on a floating-rate loan."  (*Id.*)

14

(*Id.* ¶ 332.)  But Kaufman's statements were on October 29, 2021, (*id.* ¶ 317), and thus ABR's alleged policy in early 2022 is irrelevant.  Nor is ABR's alleged policy of not requiring rate caps for "stronger performing deals" incongruous with Kaufman's statements at the 3Q21 Earnings Call about "protecting against" rate caps on non-floating rate deals[18] that might increase rates.  Later discussions of rate caps, (*see id.* ¶¶ 422, 518), involve similar nuances regarding the type of loan and ABR's business approach.  Plaintiffs therefore have not alleged facts showing Kaufman's 3Q21 Statements were false.

b)      Insufficient Allegations Showing Contemporary Falsity

Even if these statements were not precluded on the basis of puffery, Plaintiffs have failed to sufficiently allege facts from which to reasonably infer that Kaufman *knew* that his 1Q21 Statements were false.  *See Ray v. StoneCo Ltd.*, No. 21-CV-9620 (GHW), 2024 WL 4308130, at \*7 (S.D.N.Y. Sep. 25, 2024) ("Statements of optimism and puffery can be actionable where they contradict facts that are known to a defendant, or where they amount to misrepresentations of existing facts that were made even though the speaker knew that the contrary was true." (citation modified)); *Waterford*, 2016 WL 1261135, at \*10 ("Plaintiffs do not allege facts demonstrating that [defendants] did not believe the [underwriting] statements were true at the time they were made."); *Wachovia*, 753 F. Supp. 2d at 354 (distinguishing cases where underwriting standards triggered Section 10(b) liability because, in those cases, defendants had internally approved the "debasement" of applicable standards); *Lululemon*, 14 F. Supp. 3d at 571 (noting that, "without *contemporaneous* falsity, there can be no fraud").  Plaintiffs allege that Kaufman's 1Q21 Statements were false or misleading because "Kaufman knew but failed to disclose that [ABR]

---

[18] Kaufman discussed loans in ABR's "floating rate book" and, separately, "loans in [ABR's] portfolio."  (*See id.* ¶ 330.)  The Court thus reads Kaufman's statement about "portfolio" to be about *non*-floating rate loans.

had substantially deviated from its underwriting standards and guidelines." (*Id.* ¶ 273.) But the closest Plaintiffs come to alleging contradicting facts *known* to Kaufman or Elenio:

1. "Kaufman would approve the bridge loans in like a minute of receiving the proposed deal" and that "no questions [were] asked," (Am. Compl., Dkt. 26, ¶¶ 122–23);

2. "[T]here was a push to be aggressive" by approving potential deals, which were submitted to the credit committee on which Kaufman sat, (*id.* ¶ 128);

3. Kaufman "would end up calling a lot of [struggling loan] owners to do loan workouts," and "made it clear to all of [ABR's] employees that the deals needed to be made current[, including by] pull[ing] from construction reserves, or other reserves to bring [them] current," (*id.* ¶ 155);

4. Every quarter, "Kaufman and Elenio would receive an Excel spreadsheet with proposed ratings and valuations for each of the Structured loans," (*id.* ¶ 185);

5. There was "consistent pressure from 'the top'" regarding valuations, and the executive team, including Kaufman and Elenio, "would look for ways to override . . . proposed ratings" that "they did not like," (*id.* ¶ 186); and

6. There were "quarterly rating meetings" at which, an FE believed, Kaufman and Elenio "went through each" of the individual loans' ratings and valuations and asked the employees in attendance questions, (*id.* ¶ 189).

The Court considers these allegations in "the context provided by [the totality of ABR's] disclosures" and the "total mix of information made available" to investors, *see Synchrony*, 988 F.3d at 170–71, which includes ABR's core market of "borrowers whose options may be limited by conventional bank financing," (*see* Am. Compl., Dkt. 26, ¶ 74 (listing the "investment strategies" that "ABR claimed to deploy" "[t]o achieve its stated business objectives")), and the discussed risks of the syndicator market, (*see id.* ¶ 334 (excerpting Defendants' discussion of the syndicator market with investors).) Plaintiffs' allegations are consistent with a business model that "customize[s] financing solutions," e.g. workouts, and "act[s] quickly and decisively on proposals"—both of which are *publicized* elements of "ABR['s] investment strategies." (*See id.*

16

¶ 74); *see also Synchrony*, 988 F.3d at 172 ("[I]nvestors were given the warning signs and numerical metrics they needed to determine whether they agreed and whether that affected investing decisions."). There is no doubt ABR had high(er) risk loans in its portfolio, given the nature of its Structured Business, which originates loans on non-stabilized properties. (*See id.* ¶¶ 63–66.) But there are no allegations that this Structured Business—and its concomitant risks— did not exist before the influx of syndicators and their particularly risky loans. And the Amended Complaint is devoid of particularized allegations that ABR deviated from or abandoned the "underwriting standards and guidelines" that it had *always, or at least previously,* used for Structured Business loans. The allegations in the Amended Complaint, including those highlighted above, do not set forth specific information contradicting Kaufman's 1Q21 Statements, let alone specific information that "Defendants were aware [of]." *See Woolgar*, 477 F. Supp. 3d at 232 (collecting cases). Plaintiffs ultimately fail to provide "facts demonstrating that [Kaufman or Elenio] believed that [ABR's] underwriting practices were unsound or inappropriate," or "knowingly failed to follow the underwriting practices that [ABR] actually disclosed."[19] *Compare Waterford*, 2016 WL 1261135, at *10 *with zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 792 F. Supp. 3d 407, 433–5 (S.D.N.Y. 2025), *recon. denied*, 2025 WL 2962772 (S.D.N.Y. Oct. 21,

---

[19] Plaintiffs also allege widespread efforts to manipulate property appraisals, (*see, e.g.*, Am. Compl., Dkt. 26, ¶¶ 175–77), and failures to verify financials, (*see, e.g.*, *id.* ¶ 127). Defendants contest this allegation, noting, *inter alia*, that Plaintiffs' own FE10 "explained that [ABR] 'worked with pretty much all national appraisers,'" (Mem. Supp. MTD, Dkt. 32-1, at 11 n.4 (quoting Am. Compl., Dkt. 26, ¶ 138)), and Defendants argue that it "is implausible that every national third-party appraiser would have 'put[] whatever number [ABR] wanted,'" as alleged by FE2, (*id.* (quoting Am. Compl., Dkt. 26, ¶ 136)). But again, even accepting Plaintiffs' factual allegations as true, these do not "demonstrate[] the contemporaneous falsity of" Kaufman's 1Q21 Statements. *See Woolgar*, 477 F. Supp. 3d at 231–32. The Court also notes the contradiction in Plaintiffs' pleadings, where on the one hand they assert that ABR would "work[] deal[s]" in whatever way necessary to get [them] done," (*see* Am. Compl., Dkt. 26, ¶ 144), but on the other hand allege that ABR's Structured Business pipeline "dried up" by the fall of 2022 because "the deals just would not work," (*see id.* ¶ 159).

2025) (finding sufficiently pled misstatements where defendants had stated that rental properties were "under lease" or "added" to defendant's portfolio at a time when the transactions had not been consummated).[20]

The cases that Plaintiffs rely on are distinguishable.  Plaintiffs point to *Ray* for support that ABR's "reckless underwriting posed a critical threat to the company's 'agency take-out' model, such that the [excerpted] statements made by Kaufman to analysts and investors during earnings conference calls were materially misleading."  (Opp'n, Dkt. 33, at 9 (citing *Ray*, 2024 WL 4308130, at *11).)  But the portion of *Ray* that Plaintiffs cite to discusses the defendants' active lowering of their borrowing standards at a time when they publicly stated this credit scoring system was "improved" or "enhanced."  *See Ray*, 2024 WL 4308130, at *11.  Similarly, much of Plaintiffs' other case law involves instances where the defendants *knew* that the facts on the ground differed from their public statements.[21]  Not so here, where Plaintiffs have failed to allege in

---

[20] Plaintiffs also accuse Defendants of omitting the unsustainability of the "positive impact" that rising interest rates were having on ABR's earnings.  (*See, e.g.*, Am Compl., Dkt. 26, ¶ 419 ("[B]ecause Elenio chose to speak about how rising interest rates were having a positive impact on [ABR's] earnings, he had a duty to disclose that [the] described positive impact was unsustainable; rising interest rates significantly increased the risk that the vast majority of ABR's floating-rate, structurally unsound loan portfolio would be unable to make their loan payments, negatively impacting [ABR's] net interest income.").)  But this assumes that (1) rising interest rates *were actually* unsustainable for the "vast majority" of ABR's bridge loans, *and* (2) Elenio knew of the vulnerability of these loans to rate increases at the time he spoke.  Plaintiffs have not adequately alleged either.  And even if Elenio's positive predictions were wrong, "[e]conomic prognostication, though faulty, does not, without more, amount to fraud."  *Synchrony*, 988 F.3d at 172 (quoting *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 117 (2d Cir. 1982)).

[21] *See In re CIT Grp. Inc. Sec. Litig.*, No. 08-CV-6613 (BSJ), 2010 WL 2365846, at *2–3 (S.D.N.Y. June 10, 2010) (holding that plaintiffs had sufficiently alleged false statements where defendants "were aware of and approved" official changes lowering the company's lending standards but represented, *inter alia*, that the company had "conservative" lending standards and had "tightened" underwriting requirements); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 270–71 (S.D.N.Y. 2010) (holding that statements characterizing management practices as "adequate," "conservative," or similar can implicate securities laws if company "intentionally or recklessly omits certain facts contradicting these representations" (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992), *cert. denied*, 506 U.S. 934 (1992))); *Freudenberg v.*

sufficiently particularized fashion facts known to Kaufman or Elenio when they made their statements that would have made these statements false.

Plaintiffs' other case law, which discuss claims brought pursuant to Sections 11, 12, or 15 of the *Securities* Act,[22] instead of Section 10(b) of the *Exchange* Act, are thus also distinguishable. As an initial matter, the pleading standards are different for Section 10(b) claims compared to Securities Act Sections 11 and 12 claims. Unless explicitly alleging fraud, claims brought pursuant to Section 11 or 12 are assessed under the more lenient Rule 8 standard rather than Rule 9's heightened standard. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) ("In contrast to claims brought pursuant to [Section 10(b)], claims under [S]ections 11 and 12 do not require allegations of scienter, reliance, or loss causation."), *abrogated on other grounds by Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015)); *Arqit*, 774 F. Supp. 3d at 533–34 (applying Rule 8's requirement that a "pleading must contain 'short and plain statement' of claim showing pleader's entitlement to relief" to claims under Sections 11 and 12(a)(2) when plaintiffs expressly disclaimed allegations of fraud).

---

*E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190 (S.D.N.Y. 2010) (holding that misstatements were actionable where the statements were "belied by conditions internally known by defendants"); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (holding that defendants' statements were actionable where "defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"); *Synchrony*, 988 F.3d at 169 (holding that defendants had fraudulently represented that no retail partner had provided any negative commentary on the company's underwriting practices "while they allegedly knew that the contrary was true" (quoting *Novak*, 216 F.3d at 315)).

[22] "Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). "Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications." *Id.* (citing 15 U.S.C. §§ 77k(a), 77l(a)(2)). "Section 15, in turn, creates liability for individuals or entities that 'control[ ] any person liable' under section 11 or 12." *Id.* (citing 15 U.S.C. § 77o).

Unlike cases involving Section 10(b) claims, the courts in the cases cited by Plaintiff assessed Sections 11 and 12 claims against a "fair inference" instead of "particularity" standard. *See N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08-CV-8781 (HB), 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010) (finding allegations of "aggressive loan underwriting practices" and "the loan pools' near-total credit rating collapse" "sufficient to create a fair inference" of actionable omission under Sections 11 or 12); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 510 (S.D.N.Y. 2010) (holding that plaintiff had adequately pled Section 11 misstatement regarding underwriting standards where there was "sufficient nexus between the alleged underwriting standard abandonment and the [defaulting] loans"). The inferences that sufficed in *Carpenters* and *IndyMac* fall short of the particularity requirements for claims, like Plaintiffs', alleged pursuant to Section 10(b).

Thus, Plaintiffs' underwriting-based allegations fail to adequately plead actionable misstatements.[23]

### 2.      Statements Regarding Internal Controls Related to Risk

Second, Plaintiffs allege that Defendants' statements regarding ABR's internal risk controls were false and misleading. (*See* Am. Compl., Dkt. 26, ¶¶ 259–61 (copying two paragraphs

---

[23] Defendants also point out that their public filings included "three pages of detailed risk factors concerning [ABR's] model, including the risk of failed deliveries (i.e. agency refuses to close a loan)." (Reply, Dkt. 34, at 5.) Such risk disclosures have been found to undermine a claim of misrepresentation or misleading statements. *See id.* at 170–71 (finding not misleading statement that underwriting practices were consistent, despite loosening standards, where accompanied by disclosures); *In re Hut 8 Corp. Sec. Litig.*, No. 24-CV-0904 (VM), 2025 WL 2636150, at *12 (S.D.N.Y. Sep. 12, 2025) ("[F]orward-looking statements accompanied by risk-disclosing language are generally not misleading or material."). Plaintiffs counter that the risks disclosed had already occurred, and that "to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." (Opp'n, Dkt. 33, at 12 (quoting *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005))). The Court declines to opine on this, having found that Plaintiffs have failed to adequately allege contemporary falsity.

from ABR's 1Q21 10-Q,[24] as well as March 2021 LTV data, that Plaintiffs allege are "false and misleading").)  This category of statements overlaps with the previous category, as both are alleged to be misleading because of the quality of the underlying loans.  However, while the previous category concerned statements regarding how the loans were *underwritten*, this category concerns statements regarding how the loans are *performing*.  According to Plaintiffs, "Defendants knew but did not disclose the material weaknesses in [ABR's] internal controls concerning its risk ratings and LTV ratios, or at minimum, misrepresented ABR's performance monitoring process."  (*Id.* ¶ 262.)  Plaintiffs also allege that these "material[ly] weak[]" internal controls enabled ABR to "keep its risk of loss from surfacing throughout the Class Period."  (*See id.* ¶ 461.)  As best the Court can determine,[25] Plaintiffs allege these statements' falsity because Defendants improperly rated the risk of their loans, based on unsound appraisals and therefore unsupported LTVs, and then obscured these loans' spiraling underperformance as market conditions worsened.  (*See id.* ¶¶ 186–213.)

ABR's statements about their internal controls do not support a Section 10(b) action for two reasons: (1) Plaintiffs fail to show Defendants' statements were false or misleading; and (2) Plaintiffs have not shown that Kaufman or Elenio had any reason to know that their statements were false or misleading.

---

[24] 10-Q forms are used for quarterly reports submitted to the SEC.  SEC, Form 10-Q General Instructions, at 1, https://www.sec.gov/about/forms/form10-q.pdf (last accessed Mar. 10, 2026).

[25] Plaintiffs quote two entire paragraphs, (*see id.* ¶ 259), without identifying exactly what portion Plaintiffs contend to be false and misleading—or whether Plaintiffs allege the *entire* two paragraphs to be false and misleading.  Instead, Plaintiffs only offer stock arguments repeated across their pleadings.  The Court declines to scour the 224-page Amended Complaint for specific details regarding falsity.  *See Krause v. Kelahan*, 161 F.4th 66, 87 n.17 (2d Cir. 2025) ("Courts are not obligated to invent arguments that parties do not make or to scour the record for support for the parties' claims.").

a)        Falsity Not Established

Plaintiffs fail to adequately "describe the internal controls that [the company] had in place[ or] explain *how or why they were deficient*." *See Arora v. HDFC Bank Ltd.*, 671 F. Supp. 3d 305, 315 (E.D.N.Y. 2023) (emphasis added); *see also Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 405 (S.D.N.Y. 2018) (dismissing allegations regarding misleading nature of sufficiency of internal control statements where plaintiffs failed to "describe [defendant's] system of internal controls, let alone to identify why that system was inadequate"); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017) ("Plaintiff alleges nothing about the design of the [c]ompany's [internal controls] structure or processes at all, nor does [p]laintiff allege anything about the management or execution of those processes."). Instead, Plaintiffs state in conclusory fashion that ABR's "policies and practices . . . were supposed to ensure that the assigned ratings and reported LTV were correct and accurate, [such that ABR] could adequately determine its concentration of risk," and that "those very policies and practices were ripe for manipulation." (Am. Compl., Dkt. 26, ¶ 192.) But Plaintiffs never actually identify the policies and practices that Defendants allegedly manipulated.

At best, Plaintiffs charge Defendants with failing to strictly adhere to Defendants' internal "algorithm." (*See, e.g.*, *id.* ¶ 187.) But according to Plaintiffs' own allegations, Defendants' internal risk rating system appears more holistic than a mere algorithm: "ABR's purported internal controls required that '[a]ll portfolio assets are subject to, at a minimum, a thorough quarterly financial evaluation in which historical operating performance and forward-looking projections are reviewed . . . [,]' and [ABR] would assign ratings based on DSCRs, LTVs, market factors, sponsor strength, and *other items*." (*Id.* ¶ 173 (first alteration in original) (emphasis added) (citing ABR's "SEC filings").) Plaintiffs provide no basis for the Court to find that the changes in ABR's

22

loan ratings detailed in the Amended Complaint are not merely part of Defendants' typical "quarterly financial evaluation." (*See id.*)

In fact, the Amended Complaint itself and the record show that an independent audit of ABR's internal controls determined that they were effective. As alleged in the Amended Complaint, at "risk rating meetings, . . . FE7 would walk through [ABR's] loan ratings with its internal auditors, asset management leadership within accounting, third-party auditors, [and] Elenio." (*Id.* ¶ 189.) In ABR's 2021 10-K, its third-party audit "included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, [and] testing and evaluating the design and operating effectiveness of internal control based on the assessed risk." (ABR 2021 Form 10-K, Dkt. 32-4, at ECF[26] 38.) The audit concluded that ABR "maintained, in all material respects, effective internal control over financial reporting." (*Id.*) ABR's 2022 10-K reached the same conclusion. (*See* ABR 2022 Form 10-K, Dkt. 32-9, at ECF 37.) Thus, Plaintiffs have failed to allege sufficient facts showing that there were deficiencies in ABR's internal risk controls and that any statements to the contrary were false.

b)      Knowledge of Falsity Not Established

Here too, assuming the controls were in fact insufficient, Plaintiffs fail to plead "contrary facts that were available to Defendants at the time of the alleged misstatements." *See Wachovia*, 753 F. Supp. 2d at 354; *Waterford*, 2016 WL 1261135, at *11 ("[T]here are no facts pleaded to support an inference that the [c]ompany knew, at time of the earlier disclosures . . . , that its internal controls were insufficient."); *see also Woolgar*, 477 F. Supp. 3d at 230 (dismissing alleged misstatements regarding effective internal controls where the complaint lacked "factual allegations

---

[26] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

supporting the inference that [d]efendants knew about any material weakness in the [c]ompany's internal controls *prior* to this disclosure or, more importantly, during the [c]lass [p]eriod"). Plaintiffs fail to identify any FE with actual knowledge of what Defendants knew or believed *at the time they made* the challenged statements.[27]   At best, FE7 was a Director of Accounting who "reported to Defendant Elenio," (Am. Compl., Dkt. 26, ¶ 44) but FE7 "did not attend the quarterly rating[s] meetings with the Structured loan teams" that Kaufman and Elenio attended, (*id.* ¶ 189), and thus cannot speak to what was actually discussed.

Plaintiffs' attempt to retroactively infer knowledge through disclosures and statements made *after* the statements at issue, (*see id.* ¶¶ 206–11 (alleging "Defendants knew of the scope of the problems associated with the failures of [ABR's] controls for reporting non-performing loans" based on disclosures made subsequent to a short seller report); *see also* Opp'n, Dkt. 33, at 15 ("[ABR] only came clean after Viceroy started reporting on its portfolio.")), rests on a "logical fallacy," *see Argo*, 2024 WL 5089970, at *7 ("[T]he fact that defendants acted to tighten underwriting guidelines and exposures going forward does not show that their reserves for past underwritten policies were inadequate, let alone that they knew or believed they were."). Contrary to Plaintiffs' argument, "what drives the element of falsity" is *not* "the divergence between Defendants' public statements and the true state of affairs existing at the time," (*see* Opp'n,

---

[27] In their Opposition, Plaintiffs argue that "Kaufman knew about the appraisal manipulation because he was present during calls when it was discussed," and that "management would override the ratings during the quarterly ratings meetings attended by Kaufman and Elenio." (Opp'n, Dkt. 33, at 14.)  But Plaintiffs' cites to their Amended Complaint do not support the inference Plaintiffs seek to draw regarding Defendants' actual *knowledge* of alleged manipulations and failed controls. (*See* Am. Compl., Dkt. 23, ¶¶ 179–89.)  At most, FE12 alleges that Kaufman "discuss[ed] FE12's asset portfolio," including "shar[ing] thoughts on what direction [ABR] would want to go in." (*Id.* ¶ 181.)  The Amended Complaint is notably silent on whether Kaufman discussed or knew of the allegedly manipulated *appraisals*, despite the Opposition's representations.  That Kaufman allegedly "overrode" loan proposals, (*see id.* ¶ 186), does not establish that appraisals were manipulated.

Dkt. 33, at 16), but rather the divergence between Defendants' public statements and the *facts available to Defendants at the time*, *see Woolgar*, 477 F. Supp. 3d at 230.  Finally, as discussed above, the independent audit of ABR's internal controls showed them to be effective, a fact that "undermine[s] any inference that Defendants must have been aware of . . . a weakness [in their internal controls] during the same time period."  *Woolgar*, 477 F. Supp. 3d at 230 (noting that defendants' "independent auditor reviewed the effectiveness of its internal controls and concluded that the [c]ompany 'maintained effective internal control over financial reporting'").

Thus, Plaintiffs' internal controls-based allegations fail to adequately plead actionable misstatements.

3.    Statements Based on Violations of Generally Accepted Accounting Principles

The third category of alleged misstatements consists of financial statements made in ABR's public disclosures, which in turn are based on ABR's allowances for credit losses.  (*See, e.g.*, Am. Compl., Dkt. 26, ¶¶ 257–68.)  Allowances for credit losses, or loss reserves, are estimated based on a current expected credit loss methodology ("CECL"),[28] which incorporates assumptions

---

[28] The CECL model, introduced by the Financial Accounting Standards Board ("FASB") in 2016, "is an estimate of the expected credit losses on financial assets . . . measured using relevant information about past events, including historical credit loss experience on financial assets with similar risk characteristics, current conditions, and reasonable and supportable forecasts that affect the collectability of the remaining cash flows over the contractual term of the financial assets."  Federal Reserve, *Allowance For Loan And Lease Losses—Frequently Asked Questions on the Current Expected Credit Losses Methodology*, https://www.federalreserve.gov/frrs/guidance/frequently-asked-questions-on-the-current-expected-credit-losses-methodology.htm [https://perma.cc/XHJ6-W7NX] (last accessed Mar. 10, 2026); (*see* Am. Compl., Dkt. 26, ¶ 217 (explaining similar)).  The CECL was developed to enable companies to "record credit losses that are expected, but that do not yet meet the 'probable' threshold."  Federal Deposit Insurance Corporation, *Frequently Asked Questions on the New Accounting Standard on Financial Instruments – Credit Losses*, at 5 (Apr. 3, 2019) https://www.fdic.gov/news/financial-institution-letters/2019/fil19020a.pdf [https://perma.cc/4JYH-QKUC].

regarding future uncollectable interest and principal. (*See* Am. Compl., Dkt. 26, ¶¶ 173, 217.) Here, Plaintiffs allege both that ABR failed to increase its allowance for credit losses to account for "structurally unsound high-risk bridge loans . . . that could be expected to default," (*see id.* ¶ 219), and "manipulated ABR's CECL allowance by not recording a sufficient or reasonable increase of those reserves" to account for these unsound loans,[29] (*see id.* ¶ 267). According to Plaintiffs, ABR's artificially depressed credit loss allowance led to an artificially inflated net income,[30] which violated current Generally Accepted Accounting Principles ("GAAP"),[31] tainted net income-dependent financials, and caused misstatements regarding (1) loss recognition,[32] (2) reported distributable earnings,[33] and (3) ABR's adjusted book value. (*See, e.g.*, *id.* ¶¶ 214, 219, 257, 266–68.)

---

[29] Once again, Plaintiffs do not specify these "unsound loans," which could very well be the bridge loans that form the crux of ABR's Structured Business. (*See* Am. Compl., Dkt. 26, ¶ 142 (discussing "borrowers [who] need . . . non-traditional sources of money").)

[30] ABR's net income was required to include "the amount necessary to adjust the allowance for credit losses and liabilities" to account for expected credit losses. (*See id.* ¶ 218.)

[31] Plaintiffs explain that "GAAP is recognized by the accounting profession as conventions, rules and procedures necessary to define accounting practices at a particular time," that the SEC has the authority to promulgate GAAP for public companies, and that "financial statements filed with the SEC which are not presented in accordance with GAAP [are] presumed misleading." (*Id.* ¶ 215 (citing 17 C.F.R. § 210.4-01(a)(1)).)

[32] Plaintiffs appear to allege that Defendants' *recognition* of losses in the form of disclosed "delinquencies or non-performance" was also fraudulent. (*See id.* ¶ 467.) But Plaintiffs do not identify any specific loans that ABR *should have* recognized as "actual" losses but did not, relying instead on highly generalized "shifts in economic and market conditions." (*See id.* ¶ 467; *see also id.* ¶¶ 152–62 (alluding to properties "behind schedule," "struggling a lot," or "distressed," without identifying any specific property that should have been recognized as delinquent or non-performing).) Nor do they identify any misstatements regarding delinquent loans. Instead, the misstatements identified are about the risks inherent in estimating "loan loss reserves," which ABR clearly discloses. (*See id.* ¶ 466.)

[33] Defendants' reported distributable earnings are defined as "net income (loss) attributable to common stockholders computed in accordance with GAAP, adjusted for accounting items such

Plaintiffs cannot show a Section 10(b) violation based on ABR's allegedly false or misleading statements that were, in turn, based on loss reserves estimates or calculations. "[L]oss reserves are statements of opinion." *See Woolgar*, 477 F. Supp. 3d at 222–23 (collecting cases); *Burr v. Equity Bancshares, Inc.*, No. 19-CV-4346 (AJN), 2020 WL 6063558, at *5 (S.D.N.Y. Oct. 14, 2020) ("[L]oan loss reserves reflect management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible." (quoting *Fait*, 655 F.3d at 113[34]); FASB, *Accounting Standards Update*, Financial Instruments—Credit Losses, at 2 (June 2016) ("An entity must use judgment in determining the relevant information and estimation methods that are appropriate in its circumstances."). As such, these determinations "are 'inherently subjective' rather than 'matter[s] of objective fact' because they 'depend[ ] on a variety of predictable and unpredictable circumstances' and thus 'reflect management's opinion or judgment.'" *See Argo*, 2024 WL 5089970, at *6 (alterations in original) (quoting *Fait*, 655 F.3d at 113); *see also MetLife*, 129 F. Supp. 3d at 68 (S.D.N.Y. 2015) ("While [reserve] estimates involve some factual inputs, they necessarily require judgment and thus are statements of opinion or belief, not of fact.") (internal citations and quotation marks omitted).

Plaintiffs have failed to demonstrate that ABR's credit loss allowance was subjectively or objectively false, as is required for an opinion to be actionable. *See Tongue v. Sanofi*, 816

---

as . . . CECL provisions for credit losses . . . ," and are thus linked to allowances for credit losses. (Am. Compl., Dkt. 26, ¶ 257 (alterations in original) (quoting ABR's 1Q21 10-Q).)

[34] "Though *Fait* involved claims under Sections 11 and 12 of the [Securities Act], the same opinion analysis applies under Sections 10(b) and 20(a) of the [Exchange Act], as these claims all share a material misstatement or omission element." *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67–68 (2d Cir. 2012) (first citing *Fait*, 655 F.3d at 109; and then citing 15 U.S.C. §§ 77k, 77l). Section 10(b) and 20(a) of the Exchange Act must still be pleaded with a heightened particularity compared to non-fraud Sections 11 and 12 claims. *See Arqit*, 774 F. Supp. 3d at 532–33 (discussing different pleading standards).

F.3d 199, 210 (2d Cir. 2016) ("Liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief [he] professed' [(subjective falsity]) or 'the supporting fact[s] [he] supplied were untrue [(objective falsity)]." (quoting *Omnicare*, 575 U.S. at 185–88)). Plaintiffs rely on various FEs to plead that Kaufman and Elenio knew the allowance to be insufficient.   (*See* Am. Compl., Dkt. 26, ¶ 258 ("Defendants manipulated ABR's CECL allowance . . . , [as] corroborated by the accounts of FE1, FE2, FE3, FE4, FE5, FE8, FE9, FE10, and FE11.")  But "the majority of the [FEs] . . . have nothing to do with the adequacy of [the alleged] defect reserves." *See Argo*, 2024 WL 5089970, at \*7.  *Compare id.* (noting FEs "had no actual connection to or engagement with [the company's] reserves, with those employees working in underwriting") *with* (Am. Compl., Dkt. 26, ¶¶ 32–55 (describing FEs' relevant duties as underwriters (FE1, FE2, FE4, and FE9) or loan managers or analysts (FE3, FE5, FE8, FE10, and FE11).)  "Moreover, even to the extent [D]efendants allegedly were attempting to minimize reserves, such allegations are not inconsistent with a belief that existing reserves were sufficient." *Argo*, 2024 WL 5089970, at \*7.  Ultimately, the Amended Complaint "is devoid of allegations demonstrating—or even plausibly suggesting—that Defendants did not honestly believe their opinions regarding the strength or adequacy of [ABR's] loss reserves, or that they believed those estimates to be false." *See Woolgar*, 477 F. Supp. 3d at 224–25 (collecting cases).[35]

Plaintiffs also do not successfully argue objective falsity.  Loan loss reserves eschew objective standards.  *See In re Deutsche Bank AG Sec. Litig.*, No. 09-CV-1714 (DAB), 2016

---

[35] In 2022–24 financial quarters, Plaintiffs also suggest that Defendants failed to disclose loss risk due to "shifts in economic and market conditions." (*See, e.g.*, Am. Compl., Dkt. 26, ¶ 483 ("[S]hifts in economic and market conditions . . . result[ed] in delinquencies or non-performance and significantly increase[d] ABR's risk of loss.").)  But Plaintiffs fail to identify exactly what was false in, or omitted from, the relevant GAAP and loan loss statements *because of these economic shifts*.  (*See id.* ¶¶ 480–81.)

WL 4083429, at *16 (S.D.N.Y. July 25, 2016) (noting that there is "no objective standard for measuring . . . loan loss reserves, and thus any estimate would be inherently subjective and reflect management's determination of the 'fair value' of the assets or a judgment or opinion regarding which loans may not be collectible" (citing *Fait*)); *see also Argo*, 2024 WL 5089970, at *8 (recognizing the "'extremely conjectural' nature of estimating loss reserves," which are "'set aside to cover losses for which claims have not been reported but must be estimated,' and require 'underwrit[ing] casualty risks with long discovery or reporting delays'" (alteration in original) (first quoting *Stephens v. Nat'l Distillers & Chem. Corp.*, 6 F.3d 63, 65 (2d Cir. 1993); and then quoting *Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1229 (2d Cir. 1991))); (ABR 2023 Form 10-K, Dkt. 32-3, at ECF 31–32 (including "allowance for credit loss" as a "critical audit matter" for ABR's independent auditor, because it "involved a high degree of subjectivity due to the significant uncertainty associated with the assumptions used in the estimation")).    And indeed, Plaintiffs here cannot seem to "identify 'an objective standard for setting loan loss reserves.'"  *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 312 (S.D.N.Y. 2013) (quoting *Fait*, 655 F.3d at 113).  Instead, Plaintiffs merely argue that Defendants failed to "record[] a *sufficient* or *reasonable* increase of [the loss] reserves." (Am. Compl., Dkt. 26, ¶ 258 (emphasis added).)  Such allegations "mimic the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain."  *Woolgar*, 477 F. Supp. 3d at 225–26 (citation modified) (collecting cases).

This Court declines to entertain them, as well, and holds that Plaintiffs' GAAP-based allegations fail to adequately plead actionable misstatements.

*    *    *

Because Plaintiffs have failed to adequately allege material misstatements or omissions, the Court need not assess the other elements of a Section 10(b) claim. *See Saskatchewan*, 718 F. Supp. 3d at 390 ("Because the failure to establish any element is fatal to a section 10(b)/Rule 10b-5 claim, the Court need not address [d]efendants' other arguments for the dismissal of the . . . Exchange Act claims." (citations and internal quotation marks omitted)); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 172 (S.D.N.Y. 2015) (holding that plaintiff's failure to adequately plead either scienter or a misstatement or omission is dispositive, such that the court need not reach the remaining Section 10(b) factors).

## C.     Scheme Liability

Plaintiffs also allege that "Defendants engaged in a fraudulent scheme to artificially inflate the Company's loan volume and reported earnings by abandoning or, at minimum, recklessly disregarding, ABR's underwriting standards to complete high-risk bridge loans borrowed most often by syndication groups managed by sponsors who otherwise would not qualify for such loans in the conventional market because of poor creditworthiness, low debt service coverage ratios, high [LTV] ratios, and/or other risk factors." (Am. Compl., Dkt. 26, ¶ 10.) Scheme liability under Rule 10b-5 must be premised on "deceptive conduct apart from misstatements and omissions." *In re AT&T DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 522 (S.D.N.Y. 2020) (citing 17 C.F.R. § 240.10b-5(a), (c)). As Defendants point out, Plaintiffs fail to allege any scheme-specific conduct "apart from misstatements and omissions." (Mem. Supp. MTD, Dkt. 32-1, at 24 (citing *AT&T DirecTV Now*, 480 F. Supp. 3d at 522).) And, short of a few references to a "scheme" in Plaintiffs' Opposition that echo their haphazard references in the Amended Complaint, Plaintiffs fail to contest Defendants' argument on this point and have thus waived any scheme liability claim. *See Laface v. E. Suffolk BOCES*, No. 18-CV-1314 (ADS) (AKT), 2019 WL 1959489, at *8 (E.D.N.Y.

May 2, 2019) ("In the Second Circuit, '[a] plaintiff's failure to respond to contentions raised in a motion to dismiss claims constitute[s] an abandonment of those claims.'" (collecting cases)).

## II.    Section 20(a) of the Exchange Act

Section 20(a) claims rise and fall with Section 10(b) claims. *See Gluck v. Hecla Mining Co.*, No. 19-CV-4883 (ALC), 2024 WL 4362730, at *9 (S.D.N.Y. Sep. 30, 2024) ("As Plaintiffs have failed to adequately allege their [Section] 10(b) claim, the claims under [Section] 20(a) also fail as a matter of law." (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997))), *aff'd*, No. 24-2947-CV, 2025 WL 1983204 (2d Cir. July 17, 2025) (summary order); *Gimpel*, 156 F.4th at 136 ("Plaintiffs also bring Section 20(a) control-person liability claims against the [i]ndividual [d]efendants, which require an adequately pleaded Rule 10b-5(b) claim as a predicate." (citing *ECA*, 553 F.3d at 207)); *Equity Bancshares*, 2020 WL 6063558, at *8 (similar).  Because they have failed to adequately plead a Section 10(b) claim, Plaintiffs also fail to plead a Section 20(a) claim against Kaufman and Elenio.

**CONCLUSION**

For the reasons set forth herein, Defendants' Motion to Dismiss is granted in its entirety, and Plaintiffs' Amended Complaint is dismissed.  Plaintiffs are granted leave to amend their Amended Complaint within thirty (30) days of this Order to plead, with the requisite specificity, the falsity of the alleged misstatements and Defendants' knowledge of that falsity.  If Plaintiffs choose to amend their Amended Complaint, Plaintiffs shall also submit a redline demonstrating changes between the current complaint and the new complaint.  Absent amendment within 30 days, the Clerk of Court will be directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  March 31, 2026
        Brooklyn, New York

32